## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| CLAIR REYNOLDS, on behalf of herself and all others similarly situated, | Case No.: <br> Hon. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| FCA US, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

## PLAINTIFF'S CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Clair Reynolds brings this action against Defendant FCA US LLC, ("Defendant" "Jeep" or "FCA"), by and through her attorneys, individually and on behalf of all others similarly situated, and alleges as follows:

## INTRODUCTION

1.     This is a class action lawsuit brought by Plaintiff on behalf of herself and a class of current and former owners of model year 2015-2018 Jeep Wrangler vehicles (hereinafter referred to collectively as the "Jeep Vehicles" or "Class Vehicles"). FCA designed, manufactured, marketed and warranted the Jeep Vehicles. Upon information and belief, the Jeep Vehicles contain a defectively designed and/or manufactured front axle and damping system that causes the steering wheel to shake violently when operating at highway speeds after

encountering common and expected road variations. This phenomenon is referred to as the Jeep "Death Wobble."[1]

2.   The "Death Wobble" is the seemingly uncontrollable side-to-side shaking of a Jeep's front-end steering components and – by extension – its steering wheel. The "Death Wobble" makes the Jeep difficult to control for the operator, including a safety risk to the occupants and others on the road, and simulates sudden front end failure.[2]

3.   Online forums discussing the "Death Wobble" recommend that drivers "bring the Jeep to a stop through controlled braking." These forums also warn not to "mash the brake pedal, as that will only make the vehicle more difficult to control, and do not give the Jeep gas in hopes of accelerating through the problem. Instead, bring it to a controlled stop on the shoulder, and out of the way of other traffic."[3]

4.   At all material times, FCA had knowledge of the "Death Wobble." Rather than address it – or disclose its possibility and/or warn drivers at the point of sale – FCA simply claims in a news article that the "Death Wobble" is ***not*** a

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

[2] https://www.quadratec.com/c/blog/jeep-death-wobble-how-to-fix (Exhibit 1)

[3] *Id.*

"safety issue" and that it "can happen with any vehicle that has a solid front axle (rather than an independent front suspension), such as the Wrangler"[4]

5.     When owners and lessees of the Jeep Vehicles return to their dealership to complain about the Death Wobble, Jeep offers to replace the steering damper if the vehicle is under warranty. But, as widely reported and experienced by Plaintiff here, that is simply a band-aid fix that will only temporarily conceal the problem. The "Death Wobble" will ultimately return and can only be remedied by substantial revisions and repair to the suspension.

6.     Defendant misrepresented the standard, quality and grade of the Jeep Vehicles and knowingly, actively, and affirmatively omitted and/or concealed the existence of the "Death Wobble." The problem could have, and should have, been disclosed at the time of purchase so Plaintiff and the Class members could make an informed decision about whether to purchase a Jeep Vehicle and, if so, how much they were willing to pay for such a vehicle containing such a defect.

7.     Likewise, while FCA includes certain warnings in its owner's manual about safe operation of the Jeep Vehicles, it failed to warn and/or instruct consumers on how to safely operate the Jeep Vehicles during the "Death Wobble"

---

[4]     https://www.freep.com/story/money/cars/chrysler/2018/11/19/jeep-wrangler-death-wobble-nhtsa/2028633002/ (last visited May 17, 2019) (Exhibit 2)

and how to return the Jeep Vehicles to normal operation after experiencing the "Death Wobble." FCA was duty bound to provide such warnings and instructions.

8.     Plaintiff and members of the Classes (defined below) assert claims against Defendant for violation of the New Jersey Consumer Fraud Act, the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, as well as breach of the express and implied warranties.

9.     As a direct result of FCA's wrongful conduct, Plaintiff and members of the Classes have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

10.     Specifically, Plaintiff seeks: buyback of the Class Vehicles; compensation for the loss in value and depreciation of the Class Vehicles due to the "Death Wobble"; reimbursement for parts and labor costs incurred by Class Members who paid third parties to remedy the "Death Wobble" problem, as well as replacement of any components materially damaged by the "Death Wobble"; provision of a temporary replacement vehicle while repair is pending; punitive damages for FCA's knowing fraud that put drivers and members of the public nationwide at risk; and an order requiring FCA to issue a formal recall of the Class Vehicles, including a notice campaign informing Class Members about the recall.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

12.     Venue properly lies in this District and vicinage pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendant maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts a substantial amount of business in this District. Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in this District and venue is proper.

## PARTIES

**Plaintiff Clair Reynolds**

13.    Plaintiff Clair Reynolds is a citizen and resident of the State of New Jersey.

14.    Plaintiff owns a 2018 Jeep Wrangler Unlimited Sport 4 x 4 for personal use that she purchased new from Johnson Dodge Chrysler Jeep Ram ("Johnson Jeep") in Bud Lake, Morris County, New Jersey on July 14, 2018 for approximately $36,000. The VIN of her Jeep vehicle is: 1C4HJXDGJW127339.

15.    By December 2018, Plaintiff began to experience the "Death Wobble," which was not able to be fixed even after multiple repair attempts by Johnson Jeep.

16.    On or about December 27, 2018, Plaintiff returned the vehicle to the Johnson Jeep complaining about the "Death Wobble."

