# EXHIBIT 4

482 F.Supp.3d 601
United States District Court, E.D.
Michigan, Southern Division.

IN RE FLINT WATER CASES.

This Order Relates to:

Walters v. Flint

Case No. 17-10164
|
Signed 08/26/2020

**Synopsis**

**Background:** Residents brought action against Environmental Protection Agency (EPA) under Federal Tort Claims Act (FTCA) alleging that EPA was negligent in its response to city's contaminated water supply. Government moved to dismiss for lack of subject-matter jurisdiction.

**Holdings:** The District Court, Judith E. Levy, J., held that:

[1] residents satisfied state-law liability prerequisite to invoke District Court's subject-matter jurisdiction under FTCA;

[2] FTCA's discretionary function exception did not bar residents' claims; and

[3] FTCA's misrepresentation exception did not bar residents' claims.

Motion denied.

West Headnotes (41)

**[1]** **Federal Courts** 🔑 Pleadings and motions
**Federal Courts** 🔑 Evidence; Affidavits

Motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack. Fed. R. Civ. P. 12(b)(1).

1 Cases that cite this headnote

**[2]** **Federal Courts** 🔑 Pleadings and motions

On a motion to dismiss for lack of subject-matter jurisdiction, a facial attack questions the sufficiency of the pleading. Fed. R. Civ. P. 12(b)(1).

**[3]** **Federal Courts** 🔑 Pleadings and motions

When reviewing a facial attack on subject-matter jurisdiction, a district court takes the allegations in the complaint as true. Fed. R. Civ. P. 12(b)(1).

**[4]** **Federal Courts** 🔑 Pleadings and motions

In a facial attack on subject-matter jurisdiction, if the allegations in the complaint establish federal claims, jurisdiction exists. Fed. R. Civ. P. 12(b)(1).

**[5]** **Federal Courts** 🔑 Pleadings and motions

Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

**[6]** **Federal Courts** 🔑 Pleadings and motions

The approach used by a district court to review a facial attack on subject-matter jurisdiction is identical to the approach it uses when reviewing a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(1), 12(b)(6).

**[7]** **Federal Courts** 🔑 Weight and sufficiency

A factual attack on subject-matter jurisdiction raises a factual controversy requiring the district court to weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. Fed. R. Civ. P. 12(b)(1).

1 Cases that cite this headnote

**[8]** **Federal Courts** Presumptions and burden of proof

In a factual attack on subject-matter jurisdiction, there is no presumptive truthfulness that applies, and the district court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. Fed. R. Civ. P. 12(b)(1).

1 Cases that cite this headnote

**[9]** **Federal Courts** Evidence; Affidavits

In considering a motion to dismiss for lack of subject-matter jurisdiction, a district court may consider factual matters outside the pleadings and resolve factual disputes. Fed. R. Civ. P. 12(b)(1).

**[10]** **Federal Courts** Evidence; Affidavits

A district court engages in a factual inquiry on a motion to dismiss for lack of subject-matter jurisdiction only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim; if the jurisdictional issue is intertwined with the underlying substantive merits of the case, such evidentiary decisions should await a determination of the case on the merits. Fed. R. Civ. P. 12(b)(1).

**[11]** **Federal Courts** Pleadings and motions

A party who invokes the jurisdiction of a federal court must allege all facts necessary to give the court jurisdiction of the subject matter.

**[12]** **United States** Presumptions and burden of proof

On a motion to dismiss for lack of subject-matter jurisdiction in an action under the Federal Tort Claims Act (FTCA), the burden is on the plaintiff to allege facts that fall within the FTCA and outside its exceptions; however, the burden of proof shifts when the United States invokes exceptions to the FTCA. 28 U.S.C.A. § 2680; Fed. R. Civ. P. 12(b)(1).

**[13]** **United States** Waiver of immunity; limitations and exceptions in general

The Federal Tort Claims Act (FTCA) does not create a federal cause of action against the United States, but rather waives the government's sovereign immunity from certain types of claims. 28 U.S.C.A. §§ 1346(b), 2674.

**[14]** **United States** Private Person's Liability as Measure

**United States** In general; place of injury

The "law of the place," as used in the Federal Tort Claims Act (FTCA) section subjecting the government to liability for torts provided that the government, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred, means the law of the state. 28 U.S.C.A. § 1346(b).

**[15]** **United States** Medical care and public health

Residents adequately alleged liability under Michigan's good samaritan doctrine in connection with Environmental Protection Agency's (EPA's) response to city's contaminated water supply, thereby satisfying state-law liability prerequisite to invoke District Court's subject-matter jurisdiction under general waiver of sovereign immunity in Federal Tort Claims Act (FTCA), where residents alleged that EPA had undertaken to render services to them by engaging in oversight and monitoring pursuant to Safe Drinking Water Act (SDWA) and by responding directly to citizen complaints, EPA delayed its response despite having evidence of contamination, EPA's delayed response increased their risk of harm from accumulating lead and bacteria, and that their reliance on EPA was reasonable. 28 U.S.C.A. §§ 1346(b), 2674; Public Health Service Act § 1401 et seq., 42 U.S.C.A. § 300f et seq.; Restatement (Second) of Torts § 324A.

**[16]    Negligence** 🔑 **"Good Samaritan" doctrine and statutes**

Under Michigan law, the good samaritan doctrine recognizes that an actor, by affirmative acts, can create or assume a duty where none otherwise would have existed. Restatement (Second) of Torts § 324A.

**[17]    Negligence** 🔑 **"Good Samaritan" doctrine and statutes**

The inquiry under Michigan's good samaritan doctrine must be focused on the fundamental concept of duty rather than on action or inaction. Restatement (Second) of Torts § 324A.

**[18]    Negligence** 🔑 **"Good Samaritan" doctrine and statutes**

The test for determining whether a duty is owed under Michigan's good samaritan doctrine is not whether the risk was increased over what it would have been if the defendant had not been negligent; rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all. Restatement (Second) of Torts § 324A.

**[19]    Water Law** 🔑 **Statutory and Regulatory Provisions**

The Safe Drinking Water Act's (SDWA's) framework is one of cooperative federalism. Public Health Service Act § 1401 et seq., 42 U.S.C.A. § 300f et seq.

**[20]    Negligence** 🔑 **"Good Samaritan" doctrine and statutes**

To establish a duty under Michigan's good samaritan doctrine based on reliance on the defendant's undertaking, a plaintiff must show justifiable, detrimental reliance. Restatement (Second) of Torts § 324A.

**[21]    United States** 🔑 **Discretionary Acts or Functions**

If a tort claim against the government falls within the discretionary function exception under the Federal Tort Claims Act (FTCA), a district court lacks jurisdiction to adjudicate it. 28 U.S.C.A. § 2680(a).

**[22]    United States** 🔑 **Discretionary Acts or Functions**

The purpose of the discretionary function exception under the Federal Tort Claims Act (FTCA) is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. 28 U.S.C.A. § 2680(a).

**[23]    United States** 🔑 **Discretionary Acts or Functions**

The first step to determine whether the discretionary function exception under the Federal Tort Claims Act (FTCA) applies to bar a tort claim against the government is to ask whether the action or omission was discretionary. 28 U.S.C.A. § 2680(a).

**[24]    United States** 🔑 **Element of judgment or choice**

The discretionary function exception under the Federal Tort Claims Act (FTCA) does not apply to bar a tort claim against the government when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. 28 U.S.C.A. § 2680(a).

**[25]    United States** 🔑 **Considerations of public policy**

The discretionary function exception under the Federal Tort Claims Act (FTCA) protects only governmental actions and decisions based on considerations of public policy; the test is objective rather than subjective because the

question is not whether the policy considerations were actually considered, but whether they could have been considered. 28 U.S.C.A. § 2680(a).

**[26]    United States** 🖙 **Presumptions and burden of proof**

Upon finding that a challenged action was discretionary, as the first prong in determining whether the discretionary function exception under the Federal Tort Claims Act (FTCA) applies, there is a strong presumption that the second prong, which asks whether the judgment is of the kind that the exception was designed to shield, is satisfied. 28 U.S.C.A. § 2680(a).

**[27]    United States** 🖙 **Discretionary Acts or Functions**

Before applying the two-prong test for determining whether the discretionary function exception under the Federal Tort Claims Act (FTCA) applies, the crucial first step is to determine exactly what conduct is at issue. 28 U.S.C.A. § 2680(a).

**[28]    United States** 🖙 **Medical care and public health**

Environmental Protection Agency's (EPA's) conduct with respect to any delay in issuing emergency order under Safe Drinking Water Act (SDWA) in connection with contamination of city's water supply was discretionary, as required for such conduct to fall within scope of discretionary function exception under Federal Tort Claims Act (FTCA); EPA's decision under SDWA whether to issue emergency order if it learned that a state was not acting to protect public involved element of judgment or choice, and nothing in EPA's guidance document contradicted facially apparent discretion given to EPA under SDWA. 28 U.S.C.A. § 2680(a); Public Health Service Act § 1431, 42 U.S.C.A. § 300i(a).

**[29]    United States** 🖙 **Element of judgment or choice**

Conduct is "discretionary," as required for the discretionary function exception under the Federal Tort Claims Act (FTCA) to apply to bar a tort claim against the government, when it involves an element of judgment or choice, rather than following a federal statute, regulation, or policy specifically prescribing a course of action and leaving the employee no rightful option but to adhere to the directive. 28 U.S.C.A. § 2680(a).

**[30]    Administrative Law and Procedure** 🖙 **Policy statements; other informal pronouncements**

**Administrative Law and Procedure** 🖙 **Effect on agency**

Agencies are bound to follow their own regulations, but internal operating manuals do not carry the force of law, bind the agency, or confer rights.

**[31]    United States** 🖙 **Medical care and public health**

Any failure by Environmental Protection Agency (EPA) to take action pursuant to Safe Drinking Water Act (SDWA) section requiring it to issue administrative order or bring civil action upon finding that a State was not complying with SDWA was not discretionary, and, thus, discretionary function exception under Federal Tort Claims Act (FTCA) did not bar residents' negligence claims alleging that EPA failed to timely take enforcement actions with respect to city's contaminated water supply; if EPA knew that city was not in compliance, SDWA's use of word "shall" made clear that EPA had only two options, either issue an administrative order or commence civil action, such that failing to take any enforcement action was not an option. 28 U.S.C.A. § 2680(a); Public Health Service Act § 1414, 42 U.S.C.A. § 300g-3.

**[32]** **United States** 🔑 **Element of judgment or choice**

**United States** 🔑 **Considerations of public policy**

If a regulation mandates particular conduct, and the government employee obeys the direction, the government will be protected from tort liability under the discretionary function exception of the Federal Tort Claims Act (FTCA) because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation; conversely, if the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. 28 U.S.C.A. § 2680(a).

**[33]** **Statutes** 🔑 **Mandatory or directory statutes**

The term "shall" in a statute generally denotes a mandatory duty, but use of "shall" is not conclusive, because sometimes "shall" is the equivalent of "may"; the question of whether "shall" commands or merely authorizes action is determined by the objectives of the statute.

**[34]** **United States** 🔑 **Discretionary Acts or Functions**

**United States** 🔑 **In general; place of injury**

The greatest limitation upon the government's liability under the Federal Tort Claims Act (FTCA) is not the discretionary function exception; rather, the principle limitation is that, for the government to be liable, state law must provide for private liability under similar circumstances. 28 U.S.C.A. §§ 1346(b), 2674, 2680(a).

**[35]** **United States** 🔑 **Medical care and public health**

Environmental Protection Agency's (EPA's) lack of regulatory action and delay in regulatory action with respect to city's contaminated water supply were not grounded in policy of regulatory regime, including Safe Drinking

Water Act (SDWA), and, thus, discretionary function exception under Federal Tort Claims Act (FTCA) did not bar residents' negligence claims alleging that EPA delayed its emergency order and failed to issue administrative order or commence civil action, even if some of EPA's decisions were discretionary, since SDWA's framework was one of cooperative federalism, which empowered and required EPA to intervene if a state was in violation of federal drinking water standards. 28 U.S.C.A. § 2680(a); Public Health Service Act §§ 1414, 1431, 42 U.S.C.A. §§ 300g-3, 300i(a).

**[36]** **United States** 🔑 **Considerations of public policy**

Matters of scientific and professional judgment, particularly judgments concerning safety, are rarely considered to be susceptible to social, economic, or political policy, and, thus, not within the scope of the discretionary function exception of the Federal Tort Claims Act (FTCA). 28 U.S.C.A. § 2680(a).

**[37]** **United States** 🔑 **Particular Functions or Settings**

**United States** 🔑 **Premises liability**

The following types of decisions are generally shielded from tort liability by the discretionary function exception under the Federal Tort Claims Act (FTCA): (1) the proper response to hazards; (2) whether and how to make federal lands safe for visitors; and (3) whether to warn of potential danger. 28 U.S.C.A. § 2680(a).

**[38]** **United States** 🔑 **Discretionary Acts or Functions**

Under the Federal Tort Claims Act (FTCA), the discretionary function exception analysis is ad hoc because it depends on the facts of each case. 28 U.S.C.A. § 2680(a).

[39]  **United States** 🔑 Misrepresentation and deceit; fraud

Misrepresentation exception under Federal Tort Claims Act (FTCA) did not bar residents' negligence claims alleging that EPA failed to timely act in connection with city's contaminated water supply, since any misrepresentations by EPA were not essential to residents' negligence claims concerning inspection and oversight. 28 U.S.C.A. § 2680(h).

[40]  **United States** 🔑 Misrepresentation and deceit; fraud

The misrepresentation exception under the Federal Tort Claims Act (FTCA) bars claims arising out of negligent as well as willful misrepresentation. 28 U.S.C.A. § 2680(h).

[41]  **United States** 🔑 Misrepresentation and deceit; fraud

Misrepresentation exception under the Federal Tort Claims Act (FTCA) is confined most often to misrepresentations that are of a financial or commercial character. 28 U.S.C.A. § 2680(h).

**Attorneys and Law Firms**

**\*605** Hunter Shkolnik, Napoli Shkolnik Law PLLC, Renner Kincaid Walker, Corey M. Stern, Levy Konigsberg, LLP, New York, NY, Jonathan S. Massey, Massey and Gail LLP, Washington, DC, Laurence H. Tribe, Cambridge, MA, Shawntane Williams, Williams & Associates Law Firm PLLC, Lathrup Village, MI, for Lee-Anne Walters, Amanda Engelmann, Angel Schmidt, Barbara Mitchell, Chalonda Jones, Crystal Handley, Debra Soto, Derek Davis, Robert Brown, Jackie Putney, Janay Coleman-Sanders, Joyceland Fisher, Kyna Edwards, Lawana Hillard, Alicia Kuykendall, Lonise Coulter, Lovie Wright, Monica Loomis, Monique Stevenson, Nile Hawthorne, Okneea Hellems, Rosalinda Guerrero, Sarah Cheeseman, Shatoya Starks, Shawntele Brown, Shayla Robinson, Starla Barnefske, Suzan Early, Talisha Lovett, Talita Hill, Tammy Loren, Teri Matthess, Tom Abney, Tracey Gordon, Trisha Hill, Willie Daniels, Angielic

Reed, Ashley Price, Carrie Green, Jacqueline Weaver, Leah Burmeister, Leandre Beard, Melissa Kelly, Merrill Johnson, Samantha Denison, Floyd Bell, Shantara Spicer-Johnson, Sheimyee Brown, Tatyonna Handley, Tearia Anthony, Minor Child.