17.    After being at Johnson Jeep for approximately two-weeks, Plaintiff's Jeep Wrangler was returned to her on January 10, 2019.  Her service records indicate that the cause of the wobble was a leaking and/or weak steering damper. Johnson Jeep replaced the steering damper on Plaintiff's vehicle.  As expected, the "Death Wobble" returned within only a few days.

18.    After several attempts, Plaintiff obtained an appointment at Johnson Jeep for February 22, 2019.  Johnson Jeep returned the Jeep after six (6) days, on

February 28, 2019, after, again, replacing the steering damper. The technician's notes indicate that he "test drove on highway for 19 miles inspected on lift everything working as designed." Not unsurprisingly, the "Death Wobble" returned within days.

19.     On March 15, 2019, Plaintiff wrote to FCA pursuant to New Jersey's Lemon Law (N.J.S.A. §§ 56:12-29-49) informing FCA of the ongoing problems, notifying FCA that the problem "substantially impair[s] the use, value or safety of [her] vehicle" and that the issue could likely "cause death or serious bodily injury." She gave Jeep "one final opportunity to repair the vehicle" or she would demand a refund.

20.     FCA responded to Plaintiff through its outside counsel Rose & Waldorf, Albany, New York, on April 3, 2019.  FCA's lawyers told Plaintiff to "drop the subject vehicle off at Johnson Dodge Chrysler Jeep Ram…to utilize its resources to fully repair your vehicle…"

21.     Plaintiff sought to return the vehicle to Johnson Dodge, but they did not have a loaner vehicle that she could use to transport her infant child.  Johnson Jeep placed her on a waiting list for such a loaner.

22.     On April 5, 2019, FCA's counsel, Rose & Waldorf, again wrote to Plaintiff notifying her that Johnson Jeep informed FCA that the vehicle "was not

dropped off immediately as requested" and that "FCA US LLC's written limited warranty does not provide for loaner or rental vehicles."

23.     Plaintiff returned to Johnson Jeep on April 8, 2019, again, complaining about the "Death Wobble."  On April 12, 2019, a representative from Johnson Jeep left a voicemail for Plaintiff, indicating that she test drove the vehicle and that the Jeep's "Death Wobble" "*is trying to kill [her] again and I'm sure you as well…*" (emphasis added).



24.     Yet, on April 15, 2019, Johnson Jeep, again, returned Plaintiff's Jeep after replacing the steering damper *for the third time* in less than six (6) months. The service record indicates that at the time of the return the "vehicle [was]

operating as designed at this time."

25.    Had Plaintiff known or otherwise been made aware, of the Jeep Vehicles' "Death Wobble" problem and FCA's inability to repair or cure it, she would not have purchased her Jeep or otherwise would have paid significantly less for it. Prior to purchasing her 2018 Jeep, she performed research on the vehicle, including its pricing. None of the materials she reviewed contained any disclosure relating to the "Death Wobble," FCA's inability or unwillingness to fix properly repair it, and/or the associated safety risks.

26.    When Plaintiff purchased her Jeep, she reasonably relied on the reasonable expectation that her Jeep Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and eradicate any such defects. Had FCA disclosed that the "Death Wobble" could occur in its Jeep Vehicles without a remedy, Plaintiff would not have purchased her 2018 Jeep Wrangler, or would have paid substantially less for it.

27.    At all times relevant herein, Plaintiff operated her 2018 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used.

28.    Plaintiff has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory

duties, and omissions and/or misrepresentations associated with the "Death Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of her Class Vehicle.

29.    Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff of the "Death Wobble" and associated safety risk prior to the purchase or lease of the Class Vehicles.

**Defendant**

30.    Defendant FCA U.S., LLC is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan. The Jeep vehicles at issue here are part of the FCA U.S., LLC family of companies, which is, in turn, part of Fiat Chrysler Automobiles N.V.

31.    At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles throughout the United States. Defendant and/or its agents designed, caused, manufactured, the Jeep knowing about the "Death Wobble" problem, without either disclosing it at the time of sale or attempting to remedy it.  Defendant and/or its agents also developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials relating to the Jeep.

## TOLLING OF STATUTES OF LIMITATION

32.     Any applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff and the members of the Class could not have reasonably discovered the true, latent nature of the "Death Wobble" until shortly before this class action litigation was commenced.

33.     Defendant was and remains under a continuing duty to disclose to Plaintiff and the members of the Class the true character, quality and nature of the Class Vehicles, that the defect results from a poor design and/or failures in the manufacturing process, will require costly repairs, poses safety concerns, and diminishes the resale value of the Class Vehicles, in addition to causing Class members to pay out of pocket costs to repair their Vehicles. As a result of Defendant's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### A. The Death Wobble Defect

34.     FCA designs, engineers, manufactures and sells vehicles under the Chrysler, Jeep, Dodge, Ram, Fiat and Maserati brands in this District and throughout the United States. FCA manufactures, distributes, and sells motor

vehicles and parts through its network of authorized motor vehicle dealers, including Johnson Dodge-Chrysler Jeep.

35.    Due to the solid front axle, the Jeep Vehicles do not absorb natural vibrations and bumps caused by driving as efficiently as an independent suspension system.  Therefore, the solid axle design necessitates a steering damper (or steering stabilizer) to reduce impact of these vibrations and bumps to the operator.[5] This increased vibrations and forces of a solid axle suspension system can cause steering components to prematurely loosen or become damaged, including the front track bar, ball joints, tie rods, control arms, and stabilizers.