Corey M. Stern, David Alexander Latanision, Renner Kincaid Walker, Levy Konigsberg, LLP, New York, NY, for All plaintiffs from case 19-13359.

Frederick A. Berg, Butzel Long, Detroit, MI, Sheldon H. Klein, Butzel Long, Bloomfield Hills, MI, William Young Kim, City of Flint, Flint, MI, for City of Flint.

Todd Russell Perkins, Nikkiya Branch, Perkins Law Group, PLLC, T. Santino Mateo, Law Offices of T. Santino Mateo, Detroit, MI, for Darnell Earley.

Alexander S. Rusek, White Law PLLC, Okemos, MI, for Howard Croft.

Margaret A. Bettenhausen, Nathan A. Gambill, Zachary C. Larsen, Michigan Department of Attorney General, Richard S. Kuhl, Assistant Attorney General, Lansing, MI, for State of Michigan, Richard Snyder, State of MDEQ Michigan, State of DHHS Michigan, Eden Victoria Wells, M.D., Nick Lyon, Andy Dillon.

Barry A. Wolf, Barry A. Wolf, Attorney at Law, PLLC, Flint, MI, for Gerald Ambrose.

Krista A. Jackson, Smith Haughey Rice & Roegge, Grand Rapids, MI, Michael H. Perry, Thaddeus E. Morgan, Fraser, Trebilcock, Lansing, MI, for Liane Shekter Smith.

Krista A. Jackson, Philip A. Grashoff, Jr., Smith Haughey Rice & Roegge, Grand Rapids, MI, for Stephen Busch.

Allison M. Collins, Charles E. Barbieri, Foster, Swift, Collins & Smith, P.C., Lansing, MI, Krista A. Jackson, Smith Haughey Rice & Roegge, Grand Rapids, MI, for Patrick Cook, Michael Prysby.

Christopher B. Clare, Clark Hill PLC, Washington, DC, Jay M. Berger, Stephen A. Campbell, Clark Hill PLC, Detroit, MI, Jordan S. Bolton, Clark Hill PLC, Birmingham, MI, Michael J. Pattwell, Clark Hill, PLC, Lansing, MI, for Bradley Wurfel.

Michael S. Cafferty, Michael S. Cafferty & Assoc., Detroit, MI, for Nancy Peeler.

Kurt E. Krause, Mary Chartier, Okemos, MI, for Robert Scott.

James A. Fajen, Ann Arbor, MI, James W. Burdick, Burdick Law, P.C., Bloomfield Hills, MI, for Adam Rosenthal.

Gregory M. Meihn, Matthew Wise, Foley & Mansfield, PLLP, Ferndale, MI, Joseph F. Galvin, Genesee County Drain Commissioners Office, Flint, MI, for Jeff Wright.

Michael J. Gildner, Simen, Figura, Flint, MI, for Edward Kurtz.

William Young Kim, City of Flint, Flint, MI, for Dayne Walling.

Edwar A. Zeineh, Law Office of Edwar A. Zeineh, PLLC, Lansing, MI, for Daugherty Johnson.

Margaret A. Bettenhausen, Michigan Department of Attorney General, Lansing, MI, for Receivership Transition Advisory Board.

Craig S. Thompson, Sullivan Ward Patton Gleeson & Felty, Southfield, MI, for Rowe Professional Services Company.

Alaina N. Devine, Campbell Conroy & O'Neil, P.C., Boston, MA, for Veolia Water North America Operating Services, LLC.

Eric Rey, Jason T. Cohen, Michael L. Williams, United States Department of Justice, Washington, DC, for United States of America.

Michael Glasgow, pro se.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION [300]

JUDITH E. LEVY, United States District Judge

**\*607** This is one of the many cases that are collectively referred to as the Flint Water Cases. The Flint Water Case defendants are a combination of private and public individuals and entities who allegedly set in motion a chain of events that led to bacteria and lead leaching into the City of Flint's drinking water. Flint Water Case plaintiffs claim that these defendants subsequently concealed, ignored, or downplayed the risks that arose from their conduct, causing the plaintiffs serious harm. The plaintiffs contend that the impact of what has since been called the Flint Water Crisis is still with them and continues to cause them problems.

Before the Court is Defendant United States of America's motion to dismiss this case for lack of subject matter jurisdiction. The Court has previously adjudicated several other motions to dismiss in the Flint Water Cases. First, there was *Guertin v. Michigan*, No. 16-cv-12412, involving two individual plaintiffs and many of the public and private Flint Water Case defendants. Next, there was *Carthan v. Snyder*, No. 16-cv-10444, a consolidated class action that also involved similar defendants and claims as in *Guertin*. Most recently were *Walters v. City of Flint*, No. 17-cv-10164, *Sirls v. Michigan*, No. 17-cv-10342, *Brown v. Snyder*, 18-cv-10726, and *Marble v. Snyder*, No. 17-cv-12942, which involved individual plaintiffs operating under one master complaint.

In this case, Flint residents are bringing a lawsuit against the United States Environmental Protection Agency ("EPA") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–80, alleging that the EPA was negligent in its response to the Flint Water Crisis, which resulted in injuries to Plaintiffs. There are other Flint Water FTCA cases assigned to the Honorable Linda V. Parker and consolidated in *Burgess v. United States,* No. 17-cv-11218. *Meeks v. United States,* No. 19-cv-13359, however, was assigned to this Court, and because of the common issues of fact and the overlap between Plaintiffs in *Meeks* and in this Court's other Flint Water Cases, the Court consolidated it with *Walters v. Flint,* No. 17-cv-10164. (ECF No. 294.) For the reasons set forth below, the Court denies Defendants' motion to dismiss the complaint.

## Table of Contents

I. Facts...608

II. Federal Tort Claims Act...614

III. Standard of Review...615

IV. Analysis...617
A. Private Liability Requirement...617

   i. An Undertaking to Render Services to Another...618

   ii. Whether the Government was Negligent...619

   iii. Section 324A(a) Increased Risk of Harm...620

   iv. Section 324A(b) Undertaking to Perform a Duty Owed to a Third Person...621

   v. Section 324A(c) Reliance...622

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

vi. Conclusion...624

B. Discretionary Function Exception...624

    i. Prong One: Was the Action Discretionary?...626

    ii. Prong Two: Whether the Challenged Actions were Grounded in the Policy of the Regulatory Regime...632

    **\*608**  iii. Conclusion...638

C. Misrepresentation Exception...638

V. Conclusion...639

**I. Facts**

The following factual background is excerpted from Judge Parker's opinion in *Burgess v. United States,* 375 F. Supp. 3d 796, 803–09 (E.D. Mich. 2019). All of the evidence in *Burgess* is adopted here and therefore constitutes the record of this case. Neither party disputes the facts as set forth in *Burgess. See* United States' Motion to Dismiss, (ECF No. 300, PageID. 8537) (Judge Parker's "factual findings about the Flint Water Crisis, differing regulatory roles played by the City of Flint, Michigan Department of Environmental Quality (MDEQ), and EPA, are consistent with the jurisdictional record submitted by the parties and are not disputed by the United States."); Plaintiffs' Response Brief (ECF No. 305, PageID. 9894) (agreeing that the evidence in this case is "virtually identical" to *Burgess*). The factual background below is copied from *Burgess,* and the internal citations are accordingly from Case No. 17-cv-11218.

> The SDWA [Safe Drinking Water Act ("SDWA")] was enacted in 1974 "to assure that water supply systems serving the public meet minimum national standards for protection of public health." H.R. Rep. No. 93-1185 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6454, 6454. The statute authorizes the EPA "to establish Federal standards for protection from all harmful contaminants[ ] ... applicable to all public water systems[.]" *Id.* at 6454-55. It also "establish[es] a joint Federal-State system for assuring compliance with th[o]se standards and for protecting underground sources of drinking water. *Id.* at 6455.
>
> States adopting, among other things, drinking water regulations that are no less stringent than the national primary drinking water regulations are eligible to obtain primary enforcement authority [primacy] over their public

water systems. 42 U.S.C. § 300g-2(a)(1). Michigan has obtained primacy and the Michigan Department of Environmental Quality ("MDEQ") thus has primary enforcement authority with respect to the State's water systems. *See Mays v. City of Flint,* 871 F.3d 437, 446 (6th Cir. 2017). As the Sixth Circuit has described it, "the MDEQ-EPA relationship is a model of cooperative federalism ...." *Id.* at 447.

> Nevertheless, the SDWA reserves the EPA's oversight and primacy States must periodically submit compliance reports to the EPA for that purpose. 42 U.S.C. §§ 300g-3, 300i; *see also* 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 141.90, 142.15, 142.19, 142.30 [...]
>
> The EPA has ten regional offices, each of which is responsible for executing EPA programs within several States and territories. "Region 5" serves six States, including Michigan, and a number of tribes. Congress has granted the EPA Administrator the authority to "delegate any of his functions under [the statute] (other than prescribing regulations) to any officer or employee of the Agency." 42 U.S.C. § 300j-9. The EPA Administrator has delegated his authority under Sections 1414 and 1431 of the SDWA, 42 U.S.C. §§ 300g-3 and 300i, to the Regional Administrators and the Assistant Administrator for Enforcement and Compliance Assurance. (Def's Mot. Exs. 66-68, ECF Nos. 41-7, 41-8, 41-9.) [...]

> Flint owns and operates a public water system that provides drinking water to its nearly 100,000 citizens. Before April 2014, Flint purchased finished drinking water from the DWSD [Detroit **\*609** Water and Sewage Department]. DWSD drew its water from Lake Huron and treated the water to control potential contaminants, including copper and lead levels.
>
> In approximately late April 2014, Flint switched its water source from DWSD to the Flint River. The use of the Flint River as a water source was intended to be temporary, as Flint planned to connect to the Karegnondi Authority pipeline in 2016, which also draws its water from Lake Huron. (*See* Def.'s Mot. Ex. 43 at 1, ECF No. 40-3 at Pg ID 1349.) MDEQ and Flint did not, and were not required to, notify the EPA of the changing water sources for Flint. (Def.'s Mot. Ex. C at 37, ECF No. 37-3 at Pg ID 862.) The EPA does not approve such a switch in a primacy State. (*Id.* at 35, Pg ID 862; Ex. 15 at 2.) MDEQ approved Flint's water source change, but did not require Flint to begin corrosion control prior to the switch. (Ex.

2 at 1, ECF No. 38-1; Ex. 3 at 2, ECF No. 38-2 at Pg ID 1142.) MDEQ interpreted the Lead and Copper Rule ("LCR") as allowing Flint to complete two consecutive six-month rounds of sampling prior to determining what, if any corrosion control treatment was needed for the Flint River water. (*Id.* Ex. 20, ECF No. 39-3 at Pg ID 1206-07; Ex. 22 at 1-3, ECF No. 39-5 at Pg ID 1209-1211.) Its wrongful and damaging interpretation was later admitted by MDEQ Director Dan Wyant.

The Flint River provided inconsistent water quality because of elevated levels of organic matter. (*Id.* Ex. 35 at 1, ECF No. 39-18 at Pg ID 1313.) By August 2014, elevated levels of fecal coliform and E. coli bacteria were detected in the water and the MDEQ issued a "boil water advisory" instructing Flint residents to not drink the water. (Def.'s Mot. Ex. E at 66, ECF No. 37-5 at Pg ID 975; Pls.' Resp. Ex. 70 at 7, ECF No. 53-27 at Pg ID 2114.) A second E. coli exceedance occurred on September 5, 2014. (*Id.*) The City's use of chlorine to address bacteria exceedances led to another problem—high levels of total trihalomethane ("TTHM"), which poses health risks to consumers. (Pls.' Resp. Ex. 3, ECF No. 53-4 at Pg ID 1931; Ex. 70 at 7, ECF No. 53-27 at Pg ID 2114.)

Flint's residents immediately noticed the change in the quality of the water when the City switched its water source to the Flint River. Jennifer Crooks, Region 5's Michigan Program Manager for the Drinking Water Program, who was responsible for reviewing and responding to complaints from Michigan citizens on the agency's behalf, testified in this matter that she had never received as many citizen complaints since she began working for the EPA in 1987 than she did after the Flint water switch. (Def.'s Mot. Ex. E at 29, 30-32, ECF No. 37-5 at Pg ID 965-66.) When Region 5 received citizen complaints from Michigan residents, employees would discuss the issues with technical contacts, check for violations in the various databases, and contact the State person responsible for the water system and discuss the complaint. (*Id.* Ex. E at 24, 49, ECF No. 37-5 at Pg ID 964, 970; Ex. F at 33-34, ECF No. 37-6 at Pg ID 1018-19.) After Region 5's employees conducted background research and communicated with the State, they responded to citizens through emails, phone calls, and written letters. (*Id.* Ex. E at 36-37; *see also id.* Exs. 15, 16, 18.)

In its communications with Flint residents, the EPA indicated that MDEQ was working closely with the City "to ensure that the citizens of Flint are provided drinking water that meets health standards." (*See, e.g., id.* Ex. 15 at 1, **\*610** ECF No. 58-14 at Pg ID 1184.) The EPA informed Flint's residents that "[t]he most recent laboratory analyses obtained from MDEQ of the City of Flint's drinking water indicate that almost all regulated contaminants meet State and Federal health standards, as required under the Federal and Michigan Safe Drinking Water Acts." (*Id.*) TTHMs pose a health risk for some sub-populations, such as the immune-compromised and pregnant women. (*See id.* Ex. 14 at Pg ID 1183.) Despite being aware of those risks (*see id.*), the EPA did not convey those risks in at least some of its communications with Flint residents. (*See id.* Exs. 15, 18.)

In early 2015, Flint citizen LeeAnne Walters contacted the EPA after receiving the test results of drinking water samples the City of Flint had collected from her home. (Def.'s Mot. Ex. 3 at 2-3, ECF No. 38-2 at Pg ID 1142-43.) Those results showed highly elevated lead and iron levels.[1] (*Id.*) Ms. Crooks from Region 5 sent an email to MDEQ the day after receiving the test results, documenting her concerns and requesting assistance in dealing with the high lead levels in the Walters' home. (*Id.* Ex. E at 69, ECF No. 37-5 at Pg ID 975.) MDEQ indicated in response that the lead was coming from the home's plumbing, although Ms. Walters had indicated that all of the plumbing was plastic. (*Id.* Ex. 3 at 3, ECF No. 38-2 at Pg ID 1143.)