36.    As a result of the defect described above, which occurs most often when traveling at speeds over 45 mph, and the front suspension system and steering components can become jarred out of equilibrium when the Jeep Vehicles encounter customary and expected variations in the roadway.

37.    The result is a serious safety concern. For the unsuspecting driver, this unexpected violent shaking of the steering column at highway speeds is both alarming and dangerous. To eradicate the problem, the suspension components, including the ball joints, steering damper, track bar and upper inner tie rods need to be inspected and replaced.

_____

[5] Upon information and belief, the "Death Wobble" is caused, at least in part, by a defectively manufactured steering damper.

### B.     FCA's Knowledge of the Defect

#### 1.  <u>2012 Reporting on Jeep's "Death Wobble" Problem</u>

38.     Defendant has received numerous complaints about the Jeep's "Death Wobble" for years and has failed to take action to remedy it or inform its customers of its potential to occur at high speed travel.

39.     In a 2012 news report from ABC7 in San Francisco, two Jeep owners from California reported that "the whole front end of the vehicle shakes back and forth" and that "[i]t literally feels like the front of your vehicle is going to shake apart."[6]

40.     The reporter asked one of the owners featured in the story if she would have bought the Jeep if she had known about the problem, she responded, "No, absolutely not. I drive my son to school and this is my primary form of transportation for my son and I."[7]  She went further, "[t]his is something that I purchased to drive at freeway speeds; *there was no waiver or disclosure* at the time associated with it that I should have to be concerned driving it at normal speed…"[8]

41.     In response to the ABC7 news story, FCA "declined a request to go on camera, but Corporate Communications…issued a statement saying 'vehicles

---

[6] https://abc7news.com/8224/ (last visited May 17, 2019) (Exhibit 3).

[7] *Id*.

[8] *Id*. (emphasis added).

equipped with a solid axle can be susceptible to this condition.'"  Refusing to accept responsibility, FCA went further and blamed its customers by claiming that "most reported incidents…are often linked to poorly installed or maintained after-market equipment."

42.    But, as the reporter pointed out, neither of the Jeeps at issue for the story—*nor the Plaintiff's here*— have any after-market equipment.[9]

43.    FCA also told ABC7 that the "Death Wobble" can be corrected with "a change of tires or installation of a simple steering dampener."  Again, though, just as with Plaintiff here, the report indicates that one Jeep owner "replaced the dampener and was hit by the wobble again."[10]

44.    Following this report in 2012, California Congressional Representatives Henry Waxman and Anna Eshoo wrote a letter to FCA in July 2012 urging it to launch a campaign informing its customers that the Jeeps they own could suffer from a safety risk called the "Death Wobble."

45.    Specifically, the lawmakers wrote that they "believe[d] Chrysler should undertake an outreach campaign to its customers, such as a Customer Satisfaction Campaign, to notify Jeep owners of the risk of the 'wobble' condition, also described as a 'vibration' or 'shimmy,' and the possible methods for repairing

---

[9] *Id*.

[10] *Id*.

and preventing the problem," and to "advise customers how to stop the wobble if they experience it while driving."[11]

46.     In response, in August 2012, FCA issued a technical service bulletin to its dealerships acknowledging the an issues with Jeep's steering and suspension components and outlining just what dealers should be looking for when someone comes in complaining of front end shaking, including a detailed inspection of the steering controls and components as well as the tires.  However, FCA would not agree to pay for any such repairs for vehicles outside of the factory warranty period.

### 2.     FCA Fails to Remedy the Jeep "Death Wobble"

47.     In November 2018, as reported in the Detroit Free Press, a Jeep owner from Massachusetts who purchased a 2018 stock Jeep Sport model with some basic comfort and convenience options for just under $38,000, experienced the "Death Wobble" on I-495 while taking one of his children to a basketball tournament.[12]

48.     In the report, the owner described the incident, "I hit a bump that should have been nothing and all of a sudden I thought I had a flat tire or

---

[11] https://thehill.com/blogs/floor-action/house/236483-dems-press-chrysler-to-help-its-customers-fix-jeep-death-wobble (last visited May 20, 2019) (Exhibit 4).

[12]     https://www.freep.com/story/money/cars/chrysler/2018/11/19/jeep-wrangler-death-wobble-nhtsa/2028633002/ (last visited May 17, 2019) (Exhibit 5).

something else bad because the whole car and steering wheel start[ed] shaking. I slowed down and was getting ready to pull over and then it went away when I slowed down enough (probably around 50 mph)." "It was concerning, but right that second I just brushed it off," but then, the "[s]ame thing happened once or twice more that weekend on the highway and then once again Monday or Tuesday on the way to work" so he made a service appointment.[13]

49.     The report states that he was told by the dealership that the steering stabilizer was "shot and had no pressure" and that contrary to the claims of FCA otherwise, the dealership told him *it was a safety issue, and he should not be driving the vehicle*.[14]

50.     In the story, the owner rejected FCA's claims that the "Death Wobble" did not present a safety issue, stating that "[h]aving to rapidly slowdown in the center lane of a highway while going 70 mph definitely is unsafe and the amount of vibration happening from this is just bound to break something eventually…"[15]

### 3.     Reports to NHTSA and FCA's Technical Service Bulletins

51.     The National Highway Traffic Safety Administration ("NHTSA") has received numerous complaints about Jeep's "Death Wobble" problem.  In 2018, it

---

[13] *Id*.