Ms. Crooks and Miguel Del Toral, Region 5's Regulations Manager for the Groundwater and Drinking Water Branch, were in subsequent communication with MDEQ and the City concerning Ms. Walters' situation and whether there was a more widespread lead issue. (*See* Pls.' Resp. Ex. 1, ECF No. 53-2.) In a February 26, 2015 email to MDEQ officials, Ms. Crooks stated that (1) Flint must have Optimized Corrosion Control Treatment ("OCCT"), (2) the test results for the Walters' home must "be included in with compliance calculation of the 90th percentile", and (3) the City cannot flush the system in advance of taking compliance samples. (*Id.* at 3-4, Pg ID 1921-22.) Mr. Del Toral, who had been copied on Ms. Crooks' email, sent a follow-up email to MDEQ on February 27, 2015, explaining his concerns about the lead situation and Flint's testing protocols. (*Id.* at 2-3, Pg ID 1920-21.) Mr. Del Toral conveyed that pre-flushing the tap before collecting testing samples "biases the results low by eliminating the highest lead values" and "provides false assurance to residents about the true lead levels in the water." (*Id.*) Mr. Del Toral suggested that MDEQ contact Region 5's "resident expert", Mike Schock, for help with compliance. (*Id.*) Ms. Crooks

forwarded Mr. Schock's contact information to MDEQ the same day. (*Id.*)

On February 27, 2015, Stephen Busch from the MDEQ responded to Ms. Crooks' and Mr. Del Toral's emails, thanking them for their information and indicating: "[W]e will take it under consideration." (*Id.* at 1, Pg ID 1919.) Mr. Busch represented in the same email, among other things, that Flint "[h]as an Optimized Corrosion Control Program", "[c]onducts quarterly Water Quality Parameter monitoring at 25 sites and has not had any unusual results[,]" and "[h]as never had a 90th percentile lead AL exceedance[.]" (*Id.*)

Region 5 visited the Walters' home on April 27 and May 6, 2015, to inspect the plumbing and conduct additional testing. **\*611** (Def.'s Mot. Ex. 3 at 3, ECF No. 38-2 at Pg ID 1143.) Finding that the interior plumbing was primarily plastic, the EPA concluded that it was not the source of the high lead levels found in the water at the residence. (*Id.*) Shockingly, as Mr. Del Toral noted in an email to colleagues within Region 5, local officials were telling Flint residents that the source of the high lead was the home's internal plumbing. (Pls.' Resp. Ex. 2 at 5, ECF No. 53-3 at Pg ID 1929.)

During EPA's May 6 trip to the Walters' home, the service line to the residence was replaced and the EPA sent three portions of the extracted line for testing, which confirmed that a portion of the line was made of galvanized iron pipe. (*Id.*) The EPA's inspection of the remaining portion confirmed that the service line from the water main to the external shut-off valve was lead. (*Id.*) Region 5 collected water samples from other Flint residents' homes, which also showed noncompliant lead levels. (*Id.* at 4, Pg ID 1144.)

Meanwhile, on April 23, 2015, Mr. Del Toral sent an email to MDEQ asking: "What's Flint doing now (post Detroit) for corrosion control treatment?" (Pls.' Resp. Ex. 2 at 4, ECF No. 53-3 at Pg ID 1928.) MDEQ responded the following day, indicating that Flint is not practicing CCT and that the results of testing for two six-month periods indicated that no treatment was needed. (*Id.* at 3, Pg ID 1927.) Mr. Del Toral emailed MDEQ on April 25, 2015, expressing his concern regarding the lack of CCT following the water source switch considering the known corrosity of the Flint River and the City's extensive lead service lines. (*Id.* at 1, Pg ID 1925.) Mr. Del Toral further reemphasized that the City's preflushing ahead of

compliance sampling may be distorting test results. (*Id.*) Mr. Del Toral expressed that "[g]iven the very high lead levels found at one home and the pre-flushing happening at Flint ... the whole town may have much higher lead levels than the compliance results indicated ...." (*Id.*)

In May and June 2015, EPA Region 5 staff continued to express concern to MDEQ and the City about increasing concentrations of lead in Flint's drinking water and the City's lack of corrosion control treatment and offered the EPA's expertise to move forward and rectify the water quality problems. (Def.'s Mot. Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294; Ex. 3 at 4, ECF No. 38-2 at Pg ID 1144; Pls.' Resp. Ex. 6 at 1, ECF No. 53-7 at Pg ID 1945.) During this period, Mr. Del Toral prepared the EPA's interim report on high lead levels in Flint's water system, which was circulated to his colleagues. In the report, Mr. Del Toral indicated that Flint was not including tests from homes showing high lead levels in its compliance sampling pool. (Pls.' Resp. Ex. 3 at 5, ECF No. 53-4 at Pg ID 1935.) He also expressed concern that this omission, as well as Flint's sampling procedures, conceal a more wide-spread problem with high lead levels throughout the City's water supply. (*Id.* at 2, Pg ID 1932.) As Mr. Del Toral further explained in an email to his colleagues:

> The widespread high lead is my judgment based on a couple of decades of working with lead issues and I stand by it despite the limited data set from Flint. A simple application of scientific principles to the circumstances in Flint along with the limited data are enough to know that there is a problem there. They have no corrosion control treatment in place for over a year now and they have lead service lines. It's just basic chemistry on lead solubility. You will have high lead **\*612** leaching into the water where you are doing nothing to mitigate that. We don't need to drop a bowling ball off every building in every town to know that it will fall to the ground in all of these places. The fact that their sampling is designed not to capture lead (everything is fine) does not negate our scientific understanding of what is going on. The only reason we don't have more data is because the City of Flint is flushing away the evidence before measuring it. ...

(*Id.*, Ex. 5 at 3, ECF No. 53-6 at Pg ID 1942.)

Tinka Hyde, the Director of the Water Division for Region 5, convened a formal conference call with MDEQ management on July 21, 2015, to discuss the status of

Flint's lead sampling results (including MDEQ's position on pre-flushing) and MDEQ's interpretation of the LCR, which conflicted with Region 5's interpretation. (Def.'s Mot. Ex. 20, ECF No. 39-3 at Pg ID 1206-07.) The EPA interpreted the rule as requiring a public water system to use optimal corrosion control treatment upon switching water sources. (*See id.* Ex C at 41-42, ECF No. 37-3 at Pg ID 863-64; Ex. 11 at 1-2, ECF No. 38-10 at Pg ID 1169-70.) MDEQ decided to treat Flint's change in water sources as a "new source" which would require OCCT only after monitoring reflects the need for treatment. (*See id.* Ex. 20 at 1, ECF No. 39-3 at Pg ID 1206.)

In preparation for the July 21, 2015 conference call between EPA and MDEQ, EPA drafted a "Briefing Paper" which reflects what EPA already knew about Flint's water crisis and state and local officials' response (or lack thereof) to that crisis. (*See* Pls.' Resp. Exs. 11, 22, ECF Nos. 53-8, 53-16.) This included the fact that Michigan was not requiring corrosion control in Flint. (*Id.*) It further reflects EPA's knowledge that Flint was not including in its testing the citizen requested samples where high-lead levels were detected—despite EPA's direction that they needed to be included—and EPA's knowledge that Flint was "preflushing" lines before sampling—again, despite EPA's explanation of why this distorts testing. (*Id.*) These documents also reflects EPA[']s expectation that proper sampling would show high lead levels in the water supplied to Flint residents and a need for corrosion control. (*Id.*)

During the July 21, 2015 conference call, MDEQ requested an opinion from EPA headquarters to resolve the discrepancy in the LCR interpretation.[2] (*Id.*; *see also* Ex. C at 42, ECF No. 37-3 at Pg ID 864.) MDEQ nevertheless communicated a willingness "to initiate discussion with Flint sooner rather than later on corrosion control." (*Id.*, Ex. 20 at 1, ECF No. 39-3 at Pg ID 1206.) But MDEQ was unwilling to budge on its pre-flushing requirement until new regulations were issued, maintaining that the State's lead compliance sampling procedures comply with federal SDWA requirements and that pre-flushing instructions are not requirements but suggestions. **\*613** (*Id.* at 2, Pg ID 1207.) Region 5 again offered the EPA's technical assistance. (*Id.* Ex. 20 at 1-2, ECF No. 39-3 at Pg ID 1206-07.)

On August 17, 2015, MDEQ instructed Flint to implement corrosion control as soon as possible, but no later than January 1, 2016, and to fully optimize its treatment within six months. (Def.'s Mot. Ex. C at 52, ECF No. 37-3 at Pg

ID 866; Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294; Pls.' Resp. Ex. 70 at 15, ECF No. 53-27 at Pg ID 2122.) During an August 31, 2015 conference call between MDEQ and Region 5, the results of the second six-month (January-July 2015) monitoring test results for Flint were discussed, which reflected that corrosion control was needed. (Pls.' Resp. Ex. 70 at 15, ECF No. 53-27 at Pg ID 2122.) During this call, Region 5 discussed the need for outreach to Flint's citizens to reduce their exposure to high lead levels in the drinking water and reiterated the offer of technical assistance in implementing corrosion control treatment. (Def.'s Mot. Ex. 32 at 3, ECF No. 39-15 at Pg ID 1294.) But Region 5 viewed MDEQ as having the responsibility to alert the public as the primacy agency. (*Id.* Ex. C at 109, ECF No. 37-3 at Pg ID 880.)

Instead, as EPA's agents were well aware, City officials continued to assure Flint residents that there was no corrosivity issue and that MDEQ and the EPA found the City in compliance with safe water standards. (Pls.' Resp. Ex. 47 at 3, ECF No. 53-22 at Pg ID 2059.) At the same time, the EPA learned that pediatricians at Hurley Medical Center in Flint had conducted a study which showed a rise in the blood lead levels of Flint's children after the switch to the Flint River as the City's water source. (*Id.* at 2-3, Pg ID 2058-59.) For example, in the two zip codes where the highest level of lead was found in the water, the EBL (elevated blood lead) levels for infants less than fifteen months old rose from 1.5% to 4.4%. (*Id.*) The rest of Flint had an increase from .6 to 1.1% for the same age group. (*Id.*) There was no change, in comparison, for non-Flint infants less than fifteen months old. (*Id.*) For children less than five-years old, EBL levels rose from 2.1% to 4.0% throughout Flint and from 2.5% to 6.3% in the two most-affected zip codes. (*Id.*)

On September 3, 2015, Flint's Mayor announced that the City would implement corrosion control treatment and invited EPA corrosion control experts to join the Flint Technical Advisory Committee ("TAC"). (Def.'s Mot. Ex. 32 at 4, ECF No. 39-15 at Pg ID 1295.) On October 7, 2015, the TAC recommended that MDEQ direct Flint to resume purchasing treated water from the DWSD, now called the Great Lakes Water Authority. (*Id.* Ex. G at 73, 75-76; ECF No. 37-3 at Pg ID 1078; Ex. 32 at 4, ECF No. 39-15 at Pg ID 1295.) On October 16, 2015, the EPA established the Flint Safe Drinking Water Task Force ("EPA Flint Task Force") to provide technical expertise to MDEQ and the City. (Ex. 32 at 4, ECF No. 39-15 at 1295.) On the same date, Flint switched back to purchasing finished water from Detroit.

Despite the switch, corrosion control treatment remained necessary because the corrosive Flint River water had eroded away the protective coatings in the system. (*See id.* Ex. G at 76, ECF No. 37-7 at Pg ID 1078, Ex. 32 at 5, ECF No. 39-15 at Pg ID 1296.) On November 25, 2015, and on subsequent dates, the EPA Flint Task Force requested information which was not being shared to assess the City's progress with corrosion control. (*Id.* Ex. 32 at 4-5, ECF No. 39-15 at Pg ID 1295.) Without **\*614** the information, the EPA could not evaluate whether the contamination in the City's water system had been eradicated. (*Id.*) While the City began additional corrosion control treatment in early December 2015, the EPA was not assured that high levels of lead and other contaminants had been removed from the water system. (*Id.*)

On December 14, 2015, the City declared an emergency. On January 14, 2016, Michigan's Governor requested emergency disaster assistance. Two days later, President Obama declared a federal emergency in the City. On January 21, 2016, the EPA issued an emergency order pursuant to Section 1431 of the SDWA. (*Id.* Ex. 32, ECF No. 39-15 at Pg ID 1292-1309.) The EPA identified several reasons for issuing the order at that time, including continued "delays in responding to critical EPA recommendations and in implementing the actions necessary to reduce and minimize the presence of lead and other contaminants in the water supply" presently and moving forward. (*Id.* at 8 at Pg ID 1299.) Further, the EPA noted MDEQ's and the City's failure and continued failure to provide necessary information for the EPA, the EPA Flint Task Force and Flint citizens "to fully understand and respond promptly and adequately to the current deficiencies." (*Id.*) Additionally, the City viewed its switch back to Detroit water as temporary and planned to eventually move to untreated water from KWA. The EPA viewed the transition as posing "complex technical and managerial challenges ... that have serious implications for drinking water safety and public health." (Pls.' Resp. Ex. 63 at 2, ECF No. 41-4 at Pg ID 1723.) The EPA was concerned that the City lacked the professional expertise and resources to manage the transition and carry out the recommended actions to safely manage the City's water system. (*Id.*; Def.'s Mot Ex. 32 at 8, ECF No. 39-15 at Pg ID 1299.)

On October 20, 2016, the EPA Office of Inspector General (OIG) issued a "Management Alert" in which it found that "Region 5 had the authority and sufficient information to issue a SDWA Section 1431 emergency order to protect Flint residents from lead-contaminated water as early as June 2015." (Pls.' Resp. Ex. 53 at 1, ECF No. 53-25 at Pg ID 2019.) The OIG indicated that "EPA's 1991 guidance on SDWA Section 1431 orders states that if state actions are deemed insufficient, the EPA can and should proceed with a SDWA Section 1431 order, and the EPA may use its emergency authority if state action is not protecting the public in a timely manner." (*Id.*)

*Burgess*, 375 F. Supp. 3d at 803–09.

## II. Federal Tort Claims Act

The Federal Tort Claims Act permits plaintiffs to obtain compensation from the United States for the negligence of its employees. The FTCA "is the exclusive remedy for suits against the United States or its agencies sounding in tort." *Himes v. United States*, 645 F.3d 771, 776 (6th Cir. 2011) (citing 28 U.S.C. § 2679(a)). The Act waives sovereign immunity, which otherwise prohibits private citizens from suing a sovereign state without its consent. Under the FTCA, federal district courts have jurisdiction over claims against the United States for personal injury or death caused by the "negligent or wrongful act or omission" of any government employees acting within the scope of their employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

**\*615** The United States filed a motion to dismiss Plaintiffs' case for lack of subject matter jurisdiction. (ECF No. 300.) It contends that it has not waived sovereign immunity under the FTCA because Michigan law would not impose liability on private individuals in similar circumstances. The United States also argues that two exceptions to the FTCA apply: the discretionary function exception and the misrepresentation exception. The Court will first consider the viability of Plaintiffs' claims under Michigan law, and then address each of the two exceptions. For the reasons set forth below, the United States has waived sovereign immunity in this case because Plaintiffs have stated a claim under Michigan law and neither of the two FTCA exceptions apply.