[14] *Id*.

[15] *Id*.

was reported that the NHTSA is looking into the "Death Wobble" reports.[16]

52.    Prior to Plaintiff's purchase of her 2018 Jeep, and even before public news reports, FCA had been internally aware of the complaints about the Jeep Vehicles' "Death Wobble."   In fact, in an October 28, 2010, Technical Service Bulletin (02-003-10), FCA instructed its dealerships that for Jeep Wranglers built between 2007-2009, when customers complain about "vibration from rough surfaces" they should replace "the steering damper and steering damper bracket."

53.    But, just as with Plaintiff, in various online forums discussing the Jeep Vehicle's "Death Wobble" replacing the damper only masks the problem.   One Jeep owner wrote on www.wranglerforum.com in April 2011:[17]



⚠ Steering damper replacement-Death wobble

HELP!!!!!! Will a new steering damper permanently eliminate the Death Wobble? My dealer replaced my stearing damper per TSB #02-003-10 under warranty after multiple episodes (4) of the dreaded wobble. My 08 wrangler JKU has 27000 miles with all stock equip. My warranty will expire next February and I don't want this to be a repeat issue costing $$$$$$$! I am considering trading it in for something that doesn't scare the crap out of my family when were doing over 55mph on the highway.

---

[16] *Id.*

[17] https://www.wranglerforum.com/f202/steering-damper-replacement-death-wobble-89608.html (last visited May 29, 2019) (Exhibit 6).

54.     To which, another member of the forum posted:[18]



55.     Currently, the NHTSA online complaint database is replete with complaints, below are only a few examples of those made just in 2019:

**NHTSA ID Number**: 11208173
**Incident Date** January 1, 2019
**Consumer Location** Unknown
**Vehicle Identification Number** 1C4HJXDG0JW****
**Summary of Complaint**

***WHILE TRAVELING ON THE FREEWAY AT SPEEDS FROM 65-75 MY JEEP WILL START TO "DEATH WOBBLE" WHEN YOU HIT A BUMP OR UNEVEN SPOT ON THE ROAD REQUIRING ME TO DECELERATE OR COME TO A COMPLETE*** STOP. MY VEHICLE HAS BEEN BACK TO THE DEALER 5 TIMES SINCE MY PURCHASE IN NOV OF 2018. FIVE DIFFERENT THINGS HAVE BEEN REPLACED AND ***ONE OF THE DAMPENERS HAS BEEN REPLACED TWICE NOW.*** IT'S BEEN AT THE DEALER FOR 3 WEEKS STRAIGHT NOW. CHRYSLER SAYS THAT THERE IS NOTHING THAT THEY CAN DO AT THIS TIME AND REFERRED ME BACK TO THE DEALER, THE DEALER SUGGESTED I GET AN ATTORNEY SPECIALIZING IN THE LEMON LAW. I HAVE

---
[18] *Id*.

18

DONE SO AND ALSO WILL BE TALKING TO THE
FEDERAL TRADE COMMISSION. SO FAR I HAVE
LOST A DAYS WORK AND FIVE 30 MILE TRIPS TO
AND FROM
THE DEALERSHIP ONLY TO FIND OUT THAT THE
PROBLEM STILL PERSISTS. IT'S VERY
DANGEROUS TO DRIVE. THE DEALERSHIP SAID
THAT THE NEW ONES WILL SOMETIMES HAVE A
LITTLE "WIGGLE" TO THEM AT TIMES AND I
INFORMED HIM THAT IF I HAD KNOW THIS *I
WOULD NOT HAVE BOUGHT IT HAD I KNOW
THIS.* I AM VERY UPSET WITH CHRYSLER AT
THE MOMENT. I HAVE NEVER HAD A PROBLEM
OUT OF MY 2015 JEEP WRANGLER SAHARA
UNLIMITED OR MY 2009 JEEP ALI WRY. I AM
VERY DISAPPOINTED IN JEEP.[19]

**HTSA ID Number:** 11206377

**Incident Date January 1, 2019**

**Consumer Location** RICHMOND, TX
**Vehicle Identification Number** 1C4HJXEG4JW****
**Summary of Complaint**

*VIOLENT STEERING WHEEL SHAKING AND
FRONT END STEERING SHAKING WHEN
DRIVING OVER ROAD IMPERFECTIONS OVER 60
MPH*. LOOSE AND WANDERING STEERING
RESULTING IN MULTIPLE STEERING
CORRECTIONS TO REMAIN STRAIGHT IN LINE
ON A FLAT STRAIGHT AND LEVELED SURFACE.
WRANGLER WAS IN DEALERSHIP FOR MORE
THAN 40 DAYS TOTAL FOR BACKORDERED
PARTS AND REPAIRS. WRANGLER PICKED UP

---

[19]https://www.nhtsa.gov/vehicle/2018/JEEP/WRANGLER/SUV/4WD%252520Lat
er%252520Release#complaints (last visited May 17, 2019) (emphasis added)
(Exhibit 7).