## III. Standard of Review

[1] "Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Both

apply here. The United States brings a facial attack on the sufficiency of Plaintiffs' complaint by arguing that under the facts set forth above, there would be no liability under state law—a necessary prerequisite to bring a claim under the Federal Tort Claims Act. The United States also brings a factual attack on the pleadings by arguing that two exceptions to the FTCA apply.

[2] [3] [4] [5] [6] A facial attack "questions [ ] the sufficiency of the pleading." *Rote v. Zel Custom Mfg. LLC,* 816 F.3d 383, 387 (6th Cir. 2016) (quoting *O'Bryan v. Holy See,* 556 F.3d 361, 375 (6th Cir. 2009)). "When reviewing a facial attack, a district court takes the allegations in the complaint as true." *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.,* 807 F.3d 806, 810 (6th Cir. 2015) (quoting *Gentek Bldg. Prod.,* 491 F.3d at 330). "If those allegations establish federal claims, jurisdiction exists." *O'Bryan,* 556 F.3d at 376. But, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Rote,* 816 F.3d at 387 (quoting *O'Bryan,* 556 F.3d at 376). "This approach is identical to the approach used by the district court when reviewing a motion invoking Federal Rule of Civil Procedure 12(b)(6)." *Glob. Tech.,* 807 F.3d at 810.

[7] [8] [9] A factual attack, by contrast, "raises a factual controversy requiring the district court to 'weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.' " *Wayside Church v. Van Buren County,* 847 F.3d 812, 817 (6th Cir. 2017) (citing *Gentek Bldg. Prod.,* 491 F.3d at 330) (internal citations omitted). In a factual attack on subject matter jurisdiction, there is no presumptive truthfulness that applies, and "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *United States v. Ritchie,* 15 F.3d 592, 598 (6th Cir. 1994). "In considering a Rule 12(b)(1) motion to dismiss for lack of jurisdiction, a district court may consider factual matters outside the pleadings and resolve factual disputes." *Anestis v. United States,* 749 F.3d 520, 524 (6th Cir. 2014) (citing *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir. 1990)).

[10] A district court engages in a factual inquiry "only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek Bldg. Prod.,* 491 F.3d at 330 (citation omitted). If the jurisdictional issue is intertwined with the underlying substantive merits of the case, such evidentiary decisions should await a determination of

the case on the merits. ***616** *Moore v. Lafayette Life Ins. Co.,* 458 F.3d 416, 442 (6th Cir. 2006) (quoting *Eubanks v. McCotter,* 802 F.2d 790, 793 (5th Cir. 1986)); *see also Wright v. United States,* 82 F.3d 419 (6th Cir. 1996) (unpublished) (upholding a district court's decision to convert an FTCA discretionary function challenge into a motion for summary judgment because "the jurisdictional question of whether the rangers violated the applicable regulations concerning dangerous trees is interwoven with the question of whether the rangers acted negligently.").

Courts have recognized that in FTCA cases, questions of jurisdiction are often closely intertwined with the merits. *See Franklin Sav. Corp. v. United States,* 180 F.3d 1124, 1129 (10th Cir. 1999) (explaining that the district court must convert a Rule 12(b)(1) motion to one under Rule 12(b)(6), or for summary judgment on the question of whether the FTCA's discretionary function exception applies); *Douglas v. United States,* 814 F.3d 1268, 1275 (11th Cir. 2016) (finding that the 12(b)(1) motion to dismiss claiming the FTCA's discretionary function exception was based on facts intertwined with the merits and so the defendant must proceed under Rule 12(b)(6) or Rule 56); *S.R.P. ex rel. Abunabba v. United States,* 676 F.3d 329, 343–44 (3d Cir. 2012) (recognizing that Rule 12(b)(1) does not provide plaintiffs the procedural safeguards of Rule 12(b)(6) which calls for "a relaxed standard of proof for the jurisdictional question where jurisdiction is intertwined with the merits").

Although the Sixth Circuit has not spoken as to which standard of proof should apply, because the merits of this case intertwine with the jurisdictional issues, Plaintiffs must be afforded more procedural safeguards than review under 12(b)(1) affords. Because the parties have already engaged in jurisdictional discovery, the Court will treat any disputed jurisdictional issues of fact under a standard similar to Rule 56. *See Gentek Bldg. Prod.,* 491 F.3d at 330 (explaining that this provides a "greater level of protection to the plaintiff who in truth is facing a challenge to the validity of his claim" when "the defendant is forced to proceed under Rule 12(b)(6) ... or Rule 56 ... both of which place greater restrictions on the district court's discretion."). This approach will allow the Court to look beyond the pleadings, but will still afford Plaintiffs the procedural safeguards of Rule 56 insofar as the Court must view "the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.,* 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)). Thus,

dismissal in this case is only proper when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

**[11]** **[12]** Finally, "it is a universal rule ... that a party who invokes the jurisdiction of a federal court must allege all facts necessary to give the court jurisdiction of the subject matter." *Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982) (quoting *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952)). The burden is on Plaintiffs to allege facts that fall within the FTCA and outside of its exceptions listed in 28 U.S.C. § 2680. However, under Sixth Circuit precedent, the burden of proof shifts when the United States invokes exceptions to the FTCA. *Carlyle*, 674 F.2d at 556 ("Only after a plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by [Section] 2680 does the burden fall on the government to prove the applicability of a specific provision of [Section] 2680"); *Burgess*, 375 F. Supp. 3d at 801.

#### *617 IV. Analysis

##### A. Private Liability Requirement

**[13]** **[14]** The FTCA does not create a federal cause of action against the United States, but rather waives the Government's sovereign immunity from certain types of claims. The United States is subject to liability for torts "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, provided that a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The "law of the place" means the law of the state. *FDIC v. Meyer*, 510 U.S. 471, 478, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Here, that is Michigan law.

**[15]** The United States contends that Plaintiffs' pleadings have not met the private liability requirement. This is a "facial attack" on the Court's subject matter jurisdiction. Therefore, the Court will evaluate the Plaintiffs' complaint to determine whether it has alleged sufficient facts to state a claim under Michigan law. *See Glob. Tech.*, 807 F.3d at 810 (explaining that reviewing a facial attack is "identical to the approach used by the district court when reviewing a motion invoking Federal Rule of Civil Procedure 12(b)(6)."); *see also Myers v. United States*, 17 F.3d 890, 898–99 (6th Cir. 1994) ("Unless the plaintiffs have pled facts sufficient to justify liability under ordinary state-law principles, and thus invoked the court's subject matter jurisdiction under the general waiver of sovereign immunity in 28 U.S.C. § 2674, there is no need to

resort to the exceptions in 28 U.S.C. § 2680, to dismiss the suit.")

**[16]** Plaintiffs contend that the Good Samaritan doctrine applies under the facts of this case, as it is framed in the Restatement (Second) of Torts Section 324A and recognized under Michigan law. *See Fultz v. Union-Commerce Associates.*, 470 Mich. 460, 683 N.W.2d 587, 590–91 (2004). Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a) his failure to exercise reasonable care increases the risk of such harm, or

> (b) he has undertaken to perform a duty owed by the other to the third person, or

> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965). The Good Samaritan doctrine recognizes that an actor, by affirmative acts, can create or assume a duty where none otherwise would have existed. *See Myers*, 17 F.3d at 901. Under this doctrine, when the government undertakes to act, it is required to act carefully and will be liable for injuries proximately caused by the failure to do so. *Neal v. Bergland*, 646 F.2d 1178, 1181–82 (6th Cir. 1981). The Court must answer three questions when conducting a Good Samaritan doctrine analysis: 1) did the United States undertake to render services to another; 2) was the United States negligent in its undertaking; and 3) if so, do any of the three statutory factors described in Section 324A(a)-(c) apply here. For the reasons set forth below, the Good Samaritan doctrine applies to the EPA's alleged conduct and the United States can therefore be found liable under the FTCA.

#### *618 i. An Undertaking to Render Services to Another

The threshold inquiry under Section 324A is whether the EPA undertook "to render services to another which he should recognize as necessary for the protection of a third person." Restatement § 324A. Plaintiffs plausibly allege that the EPA voluntarily acted for the benefit of Flint's citizens. For

example, the EPA responded to individual citizen complaints and met with Flint residents regarding these complaints, even going to citizens' homes to conduct independent water testing. (ECF No. 315-1, PageID.11841, 11845.) For months, EPA Region 5 staff emailed back and forth with the MDEQ staff regarding Flint's worrisome lack of corrosion control and high lead levels. (*Id.* at PageID.11842–11850.) Throughout the summer of 2015, the EPA continued to ask the MDEQ for updates regarding much-needed corrosion control for the public water system. (*Id.* at PageID.11849–11851.) In June 2015, the EPA even offered the MDEQ additional technical assistance in responding to the water quality issues. (*Id.* at PageID.11846.) Ultimately, in January of 2016, the EPA issued an Emergency Order under Section 1431. Importantly, the EPA's Office of the Inspector General ("OIG") found in a report that "EPA Region 5 had the authority and sufficient information to issue a SDWA Section 1431 emergency order to protect Flint residents from lead-contaminated water as early as June 2015." (*Id.* at PageID.11858.) The Court agrees with Judge Parker's conclusion in *Burgess*, which found that the "EPA undertook to render services to Plaintiffs by engaging in oversight, including monitoring, of the State's and local water systems' compliance with the SDWA and by responding directly to citizen complaints." 375 F. Supp. 3d at 818.

The United States argues that action pursuant to a federal statute cannot be a voluntary undertaking. (ECF No. 300, PageID.8570.) Supreme Court and Sixth Circuit precedent undercut this argument. FTCA claims based on the Good Samaritan doctrine often involve government officials acting pursuant to a statute or regulatory framework. This is because the government may assume an undertaking by enacting a regulation requiring government employees to perform a service or function for the protection of the public. *See Sheridan v. United States*, 487 U.S. 392, 401, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988) (finding a Good Samaritan doctrine claim when the government "voluntarily adopt[ed] regulations" that prohibited the possession of firearms on the naval base) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 65, 76 S.Ct. 122, 100 L.Ed. 48 (1955)); *Myers*, 17 F.3d at 902 (finding that mine inspections pursuant to a federal statute were "sufficient undertakings to justify application of the good samaritan doctrine's other elements."); *Raymer v. United States*, 660 F.2d 1136, 1144 (6th Cir. 1981) (explaining that "the United States has undertaken to render services to others in adopting the [Federal Coal Mine Health and Safety Act of 1969], and that cases of this kind are properly resolved

by applying the '[G]ood Samaritan doctrine' as the Supreme Court did in *Indian Towing*.").

**[17]** The United States also argues that a Good Samaritan claim cannot be premised on a "failure to act," targeting Plaintiffs' allegations of the EPA's "inaction" pursuant to the SDWA. (ECF No. 300, PageID.8570.) The United States cites *Ashbrook v. Block*, which explains that the Good Samaritan doctrine requires "the defendant undertake to act" and therefore precludes claims based on inaction. 917 F.2d 918, 926 (6th Cir. 1990) (citing **\*619** *Hart v. Ludwig*, 347 Mich. 559, 79 N.W.2d 895 (1956)). As Plaintiffs point out, however, *Hart v. Ludwig*—the Michigan Supreme Court case that *Ashbrook* cites for this proposition—also discusses the "slippery distinction between action and nonaction." 347 Mich. 559, 565, 79 N.W.2d 895 (1956). Therefore, the inquiry must be focused instead on "the fundamental concept of 'duty' " rather than on action or inaction. *Id.* In *Hart*, the court explained that when viewed as a smaller part of a whole, negligent acts—such as a surgeon failing to sterilize her tools—could all be characterized as "inaction." But, in the context of a duty, a doctor failing to sterilize tools during surgery is negligent action. So too here. When Plaintiffs allege that the EPA's inaction in response to the Flint Water Crisis caused them harm, that alleged failure to act was in the course of an undertaking.

### ii. Whether the Government was Negligent

The second pre-requisite to liability under Section 324A is that the EPA must have been negligent in its undertaking. Plaintiffs have alleged sufficient facts to show that the EPA was negligent in its oversight and monitoring pursuant to the SDWA and in responding to citizen complaints. Plaintiffs allege that by "October 2014, EPA Region 5 had authority and sufficient information to require the issuance of a SDWA Section 1431 emergency order to protect Flint residents from lead contaminated water." (ECF No. 315-1, PageID.11863.) That emergency order did not come until January 21, 2016. (*Id.* at PageID.11857.) Plaintiffs also allege that the EPA did not provide expert advice and technical assistance as required under Section 1414 until September 2015, despite knowing about the urgent need for such assistance as early as October 2014. (*Id.* at PageID.11861–11863.)

Plaintiffs additionally allege that the EPA did not respond to citizen complaints in a timely way. (*Id.* at PageID.11841–11842.) For example, in October 2014, the EPA received a

citizen complaint from Jan Burgess that her water smelled sometimes like an "over-chlorinated swimming pool" and other times "like pond scum." (*Id.* at PageID.11840.) That complaint stated that Flint's water is "often brown in color and frequently had visible particles floating in it." (*Id.*) The EPA did not meet with Burgess until April 2016, almost a year and a half after she reported the environmental violations. (*Id.* at PageID.11841.) LeeAnne Walters, another citizen who is a plaintiff in this case's non-FTCA counts, informed the EPA in January 2015 that she and her family members "were becoming physically ill from exposure to the water coming from her tap." (*Id.* at PageID.11842.) Walters later provided the EPA with reports of elevated blood lead levels for her children. (*Id.* at 11844.) Plaintiffs plausibly allege that the EPA did not follow up on these investigations in a timely way, even though it was involved early in the Flint Water Crisis and had evidence that there were dangerous levels of lead in Flint's public water system.

Plaintiffs also allege that the EPA failed to promptly notify and later warn Flint water users that their water was highly corrosive and contaminated with lead and dangerous bacteria. (*Id.* at PageID.11862–11865.) To the contrary, when EPA water expert Miguel Del Toral's draft report first circulated in June 2015—a report which detailed the major public health concern of Flint's elevated lead and copper levels—EPA Region 5's Director Hedman told Flint's mayor that "[t]he preliminary draft report should not have been released outside the agency." (*Id.* at PageID.11848.) Hedman told the mayor that he could tell those investigating the lead issues that Del **\*620** Toral's report was a "preliminary draft" and so "it would be premature to draw any conclusions based on that draft." (*Id.*) Despite the alarming content of Del Toral's report, the revised memo was released four months later—in November 2015. (*Id.* at PageID.11857.)