19

TODAY AFTER 3RD VISIT. *STEERING DAMPER REPLACED FOR 2ND TIME*. DRIVER SIDE SHOCK ABSORBER REPLACED. VIOLENT SHAKING HAS BEEN RESOLVED SO FAR. BUT LOOSE AND INDIRECT STEERING IS STILL PRESENT. VIDEOS AVAILABLE UPON REQUEST.[20]

**NHTSA ID Number:** 11205859
**Incident Date May 3, 2019**
**Consumer Location** PRESCOTT, AZ
**Vehicle Identification Number** 1C4HJXFG7JW****
**Summary of Complaint**

AFTER INSTALLATION OF THE JEEP MANUFACTURED AND WARRANTIED 2 INCH MOPAR LIFT KIT AT THE JEEP DEALERSHIP, THE *VEHICLE'S STEERING WHEEL AND FRONT END WILL VIOLENTLY SHAKE AFTER HITTING A BUMP AT SPEEDS OF 50 MILES PER HOUR AND ABOVE.* THIS WAS MOST COMMONLY SEEN WHEN DRIVING OVER BRIDGES AT SPEEDS OF AROUND 50 MPH. THE VEHICLE WAS TAKEN TO THE DEALER WHEN THEY CLAIMED THEY COULD NOT DUPLICATE THE RESULTS. I THEN HAD TO RISK MY OWN SAFETY TO DEMONSTRATE TO A TECHNICIAN THAT THE PROBLEM WAS INDEED HAPPENING. THIS OSCILLATION OF THE STEERING AND SUSPENSION COMPONENTS IS EXTREMELY DANGEROUS AND REQUIRES ME TO COME TO A COMPLETE STOP BEFORE THE VEHICLE WILL STOP SHAKING. I ALSO HAVE LITTLE TO NO CONTROL OVER THE VEHICLE WHEN THIS HAPPENS UNTIL THE VEHICLE HAS BEEN SLOWED DOWN SUBSTANTIALLY. THE PROBLEM IS ONGOING AND HAS YET TO BE SOLVED.

---

[20] *Id.*

**NHTSA ID** Number: 11205782
**Incident Date May 4, 2019**
**Consumer Location** CHESTER, NJ
**Vehicle Identification Number** 1C4HJXDG9JW****
**Summary of Complaint**

*WHILE DRIVING AT NORMAL HIGHWAY SPEEDS (60MPH AND ABOVE) EACH OVERPASS, SEAM OR POTHOLE IN THE ROAD CAUSES MY 2018 WRANGLER TO SHAKE AND VIBRATE UNCONTROLLABLY*. AT TIMES THIS "DEATH WOBBLE" IS SO VIOLENT THAT THE ONLY WAY TO MAKE IT STOP IS TO PULL OVER AND COME TO A COMPLETE STOP. IMAGINE TRYING TO KEEP CONTROL OF YOUR JEEP WHILE IT'S SHAKING UNCONTROLLABLY AND YOU HAVE TO CROSS 3 LANES OF TRAFFIC TO PULL OVER. THIS WAS MY EXPERIENCE ON 5.4.19. THIS WAS NOT THE FIRST TIME. *THIS IS ALSO AFTER THE DEALERSHIP AND MANUFACTURER HAVE "REPAIRED" THE ISSUE ON 3 PREVIOUS OCCASIONS.*

**NHTSA ID** Number: 11205408
**Incident Date May 2, 2019**
**Consumer Location** ESSEX, VT
**Vehicle Identification Nu**mber 1C4HJXEN6JW****
**Summary of Complaint**

WHILE DRIVING ABOUT 65 MILES PER HOUR I RAN OVER A BRIDGE EXPANSION JOINT ON A BRIDGE APPROXIMATELY TEN OR MORE TIMES DURING MY TRIP. *ON THREE OCCASIONS WHEN I RAN OVER THE EXPANSION JOINT THE FRONT OF THE VEHICLE BEGAN TO SHAKE VIOLENTLY UP THROUGH THE STEERING WHEEL CAUSING ME TO LEAVE MY LANE OF TRAVEL*. I FEEL IF A CAR WAS NEXT TO ME AT THE TIME I COULD HAVE CRASHED. APPLYING BRAKES AND

SLOWING ENDED THE PROBLEM EACH TIME.

56.    FCA, through (1) its public acknowledgement of the problem; (2) its own records of customers' complaints, (3) dealership repair records, (4) records from the National Highway Traffic Safety Administration (NHTSA), (5) warranty and post-warranty claims, (6) internal pre-sale durability testing and internal investigations, and (7) other various sources, is and was well aware of the Death Wobble problem but failed to notify customers of the nature and extent of the problems at the time of sale nor is it yet provide any adequate remedy.

57.    Defendant failed to adequately research, design, test and/or manufacture the Jeep Vehicles before warranting, advertising, promoting, marketing, and/or selling them as suitable and safe for use in an intended and/or reasonably foreseeable manner.

58.    Defendant is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendant conducts tests, including pre-sale durability testing, to verify the vehicles it sells are free from defect and align with Defendant's specifications and intended use of the Jeep, including routine highway travel.

59.    Upon information and belief, Defendant performs a four-part durability evaluation on its vehicles before they are released for sale to the general public. The four steps are a virtual analysis, data acquisition, bench testing, and

road testing.

60.    The virtual analysis stage is conducted by FCA engineers. It is designed to identify risk areas early in the development process by using software simulations to identify potential part failures by using advanced mathematical models. This process allows FCA to identify and correct any issues with its vehicles before they are produced and when it is the least costly to remedy.

61.    The data acquisition stage is also conducted by FCA engineers. FCA engineers collect and analyze road load data (data regarding the expected load the vehicles will undergo during their anticipated lifetime).