For these reasons, the Court finds that Plaintiffs have adequately alleged that the EPA was negligent in its undertaking. Once the threshold is met for a claim under Section 324A, a plaintiff must then demonstrate that one of the three alternative statutory bases also exists: (a) a failure to exercise reasonable care that increases the risk of such harm, (b) an undertaking to perform a duty owed by the other to the third person, or (c) that a harm is suffered because of reliance of the other or the third person upon the undertaking. Restatement § 324A. Plaintiffs allege facts sufficient to show that all three alternative bases apply in this case.

### iii. Section 324A(a) Increased Risk of Harm

**[18]** The first circumstance under which the government might owe a duty to Plaintiffs is under Section 324A(a). Plaintiffs must allege that the EPA's negligence increased the risk of harm to them. The Sixth Circuit explained that the test is "not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." *Myers*, 17 F.3d at 903.

Here, Plaintiffs allege that the EPA's failure to comply with Section 1431 and 1414 of the SDWA increased their risk and level of harm. (ECF No. 315-1, PageID.11864.) Plaintiffs also contend that the EPA's failure to warn Flint citizens of the environmental disaster and subsequent cover-up increased their harm. (*Id.* at PageID.11866–11867.) The United States contends that the EPA's inaction did not affirmatively cause the Flint Water Crisis or increase the risk of harm to Plaintiffs. (ECF No. 300, PageID.8571–8572.) Rather, the United States argues that it was the City of Flint and MDEQ's switch to the Flint River without corrosion control that caused the harm to Plaintiffs.

The United States argues that this case is like *Myers* where the Sixth Circuit found that the alleged negligence of federal mine inspectors did not increase a risk of harm to the miners. 17 F.3d at 902. In *Myers*, the mine owners were out of compliance with federal safety regulations and methane gas accumulated, eventually causing an explosion that killed several miners. *Id.* at 893. The plaintiffs sued the United States over the mine inspectors' failure to detect safety violations. The court did not find that this failure increased the miners' risk of harm. *Id.* at 902–03.

One key difference between this case and *Myers* is that the mine inspectors failed to identify a safety hazard, whereas in this case, the EPA knew as early as June 2015 that Flint residents were in danger of drinking and being exposed to lead contaminated water. (ECF No. 315-1, PageID.11846, 11858.) In fact, Plaintiffs allege the EPA had enough information at that time to issue an emergency order under Section 1431 of the SDWA. (*Id.*) Yet the EPA did not issue its emergency order until seven months later, in January 2016. This is one reason why the holding in *Myers* does not require dismissal in this case.

Another difference is that in *Myers*, the Sixth Circuit found that the risk of explosion "was constant," explicitly rejecting the idea that an unreported safety violation over time necessarily resulted in an "increased risk of harm" merely because the **\*621** probability of an explosion increased each day. 17 F.3d at 902. Conversely, the dangers of consuming lead are not constant and certainly accumulate over time. Indeed, the harm to Plaintiffs increased every day they drank, fed their babies formula made with contaminated water, and took showers in lead and bacteria-infested water. This case is not about a "constant harm" as the Sixth Circuit found in *Myers*, but instead demonstrates an increased risk of harm to Plaintiffs as each day passed. In this way, the EPA's role is similar to that of other Defendants in the Court's prior Flint Water Cases who were not alleged to have caused the Flint Water Crisis (by authorizing the switch to Flint River Water), but acted in ways that increased the harm to Flint citizens. Defendant Gerald Ambrose, for example, took over as Emergency Manager in the midst of the crisis, and despite knowing of the dangers, never ordered the City to stop using Flint River Water. *In re Flint Water Cases*, 960 F.3d 303, 325–26 (6th Cir. 2020). Defendant Bradley Wurfel was similarly not part of the decision to switch Flint's water source, but the Sixth Circuit held that he could be liable for knowing of the harm plaintiffs faced and taking steps to deceive them into thinking that their water was safe. *Id.* at 329.

*Myers* is similar to this case in one respect. The Sixth Circuit explained that the government could be held liable for injuries if, by undertaking to monitor "compliance with federal safety regulations, and by subsequent negligence in the course of that monitoring, the MSHA inspectors make the mine less safe than it otherwise would have been." 17 F.3d at 902. This is exactly what Plaintiffs plausibly allege here: That the EPA contributed to the Flint Water Crisis by making the water less safe than it otherwise would have been. Every passing day that the EPA knew of the high lead levels in the water, but did not take appropriate action, resulted in increased contaminates being extracted from water pipes, hot water tanks, and dishwashers, and ultimately being ingested, harming Plaintiffs and their property. (ECF No. 315-1, PageID.11838–11839.) The longer untreated water flows through pipes and into homes, the more the lead levels increase. (*Id.* at PageID.11847.) Also, as set forth below, *see* Part IV.A.v., the harm resulted in part because the EPA encouraged Plaintiffs' reliance on its role in inspecting and supervising the water quality in Flint. The EPA encouraged this reliance by responding to individual citizen complaints and even going to citizens' homes to conduct independent water testing. (*Id.* at PageID.11841, 11845.) Plaintiffs also allege that the EPA made a public statement in July of 2015 that it would work with the MDEQ and City of Flint to deal with the "lead contamination issues and to ensure that Flint's drinking water meets federal standards." (*Id.* at PageID.11849.) Plaintiffs have plausibly alleged that they suffered increased harm because they relied on the EPA for oversight and intervention.

#### iv. Section 324A(b) Undertaking to Perform a Duty Owed to a Third Person

The "undertaking to perform a duty" alternative theory of relief set forth in Section 324A(b), requires Plaintiffs to allege that the EPA "has undertaken to perform a duty owed by the other to the third person." Restatement § 324(A)(b). Here, Plaintiffs allege that the EPA undertook to fulfill the duty owed to Plaintiffs by the MDEQ. Specifically, Plaintiffs argue that the EPA provided services in testing, evaluating, water sample collection and analysis, as well as technical and supervisory services to the City of Flint, and that these were all the duties required of the MDEQ.

**\*622** The United States' main argument here is that under the SDWA, because Michigan is a primacy state, the MDEQ retains primary enforcement responsibility for the public water system in Flint, which negates any possibility that the EPA undertook duties that the MDEQ owed to Plaintiffs. The United States compares this case to the Sixth Circuit's decisions in *Myers* and *Raymer*, both of which held that federal mine inspectors did not owe a duty to mine owners or miners under the Mine Safety and Health Act. *Myers*, 17 F.3d at 903; *Raymer*, 660 F.2d at 1143–44 ("The mine operator's duty to the miners to maintain safe conditions was unaffected by the 1969 Act and the mine inspectors did not assume this duty.") In *Myers*, the court found that the plain language of the statute made clear that "inspections performed by MSHA are for the purpose of ensuring that Grundy and the miners comply with their duties, not for the purpose of relieving them of those duties." 17 F.3d at 903.

The Safe Drinking Water Act, in contrast to the Federal Mine Safety and Health Act, does not serve to merely ensure that states comply with their duties. As the Sixth Circuit found in *Mays*, another Flint Water case, "the EPA retains the ability to intervene when a state with primary enforcement authority fails to meet the requirements to maintain such authority." *Mays v. City of Flint*, 871 F.3d 437, 447 (6th Cir. 2017)

(citing 40 C.F.R. § 142.17(a)(2)). Even though the *Mays* court found that under similar facts, "Michigan was so governing itself when the alleged actions and inactions giving rise to the Plaintiffs' claims occurred," *id.,* does not mean that the EPA had not begun to undertake some of the MDEQ's duties.

**[19]** The SDWA's framework is one of "cooperative federalism." *Mays,* 871 F.3d at 447. In order for the MDEQ to obtain primacy in the first place, the EPA Administrator had to "delegate any of his functions under [the statute] (other than prescribing regulations) to any officer or employee of the Agency." 42 U.S.C. § 300j-9. The EPA retains authority to step in, as well as to reassume primary authority. *See* 42 U.S.C. § 300g-2(a) ("a State has primary enforcement responsibility for public water systems during any period for which the Administrator determines" several criteria are met); 40 C.F.R. § 142.17(a)(2) ("When, on the basis of the Administrator's review or other available information, the Administrator determines that a State no longer meets the requirements [to remain a primacy state] the Administrator shall initiate proceedings to withdraw primacy approval."). This is another way in which the SDWA is unlike the MSHA in *Myers* and *Raymer*—the federal mine inspectors cannot step in a seize a mine.

Even though the MDEQ had primacy during the relevant time period, Plaintiffs plausibly allege that under the SDWA, the EPA began undertaking some of the MDEQ's duties to Plaintiffs. For example, it began monitoring lead test results from Flint (ECF No. 315-1, PageID. 11844), doing independent investigations of citizens' lead levels in their homes (*id.* at PageID.11845), supervising a service line replacement of a home with high lead levels (*id.* at PageID.11846), and offering additional technical assistance to managing the water quality issues in Flint. (*Id.*) The fact that the EPA began strategizing with the MDEQ about how to respond to (and even downplay) the public health crisis to the media and independent investigators also plausibly suggests more than mere supervisory involvement. (*Id.* at PageID.11851–11853.)

### v. Section 324A(c) Reliance

**[20]** Under the reliance alternative set forth in Section 324A(c), Plaintiffs must **\*623** "show justifiable, detrimental reliance." *Myers,* 17 F.3d at 903. The detrimental reliance must have induced Plaintiffs "to forgo other remedies or precautions against the risk." *Id.* (citing Restatement § 324A

cmt. e. (1965)). For the reasons set forth below, Plaintiffs allege sufficient facts to plead reliance under the Good Samaritan doctrine.

The United States argues that Plaintiffs could not have reasonably relied upon the EPA to protect them from harm during the Flint Water Crisis. (ECF No. 300, PageID.8573.) This is because the SDWA places primary responsibility for compliance onto the City of Flint and the State of Michigan, and so it would be unreasonable for Plaintiffs to rely upon the EPA. (*Id.*) Plaintiffs contend that their reliance was reasonable and that it was not only Plaintiffs who relied upon the EPA, but also the City of Flint and MDEQ. (ECF No. 305, PageID.9908–9909.)

First, Section 324(A)(c) has a broader view of reliance than the United States suggests. This is because harm can be suffered because "of reliance of the other or the third person upon the undertaking." Restatement § 324(A)(c). Thus, either the Plaintiffs or the "other"—the City of Flint or MDEQ— may have detrimentally relied on the EPA under the Good Samaritan doctrine. Plaintiffs contend that the MDEQ and the City of Flint relied on the EPA's conduct and inaction "as a basis for assuring Plaintiffs that the water was safe and they could continue to drink it, because EPA was not issuing any emergency order, was not warning the public and had not advised anyone that the state and city were violating the LCR." (ECF No. 305, PageID.9909.) Plaintiffs have sufficiently alleged here that the MDEQ and the City of Flint detrimentally relied on the EPA, and that this reliance harmed Plaintiffs.

Plaintiffs also assert that they reasonably relied on the EPA to their detriment. The United States argues that under *Myers,* it was unreasonable for Plaintiffs to have relied on the EPA. In *Myers,* the Sixth Circuit found that because federal mine inspectors did not have primary responsibility over mine safety under the relevant statute, "the government employees [were] mere observers, monitoring the actions of others." *Myers,* 17 F.3d at 904. The Sixth Circuit set forth an "actor/ monitor dichotomy" to determine whether "the government employees were active participants, providing services to others" or "mere observers." *Id.*

The United States argues that the SDWA is like the Federal Mine Safety and Health Act at issue in *Myers* where the court found that "[i]n light of the clear Congressional purpose to ensure that the primary responsibility for safety remains with the mine owners and miners ... such reliance—even

had it occurred—would have been manifestly unreasonable and unjustified." *Id.* (citing *Moody v. United States*, 774 F.2d 150, 157 (6th Cir. 1985)). But as explained above, *see* Part IV.A.iv., in passing the SDWA, Congress never intended to leave compliance entirely to the states, and instead it built in federal oversight for our nation's drinking water. As Plaintiffs argue, it is unreasonable to think that citizens have any primary responsibility over the safety of their drinking water. (ECF No. 305, PageID.9909.) No average citizen could be expected to understand the chemistry of Flint's water. Moreover, even though citizens complained about the smell and taste of their water, the threats of lead and dangerous bacteria are practically invisible. (*Id.*)

The EPA also took actions that went beyond that of "mere observers, monitoring the actions of others." *Myers*, 17 F.3d at 904. From Plaintiffs' complaint, it is **\*624** clear that the EPA played an active role since at least early 2015. For example, the EPA undertook to respond directly to citizen complaints. (ECF No. 315-1, PageID.11839–11842, 11844.) The EPA also worked with the MDEQ and City of Flint collaboratively. It provided services in testing and evaluating water samples along with providing technical and consulting services to the MDEQ and City of Flint. (*Id.* at PageID.11845–11848.) In fact, Plaintiffs allege that on July 10, 2015, EPA Region 5 Director Hedman "issued a press statement which stated in part that the 'EPA will work with the Michigan DEQ and the City of Flint to verify and assess the extent of lead contamination issues and to ensure that Flint's drinking water meets federal standards.' " (*Id.* at PageID.11849.)

Plaintiffs also allege that they relied to their detriment on the EPA, causing them "to forgo other remedies or precautions against the risk." *Myers*, 17 F.3d at 903. For example, citizens of Flint submitted complaints directly to the EPA, which the EPA did not timely investigate. Plaintiffs allege that if a timely investigation had happened, "a violation of environmental law would have been detected and City of Flint would have been required to implement corrosion control treatment or to develop another remedy to prevent harm to claimants." (ECF No. 315-1, PageID.11865.) Plaintiffs further contend that the EPA's press officer misled the media when asked whether there was need for a warning to citizens about drinking the water—the EPA "responded that the 'lead monitoring shows Flint has not exceeded the lead action level' and that 'Flint recently accepted EPA's offer to provide technical assistance to the City and MDEQ.' " (*Id.* at PageID.11852.)

It is plausible, given these factual allegations, that the citizens of Flint did not seek other help because the federal government undertook to intervene. By 2015, three levels of government were on the ground in Flint, all claiming that the water situation was under control and the drinking water was safe. This combination of local, state, and federal government oversight is surely enough for citizens "to forgo other remedies or precautions against the risk." *Myers*, 17 F.3d at 903.

**vi. Conclusion**

The United States relies heavily on the Sixth Circuit's opinion in *Myers* to argue that Plaintiffs have not stated a claim under the Good Samaritan doctrine. It is worth stepping back to note that even before the *Myers* court's detailed analysis of the doctrine, the Sixth Circuit held "that the mere failure to detect another's violation of safety regulations, without more, does not give rise to a duty under the good samaritan doctrine." 17 F.3d at 901. Unlike the complaint in *Myers*, Plaintiffs' complaint details much more than a "mere failure to detect another's violation of safety regulations." Plaintiffs allege that the EPA found safety violations and was actively involved with the City of Flint and MDEQ as a lead-contaminated public water supply system persisted for months.