62.    Bench testing involves testing individual components of the vehicle to simulate real world conditions. Bench testing is designed to verify the overall soundness of a design under controlled conditions. The testing performed typically includes testing various component parts to failure.

63.    Finally, FCA's presale durability road testing system is nicknamed DUMBO, which stands for Durability Monitoring Box and Off-board.

64.    The purpose of DUMBO is to detect preliminary degradation of vehicle component parts. Road testing of the vehicles is conducted and data is logged through an on-board unit within the vehicle, which is then transferred to a server for analysis. The DUMBO system is used to verify the correct execution of durability tests, to monitor any performance losses, and to collect data. The

collected data is then run through various event recognition, event validation, and performance evaluation algorithms to identify any loss of performance.

65.     Through these quality control metrics, FCA knew or should have known of the "Death Wobble" problem prior to and shortly after the time of sale to Class members and could have, and should have, worked to develop a workable remedy to obviate the problem.

## C.     FCA Fails to Disclose or Warn About the "Death Wobble"

66.     Despite its knowledge, FCA failed to warn consumers about the "Death Wobble" and how to safely gain control of the vehicle should it occur at highway speed.

67.     Yet, in the 2018 Jeep Wrangler owner's manual, FCA does include a section titled "On-Road Driving Tips" and warns drivers about higher ground clearances and that the driver should "[a]void sharp turns and abrupt maneuvers" and that "failure to operate th[e] vehicle correctly may result in loss of control or vehicle rollover."[21]

68.     FCA took it upon itself to speak and warn about safe operation of the Jeep.  With its long standing knowledge of the Jeep's "Death Wobble," FCA had a similar duty to not only warn its consumers both before and after purchase, but

---

[21] 2018 Jeep All New Wrangler Owners Manual at 359 (available at https://www.jlwranglerforums.com/downloads/guides/2018-Jeep-Wrangler-JL-JLU-Owners-Manual.pdf) (last visited May 20, 2019) (Exhibit 8).

provide similar precautions, warnings, and instructions on how to safely operate the vehicle during the "Death Wobble" and bring the vehicle back to normal operating conditions.

### D. FCA Touts Safety in its Marketing and Advertising

69.     FCA has touted its "commitment" and "dedication" to "transportation safety include[ing] engineering active and passive features for diverse drivers and vehicle segments."[22] Amid worsening reliability ratings and recall investigations from NHTSA,[23] FCA's head of vehicle safety and regulatory compliance assured the market in 2014 that "safety considerations are baked into every component of every product we make."[24]

70.     On its website, FCA represents that its "objective is to ensure vehicle quality and safety."[25] Defendant informs consumers that FCA "vehicles meet the

---

[22] FCA 2015 Sustainability Report, https://www.fcagroup.com/en-US/investors/financial_information_reports/sustainability_reports/sustainability_reports/2015_Sustainability_Report.pdf (last visited May 23, 2019) (Exhibit 9).

[23] Michael Wayland, *Quality Chief Leaves FCA Amid Recalls, Poor Reliability*, THE DETROIT NEWS (Oct. 29, 2014), http://www.detroitnews.com/story/business/autos/chrysler/2014/10/28/fiat-chrysler-replaces-longtime-quality-chief/18052121/ (Exhibit 10)

[24] Sandy Smith, *Sandy Says: Are You a Safety Advocate?*, EHS TODAY, (Feb. 4, 2016), http://ehstoday.com/safety-leadership/sandy-says-are-you-safety-advocate (Exhibit 11)

[25] https://www.fcagroup.com/enUS/media_center/insights/Pages/quality_lifecycle.aspx (last visited May 23, 2019) (Exhibit 12).

highest standard in terms of safety, ecological profile, driving performance and quality."[26] Specifically, FCA's website focuses on Defendant's purported rigorous testing and quality control:

> To ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, every mechanical and electronic component, body part and trim element is rigorously tested. The designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality.[27]

71.     On its webpage advertising the 2018 Jeep Wrangler, FCA states that it "builds on a proven tradition of smart design combined with preventative features to help keep you safe and secure."[28] It also says that the 2018 Jeep Wrangler "has been designed to make your life easier, more convenient, safer, and more secure."[29] FCA made these claims and advertisements touting its dedication to safety to boost sales of the Class Vehicles even though it knew the "Death Wobble" presented a safety risk on these vehicles.

## E. Warranties Related to the Defect

72.     The Jeep Vehicles come with a three-year/36,000 mile Basic Limited Warranty. The Basic Limited Warranty lasts for three years from the date delivery

---

[26] *Id.*

[27] *Id.*

[28] https://www.jeep.com/wrangler/safety-security.html (last visited May 23, 2019) (Exhibit 13).

[29] *Id.*

of the Jeep Vehicle is taken, or for 36,000 miles on the odometer, whichever occurs first. The Jeep Vehicles also come with a five-year/60,000 mile Powertrain Warranty. The Powertrain Warranty covers the engine, transmission, and drive systems.

73.    FCA instructs vehicle owners and lessees to bring their vehicles to an FCA dealership for the warranty repairs. Many owners and lessees have presented Jeep Vehicles to FCA dealerships with complaints about the Death Wobble.