Plaintiffs allege facts sufficient to support state law liability for a similarly situated private individual under the Good Samaritan doctrine. Thus, Plaintiffs have alleged conduct that is within the FTCA, and so the only question remaining is whether an exception to the FTCA applies.

**B. Discretionary Function Exception**

**[21]** The United States argues that Plaintiffs' complaint must be dismissed because all of the alleged conduct falls under the discretionary function exception to the FTCA. The "discretionary function exception" exempts "[a]ny claim ... based upon **\*625** the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The burden of proof is on the United States when invoking exceptions to the FTCA. See *Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982). But if a tort claim falls within an exception, the Court lacks jurisdiction to adjudicate it. See *Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012). The United States' argument is a factual attack

on the Court's subject matter jurisdiction over this case, and as set forth above, *see* Section III, the Court will treat any jurisdictional factual disputes that intertwine with the merits of the case under a Rule 56 standard, viewing "the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc.*, 95 F. App'x at 135 (citing *Skousen*, 305 F.3d at 526).

[22] As the Supreme Court explained, Congress, through the discretionary function exception, "wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The Supreme Court has set forth a two-step test to determine whether a claim falls within the discretionary function exception. *United States v. Gaubert*, 499 U.S. 315, 322–23, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *see also Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012).

[23] [24] The first step to determine whether the discretionary function exception applies is to ask, simply, whether the action or omission was discretionary. This step "requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *Gaubert*, 499 U.S. at 322–23, 111 S.Ct. 1267). As the Supreme Court explained, the "discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

[25] [26] If the challenged action was discretionary, then courts move to the second step of the test: "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23, 111 S.Ct. 1267. Thus, the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954 (citation omitted). The test is objective rather than subjective because the policy considerations need not actually have been considered—the only question is: could they have been considered? *See Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 159 (6th Cir. 2018) (citations omitted). There is also a "strong presumption" that the second prong is satisfied upon finding the first prong satisfied. *A.O. Smith Corp. v.*

*United States*, 774 F.3d 359, 365 (6th Cir. 2014) (citing *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267.)

[27] Before applying the discretionary function test, however, "the crucial first step is to determine exactly what conduct is at issue." *Rosebush*, 119 F.3d at 441 (citing *Autery v. United States*, 992 F.2d 1523, 1527–28 (11th Cir. 1993)). Here, Plaintiffs allege that the United States is liable because the EPA failed to take mandatory **\*626** actions under Sections 1414 and 1431 of the Safe Drinking Water Act in response to the Flint Water Crisis. (ECF No. 315-1, PageID.11859–11861.) Specifically, Plaintiffs claim that the EPA failed to timely investigate, provide technical assistance, obtain compliance, or commence a civil action. (*Id.*) Additionally, Plaintiffs allege that the EPA was negligent in failing to warn Flint's citizens about the hazards presented by Flint's water (*id.* at PageID.11866–11867), and negligent in responding to citizen complaints. (*Id.* at PageID.11865); (ECF No. 305, PageID.9911.)

For the reasons set forth below, the Court concludes that the discretionary function exception does not apply to the EPA's conduct. Under prong one, the Court finds that the EPA had discretion in its actions pursuant to Section 1431, as well as over its choice of whether to warn and how to respond to citizen complaints. The EPA's conduct pursuant to Section 1414, however, was not discretionary and so prong one is not satisfied. But, even if the EPA's conduct under Section 1414 was discretionary, it does not satisfy prong two. As for the EPA's conduct pursuant to Section 1431, its failure to warn, and its negligence in response to complaints, the Court finds that the alleged conduct does not entail the kind of judgment that the discretionary function exception was designed to shield.

### i. Prong One: Was the Action Discretionary?

Plaintiffs contend that the EPA's conduct pursuant to Sections 1431 and 1414 was mandatory, not discretionary. In their response brief, Plaintiffs do not argue that the EPA's conduct in failing to warn or to timely respond to citizen complaints was mandatory for purposes of prong one of the discretionary function exception analysis.[3] Therefore, the Court will only analyze the EPA's conduct pursuant to Sections 1431 and 1414 under this first prong.

### a. Section 1431

[28] Section 1431 of the SDWA provides that the EPA Administrator[4] has the authority, upon learning that the state has not acted to protect the public from a contaminant that is present or likely to enter a public water supply, to issue an emergency order to protect the users of that system. 42 U.S.C. § 300i(a). Plaintiffs argue that this statute, along with a 1991 EPA guidance document, creates a mandatory obligation to act. Section 1431 reads in relevant part:

> [T]he Administrator, upon receipt of information that a contaminant which is present in or is likely to enter a public water system or an underground source of drinking water, or that there is a threatened or potential terrorist attack (or other intentional act designed to disrupt the provision of safe drinking water or to impact adversely the safety of drinking water supplies to communities and individuals), which may present an imminent and substantial endangerment to the health of persons, and that appropriate State and local authorities have not acted to protect the health of such persons, may take such actions as he **\*627** may deem necessary in order to protect the health of such persons. To the extent he determines it to be practicable in light of such imminent endangerment, he shall consult with the State and local authorities in order to confirm the correctness of the information on which action proposed to be taken under this subsection is based and to ascertain the action which such authorities are or will be taking. The action which the Administrator may take may include (but shall not be limited to) (1) issuing such orders as may be necessary to protect the health of persons who are or may be users of such system (including travelers), including orders requiring the provision of alternative water supplies by persons who caused or contributed to the endangerment, and (2) commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction.

42 U.S.C. § 300i(a).

[29] The statute's plain language makes clear that the EPA's decision to act under the statute involves "an element of judgment or choice." *Gaubert*, 499 U.S. at 322, 111 S.Ct. 1267. It provides that Administrators "may take such actions" as they "may deem necessary" to protect public health if there is a contaminate in the public water system and state or local authorities have not acted properly. Moreover, the enumerated actions that the Administrator "may take" are

qualified with the parenthetical "(but shall not be limited to)." 42 U.S.C. § 300i(a). Conduct is discretionary when it involves "an element of judgment or choice," rather than following a " 'federal statute, regulation, or policy specifically prescrib[ing] a course of action' and leaving 'the employee [ ] no rightful option but to adhere to the directive.' " *A.O. Smith Corp.*, 774 F.3d at 364–65 (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954). Here, the Administrator had options that were not congressionally limited to a given course of action.

[30] Plaintiffs contend that the 1991 EPA guidance document, which the EPA issued to provide final guidance regarding Section 1431, shows the mandatory nature of the EPA's responsibility under this section. (ECF No. 305, PageID.9913.) The guidance document directs the EPA to act under Section 1431 if the state's own "action is insufficient and State and local agencies do not plan to take stronger or additional actions to ensure public health protection, in a timely way." (ECF No. 305, PageID. 9913) (citing *Burgess*, No. 17-cv-11218, ECF No. 53.) As a general matter, "agencies are bound to follow their own regulations," *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004), but "[i]nternal operating manuals ... do not carry the force of law, bind the agency, or confer rights." *Reich v. Manganas*, 70 F.3d 434, 437 (6th Cir. 1995); *see also Summit Petroleum Corp. v. U.S. E.P.A.*, 690 F.3d 733, 738 (6th Cir. 2012) ("Before this Court and, it appears, in practice, the EPA styles and regards its guidance memorandums as non-binding, advisory documents."). The Court agrees with Judge Parker's decision in *Burgess* which found that as a whole, the 1991 document "emphasizes the discretionary nature of the agency's actions under this provision." *Burgess*, 375 F. Supp. 3d at 813. Nothing in the guidance document contradicts the facially apparent discretion given to the EPA in Section 1431.

For these reasons, the EPA's conduct under Section 1431 was discretionary for purposes of the first prong of the discretionary function exception analysis.

### b. Section 1414

[31] The EPA's conduct pursuant to Section 1414, by contrast, was not discretionary. The plain text of the statute sets **\*628** forth actions that the EPA must take, and Plaintiffs claim that the EPA did not take those actions. Section 1414 reads in relevant part:

(a) Notice to State and public water system; issuance of administrative order; civil action

(1)(A) Whenever the Administrator finds during a period during which a State has primary enforcement responsibility for public water systems (within the meaning of section 300g-2(a) of this title) that any public water system—

(i) for which a variance under section 300g-4 or an exemption under section 300g-5 of this title is not in effect, does not comply with any applicable requirement, or

(ii) for which a variance under section 300g-4 or an exemption under section 300g-5 of this title is in effect, does not comply with any schedule or other requirement imposed pursuant thereto,

he shall so notify the State and such public water system and provide such advice and technical assistance to such State and public water system as may be appropriate to bring the system into compliance with the requirement by the earliest feasible time.

(B) If, beyond the thirtieth day after the Administrator's notification under subparagraph (A), the State has not commenced appropriate enforcement action, the Administrator shall issue an order under subsection (g) requiring the public water system to comply with such applicable requirement or the Administrator shall commence a civil action under subsection (b).

42 U.S.C. § 300g-3.

For the reasons set forth below, the Court finds that the EPA has a mandatory duty under Section 1414(a)(1)(B). The statute is clear that thirty days after the EPA notifies a state of its non-compliance with the SDWA and the state has not taken appropriate action, the EPA "shall" issue an order or commence a civil action.

The United States first argues that the threshold finding of non-compliance was never met, and so the term "shall" in Section 1414 was never triggered. (ECF No. 300, PageID.8554.) Because this is a factual dispute intertwined with the merits of the case, it is not appropriate to resolve at this time, and so the Court will afford Plaintiffs the procedural safeguards of Rule 56 of the Federal Rules of Civil Procedure, *see Gentek Bldg. Prod.*, 491 F.3d at 330, and the burden of proof is on the United States when it invokes an exception to the FTCA. *Carlyle*, 674 F.2d at 556.

The United States contends that because of ambiguities in the Lead and Copper Rule that existed in 2015, the EPA could not have made a finding of non-compliance to trigger Section 1414's duties. (ECF No. 300, PageID.8554–8555.) But Plaintiffs point to evidence that the EPA did make a finding of non-compliance. For example, on June 24, 2015, the EPA Region 5's Regulation Manager, Miguel Del Toral, issued an interim report detailing five separate violations of the National Primary Drinking Water Regulations by the City of Flint from September 2014 to June 2015. (*Burgess*, No. 17-cv-11218, ECF No. 53-4, PageID. 1931); *see also* (*Burgess*, No. 17-cv-11218, ECF No. 53-9) (final report issued in October 2015 finding six violations ranging from August 2014 to June 2015.) In June 2015, the EPA alerted the MDEQ to these concerns, but it was not until September 2015 that the City began implementing corrosion control treatment. (*Burgess*, No. 17-cv-11218, ECF No. 39-15, PageID.1295.) Lead and Copper Rule ambiguities aside, there is a genuine issue of fact about whether the EPA found non-compliance "with any applicable **\*629** requirement" of the SDWA. 42 U.S.C. § 300g-3.

Plaintiffs argue that the findings of non-compliance may have occurred even earlier than June 2015. For example, the EPA was aware of the high lead levels in a Flint home in February 2015 and there was an email exchange between the EPA and MDEQ about these issues. (*Burgess*, No. 17-cv-11218, ECF No. 53-2.) MDEQ official Stephen Busch told the EPA that the City of Flint had an optimized corrosion control program in place (*id.*, at PageID.1919), but in April of 2015, the EPA learned through MDEQ official Patrick Cook that the MDEQ had lied about these corrosion control measures. (*Burgess*, No. 17-cv-11218, ECF No. 53-3.) The EPA then watched as the MDEQ and City of Flint continually hid the potential lead exposure from the public; in fact, on July 9, 2015, the Flint mayor told residents in a press conference that their water was safe to drink. (*Burgess*, No. 17-cv-11218, ECF No. 53-25, PageID.2098.) Finally, in September 2015, the City of Flint issued a formal health advisory and initiated corrosion control. There is a genuine issue of fact as to whether the EPA notified the MDEQ of non-compliance and more than thirty days passed without the MDEQ taking appropriate enforcement action.

Plaintiffs raise a genuine issue of material fact as to whether the threshold requirements of Section 1414 were met. If the threshold was met, the EPA was to either issue an order or commence an action, but the EPA did neither. Doing

neither of these two statutory directives cannot be considered discretionary for purposes of the discretionary function test.

Consider the following. Congress passes a statute that requires an agency to take option A or option B if there is a finding of grave danger. Though the statute mandates one of two agency responses, it provides discretion for the agency to choose between A and B. But what if the agency finds there is grave danger and chooses Option C? Congress did not give the agency the choice to select Option C. It is therefore not a proper option for the agency to take. Choosing Option C cannot be considered "discretionary" even though the statute provides for two other options. The discretionary function exception cannot protect an agency's decision to ignore a mandatory statutory directive and instead choose an option that Congress did not authorize.

Similarly, here Congress set forth two options for the EPA to take upon finding that a State was not complying with the Safe Drinking Water Act. According to Plaintiffs, the EPA chose neither of these two options. That was not a permissible choice, and the discretionary function exception cannot be manufactured to protect a non-prescribed choice in the face of a congressional mandate.

 **[32]**  As the Supreme Court explained, "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267. Conversely, "[i]f the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Id.* Here, part of Section 1414 provides a mandatory regulation, and Plaintiffs allege that the EPA violated that mandatory regulation.

The United States argues that even though Section 1414 uses the term "shall," the statute remains discretionary. It points to Supreme Court decisions like **\*630** *Heckler v. Chaney*, where the Court held that even though the text of an Act indicated that violators of that Act "shall be imprisoned," the agency still had discretion over whether to recommend prosecution. 470 U.S. 821, 835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In *Chaney*, inmates on death row sued to require the Food and Drug Administration ("FDA") to take enforcement action to prevent drugs from being used in lethal injections. *Id.* at 823–24, 105 S.Ct. 1649. The FDA refused to act, contending it had inherent discretion not to act.

*Id.* The plaintiffs argued that the use of "shall" in the statute mandated "criminal prosecution of every violator of the Act." *Id.* at 835, 105 S.Ct. 1649. But the Court found "no indication in case law or legislative history that such was Congress' intention in using this language, which is commonly found in the criminal provisions of Title 18 of the United States Code." *Id.* The Supreme Court was "unwilling to attribute such a sweeping meaning to this language." *Id.* Thus, the Court held that the FDA's decision not to act was an unreviewable act of prosecutorial discretion. *Id.* at 837–38, 105 S.Ct. 1649.

Although the Supreme Court in *Chaney* held that there was a presumption that agency decisions not to take enforcement actions are unreviewable, the Court also said that "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33, 105 S.Ct. 1649. Thus, the presumption can be overcome if Congress indicates that a decision or action is not discretionary. Analysis of the structure and legislative history of the Safe Drinking Water Act leads the Court to conclude that Section 1414 creates mandatory enforcement duties for the EPA.