74.    Despite FCA's knowledge of the problem—and presumably how to appropriately remediate and prevent the "Death Wobble" from recurring (replacing suspension systems ball joints, track bar and upper inner tie rods)—FCA refuses to provide appropriate warranty coverage, instead opts only to replace the Jeep's steering damper pursuant to the warranty or suggests to the consumer that they have their tires aligned, rotated, or purchase new tires altogether, none of which is covered by the warranty nor will it solve the "Death Wobble" problem.

## CLASS ALLEGATIONS

75.    Plaintiff brings this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and the following proposed classes:

> **Nationwide Class:**
> All persons or entities in the United States
> who purchased or leased a 2015-2018 Jeep Wrangler.

27

**New Jersey Subclass:**
All persons or entities that purchased or leased a
2015-2018 Jeep Wrangler in New Jersey.

76.     Excluded from the Class are FCA, its employees, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; FCA dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

77.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

78.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

79.     Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. In 2018 alone, FCA sold more than 205,000 Jeep Wranglers in the United States. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination

methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class members may be easily derived from Jeep sales records.

80.    <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.  Whether FCA engaged in the conduct alleged herein;

    b.  Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Jeep Vehicles into the stream of commerce in the United States;

    c.  Whether the "Death Wobble" constitutes a safety defect;

    d.  Whether FCA knew about the "Death Wobble" at the time of Plaintiff and the Class members purchase their Subject Vehicles and failed to disclose the risk of the Death Wobble;

    e.  Whether FCA designed, manufactured, marketed, and distributed the Jeep Vehicles knowing that the "Death Wobble" could and would occur;

    f.  Whether FCA's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

    g.  Whether FCA owed a duty to warn Plaintiff and Class Members about the "Death Wobble" and how to safely stop it when operating their Jeep at highway speeds;

    h.  Whether Plaintiff and the other Class members overpaid for their Class Vehicles;

29

      i.   Whether FCA breached the warranty by failing to properly inspect and repair the Jeep's suspension system after Plaintiff and Class Members complained about the "Death Wobble";

     j.   Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

    k.   Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

81.   <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.

82.   <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representatives because her interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

83.   <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): FCA has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

84. <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT,
### 15 U.S.C. § 2301, *et seq*. ("MMWA")
### <u>On Behalf of Nationwide Class</u>

85. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

86.    The MMWA provides a private right of action by purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of an implied or written warranty.  15 U.S.C. § 2310(d)(1).  As alleged herein, FCA has failed to comply with its implied warranty of merchantability with regard to the Jeep Vehicles.

87.    The Jeep Vehicles are consumer products, as that term is defined in 15 U.S.C. § 2301(1).

88.    Plaintiff and each member of the Class are consumers, as that term is defined in 15 U.S.C. § 2301(3).

89.    FCA is a supplier and warrantor, as those terms are defined in 15 U.S.C. § 2301(4)-(5).

90.    The MMWA provides a cause of action for breach of warranty or other violations of the Act.  15 U.S.C. § 2310(d)(1).  FCA breached the implied warranty of merchantability for the Jeep Vehicles, as alleged herein, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods.  Plaintiff has suffered damages as a result of FCA's breach of the implied warranty of merchantability as set forth herein.   15 U.S.C. § 2310(d)(1)-(2).

91.    FCA was provided notice of the claims raised by Plaintiff and was afforded a reasonable opportunity to cure.  FCA failed to cure in that it only

replaced the vehicles steering damper with knowledge that the cause of the "Death Wobble" is due to loosening or weakening of the suspension system.   Until Plaintiff's representative capacity is determined, notice and opportunity to cure through Plaintiff, and on behalf of the Class, can be provided under 15 U.S.C. § 2310(e).

92.    FCA's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful.  15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

93.    Plaintiff and the Class Members have suffered, and are entitled to recover, damages as a result of FCA's breach of implied warranty and violations of the MMWA.

94.    Plaintiff also seeks an award of costs and expenses, including attorneys' fees, under the MMWA to prevailing consumers in connection with the commencement and prosecution of this action.  15 U.S.C. § 2310(d)(2).  Plaintiff and the prospective Class intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### On Behalf of Nationwide Class

95.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

96.     FCA manufactured and distributed Jeep vehicles throughout the United States for sale to Plaintiff and the Class Members.

97.     FCA impliedly warranted to Plaintiff and members of the Class that their Jeep Vehicles were free of defects, and were merchantable and fit for their ordinary purpose for which such goods are used.

98.     As alleged herein, FCA breached the implied warranty of merchantability because the Jeep vehicles suffer from defects that cause it to "Death Wobble" when operated at normal highway speeds.  The Jeep Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

99.     After Plaintiff experienced the "Death Wobble" on numerous occasions and returned the vehicle to the dealership on two separate occasions without relief, as well as sending a letter to FCA on March 15, 2019 pursuant to the New Jersey Lemon Law, she gave reasonable and adequate notice to FCA that the Jeep Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

100.   Plaintiff did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies.  Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiff is entitled to all remedies available under Article 2 of the New Jersey Uniform Commercial Code.  Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.  As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiff and members of the Class have been injured in an amount to be proven at trial.

101.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

102.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

103.   The parts affected by the "Death Wobble" were distributed by Defendant in the Class Vehicles and are covered by the warranties Defendant provided to all purchasers and lessors of Class Vehicles.

104.   Defendant breached these warranties by selling and leasing Class Vehicles with the Death Wobble, requiring repair or replacement within the

applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

105.   Plaintiff notified Defendant of the breach within a reasonable time though they were not required to do so because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant also knew of the "Death Wobble" and yet have chosen to conceal it and to fail to comply with its warranty obligations.