 **[33]**  The term "shall" in a statute generally denotes a mandatory duty, *Alabama v. Bozeman*, 533 U.S. 146, 153–54, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), but use of "shall" is not conclusive, because sometimes "shall" is the equivalent of "may." *Richbourg Motor Co. v. United States*, 281 U.S. 528, 534, 50 S.Ct. 385, 74 L.Ed. 1016 (1930). The question of whether "shall" commands or merely authorizes action is determined by the objectives of the statute. *Escoe v. Zerbst*, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935).

First, comparing Sections 1431 and 1414 reveals that the EPA's alleged conduct under Section 1414 may not be shielded by the discretionary function exception. Unlike Section 1431 which sets out actions the Administrator "may" take, the language under Section 1414 uses the term "shall." Moreover, Section 1414 does not contain the same parenthetical "(but shall not be limited to)" as Section 1431(a). In Section 1414, when the Administrator finds that a state is not complying with the SDWA, the statute makes clear that the Administrator has two options: issue an order or commence a civil action. There are no other options. And this makes good sense. Afterall, it is our nation's drinking water that is the subject of this law.

The legislative history of the Safe Drinking Water Act also supports this view. The SDWA was first amended and

reauthorized in 1986. At that time, Congress amended Section 1414, changing the verb authorizing enforcement action from "may" to "shall":

> (2) Section 1414(a)(2) of the Safe Drinking Water Act is amended by striking the words "he may commence a civil action under subsection (b)" and substituting the following: "the Administrator shall issue an order under subsection (g) requiring the public water system to comply with such regulation or requirement or the Administrator shall commence **\*631** a civil action under subsection (b)".

Safe Drinking Water Act Amendments of 1986, S. 124, 99th Cong. § 202 (1986). This textual change indicates the congressional intent to require the EPA to bring enforcement actions under certain conditions. Moreover, the Conference Report explained that this change to Section 1414 was to "require" the Administrator to take action:

> The Senate bill amends section 1414 of the Act to ... (2) *require* the Administrator to either to issue an order or institute a judicial action against a public water system in violation when the delegated State authority does not take appropriate enforcement action within 30 days of notification.

H.R. Rep. No. 99-575, at 9451 (1986) (emphasis added).

Moreover, during the 1986 amendment, Congress added the EPA's thirty-day response timeline if a state had not acted in response to being notified it was in violation of the SDWA:

> (b) PROMPT FEDERAL ENFORCEMENT.—(1) Section 1414(a)(1)(B) of the Safe Drinking Water Act is amended to read as follows: '(B) If, beyond the thirtieth day after the Administrator's notification under subparagraph (A), the State has not commenced appropriate enforcement action ...'

Safe Drinking Water Act Amendments of 1986, S. 124, 99th Cong. § 202 (1986). The addition of a timeline and use of the term, "prompt federal enforcement" also signal the mandatory nature of Section 1414's enforcement actions. The changes indicate Congress' desire for federal oversight and prompt enforcement of the Safe Drinking Water Act.

In *Burgess*, Judge Parker found that Sixth Circuit precedent supports the discretionary nature of Section 1414. However, the discretion Judge Parker identified comes at an earlier point in the statute and is not at issue in this analysis. For example, under Section 1414, the EPA Administrator has discretion to decide what "advice and technical assistance ... may be appropriate to bring the system into compliance" and

what "the earliest feasible time[ ]" was to reach compliance. 42 U.S.C. § 300g-3(a)(1)(A). But, as set forth above, once the EPA found non-compliance with the SDWA, notified the State, and the State had not "commenced appropriate enforcement action" within thirty days, the EPA was to take mandatory action.

This mandate is what distinguishes the present case from *Myers*, 17 F.3d 890. In *Myers*, the Sixth Circuit held that inspectors from the Mine Safety and Health Administration had discretion because their statutory instructions followed an " 'if/then' logical structure" that required the inspectors to make preliminary assessments involving judgment prior to acting. *Id.* at 895. The court held that decision of whether the "predicate condition exists" involved sufficient discretion to satisfy the first prong of the discretionary function test even though the outcome of the preliminary assessment mandated specific corresponding next steps. *Id.* The Sixth Circuit said it was "[t]his requirement of an antecedent assessment or determination presents the MSHA official or inspector with a *choice*; does the condition exist or doesn't it? This choice is sufficient to satisfy the first prong of the [discretionary function exception analysis]." *Id.* at 896. But the EPA's conduct under Section 1414 statute is not like the MSHA inspectors' conduct in *Myers*. Even though some of Section 1414 had predicate conditions to be met, Plaintiffs claim that those conditions had already been met and so the discretionary part of the statute had already been fulfilled when the EPA notified the **\*632** MDEQ of non-compliance. New mandatory duties were triggered once the MDEQ was notified and did nothing after thirty days.

The Sixth Circuit in *Myers* identified a key factual difference that distinguishes the present case:

> Plaintiffs do not contend, for instance, that MSHA inspectors actually found safety violations in the Grundy mine but then failed to take the required action. Rather, plaintiffs contend that the MSHA inspectors should have found, but failed to find, the existence of certain safety violations and, if they had, the deaths of these miners would have been prevented.

*Id.* at 897. Unlike in *Myers*, Plaintiffs are not suing the United States for the EPA's failure to *identify* safety hazards, but rather the failure to take mandatory action once those hazards were identified. In fact, the Sixth Circuit distinguished *Myers* from *Collins v. United States*, where the Fifth Circuit held the discretionary function exception inapplicable to claims arising when MSHA inspectors failed to follow the statute after determining that the predicate condition had been met.

*Id.* at 897 fn.7 (citing *Collins v. United States*, 783 F.2d 1225, 1230–31 (5th Cir. 1986)) ("The [*Collins*] court correctly noted that, once the initial assessment had been made, the MSHA officials had an absolute duty to reclassify the mine and their failure to do so was not a protected exercise of policy discretion.") Here, Plaintiffs contend that the EPA found violations of the SDWA and then failed to take required action.

**[34]** *Myers* does not and cannot stand for the proposition that if Congress mandates action but provides an agency with two options, that this very choice immunizes the agency when it chooses a third "option" not given by Congress. Such a broad reading of *Myers* would serve to eviscerate liability under the discretionary function exception to the FTCA any time Congress mandates more than one course of action. As the Sixth Circuit said in *Myers*, "[t]he greatest limitation upon the government's liability under the FTCA is not, and was not intended to be, the discretionary function exception. Rather, the principle limitation is that, for the government to be liable, state law must provide for private liability under similar circumstances." *Myers*, 17 F.3d at 905. The rationale behind excluding from immunity under the discretionary function exception conduct which violates mandatory safety standards is obvious here. Once Congress, having balanced economic, social, and political policy considerations, adopts safety standards in the form of specific and mandatory regulations or policy, employees do not have discretion to violate these standards.

The Court concludes that, because relevant portions of Section 1414 require the EPA to take specific actions, the first prong of the discretionary function exception test has not been satisfied by the United States for the EPA's alleged conduct under Section 1414. Because the first prong has not been established, the Court need not address the second prong. However, as explained below, even under the second prong, the United States' argument fails.

### ii. Prong Two: Whether the Challenged Actions were Grounded in the Policy of the Regulatory Regime

The second prong of the discretionary function exception test asks "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322–23, 111 S.Ct. 1267 (citations omitted) The discretionary function exception "protects only governmental actions and decisions based on considerations of public policy," *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954, and **\*633** there is a "strong presumption" that the second prong is satisfied upon finding that the first prong is satisfied. *A.O. Smith Corp.*, 774 F.3d at 365 (citing *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267). The focus of the inquiry is not on the government employee's subjective intent in exercising discretion, but on the objective nature of the actions taken and whether they are susceptible to policy analysis. *Gaubert*, 499 U.S. at 324–25, 111 S.Ct. 1267. Therefore, the Court must decide "if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954. When "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," the discretionary function exception is inapplicable. *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267.

**[35]** The United States argues that the EPA's decisions about whether and how to respond to the Flint Water Crisis are all susceptible to policy analysis. The United States contends that the EPA was balancing multiple and competing policy considerations during the Flint Water Crisis, such as the SDWA's goal of cooperative federalism, the effectiveness of state and local authorities in protecting the health of their citizens, and the short and long-term effects of any actions on the relationship between the EPA and primacy State. (ECF No. 300, PageID.8560–8561.)

Plaintiffs argue that the EPA's decisions, in the face of continued safety hazards, were not the kind of judgments that the discretionary function exception was designed to shield. Specifically, Plaintiffs contend that the EPA's decisions not to act under Sections 1414[5] and 1431 of the SDWA do not fall under the discretionary function exception. Further, the EPA's failure to warn Flint's citizens about the hazards of drinking and bathing in lead-tainted and bacteria-infested Flint River water and its failure to timely and adequately respond to citizen complaints were not the types of decisions that the exception was designed to shield.

The EPA's lack of regulatory action under Section 1414 and delayed action under Section 1431 of the SDWA are not the kinds of "conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267. The SDWA's framework is one of cooperative federalism, which authorizes the EPA to request information, take independent enforcement actions, and revoke state primacy when states do not implement the SDWA with the stringency required by federal law. *See, e.g.*,

42 U.S.C. § 300g–3; 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 142.17(a)(2), 142.19, 142.30, 142.34. If a state is in violation of federal drinking water standards, the EPA is empowered and required to intervene. The EPA's continued inaction in the face of an environmental crisis is not the kind of conduct that is grounded in the policy regime of the SDWA. As Judge Parker's decision in *Burgess* highlights:

> In passing the SDWA, Congress intended to leave the primary responsibility for overseeing public water systems with the States. However, Congress sought to set national standards for compliance 'to assure that water supply systems serving the public meet minimum national standards for protection of public health' and to empower the federal government to intervene if States fail in their primary responsibilities. Federalism and the efficient use of federal and state **\*634** resources were policy considerations that factored into devising the regulatory scheme and establishing conditions for the federal government's intervention. Nevertheless, Congress expressly directed the EPA to intervene under specified conditions. In other words, having weighed varying policy interests, Congress decided when federal intervention is necessary.

*Burgess*, 375 F. Supp. 3d at 815 (internal citations omitted). As the EPA Office of Inspector General's report makes clear, the EPA did not take action that it was authorized to take and should have taken upon finding that the City of Flint was in violation of several Federal Drinking Water Standards. (*Burgess*, No. 17-cv-11218, ECF No. 60-1, PageID.2325–2335.)

The EPA's actions and inactions—after learning that the City of Flint and the MDEQ were severely out of compliance, MDEQ and Flint officials were lying to EPA staff, and Flint's water was poisoning Flint's citizens—cannot be said to be grounded in, or calculated to advance, the policies of the SDWA, or any reasonable or legitimate public policy. As the OIG report concluded, "[t]he Flint water crisis demonstrates that public health is not protected when EPA regional staff—with multiple warning signs—do not use the agency's SDWA authorities in conjunction with EPA oversight tools." (*Id.* at PageID.2334.)

As Judge Parker found in *Burgess*, the EPA's decisions in Flint involved professional and scientific judgments, not multiple and competing policy considerations. 375 F. Supp. 3d at 814. So, for example, once there was a finding of lead levels dramatically over the federal limit and the state was not taking appropriate action, under the SDWA, the EPA should have

intervened. *Cf. Boler v. Earley*, 865 F.3d 391, 404 (6th Cir. 2017) ("The language of the SDWA centers on instructions to the EPA to establish the requirements for national drinking water standards. *See* 42 U.S.C. § 300g-1. Its provisions set out standards identifying particular contaminants selected for regulation and establishing maximum levels that limit the amount of those specified contaminants permitted in public drinking water systems. *See id.* § 300g-1(b). The statutory language also specifies the time frame for the EPA's promulgation of regulations, the use of science in the EPA's decisionmaking, and the technology by which public systems should achieve compliance with the standards.")

**[36]** As the Ninth Circuit has found, "matters of scientific and professional judgment—particularly judgments concerning safety—are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. United States*, 400 F.3d 1177, 1181–83 (9th Cir. 2005) (explaining that the government's duty to clean up toxic mold "involves professional and scientific judgment, not decisions of social, economic, or political policy"); *see also Andrulonis v. United States*, 952 F.2d 652 (2d Cir. 1991) (federal scientist's failure to warn of the hazards associated with rabies vaccine did not implicate any policy of the federal agency); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 583 F. Supp. 2d 758, 782–84 (E.D. La. 2008) *aff'd in part sub nom. In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Louisiana Plaintiffs)*, 713 F.3d 807 (5th Cir. 2013) (concluding that FEMA's response after learning of unsafe levels of formaldehyde in temporary housing provided to hurricane victims was guided by fear of litigation which was not a permissible policy choice).

The Sixth Circuit's decision in *Anestis v. United States*, 749 F.3d 520 (6th Cir. 2014), reflects the general principle that **\*635** scientific and professional judgments are not the types of decisions that are susceptible to policy analysis. In *Anestis*, the court held that the "determination of a healthcare professional or an in-take clerk as to the emergency state of a patient would not involve a consideration of public policy" because it was a medical decision. *Id.* at 529. Similarly, the EPA's conduct and inaction under SDWA 1414 and 1431 involved matters of scientific and professional judgment that were not susceptible to policy analysis.

The United States also argues that none of the cases related to matters of scientific and professional judgement concern an agency's decisions on how to deal with a third party's actions. (ECF No. 300, PageID.8560.) It is true that these

cases involve one government agency tasked with making a professional determination. But that fact is not dispositive here because as explained more fully in Part IV.A.iv, the EPA was not just a third party. As the OIG report explains, "[t]he EPA retains the authority and responsibility to oversee states with primacy over their drinking water programs. The EPA is empowered and required to intervene when states do not fulfill their responsibilities." (*Burgess*, No. 17-cv-11218, ECF No. 60-1, PageID.2325.) One of the SDWA's features is that it allows the federal government to intervene when a local government fails to protect its citizens from unsafe drinking water. *See* 42 U.S.C. § 300g–3; 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 142.17(a)(2), 142.19, 142.30, 142.34 (detailing mandatory EPA intervention in the form of notifications, advice, technical assistance, enforceable orders and inspections to bring water systems into compliance with federal standards, and removal of primacy).