106.   As a direct and proximate cause of Defendant's breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the "Death Wobble."

107.   Defendant's attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

108.   Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

109.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Class.

Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

110.   Plaintiff and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
## <u>On Behalf of Nationwide Class</u>

111.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

112.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.

113.   The parts affected by the "Death Wobble" were distributed by Defendant in the Class Vehicles and are covered by the warranties Defendant provided to all purchasers and lessors of Class Vehicles.

114.   Defendant breached these warranties by selling and leasing Class Vehicles with the Death Wobble, requiring repair or replacement within the

applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

115.     Plaintiff notified Defendant of the breach within a reasonable time though they were not required to do so because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant also knew of the "Death Wobble" and yet have chosen to conceal it and to fail to comply with its warranty obligations.

116.   As a direct and proximate cause of Defendant's breach, Plaintiff and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the "Death Wobble."

117.   Defendant's attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

118.   Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

119.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Class.

Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

120.   Plaintiff and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT,**
**N.J.S.A. § 56:8-2, *et seq.* ("CFA")**
**<u>On Behalf of the New Jersey Sub-Class</u>**

121.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122.   Plaintiff and other members of the Class are "consumers" within the meaning of the New Jersey Consumer Fraud Act.

123.   The Jeep Vehicles are "merchandise" within the meaning of the CFA, as they are goods that are offered directly or indirectly to the public for sale.

124.   At all relevant times, FCA conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

39

125.  The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under other remedies.

126.  FCA has engaged in deceptive, unconscionable, unlawful, unfair, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion, and sale of Jeep Vehicles without disclosing the probability of the "Death Wobble."

127.  FCA knew of the probability that the "Death Wobble" would occur when the Jeep Vehicles are operated at routine highway speeds and did not disclose it to consumers like Plaintiff and did not provide any warning to protect consumers like Plaintiff or instructions on how to safely operate the vehicle during the "Death Wobble" or how to return the vehicle to normal operating conditions once the "Death Wobble" ensued.

128.  FCA had knowledge of the Jeep Vehicles' propensity to "Death Wobble" at the time of sale.  The causes of the "Death Wobble" in the Jeep Vehicles are latent and are not something that Plaintiff or Class members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

129.   FCA intended that consumers like Plaintiff and members of the Class rely on its deceptive, false and misleading misrepresentations or omissions of material fact in order to increase its sales and profits.

130.   FCA intended that Plaintiff and the other members of the Class to rely on its acts of concealment and omissions by purchasing the Jeep Vehicles at full price rather than paying less or purchasing competitors' vehicle.

131.   Had FCA disclosed all material information regarding the Death Wobble to Plaintiff and other members of the Class, they would not have purchased the Jeep Vehicles, or they would have paid less for them.

132.   FCA's conduct had an impact on the public interest because the acts were part of a generalized course of conduct affecting numerous consumers.

133.   As a result of the foregoing acts, omissions, and practices, Plaintiff and other members of the Class have suffered an ascertainable loss by purchasing defective Jeep Vehicles that are unable to perform their essential function for their expected useful life and present a risk of safety to Plaintiff and members of the Class. Plaintiff is entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees, and costs of suit.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class and Subclasses, respectfully requests that the Court enter judgment against

FCA and in favor of Plaintiff, the Class, and Subclasses, and award the following relief:

A.     Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Subclass, and Plaintiff's counsel as counsel for the Class and Subclass;

B.     An order awarding declaratory relief and temporarily and permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Jeep Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class members with appropriate curative notice regarding the existence and cause of the "Death Wobble";

D.     An award of appropriate damages to repair or replace the Jeep vehicles or otherwise compensate Plaintiffs and the Class;

E.     A declaration that FCA is financially responsible for all Class notice and the administration of Class relief;

F.     An order awarding any applicable statutory and civil penalties;

G.     An order awarding any punitive and/ or exemplary damages that are available to Plaintiff and/or members of the Class;

H.     An award of costs, expenses, and attorneys' fees as permitted by law; and

I.     Such other or further relief as the Court may deem appropriate, just, and equitable.

J.     An award of any such equitable remedy as may be appropriate, including but not limited to disgorgement and restitution;

K.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: June 12, 2019                  Respectfully submitted,

> */s/ E. Powell Miller*
> E. Powell Miller (P39487)
> Sharon S. Almonrode (P33938)
> William Kalas (P82113)
> **THE MILLER LAW FIRM, P.C.**
> 950 W. University Dr., Suite 300
> Rochester, Michigan 48307
> Tel: (248) 841-2200
> Fax: (248) 652-2852
> epm@millerlawpc.com
> ssa@millerlawpc.com
> wk@millerlawpc.com
>
> Simon B. Paris, Esquire
> Patrick Howard, Esquire
> Charles J. Kocher, Esquire
> **SALTZ, MONGELUZZI, BARRETT
> & BENDESKY, P.C.**

43

1650 Market Street, 52nd Floor
Philadelphia, PA  19103
Tel: 215-496-8282;
Fax: 215-496-0999

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF**
555 Lancaster Avenue
Berwyn, PA 19312
Tel: (888) 711-9975
Fax: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

Daniel E. Gustafson
David A. Goodwin
Raina C. Borrelli
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 S. Sixth St., Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
rborrelli@gustafsongluek.com