The United States contends that the Sixth Circuit's decision in *Lockett v. United States*, 938 F.2d 630 (6th Cir. 1991) is on point and shows that the EPA's decisions in Flint were discretionary. In *Lockett*, the plaintiffs alleged that the EPA acted negligently in failing to initiate a clean-up action upon discovery that a hazardous waste site was contaminated with a dangerous substance, polychlorinated biphenyl ("PCB"), which are chemicals subject to federal regulation under the Toxic Substance Control Act ("TSCA"). Twenty plaintiffs lived near a scrap yard which had electronic transformers that could produce high levels of PCBs. The EPA learned that the site had detectable levels of PCBs in 1981, but a later inspection did not reveal sufficient evidence to show that PCBs were an issue. In 1986, after another field test revealed high levels of PCB, the EPA took action to clean up and notify the public. Plaintiffs filed suit for failure to warn or act earlier in 1981 when detectable levels of PCB were first discovered. The EPA's reasons for not intervening were that it "lacked sufficient evidence" to find a safety violation, it determined that further study was appropriate, and that there was another environmental risk at the time that required more attention. *Id.* at 638. In reviewing the EPA's policy considerations, the court found them to be protected "discretionary decisions, based upon 'judgment calls' concerning the sufficiency of evidence of violations of applicable regulations, the allocation of limited agency resources, and determinations about priorities of serious threat to public health." *Lockett*, 938 F.2d at 639.

The United States argues that similar to *Lockett*, EPA Region 5 faced questions about the sufficiency of evidence to conclude that a regulatory violation occurred in Flint, and

also uncertainty about whether the Lead and Copper Rule provided an unambiguous basis for formal enforcement. The United States also argues that as in *Lockett*, "the allocation of limited agency resources and determinations about priorities **\*636** were implicated for Flint, which is one of over 10,000 public water systems under MDEQ's jurisdiction in Michigan and additional tens of thousands of water systems in states and tribes throughout Region 5." (ECF No. 300, PageID.8559.)

But *Lockett* is distinguishable. The situation in Flint was not just a detected safety violation, but a public health crisis. In *Lockett*, the EPA did not intervene in 1981, in part, because although PCB levels were detected, a later inspection did not reveal sufficient evidence to show that the TSCA was violated. *Lockett*, 938 F.2d at 638. By contrast, in Flint the EPA grew increasingly concerned and confident that the people of Flint were at risk of lead poisoning throughout the spring and summer of 2015. For example, in a June 2015 email from Del Toral to Rita Bair, the Region 5 Branch Chief of the Ground Water and Drinking Section, Del Toral reported Flint's alarming lack of corrosion control and lead levels, telling Bair:

> [T]he State is complicit in this and the public has a right to know what they are doing because it is their children that are being harmed. At a MINIMUM, the City should be warning residents about the high lead, not hiding it telling them that there is no lead in [the] water. To me that borders on criminal neglect.

(*Burgess*, No. 17-11218, ECF No. 53-6, PageID.1942.)

Moreover, the Inspector General for the EPA found that "[w]hile Flint residents were being exposed to lead in drinking water, the federal response was delayed, in part, because the EPA did not establish clear roles and responsibilities, risk assessment procedures, effective communication and proactive oversight tools." (*Burgess*, No. 17-cv-11218, ECF No. 60-1, PageID.2306.) Unlike *Lockett*, here there is a genuine issue of material fact that the EPA's inaction during crucial moments in the Flint Water Crisis was not due to policy considerations, but rather due to mismanagement and a breakdown in communication. Painting policy considerations over these actions with a broad brush does not turn them into the type of decision that Congress intended to shield under the discretionary function exception. Such "challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267, where the regulatory regime is the Safe Drinking Water Act.

The EPA's responses to citizen complaints are not shielded by the discretionary function exception. As Judge Parker's decision in *Burgess* concluded, even though the EPA's decision about "whether and how to respond to citizen complaints was discretionary," "once the Government decided to act, it was required to do so without negligence." *Burgess*, 375 F. Supp. 3d at 816 (citing *Wysinger v. United States*, 784 F.2d 1252, 1253 (5th Cir. 1986); *Whisnant*, 400 F.3d at 1182–83); *cf. Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (explaining that the "Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated" to do so without negligence).

Within a month of the switch of the water source to the Flint River, the EPA started receiving citizen complaints from Flint residents about the water. (*Burgess*, No. 17-cv-11218, ECF No. 37-5, PageID.965–968.) Jennifer Crooks, the EPA Program Manager who was responsible for hearing complaints on behalf of EPA, attested that she had never received as many citizen complaints since she started working for EPA in 1987 as she did from **\*637** Flint residents after the water switch. (*Id.*) She received around 100 complaints overall. (*Id.* at PageID.967.) The EPA began responding to some citizen complaints, but did so in an untimely manner, given the alarming content and number of complaints. When the EPA did respond, it did so in ways that downplayed the urgency of the situation in Flint and may have induced detrimental reliance on the EPA. For example, in responses to citizen complaints in February and March 2015, the EPA's Water Division Director reported that despite the City of Flint's earlier violations of the SDWA, that the City was now in compliance. (*Burgess*, No. 17-cv-11218, ECF No. 53-11, PageID.1958; ECF No. 53-13, PageID.1962.)

As the court found in *In re FEMA Trailer Formaldehyde Products Liability Litigation*, the discretionary function exception did not apply to Plaintiffs' claims regarding FEMA's alleged negligent conduct in responding to complaints and concerns of formaldehyde in the temporary housing provided after Hurricane Katrina. 583 F. Supp. 2d at 783 ("[L]ike in the *Indian Towing* case, the government undertook in its discretion to provide a service ... [and its] decision to, at least for a time, ignore potential health concerns associated with this alternative housing [ ] did not involve any permissible exercise of policy judgment.") Although *In re FEMA Trailer Formaldehyde Products Liability Litigation*

is out of circuit, the decision is instructive because both cases involve the government's alleged negligent response to citizen complaints involving large-scale public health concerns. Upon consideration of these cases and the facts as set forth above, the Court finds there are genuine issues of material fact as to whether the EPA's actions in responding to citizen complaints were grounded in policy.

[37] [38] As for the EPA's failure to warn citizens, the United States argues that under Sixth Circuit precedent, the EPA's decisions involved policy considerations and are therefore shielded. It is true that the following types of decisions "are generally shielded from tort liability by the discretionary function exception: (1) 'the proper response to hazards,' (2) 'whether and how to make federal lands safe for visitors,' and (3) 'whether to warn of potential danger.' " *Edwards v. Tennessee Valley Auth.*, 255 F.3d 318, 324 (6th Cir. 2001) (quoting *Rosebush*, 119 F.3d at 443). Yet the Sixth Circuit has also cautioned that to the extent that their "opinions may be read to suggest that failure-to-warn claims categorically satisfy the discretionary function exception ... we decline to endorse that position." *A.O. Smith Corp.*, 774 F.3d at 369. The discretionary function exception analysis is "*ad hoc*" because it "depends on the facts of each case." *Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989) (citation omitted).

Events like the Flint Water Crisis are rare in the United States, let alone within the Sixth Circuit. To find adequate analogies in legal precedent, the Court must look to out-of-circuit precedent for guidance. The First Circuit recognized that there are some decisions that "may pass a threshold of objective unreasonableness such that no reasonable observer would see them as susceptible to policy analysis." *Hajdusek v. United States*, 895 F.3d 146, 152 (1st Cir. 2018). Likewise, the Third Circuit noted that federal officials "could be aware of a safety hazard so blatant that its failure to warn the public could not reasonably be said to involve policy considerations." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 340 n.6 (3d Cir. 2012). Contrary to what the United States argues, these cases do not contradict Sixth Circuit precedent (ECF No. 300, PageID. 8560), because the Sixth Circuit has not **\*638** yet decided a case where a safety hazard was so blatant that any policy considerations mustered in support of inaction were unreasonable.

### iii. Conclusion

The Court finds that the United States has not carried its burden to show that the EPA's actions and inactions in Flint pursuant to the SDWA Sections 1414 and 1431 are shielded by the discretionary function exception. Further, the EPA's failure to warn Flint citizens about the lead and dangerous bacteria that was in their water for months, and its allegedly negligent responses to citizen complaints, are not the kinds of decisions that the discretionary function exception was designed to shield.

### C. Misrepresentation Exception

[39] [40] [41] The United States contends that to the extent Plaintiffs' claims involve reliance on the EPA's misrepresentations, these claims are barred under the FTCA's "misrepresentation" exception. *28 U.S.C. § 2680(h)*. Such immunity would bar claims arising out of negligent as well as willful misrepresentation. *United States v. Neustadt, 366 U.S. 696, 702, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961)*. As Judge Parker explained in *Burgess*, this exception is confined most often to misrepresentations that are of a financial or commercial character. *Burgess, 375 F. Supp. 3d at 817*. Here, as in *Burgess*, Plaintiffs do not allege that the EPA made any commercial or financial misrepresentations, and so the exception does not apply.

The United States argues that the misrepresentation exception is not limited to invasions of commercial or financial interest. (ECF No. 300, PageID.8574.) The Sixth Circuit has not yet spoken on whether the exception is so limited, but in this district, courts have held that the misrepresentation exception does not apply when the misrepresentation is not commercial or financial in character. *See Burgess, 375 F. Supp. 3d at 817; Vogelaar v United States, 665 F. Supp. 1295, 1304 (E.D. Mich. 1987)* (holding that the misrepresentation exception does not apply when a plaintiff does not claim a financial or commercial loss).

The Supreme Court in *Block* explained that a misrepresentation claim, as traditionally understood, has "been identified with the common law action for deceit, and has been confined very largely to the invasions of interests of a financial or commercial character, in the course of business dealings." *Block v. Neal, 460 U.S. 289, 296 n.5, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983)* (citations and internal quotation marks omitted). This observation tracks a comparable footnote in *Neustadt, 366 U.S. at 711 n. 26, 81 S.Ct. 1294*. Both of these Supreme Court cases deal with misrepresentations relied upon by plaintiffs to their financial detriment.

The Supreme Court has not clarified whether the scope of the exception is limited to financial or commercial misrepresentations, and circuit courts "have reached discordant answers." *Carter v. United States, 725 F. Supp. 2d 346, 357 (E.D.N.Y. 2010)*. In *Kim v. United States*, for example, the Ninth Circuit explicitly rejected a plaintiffs' argument that the misrepresentation exception was limited to those "seeking to recover for *economic loss* suffered as a result of a *commercial decision* the plaintiff made in reliance on a government misrepresentation." *940 F.3d 484, 492–93 (9th Cir. 2019)* (explaining that "[o]ur cases impose no such limitation."); *see also Reynolds v. United States, 643 F.2d 707, 712 (10th Cir. 1981)* (even the 'misrepresentation' exception of *28 U.S.C. s 2680(h)* has been broadly construed to include false representations of any type.").

Even if the misrepresentation exception is limited to commercial and financial injuries, **\*639** however, Plaintiffs' claims are not vulnerable to this exception. As Judge Parker found, "the gravamen of Plaintiffs' complaint is that the EPA was negligent in its performance of operational tasks, that being to respond to residents' complaints and provide them with guidance." *Burgess, 375 F. Supp. 3d at 817*. Here too, Plaintiffs argue the EPA's misrepresentations are not essential to their negligence claims. (ECF No. 305, PageID.9928.) As set forth above, even though the EPA was not required to respond to citizen complaints, once it undertook the duty to respond, it was required to do so without negligence. *Indian Towing Co. v. United States, 350 U.S. 61, 64–65, 76 S.Ct. 122, 100 L.Ed. 48 (1955)* ("[I]t is hornbook tort law that one who undertakes [a duty] and thereby induces reliance must perform his 'good Samaritan' task in a careful manner.").

The Supreme Court has held that where the misrepresentations alleged are "not essential" to an otherwise actionable claim, the exception will not bar that claim. *Block, 460 U.S. at 296–98, 103 S.Ct. 1089*. For example, the plaintiff in *Block* contracted with a builder to construct his house according to Farmers Home Administration ("FmHA") specifications. A FmHA representative inspected the work and reported that it complied with the FmHA, even though the home was defective. Plaintiff later sued FmHA for the cost of repairs, and the Supreme Court held that the claim was not barred by the misrepresentation exception. *Id. at 297, 103 S.Ct. 1089*. The Court found that the claim arose out of negligent supervision rather than being misled by an inspection report, and that "the Government's misstatements

[were] not essential to plaintiff's negligence claim." *Id.* at 297–98, 103 S.Ct. 1089.

Similarly, Plaintiffs' claims are about negligence in inspection and oversight. Plaintiffs allege that the EPA acted negligently when it responded to citizen's complaints about Flint's water—in particular, when the EPA reassured citizens that the EPA was providing oversight and that Flint and the MDEQ were providing safe drinking water. But the EPA's misstatements to Flint citizens are not essential to Plaintiffs' claims, which are about negligence. In *Neustadt,* the Court took care to distinguish the case before it from *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), "which held cognizable a Torts Act claim for property damages suffered when a vessel ran aground as a result of the Coast Guard's allegedly negligent failure to maintain the beacon lamp in a lighthouse." *Neustadt,* 366 U.S. at 711 n.26, 81 S.Ct. 1294. The Court explained that the claim in *Indian*

*Towing* did not arise out of misrepresentation "any more than does one based upon a motor vehicle operator's negligence in giving a misleading turn signal." *Id.* To the extent that the EPA's misrepresentations contributed to Flint citizens' false sense of security in, and reliance on their government, this fact is tragic, but not essential to Plaintiffs' claims here.

### V. Conclusion

The United States' motion to dismiss Plaintiffs' complaint is DENIED.

IT IS SO ORDERED.

### All Citations

482 F.Supp.3d 601

### Footnotes

1  The LCR results from the Walters' home showed a level of 104 ppb for lead. (Pls.' Resp. Ex. 1 at 5, ECF No. 53-2 at Pg ID 1924). The regulatory limit is 15 ppb. (*Id.*)

2  In response to this request, the EPA issued a policy memorandum on November 3, 2015, clarifying how the LCR should be interpreted on a prospective basis and agreeing with Region 5's interpretation. (Def.'s Resp. Ex. 31, ECF No. 39-14.) In the memo, EPA headquarters recognized that "the language of the LCR does not specifically discuss [the situation where a public water system disconnects from one source and begins distributing water from another source]" and "that there are differing possible interpretations of the LCR with respect to how the rule's optimal corrosion control treatment procedures apply to this situation ....." (*Id.* at 1, Pg ID 1290.)

3  Even if Plaintiffs made this argument, the Court agrees with Judge Parker in *Burgess* that such conduct is discretionary for purposes of the first prong of the test. 375 F. Supp. 3d at 813–14.

4  The EPA Administrator delegated authority under Sections 1414 and 1431 of the SDWA, 42 U.S.C. §§ 300g-3, 300i, to the Regional Administrators and the Assistant Administrator for Enforcement and Compliance Assurance. (*Burgess*, No. 17-cv-11218, ECF Nos. 41-7, 41-8, 41-9.) The Region 5 Administrator at the time was Dr. Susan Hedman. *See* (*Burgess*, No. 17-cv-11218, ECF No. 53-19, PageID.2034.)

5  As noted above, even though the Court concludes that the EPA's actions under Section 1414 were mandatory, the Court will analyze prong two in the alternative, because under either prong, the United States cannot prevail on their sovereign immunity defense.

**End of Document**      © 2021 Thomson Reuters. No claim to original U.S. Government Works.