# EXHIBIT 5

both claims makes its theory of liability sufficiently clear.

The Court agrees with BMZ that All About It's third-party complaint contains minimal details about the transaction and the relationship between the parties. However, All About It's assertion that it purchased the batteries from BMZ, along with the additional factual allegations in the third-party complaint, are enough to allege that a contract was formed by the parties' conduct, regardless of whether All About It identified a specific written agreement in its third-party complaint. *See* M.C.L. § 440.2204. *See generally Gage Prods. Co.*, 393 F.3d at 642 (finding genuine issue of material fact as to the existence of contract where the plaintiff presented evidence that it submitted numerous purchase orders to the defendant, the defendant shipped products in response to those orders, and the plaintiff received and paid for the products). Furthermore, although the statement that BMZ is a "merchant regularly dealing" in electronic cigarette batteries could be construed as blurring the line between a factual assertion and a legal conclusion, it is certainly plausible that a company doing business as AER Premium Electronic Cigarettes would deal in electronic cigarette batteries in its "normal course of business." *See* M.C.L. § 440.2312 cmt. 3.

For these reasons, the Court finds that All About It's third-party complaint states plausible claims for indemnification under § 440.2312(3) and that its claims are sufficiently pled to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). This opinion, however, should not be construed as support for the ultimate viability of All About It's indemnification claims. In addition to providing more detail than its factually sparse third-party complaint currently provides, All About It will need to prove that the transactions actual-ly occurred, which BMZ maintains will not be possible.

**IV. Conclusion**

For the reasons set forth above, BMZ's motion to dismiss (ECF No. 18) is **DE-NIED**. All About It's request for leave to amend its third-party complaint is **DE-NIED as moot**.

**SO ORDERED.**



**Jeremy RAYMO, et al., Plaintiffs,**

**v.**

**FCA US LLC and Cummins Inc., Defendants.**

**2:17-cv-12168**

United States District Court, E.D. Michigan, Southern Division.

Signed 07/30/2020

**Background:** Purchasers filed putative class action alleging that truck manufacturer and diesel engine manufacturer misleadingly advertised trucks as fuel-efficient and emissions regulation-compliant while knowing that defects in trucks' emissions aftertreatment systems would cause them to be less efficient and to exceed applicable emissions standards, in violation of Racketeer Influenced and Corrupt Organizations Act (RICO), Magnuson-Moss Warranty Act (MMWA), and state law.

**Holdings:** The District Court, Terrence G. Berg, J., held that:

(1) Clean Air Act (CAA) did not preempt consumers' state law claims;

(2) consumers alleged sufficient economic injury to establish standing;

(3) manufacturers' voluntary recall did not render consumers' monetary claims prudentially moot;

(4) consumers failed to establish common purpose required to state claim that manufacturers engaged in RICO enterprise;

(5) consumers failed to plead manufacturers' intent to defraud with requisite particularity;

(6) consumers pled plausible fraud claim against engine manufacturer;

(7) consumers pled plausible fraud claim against truck manufacturer;

(8) consumers pled fraudulent omission claims with requisite particularity; and

(9) consumers pled plausible unjust enrichment claims.

Motions granted in part and denied in part.

**1. Federal Civil Procedure ⬗1832**

Consideration of motion to dismiss for failure to state claim is generally confined to pleadings, but courts may consider any exhibits attached to complaint or defendant's motion to dismiss so long as they are referred to in complaint and are central to claims contained therein. Fed. R. Civ. P. 12(b)(6).

**2. Federal Civil Procedure ⬗636**

Heightened pleading standard for fraud claims is slightly more relaxed for claims of fraudulent concealment or fraud by omission, as opposed to affirmative fraud. Fed. R. Civ. P. 9(b).

**3. Federal Civil Procedure ⬗636**

Fraud claim typically meets particularity pleading requirements if it alleges: (1) time, place, and content of alleged misrepresentation, (2) fraudulent scheme, (3) defendant's fraudulent intent, and (4) resulting injury. Fed. R. Civ. P. 9(b).

**4. Fraud ⬗31**
  **States ⬗18.15**

Clean Air Act (CAA) did not preempt consumers' state law claims premised on truck manufacturer's and diesel engine manufacturer's alleged misrepresentations and omissions concerning trucks' compliance with federal emissions standards; claims were rooted in allegations of false statements and omissions concerning trucks' fuel efficiency, compliance with applicable environmental regulations, and alleged defects, and did not seek to enforce compliance with federal standards. Clean Air Act § 209, 42 U.S.C.A. § 7543(a).

**5. Federal Civil Procedure ⬗103.2, 164**

Individual standing is prerequisite for all suits, including class actions. U.S. Const. art. 3, § 2, cl. 1.

**6. Federal Civil Procedure ⬗164**

Potential class representatives must establish standing vis-à-vis each defendant; they cannot acquire standing simply by virtue of bringing class action. U.S. Const. art. 3, § 2, cl. 1.

**7. Antitrust and Trade Regulation ⬗290**
  **Fraud ⬗29**
  **Racketeer Influenced and Corrupt Organizations ⬗59**

Consumers alleged sufficient economic injury to establish standing to assert Racketeer Influenced and Corrupt Organizations Act (RICO), Magnuson-Moss Warranty Act (MMWA), and state law fraud and consumer protection claims against truck and diesel engine manufacturers, based on alleged washcoat defect in trucks' selective catalytic reduction system (SCR) interior lining, which rendered SCR ineffective in reducing trucks' NOx emissions, regardless of whether their own trucks contained defect; consumers claimed that they paid premium for "clean diesel" vehi-

cles that in fact polluted at levels far higher than reasonable consumer would have expected, and would not have paid premium but for manufacturers' misrepresentation. U.S. Const. art. 3, § 2, cl. 1; Federal Trade Commission Improvement Act § 101, 15 U.S.C.A. § 2301; 18 U.S.C.A. § 1962(c).

**8. Federal Courts ⟜2138**

Truck and engine manufacturers' voluntary recall to remedy washcoat defect in diesel trucks' selective catalytic reduction system (SCR) interior lining, which rendered SCR ineffective in reducing trucks' NOx emissions, did not render prudentially moot consumers' monetary claims against them under overpayment theory of damages.

**9. Declaratory Judgment ⟜82**

Where lawsuit seeks as relief only that manufacturer be compelled to notify consumers of alleged defect and repair it free-of-charge to consumers, recall of subject product will moot claims for injunctive and declaratory relief.

**10. Products Liability ⟜384**

Establishing economic injury using overpayment theory requires plaintiffs to sufficiently and plausibly plead existence of defect in product.

**11. Antitrust and Trade Regulation ⟜290**

**Fraud ⟜29**

**Racketeer Influenced and Corrupt Organizations ⟜75**

Consumers did not sufficiently identify injury in fact to confer standing in action against truck and diesel engine manufacturers for violations of Racketeer Influenced and Corrupt Organizations Act (RICO) and Magnuson Moss Warranty Act (MMWA), state law claims for fraudulent concealment, and consumer protection violations based on alleged washcoat defect in previous model years' selective catalytic reduction system (SCR) interior lining, absent allegation that consumers had leased or purchased subsequent model year trucks, or that SCRs in those trucks had same defect. U.S. Const. art. 3, § 2, cl. 1; Federal Trade Commission Improvement Act § 101, 15 U.S.C.A. § 2301; 18 U.S.C.A. § 1962(c).

**12. Antitrust and Trade Regulation ⟜290**

**Products Liability ⟜158**

Plaintiff has standing to assert claims stemming from defective product or false advertising only if she experienced injury stemming from purchase of that product.

**13. Antitrust and Trade Regulation ⟜290**

**Fraud ⟜29**

**Racketeer Influenced and Corrupt Organizations ⟜59**

Consumers alleged sufficient economic injury to establish standing to assert Racketeer Influenced and Corrupt Organizations Act (RICO), Magnuson-Moss Warranty Act (MMWA), and state law fraud and consumer protection claims against truck and diesel engine manufacturers, based on allegation that diesel particulate filters (DPF) in trucks they purchased or leased became clogged with soot, and that dealers reprogrammed trucks to enter active regeneration mode to burn more fuel in order to clear DPF; consumers claimed that they paid premium for trucks based on representations that they had superior fuel economy compared to gas engine, but that reprogramming caused their fuel economy to drop 20-25 percent. U.S. Const. art. 3, § 2, cl. 1; Federal Trade Commission Improvement Act § 101, 15 U.S.C.A. § 2301; 18 U.S.C.A. § 1962(c).

**14. Racketeer Influenced and Corrupt Organizations ⟜50**

To successfully plead claim under Racketeer Influenced and Corrupt Organi-

zations Act (RICO) participation provision, plaintiffs must allege that defendants participated, directly or indirectly, in (1) conduct (2) of enterprise that affects interstate commerce (3) through pattern (4) of racketeering activity. 18 U.S.C.A. § 1962(c).

**15. Racketeer Influenced and Corrupt Organizations ⟺35**

Demonstrating existence of "enterprise" under Racketeer Influenced and Corrupt Organizations Act (RICO) requires showing that defendants were continuing unit that functioned with common purpose. 18 U.S.C.A. § 1962(c).

> See publication Words and Phrases for other judicial constructions and definitions.

**16. Racketeer Influenced and Corrupt Organizations ⟺26**

Establishing pattern of racketeering activity under Racketeer Influenced and Corrupt Organizations Act (RICO) entails alleging that defendants each engaged in two or more predicate acts of prohibited conduct. 18 U.S.C.A. §§ 1961(1)(B), 1962(c).

**17. Racketeer Influenced and Corrupt Organizations ⟺59**

To establish standing to bring claim under Racketeer Influenced and Corrupt Organizations Act (RICO), injury to business or property must be concrete, rather than speculative or tangible. 18 U.S.C.A. § 1964(c).

**18. Racketeer Influenced and Corrupt Organizations ⟺59**

Consumers' alleged overpayment for diesel trucks under misapprehension that they were lower-emitting and had better fuel economy and other qualities superior to similar gas vehicles satisfied injury requirement for claims against truck and engine manufacturers under Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1964(c).

**19. Racketeer Influenced and Corrupt Organizations ⟺47**

Truck manufacturer and diesel engine manufacturer did not share common purpose uniting them in alleged enterprises to conceal defects in and to misrepresent benefits of trucks' selective catalytic reduction system (SCR) and diesel particulate filter (DPF), as required to state claim that manufacturers engaged in association-in-fact enterprise, in violation of Racketeer Influenced and Corrupt Organizations Act (RICO); SCR's washcoat defect was not inherently deceptive product, and there was no allegation that manufacturers designed, manufactured, marketed, and sold trucks with common purpose of misleading regulators and public. 18 U.S.C.A. § 1962(c).

**20. Postal Service ⟺35(2)**

**Telecommunications ⟺1014(2)**

To state claim for mail or wire fraud, plaintiffs must allege: (1) devising or intending to devise scheme to defraud or to perform fraudulent acts; (2) involving use of mails or wires; (3) for purpose of executing scheme or attempting to do so. 18 U.S.C.A. §§ 1341, 1343.

**21. Postal Service ⟺35(10)**

**Telecommunications ⟺1014(8)**

Scheme to defraud that plaintiffs must demonstrate to establish claims for mail or wire fraud must involve misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. 18 U.S.C.A. §§ 1341, 1343.

**22. Postal Service ⟺35(5)**

**Telecommunications ⟺1014(3)**

Plaintiffs must allege that defendants had specific intent to deceive or defraud in order to establish mail and wire fraud claims. 18 U.S.C.A. §§ 1341, 1343.

**23. Postal Service ⟜35(11.1)**
**Telecommunications ⟜1014(9)**

Although plaintiffs alleging wire or mail fraud need not allege actual reliance, they must plausibly claim that misrepresentations or omissions were material. 18 U.S.C.A. §§ 1341, 1343.

**24. Federal Civil Procedure ⟜636**

Consumers failed to plead with requisite particularity truck and diesel engine manufacturers' intent to defraud in their action alleging that manufacturers concealed defects in and misrepresented benefits of trucks' selective catalytic reduction system (SCR) and diesel particulate filter (DPF), as required to state claim against manufacturers for violation of Racketeer Influenced and Corrupt Organizations Act (RICO) premised on wire and mail fraud, despite consumers' allegation that manufacturers must have discovered defects during useful-life testing. 18 U.S.C.A. §§ 1341, 1343, 1962(c).

**25. Federal Civil Procedure ⟜636**

Plaintiffs asserting fraud claims must at least allege that defendant possesses specific intent to deceive or defraud. Fed. R. Civ. P. 9(b).

**26. Antitrust and Trade Regulation ⟜205, 280**

Magnuson-Moss Warranty Act (MMWA) serves only to supplement state law implied warranties by prohibiting their disclaimer in certain circumstances and providing federal remedy for their breach, and thus claim under MMWA is derivative of and relies on underlying state law claim. Federal Trade Commission Improvement Act § 101 et seq., 15 U.S.C.A. § 2301 et seq.

**27. Federal Civil Procedure ⟜611.16**

Federal courts are not responsible for sua sponte raising and resolving legal questions not sufficiently briefed by parties.

**28. Federal Civil Procedure ⟜636**

Claims for affirmative misrepresentations must: (1) specify statements that plaintiff contends were fraudulent, (2) identify speaker, (3) state where and when statements were made, and (4) explain why statements were fraudulent. Fed. R. Civ. P. 9(b).

**29. Federal Civil Procedure ⟜636**

For claims involving fraudulent omissions, plaintiffs must plead (1) precisely what was omitted; (2) who should have made representation; (3) content of alleged omission and manner in which omission was misleading; and (4) what defendant obtained as consequence of alleged fraud. Fed. R. Civ. P. 9(b).

**30. Fraud ⟜11(1)**

Inherently subjective statements cannot form basis of fraud action.

**31. Fraud ⟜11(1)**

Truck and diesel engine manufacturers' statements about trucks' "leading fuel economy," "unprecedented performance and fuel economy," "environmentally clean," "low-cost of ownership" and "built to last for years" were general and non-quantifiable, and thus constituted puffery that could not form basis of fraud claim.

**32. Fraud ⟜27**

Consumers pled plausible fraud claim against diesel engine manufacturer by alleging that it stated that its "after-treatment system allows your truck to comply with federal laws governing exhaust emissions," and that defect in selective catalytic reduction system's (SCR) interior lining rendered it ineffective in reducing trucks' NOx emissions, causing trucks they had brought or leased to exceed federal emissions standards.

**33. Fraud** ⬯27

Consumers pled plausible fraud claim against truck manufacturer by alleging that it stated that truck's engine had selective catalytic reduction system (SCR) that was "fully compliant with recent federal mandates," and that defect in SCR's interior lining rendered it ineffective in reducing trucks' NOx emissions, causing trucks they had brought or leased to exceed federal emissions standards.

**34. Fraud** ⬯16

Under Alabama, California, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and Washington law, plaintiff asserting fraudulent omission claim based on design defect must allege knowledge of defect by defendant, or at least allegation that defendant should have discovered defect.

**35. Federal Civil Procedure** ⬯636

Under Alabama, California, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and Washington law, consumers' allegation that truck and diesel engine manufacturer must have been discovered engines' defective diesel particulate filters (DPF) and selective catalytic reduction system (SCR) during pre-production testing was insufficient to plead manufacturers' knowledge of defects required to plead fraudulent omission claims with requisite particularity. Fed. R. Civ. P. 8, 9(b).

**36. Contracts** ⬯333(5)

Party can only advance claim of breach of written contract by identifying and presenting actual terms of contract allegedly breached.

**37. Implied and Constructive Contracts** ⬯3

Essence of unjust enrichment claim is that it requires plaintiffs to allege facts showing that defendants received benefit and that, under circumstances of case, retention of benefit would be unjust.

**38. Implied and Constructive Contracts** ⬯3

California and Texas law do not recognize unjust enrichment as cause of action.

**39. Implied and Constructive Contracts** ⬯3

Under Alabama, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Utah, Virginia, and Washington law, consumers pled plausible unjust enrichment claims against truck and diesel engine manufacturer by alleging that manufacturers convinced them to pay premium for vehicles that were higher-emitting and less fuel-efficient than they were led to believe, and that manufacturers unjustly retained that premium.

––––––––––

Caroline F. Bartlett, Carella, Byrne, Cecchi, Olstein, Brody and Agnello, James E. Cecchi, Carella Byrne, Roseland, NJ, E. Powell Miller, Sharon S. Almonrode, William Kalas, The Miller Law Firm, P.C., Rochester, MI, Jennifer R. Scullion, Seeger Weiss LLP, New York, NY, Jerrod C. Patterson, Hagens Berman Sobol Shapiro, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Scott A. George, Seeger Weiss LLP, Philadelphia, PA, for Plaintiffs Jeremy Raymo, Forrest Poulson, Gary Gaster, Brendon Goldstein, Manuel Pena.

Caroline F. Bartlett, Carella, Byrne, Cecchi, Olstein, Brody and Agnello, Rose-

land, NJ, Dennis A. Lienhardt, Sharon S. Almonrode, William Kalas, The Miller Law Firm, P.C., Rochester, MI, Jennifer R. Scullion, Seeger Weiss LLP, New York, NY, Scott A. George, Seeger Weiss LLP, Philadelphia, PA, Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, for Plaintiffs Clarence Johnson, James Blount, Stephen Zimmerer, Darin Ginther, Justin Sylva, Jeremy Batey, Chris Wendel, Luke Wyatt, John Reyes, Matt Baffunno, Jason Gindele, Dennis Kogler, Ian Hacker.

Brittany J. Mouzourakis, James P. Feeney, Dykema Gossett, Bloomfield Hills, MI, Robert J. Giuffra, Jr., William B. Monahan, Sullivan & Cromwell LLP, New York, NY, for Defendant FCA US LLC.

Jeffrey Soble, Jonathan W. Garlough, Lauren M. Loew, Foley & Lardner LLP, Chicago, IL, Leah R. Imbrogno, Foley & Lardner LLP, Detroit, MI, Michael D. Leffel, Foley & Lardner LLP, Madison, WI, for Defendant Cummins Inc.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

TERRENCE G. BERG, UNITED STATES DISTRICT JUDGE

Plaintiffs seek to bring a nationwide class action alleging defects in the emissions aftertreatment systems of model year 2013–2017 Dodge 2500 and 3500 Ram trucks with Cummins 6.7-liter diesel engines (the "trucks" or "class vehicles"). Defendant FCA US LLC ("FCA") manufactured the trucks while Defendant Cummins, Inc. ("Cummins") manufactured the engines. According to Plaintiffs, Defendants misleadingly advertised the trucks as both fuel-efficient and emissions regulation-compliant while knowing that two separate defects in the aftertreatment system would actually cause the trucks to be less efficient and to exceed applicable emissions standards. In a 438-page Amended Complaint supplemented by 56 exhibits, Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)–(d), the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, as well as claims under the laws of 18 different states for breach of contract, unjust enrichment, fraudulent misrepresentation, fraudulent omission, and violation of consumer-protection statutes. Pending before the Court are motions to dismiss filed by FCA, ECF No. 35, and by Cummins, ECF No. 34. The Court will grant in part and deny in part the motions to dismiss.

**BACKGROUND**

Plaintiffs allege that Defendants manufactured, marketed, and sold the trucks with defects in their aftertreatment system. Aftertreatment systems, when functioning properly, cause the engine to produce exhaust within applicable emissions limits. ECF No. 34, PageID.5173 (Cummins Mot. to Dismiss Br.). These systems represent an auto-industry response to the increasing push for clean-diesel emissions and new regulations for diesel trucks issued by the Environmental Protection Agency ("EPA") and are commonly installed in medium and heavy-duty diesel trucks. *See* ECF No. 17, PageID.2479 (Am. Compl.). The primary components of an aftertreatment system are the Selective Catalytic Reduction system ("SCR"), and the Diesel Particulate Filter ("DPF"). The SCR helps capture and reduce NOx into less harmful substances, such as nitrogen and oxygen, essentially cleaning the exhaust before trucks emit it into the environment.[1] ECF No. 17, PageID.2484, ECF

---

1. NOx refers to oxides of nitrogen, which Plaintiffs describe as "several compounds comprised of nitrogen and oxygen atoms." ECF No. 17, PageID.2483. NOx emissions

No. 34, PageID.5173. The DPF traps and removes particulate emissions. ECF No. 17, PageID.2484.

The crux of this case is the allegation that FCA and Cummins deceived consumers by marketing the trucks as high-performing, low-emission, reliable vehicles with good fuel economy, ECF No. 17, PageID.2490, when defects in their after-treatment system actually caused the trucks to emit NOx in excess of EPA emissions standards and to fall below promised fuel-economy performance. ECF No. 17, PageID.2480. By concealing the existence of these defects, Plaintiffs claim FCA and Cummins deprived consumers of the benefit of their bargain, causing them to pay more for the trucks than they would have had they known about the defects. Plaintiffs further allege that the trucks' defects caused them to "pay more at the pump," because of reduced mileage efficiency, and to pay more for necessary replacement parts. ECF No. 17, PageID.2490–91.

According to Plaintiffs, the class vehicles contained two defects, which they call the "washcoat defect" and the "flash defect." The "washcoat defect" refers to a problem with the sealant (or washcoat) used for the SCR's interior lining. Plaintiffs claim that the type of washcoat used rendered the SCR ineffective in reducing the trucks' NOx emissions. The "flash defect" refers to a problem of soot build-up in the DPF that Defendants were allegedly fixing by "flashing" or reprogramming the trucks' Electronic Control Modules to divert more fuel into the exhaust system in order to burn away the excess soot, thereby allegedly reducing fuel mileage at the expense of consumers. ECF No. 17, PageID.2480–90.

As to the "washcoat" defect, ordinarily the SCR's interior lining or "washcoat" facilitates the conversion of NOx emissions produced by diesel engines into nitrogen gas, water, and carbon dioxide. ECF No. 17, PageID.2480. But according to Plaintiffs, the class vehicles' defective washcoat "almost immediately" caused the vehicles to exceed emissions standards. ECF No. 17, PageID.2480. Because of this defect, Plaintiffs assert, the trucks exceeded applicable emissions limits by 50%. ECF No. 17, PageID.2484. If left untreated, Plaintiffs claim the washcoat defect can cause the trucks' emissions systems to shut down and, eventually, to reduce the engines' maximum speed to only five miles per hour. ECF No. 17, PageID.2484–85. They refer to this as "limp mode." *Id.* At least some of the Plaintiffs claim their trucks were forced into "limp mode" as a result of the washcoat defect, creating safety risks and out-of-pocket expenses. *Id.*

As to the injury caused by the washcoat defect, mainly Plaintiffs contend they were injured at the point of sale because they paid more for the trucks than they would have had they known about the defect, which allegedly caused the trucks to pollute at higher levels than Plaintiffs expected based on Defendants' representations and "to frequently enter into 'limp mode.' " ECF No. 17, PageID.2487–88.

According to the Amended Complaint, FCA and Cummins became aware of the washcoat defect "as early as September 2014" yet took no immediate steps to remedy it. ECF No. 17, PageID.2485. Instead, Plaintiffs assert, Defendants continued to misleadingly market the trucks as EPA-compliant and equipped with "the lowest emitting diesel engine ever produced." ECF No. 17, PageID.2481 (quoting ECF

---

form in the engine's cylinder during high-temperature combustion. *Id.* These emissions "contribute[ ] to nitrogen dioxide, particulate matter in the air, and react[ ] with sunlight in the atmosphere to form ozone." *Id.*

No. 17-2, Ram Owner's Manual, Ram Truck Diesel Supplement (2013)). FCA acknowledges it began receiving an increasing number of emissions-related warranty claims pertaining to model-year 2013–2015 trucks around this time. *See* ECF No. 35, PageID.5628 (FCA Mot. to Dismiss Br.); ECF No. 34, PageID.5173.

In response, Cummins conducted emissions testing on a number of affected trucks. That testing, which Cummins reported to the EPA on March 5, 2015, showed that for trucks exhibiting the emissions issue "the average NOx emissions were 0.1 g/mile over the 0.2 g/mile NOx standard." ECF No. 36-1, PageID.5675 (EPA Emissions Defect Inf. Report). The defect appeared present in at least 896 trucks of those 188,271 potentially affected (though Cummins did not test each potentially affected truck). ECF No. 36-1, PageID.5677–79. Cummins's report further explained that the washcoat issue "may cause some MY2013-2015 RAM 2500/3500 vehicles to experience degradation with the selective catalyst reduction (SCR) system." ECF No. 36-1, PageID.5675. After receiving Cummins's report, the Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") requested that Cummins, because it held the class vehicles' Certificates of Compliance ("COCs") and Executive Orders ("EOs"), submit a voluntary recall plan addressing the emissions issue.[2] ECF No. 17, PageID.2562. FCA and Cummins then sued one another over who should bear the financial and logistical costs of the recall.

That case ultimately settled. ECF No. 34, PageID.5157.

The process of rolling out the voluntary recall began in November 2016, according to Cummins, but appears not to have been announced by the EPA until July 2018. ECF No. 34, PageID.5157, 5174; ECF No. 36-2, PageID.5685 (Jul. 31, 2018 EPA Press Release). Cummins and FCA worked together to recall thousands of model year 2013–2015 trucks so that FCA dealers could replace the trucks' SCR catalysts—free of charge to consumers—with a newer version containing an updated washcoat, thus resolving the defect. ECF No. 35, PageID.5630; ECF No. 36-5, PageID.5695–96 (Cummins Influenced Recall Plan). This newer washcoat was already being used in model year 2016 and later trucks. An EPA administrator lauded the recall as "a great example of how government and industry work together to protect health and environment." He continued, "[t]his is the way it's supposed to work." ECF No. 36-2, PageID.5685.

The "flash defect" is the second defect at issue in this lawsuit. Plaintiffs allege that the DPF in the trucks' aftertreatment system routinely becomes clogged with soot. ECF No. 17, PageID.2488. Plaintiffs suggest this alleged problem with the DPF is caused by "the configuration of the two emissions catalysts," though they do not explain what exactly the issue is with how the catalysts are configured, or why it would cause soot to clog the DPF.[3] ECF No. 17, PageID.2488. When the DPF be-

---

2. As the engine manufacturer, Cummins was responsible for obtaining COCs from the EPA verifying that the trucks met federal emissions standards. ECF No. 17, PageID.2546–47; ECF No. 34, PageID.5173. Vehicles sold in California also required an EO from CARB, which Cummins was likewise responsible for securing. ECF No. 17, PageID.2546–47.

3. A footnote in the Amended Complaint alleges that, beginning in the 2013 model year

trucks, "the DPF was placed between the diesel oxidation catalyst and the SCR catalyst," while in earlier model year trucks the DPF was "next to the muffler, and the emissions first passed through two catalysts before it reached the [DPF] filter." ECF No. 17, PageID.2488 n.19. Plaintiffs provide no allegations or analysis explaining why the more recent configuration would cause the DPF to become clogged.

comes clogged, Plaintiffs allege, the trucks enter "active regeneration mode," a process which burns more fuel to clear the filter. ECF No. 17, PageID.2488. Active regeneration, according to Plaintiffs, can also cause the class vehicles to enter "limp mode," necessitating that owners bring their trucks into an FCA dealership for service within a certain number of miles to prevent them from becoming inoperable. ECF No. 17, PageID.2488. According to some of the Plaintiff owners, when they brought their vehicles in for routine service, the dealerships were instructed to "flash," i.e. reprogram, the vehicles' Electronic Control Modules in order to address the DPF soot build-up issue. ECF No. 17, PageID.1488.

This reprogramming, Plaintiffs assert, caused the trucks' emissions systems to run at higher temperatures, diverting more fuel to burn out the soot in the DPF. ECF No. 17, PageID.2488. After the flashing had been applied, Plaintiffs claim their vehicles' fuel economy dropped by 20–25%, costing them significantly more in diesel fuel purchases annually. ECF No 17, PageID.2489. The Amended Complaint asserts that "[t]ruck owners" were often not even informed that the dealership was "flashing" their trucks. ECF No. 17, PageID.2489. The pleading does not elaborate as to whether Plaintiffs themselves were told that their trucks were being flashed by FCA dealerships.

In attempting to define the flash defect, Plaintiffs somewhat conflate the alleged DPF configuration issue, which sounds like a design defect that may cause soot to clog the filter, with the dealerships' actions in allegedly "flashing" or reprogramming the trucks in an effort to address soot build-up in the DPF. Both the clogging and the "flashing," Plaintiffs contend, cause the trucks to burn more fuel to clear the DPF, although they attribute the trucks' declining fuel economy mostly to the "flashing."

ECF No. 17, PageID.2488–89. For example, Plaintiff Jeremy Raymo claims that the flash defect caused his truck's miles-per-gallon usage to drop "approximately 20-25%." ECF No. 17, PageID.2495. But he clarifies that "the Truck's MPG has dropped by approximately three MPG *after his Truck was 'flashed.'*" ECF No. 17, PageID.2495. As the Amended Complaint describes it, Raymo and other named Plaintiffs thus associate their declining fuel economy—the injury Plaintiffs attribute to the flash defect—more with "flashing," the dealerships' alleged remedy for the DPF defect, than with the DPF defect itself.

Plaintiffs are 18 consumers who purchased or leased one of the class vehicles on or before October 4, 2018. ECF No. 17, PageID.2579. In addition to proposing a nationwide class, they seek to certify subclasses of individuals or entities in 18 different states who owned or leased a class vehicle during the relevant period. Those states are Alabama, California, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and Washington. Plaintiffs assert federal claims under the RICO Act, 18 U.S.C. § 1962(C)–(D), and the MMWA, 15 U.S.C. § 2301. They also allege violations of the same 18 states' breach of contract, fraudulent misrepresentation, fraudulent omission, consumer protection, and unjust enrichment laws. Pending before the Court are motions to dismiss filed by FCA, ECF No. 35, and by Cummins, ECF No. 34. The Court will grant in part and deny in part both motions to dismiss.

## LEGAL STANDARD

### I. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes courts to dismiss a lawsuit if they determine that the

plaintiff has "fail[ed] to state a claim upon which relief can be granted." In evaluating a motion to dismiss under Rule 12(b)(6), courts "must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true and determine whether the plaintiff undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

[1] Consideration of a motion to dismiss under Rule 12(b)(6) is generally confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Courts may, however, consider any exhibits attached to the complaint or the defendant's motion to dismiss "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). The exhibits attached by the parties in this case satisfy those parameters.

## II. Rule 9(b)'s heightened pleading standards for fraud claims

There are heightened pleading standards for fraud-based claims. These more exacting standards apply to Plaintiffs' RICO claims and state-law claims alleging fraudulent concealment or omission. *See Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, No. 13-13804, 2015 WL 3541905, at *3 (E.D. Mich. Apr. 30, 2015) (holding that Rule 9(b)'s particularity requirement applies to state-law claims asserted in federal court). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

[2] This pleading standard is "slightly more relaxed" for claims of fraudulent concealment or fraud by omission (as opposed to affirmative fraud). *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751 (E.D. Mich. 2017) (quoting *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007)). This is because fraudulent omissions or concealments are by nature "more amorphous" than affirmative misrepresentations. *See In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1055 (E.D. Mich. 2018) and *Counts v. Gen. Motors, LLC ("Counts I")*, 237 F. Supp. 3d 572, 595 (E.D. Mich. 2017) (both Ludington, J.) (observing the difficulty posed to plaintiffs by having to pinpoint the time at which a manufacturer's fraudulent omission occurred).

[3] Concerning affirmative misrepresentations, courts have held that a fraud claim typically meets Rule 9(b)'s particularity requirements if it alleges: "(1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1003 (E.D. Mich. 2017) (Lawson, J.) (internal quotations omitted) (quoting *Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017)). At a minimum, the Sixth Circuit requires that a plaintiff "must allege the time, place and contents of the misrepresentations upon which they relied." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (citing *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984)).

## DISCUSSION

### I. Plaintiffs' claims are not preempted by the Clean Air Act.

[4] Plaintiffs' state-law claims are premised on FCA's and Cummins's alleged

misrepresentations and omissions concerning the trucks' compliance with federal emissions standards, rather than on allegations that those standards were violated. Because the success of Plaintiffs' claims is not contingent on proving Defendants' noncompliance with EPA emissions regulations, their lawsuit cannot be construed as an effort to enforce federal emissions standards. Plaintiffs' claims are therefore not preempted by the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*

Assessing whether Plaintiffs' state-law claims are preempted by the CAA requires examining Congress's intent, as expressed through the statute's plain language. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Section 209 of the CAA provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a). The Supreme Court, in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) described the phrase "relating to the control of emissions," as used in this provision, as signaling a "broad preemptive purpose." Accordingly, several courts have concluded that "enforcement actions that have *any* 'connection with or reference to' the control of emissions from motor vehicles are preempted by § 209(a)." *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 577 (S.D.N.Y. 2011) (quoting *Morales*, 504 U.S. at 384, 112 S.Ct. 2031).

If Plaintiffs' state-law claims seek to establish or enforce a standard for the control of emissions, they are expressly preempted. *See Duramax*, 298 F. Supp. 3d at 1059. For example, in *Counts v. General Motors, LLC*, 237 F. Supp. 3d at 589 another court in this district found that to the extent the plaintiffs were requesting

damages "based solely on GM's alleged violations of the CAA," those claims were preempted. Likewise, in *Beshear v. Volkswagen Grp. of Am., Inc.*, No. 16-CV-27-GFVT, 2016 WL 3040492, at *4 (E.D. Ky. May 25, 2016) the court determined that plaintiffs could not premise state-law claims solely on their allegation that the defendants were violating the CAA's emissions standards. Finally, this Court recently held in *Bledsoe v. FCA US LLC ("Bledsoe II")*, 378 F. Supp. 3d 626, 642 (E.D. Mich. 2019) that claims involving alleged misrepresentations and omissions about vehicles' emissions technology are not preempted by the CAA because such claims "do not depend on proof of noncompliance with federal emissions standards." (citing *Counts v. Gen. Motors, LLC ("Counts II")*, No. 16-cv-12541, 2018 WL 5264194, at *2 (E.D. Mich. Oct. 23, 2018)).

A close reading of Plaintiffs' amended pleading shows their claims are rooted in allegations of false statements and omissions concerning the trucks' fuel efficiency, compliance with applicable environmental regulations, and alleged defects. Plaintiffs claim FCA and Cummins misled them about the trucks' emissions rates, leading them to purchase the trucks at a higher price than they would have paid had they known the truth. For example, Plaintiffs claim that "[n]one of the advertisements or representations received by Plaintiff[s] contained any disclosure that the Truck has high emissions compared to gasoline vehicles or the fact that the emissions system would break down and not perform as advertised." ECF No. 17, PageID.2504. Similarly, Plaintiffs take issue with the fact that FCA stated in a 2013 owner's manual that "[t]he Cummins diesel engine meets all EPA Heavy Duty Diesel Engine Emissions Standards, resulting in the lowest emitting diesel engine ever produced." ECF No. 17, PageID.2486 (emphasis omitted). Plaintiffs also claim that Cummins

and FCA misleadingly advertised the trucks as EPA-compliant when they in fact emit NOx "far in excess of the levels allowed by federal law." *See* ECF No. 17, PageID.2487, 2506–07, 2553. In this case it is the alleged "deceit about compliance, rather than the need to enforce compliance, that is the gravamen of Plaintiffs' claims." *In re Volkswagen "Clean Diesel" Litig.*, No. CL-2016-9917, 2016 WL 10880209 (Va. Cir. Ct. Aug. 30, 2016) (finding that plaintiffs' claims involving misleading advertising and news releases about car manufacturer's compliance with federal regulations and fuel economy were not preempted by the CAA).

Plaintiffs' state-law claims are premised on assertions that FCA and Cummins concealed the existence of emissions-related defects in the vehicles and misleadingly marketed the trucks as comparatively low-emissions vehicles that complied with EPA regulations. Establishing that the vehicles were in fact emitting NOx in excess of EPA emissions would certainly bolster Plaintiffs' claims. *See Counts I*, 237 F. Supp. 3d at 592. But proving noncompliance with federal emissions standards is by no means essential to their success. Because this is not an action seeking to enforce EPA emissions regulations, the Court concludes Plaintiffs' claim are not preempted by the CAA.

## II. Plaintiffs have established Article III, Section 2 standing for claims related to the washcoat defect in 2013–2015 model year trucks, and the flash defect in 2013–2016 trucks.

The existence of the washcoat defect in the 2013–2015 model year trucks is sufficiently and plausibly pled by all Plaintiffs. Plaintiffs provide detailed allegations about the washcoat defect that appeared in some unknown percentage of 2013–2015 model year trucks, resulting in the recall. Although they do not specifically plead that their own trucks contained this defect,

Plaintiffs frame the washcoat defect as a "design defect." ECF No. 17, PageID.2609. Such defects, by their nature, exist in all products "possessing the faulty design." *McKee v. General Motors, LLC*, 376 F. Supp. 3d 751, 761 (E.D. Mich. 2019). Because defective trucks are just not worth as much as defect-free trucks, Plaintiffs have adequately alleged an economic injury sufficient to establish standing under Article III, § 2 of the United States Constitution with respect to the washcoat defect in 2013–2015 model year trucks.

In contrast, the Amended Complaint's allegations about the washcoat defect in 2016–2017 model year trucks are too sparse to survive FCA's and Cummins's motions to dismiss. Plaintiffs' allegations concerning the washcoat defect relate only to the washcoat used in the 2013–2015 trucks. As Plaintiffs acknowledge, those trucks were "recall[ed] to fix the defect." ECF No. 17, PageID.2482. The Amended Complaint contains no allegations specific to the alleged washcoat defect in later 2016 and 2017 trucks, which were not part of the recall, and used a different washcoat.

Finally, Plaintiffs' allegations about the flash defect are sufficiently plausible to establish standing for claims arising from that alleged defect in the 2013–2016 model year trucks. Although Plaintiffs provide no detailed explanation as to precisely what causes the trucks' DPF filter to become clogged with soot, they do specifically allege that it clogs, and that this requires more fuel to be diverted in order to burn out the soot—both through active regeneration mode, and as a result of the dealerships' flashing of the trucks' Electronic Control Modules.

[5, 6] Article III of the United States Constitution provides that federal courts may exercise jurisdiction only over an actual "case or controversy." U.S. Const. art. III, § 2. Individual standing is therefore a

prerequisite for all suits, including class actions. *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). The Supreme Court has identified three elements necessary to establish standing. First, the plaintiff must have sustained "an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations omitted). Second, standing requires a "causal connection" between the injury and the challenged conduct; the injury must be "fairly traceable" to the alleged injurious conduct by the defendant. *Id.* Potential class representatives must establish standing vis-à-vis each defendant; they cannot acquire standing simply by virtue of bringing a class action. *Fallick*, 162 F.3d at 423.

## A. The washcoat defect in 2013–2015 model year trucks

[7] Plaintiffs have standing to pursue claims arising from the alleged washcoat defect in the 2013–2015 model year trucks. They contend they overpaid for the class trucks at the point of purchase because FCA and Cummins led Plaintiffs to believe the trucks were lower-emitting and compliant with federal emissions standards when they were not. Although FCA and Cummins have already repaired the washcoat defect in these model year trucks free of charge to consumers, Plaintiffs argue the recall and associated washcoat replacement have not made them whole for the $8,000 to $10,000 premium they paid for the promise of lower emissions, and superior fuel economy, torque, and towing ability. Although Plaintiffs would not be able to seek injunctive relief, Sixth Circuit precedent permits them to seek monetary damages in connection with the washcoat defect in 2013–2015 trucks under an overpayment theory of damages.

Concerning the existence of the defect in 2013–2015 trucks, Defendants rightly point out that Plaintiffs have not alleged the washcoat defect was present in the specific trucks they purchased or leased. In the design-defect context, however, the Sixth Circuit has not required named plaintiffs and potential class members to show that they themselves experienced the design defect. Rather, it is enough for standing to allege only that the product was defectively designed, and that the plaintiff purchased the product and himself or herself experienced the design defect.

The Sixth Circuit's reasoning in *Rikos v. Proctor & Gamble Co.* is instructive. In that case, which involved a probiotic nutritional supplement marketed to promote digestive health, the Sixth Circuit declined to require Plaintiffs to show that all potential class members had suffered an injury based on their purchase of the supplement. 799 F.3d 497, 524 (6th Cir. 2015). The court of appeals explained that, because Plaintiffs' theory was that the manufacturer "falsely advertised to every purchaser" of the product, if the product was defectively designed "then every purchaser was harmed." *Id.* Similarly, the Sixth Circuit in *In re Whirlpool Corporation Front-Loading Washer Products Liability Litigation*, another design-defect class action, concluded that not all class members had to demonstrate their washing machines were growing biofilm and mold as a result of the design defect at issue. Like in this case, the plaintiffs in *In re Whirlpool* had argued that "*all* Duet owners suffered injury immediately upon purchase of a Duet due to the design defect in, and the decreased value of, the product itself, whether mold causing additional consequential damages has yet manifested or not." 722 F.3d 838, 857–58 (6th Cir. 2013). Accordingly, Plaintiffs' standing to assert claims arising from the washcoat defect is not foreclosed by the fact that not all of them purport to

have experienced the washcoat defect in their trucks.

As to whether Plaintiffs have adequately pled an injury, the Court observes that the Sixth Circuit and other courts in this district have countenanced the overpayment theory of injury advanced by Plaintiffs in connection with the alleged washcoat (and flash) defects. The circuit court has found that a plaintiff who pays a premium for a product but does not receive the anticipated benefit demonstrates a cognizable injury in fact sufficient to establish Article III standing. *See Wuliger v. Mfrs. Life. Ins. Co.*, 567 F.3d 787, 794 (6th Cir. 2009). And district courts have determined that other plaintiffs' allegations of overpayment for "clean diesel" vehicles that in fact polluted at levels far higher than a reasonable consumer would expect satisfied Article III's injury requirement. Although those cases involved defeat devices (emissions-control devices that operate to bypass or interfere with emissions-reduction technologies in certain circumstances), there is no reason their holdings on economic injury cannot be applied outside that context, to emissions system cases more broadly.

In *In re Duramax Diesel Litigation*, for example, General Motors had developed an allegedly defective engine, marketed it as environmentally friendly, and set the sale price. *Duramax*, 298 F. Supp. 3d at 1052. The Court found plaintiffs' allegations that they had paid a premium for a "clean diesel" vehicle that did not operate in the way they expected sufficed to establish standing using an overpayment theory of injury. *See id.* Likewise, in *Counts I* the same court held that plaintiffs could establish an economic injury sufficient for Article III standing by alleging that General Motors had misrepresented the class vehicles as "clean diesel" cars and that, in reliance on those representations, the plaintiffs had overpaid for them. *Counts I*, 237 F. Supp. 3d at 582–83. According to

that court, even if the plaintiffs had not specifically purchased the diesel cars because of their advertised clean-diesel system, they had paid more for the cars because of it. *Id.* at 584. If the clean-diesel system in fact provided no additional value, the court reasoned, the plaintiffs had suffered financial injury in the form of overpayment "regardless of whether they relied on GM's alleged misrepresentations." *Id.*

Another court in this district also recently approved the overpayment theory of injury in *Gamboa v. Ford Motor Company*, 381 F. Supp. 3d 853, 886 (E.D. Mich. 2019) (Hood, C.J.). There, the Court relied on plaintiffs' allegations that they had overpaid for a "clean diesel" vehicle that in fact polluted at levels far higher than a reasonable consumer would expect. *Id.* In other words, the court reasoned, the *Gamboa* plaintiffs had "paid a premium" for a product "but did not receive the anticipated consideration." *Id.* at 886. This, Chief Judge Hood found, established a cognizable injury in fact. *Id.* (citing *Wuliger*, 567 F.3d at 794).

The prevailing jurisprudence in this district, as well as in the Northern District of California, thus holds that a consumer who alleges she would not have purchased a vehicle (or would have paid less for it) had the manufacturer not misrepresented the vehicle to customers' detriment or omitted mention of its significant limitations, has alleged a plausible injury-in-fact. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 945 (N.D. Cal. 2018) (citing *Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013)). Put another way, once a consumer "sufficiently and plausibly" pleads the existence of a product defect, the financial injury stemming from the defect is easily established: "defective cars [and trucks] are simply not worth as

much." *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011). Plaintiffs have adequately pled facts that create standing to assert claims related to the washcoat defect in 2013–2015 model year trucks.

**[8, 9]** The Court is not persuaded by Cummins's argument that Plaintiffs' claims arising from the washcoat defect in 2013–2015 trucks are prudentially moot because Defendants have already remedied that defect as part of the voluntary recall. Where a lawsuit seeks as relief only that the manufacturer be compelled to notify consumers of the alleged defect and repair it free-of-charge to consumers, a recall of the subject vehicles will moot claims for injunctive and declaratory relief. *See Hadley v. Chrysler Group, LLC*, 624 F. App.'x 374, 379 (6th Cir. 2015); *Winzler v Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208 (10th Cir. 2012). As FCA and Cummins have already repaired the washcoat defect in 2013–2015 class vehicles free of charge to consumers, injunctive or declaratory relief is unavailable, and Plaintiffs do not request it. *See* ECF No. 17, PageID.2903. But there is no similar legal bar that serves to prevent Plaintiffs from seeking monetary damages in connection with the washcoat defect in 2013–2015 model year trucks under an overpayment theory of damages.

Cummins argues that *Cheng v. BMW of North America, LLC* and *Hadley v. Chrysler Group, LLC* stand for the proposition that Plaintiffs should be barred from seeking monetary damages for a defect that Defendants have already remedied through the recall. *See* No. CV 12- 09262 GAF (SHx), 2013 WL 3940815 (C.D. Cal. Jul. 26, 2013); 624 F. App.'x 374. But in *Cheng* the plaintiffs were not actually requesting monetary damages, so that case is inapposite. 2013 WL 3940815, at *4 (explaining that plaintiff's pleading stated, "at this time [he] does not pray for any mone-

tary damages as a result of Defendants' violations of the [applicable statute]."). Although *Hadley*, a Sixth Circuit case, is more on point, the plaintiffs in that case did not claim, as Plaintiffs in this case do, that their injury occurred at the point of purchase. 624 F. App'x at 378. The *Hadley* plaintiffs' claims were "not based on the existence of the defect[ ] . . . instead they are based on New Chrysler's delay in implementing the promised repair." *Id.* The Sixth Circuit agreed with the district court that the plaintiffs could not establish a diminished-value injury "based solely on New Chrysler's delay" in repairing the defect. *Id.*

In this particular case, there is some concern that allowing Plaintiffs to sue for monetary damages over a defect that Defendants have already remedied cuts against basic fairness and may disincentivize manufacturers from incurring the expense of voluntary recalls in the first place. Nonetheless, because Plaintiffs claim their injury occurred at the point of purchase, and that the recall did not necessarily remediate the loss caused to Plaintiffs by their allegedly having to pay an additional $8,000 to $10,000 premium based on Defendants' alleged misrepresentations, *Hadley* does not plainly bar Plaintiffs' claim for monetary damages in connection with the washcoat defect in 2013–2015 class vehicles. *See* ECF No. 18, PageID.2559–60. Plaintiffs have pled an injury in connection with the washcoat defect in those trucks sufficient to establish standing.

## B. The washcoat defect in 2016–2017 model year trucks

**[10, 11]** Plaintiffs have not sufficiently alleged an injury arising from their purchase of the 2016–2017 model year trucks. Establishing an economic injury using overpayment theory requires Plaintiffs to

"sufficiently and plausibly" plead the existence of a defect in trucks they purchased or leased. *See In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1163. But, as to the 2017 trucks, none of the Plaintiffs claim to have purchased or leased a truck from that model year. What's more, Plaintiffs make no specific allegations about a washcoat defect in either the 2016 or the 2017 model year trucks. Plaintiffs acknowledge those trucks contained an entirely different washcoat than the one that was used in the 2013–2015 vehicles that were recalled. Because of these pleading deficiencies, the Court will dismiss Plaintiffs' claims pertaining to the washcoat defect in 2016 and 2017 model year trucks.

**[12]**  A plaintiff has standing to assert claims stemming from a defective product or false advertising only if she "experienced injury stemming from the purchase of that product." *Granfield v. NVIDIA Corp.*, No. C 11-05403 JW, 2012 WL 2847575, at *6 (N.D. Cal. Jul. 11, 2012). Because none of the Plaintiffs claim to have owned or leased a 2017 model year Dodge Ram 2500 or 3500 truck with a Cummins 6.7-liter diesel engine, any claims alleging injury from the 2017 trucks must be dismissed. Plaintiffs cannot assert claims pertaining to defects in a vehicle none of them purchased. *See id.*

Plaintiffs have likewise not pled facts sufficient to demonstrate they suffered any injury arising from a washcoat defect in the 2016 model year trucks. The Amended Complaint's allegations about the washcoat defect rest on information gathered from documents pertaining to the EPA-supervised recall of model year 2013–2015 Ram 2500 and 3500 trucks, and related litigation. The model year 2016–2017 trucks use a different washcoat—the same washcoat FCA and Cummins deployed to *remedy* the defective washcoat problem in the 2013–2015 vehicles that were recalled. Plaintiffs do not offer any specific allega-

tions establishing the existence of the washcoat defect in the 2016 or 2017 trucks and therefore have not shown any injuries arising specifically from this newer washcoat.

To survive a motion to dismiss in the defeat-device context, courts have generally required plaintiffs to allege that their experts, or another reputable third party, conducted rigorous testing on the vehicles' emissions system and identified a defect. The washcoat defect differs fundamentally from a defeat device because defeat devices are engineered to reduce the effectiveness of a car's emissions-control system when the vehicle is not being tested for compliance with emission regulations. As such, defeat devices are "inherently deceptive" and, according to some courts, indicative of "specific intent to defraud" on the part of the manufacturer. *See Duramax*, 298 F. Supp. 3d at 1083. Nonetheless, while the misleading character of the defeat device may require distinguishing those cases from non-defeat-device cases in the context of analyzing fraud claims, there is no reason to differentiate between defeat-device cases and cases involving mere emissions-system defects in assessing economic injury and standing. In both situations, the injury stems from the defendant's alleged misrepresentations or omissions about the vehicles' emissions rate to the EPA and to consumers as compared to the vehicles' actual emissions rate on the road in normal use. And in both settings testing is useful to establish a defect and resulting injury because vehicle emissions are not something observable with the naked eye, or by the average plaintiff. If courts in this district require specific allegations of emissions testing to establish a defect in the defeat-device context, it is unclear why they should not apply that same standard to all emissions-defect cases where the gravamen of the

claim is that the defect caused excessively high emissions.

Turning to what type of emissions testing courts have required to show injury, courts have allowed plaintiffs to survive a motion to dismiss when they have conducted their own "scientifically valid emissions testing" on the diesel trucks at issue. In *In re Duramax Diesel Litigation*, for example, that testing showed that the class trucks emitted NOx at rates significantly higher than similar gasoline-engine trucks. *Duramax*, 298 F. Supp. 3d at 1046. Data gathered by those plaintiffs also indicated that the class trucks were noncompliant with EPA standards and thus fell short of what reasonable consumers would expect, especially based on the manufacturer's representations. *Id.*

Similarly, in *Counts I* the plaintiffs conducted their own emissions testing on the class vehicles and in their pleading explained that several European government agencies had found that other General Motors vehicles with engine technology similar to the class vehicles produced significantly higher emissions than the manufacturer represented. *Counts I*, 237 F. Supp. 3d at 583. This, according to the court, was "enough" to support a plausible allegation that General Motors's representations about the vehicles' emissions were deceptive, and therefore to establish the "concrete and particularized injury" requisite for standing. *See id.* at 581–83.

In contrast, in *Bledsoe I* this Court found the plaintiffs' allegations about the presence of a defeat device in the class vehicles lacking because plaintiffs based that claim entirely on emissions testing conducted on a single truck "under poorly-defined parameters." *See Bledsoe II*, 378 F. Supp. 3d at 632 (discussing *Bledsoe v. FCA US LLC ("Bledsoe I")*, 307 F. Supp. 3d 646, 657 (E.D. Mich. 2018)). This was deemed insufficient to establish a cognizable Article III injury. In *Bledsoe II*, this Court examined the plaintiffs' amended complaint, which they filed after considerably expanding their emissions testing of the proposed class vehicles. 378 F. Supp. 3d at 632–33. In large part because of this "considerably expanded" emissions testing, and the additional detail plaintiffs provided about the nature of that testing, the Court permitted the bulk of the *Bledsoe II* plaintiffs' updated allegations to proceed past the motion to dismiss phase. *See id.*

In the instant case, Plaintiffs do not plausibly allege that the washcoat defect present in 2013–2015 model year vehicles also plagued 2016–2017 vehicles. Without any emissions testing or other specific data relating to the performance of the later vehicles, which contained a different washcoat than the 2013–2015 vehicles, Plaintiffs fail to adequately plead the existence of a defect—and any resultant overpayment injury—in the 2016 trucks. And again, their claims related to the 2017 trucks fail because no Plaintiff claims to have owned a 2017 model year truck.

## C. The flash defect in 2013–2016 model year trucks

[13]   The Amended Complaint's allegations concerning the flash defect are plausible enough to establish an Article III injury caused by the conduct of both Defendants. Plaintiffs allege the flash defect caused them to experience less fuel economy and spend more money on diesel than they would have absent the defect. In support of this injury they attribute to the flash defect, Plaintiffs have collected observations about their trucks' decline in fuel economy. Those observations are set forth in the Amended Complaint. Because this claimed defect does not involve the trucks' rate of actual emissions as compared to that represented by the manufacturer, the Court finds no precedent for

applying the testing requirement to the flash defect.

According to the Amended Complaint, the trucks' DPF routinely became clogged with soot, causing the trucks to enter active regeneration mode to burn more fuel in order to clear the DPF. ECF No. 17, PageID.2488. Active regeneration mode, Plaintiffs contend, also causes the trucks to enter "limp mode," necessitating that Plaintiffs bring their trucks to the dealership for service. *Id.* Plaintiffs claim that when they brought their trucks to a FCA dealership for service, service providers "flashed" or reprogrammed the trucks' Electronic Control Modules, essentially instructing the trucks to divert more fuel to burn out soot in the DPF. *Id.* Each of the Plaintiffs alleges that his car was "flashed," although Plaintiffs do not specify when or where. Because the Amended Complaint explains that the "flashing" occurred when Plaintiffs brought their cars into FCA dealerships for servicing, the Court infers it was FCA's representatives who carried out the reprogramming.

Plaintiffs say they each paid a premium of between $8,000 to $10,000 to purchase diesel trucks with the understanding that they had "better fuel economy compared to a gas engine, and superior torque and towing capabilities." ECF No. 18, PageID.2559–60. The Amended Complaint asserts that they did not receive the benefit of this bargain. After their trucks were "flashed," Plaintiffs claim, the vehicles' fuel efficiency dropped 20–25 percent, causing Plaintiffs to spend significantly more on diesel fuel annually. *See, e.g.*, ECF No. 17, PageID.2489, 2495, 2497.

Jeremy Raymo, for example, says that his truck's "MPG has dropped by approximately three MPG," costing him an additional $2,013 in fuel costs annually. Forrest Poulson claims that after his truck was flashed its MPG dropped by approximately five MPG, costing him about an additional

$750 in spending on diesel fuel annually. ECF No. 17, PageID.2497. He further asserts that he incurred an additional $400 or $500 in out-of-pocket expenses when his truck went into limp mode as a result of the flash defect, stranding him 200 miles from home. *Id.* at 2497–98. Plaintiff Manuel Pena also says his truck's MPG dropped by approximately five MPG after being "flashed," causing him to spend an additional $538 on diesel fuel each year, as well as $50 in "unreimbursed fuel costs" he incurred when his truck broke down 250 miles from home. ECF No. 17, PageID.2505.

The only Plaintiff who makes no allegations about an injury he suffered as a result of the flash defect is Gary Gaster. He does not allege that his trucks were ever "flashed," and does not say that he sustained any injury in connection with the flash defect. *See* ECF No. 17, PageID.2499–2502. Accordingly, Gaster lacks standing to pursue claims related to the flash defect.

Although Plaintiffs do not explain how or when they measured the fuel economy of their vehicles after they were "flashed," or how, if at all, they compared the trucks' post-"flashing" fuel economy to the their pre-"flashing" fuel economy, the Court finds that they—with the exception of Gaster—have alleged a non-speculative injury fairly traceable to the flash defect, and redressable by this Court. *See Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. That is enough to survive a motion to dismiss.

As support for the flash defect, Plaintiffs also rely on comments by one mechanic who allegedly said, "I will deny this later, but I can tell you that the ECM updates [i.e. "flashing"] are diverting fuel into the exhaust system to make it burn hotter so that it reduces the amount of emissions leaving the tailpipe." ECF No. 17, PageID.2489. The same mechanic apparently

said that "upwards of 25%" of the trucks' fuel was being diverted through the exhaust system to heat up the emissions because of the flash defect. ECF No. 17, PageID.2490. No information is provided about the identity of this mechanic, the FCA dealership where he worked, or the date on which he made these comments. Taking all the allegations in the Amended Complaint as true, however, the Court finds that it sufficiently alleges the existence of the flash defect and a cognizable injury relating to that defect in the 2013–2016 trucks.

### III. Plaintiffs fail to state a claim for violation of RICO.

In reviewing the Amended Complaint's factual allegations, it is clear this case is not an appropriate vehicle for a civil RICO action. Although Plaintiffs have pled a cognizable injury under the RICO Act by alleging that they overpaid for the trucks at the point of purchase because of the washcoat defect and the flash defect, they have not adequately pled the existence of a common enterprise between FCA and Cummins, or the required state of mind for a RICO claim. Plaintiffs must allege the Defendants acted with the requisite scienter to support their allegations about the predicate fraud offenses. This they fail to do. The RICO claims will be dismissed for failure to state a claim.

[14] To successfully plead a RICO claim under 18 U.S.C. § 1962(c) Plaintiffs must allege that FCA and Cummins participated, directly or indirectly, in (1) the conduct (2) of an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity. *Counts II*, 2018 WL 5264194 at *3 (citing *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012)).

[15–17] Demonstrating the existence of a RICO "enterprise" requires showing that the defendants were "a continuing unit that functions with a common purpose." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794 (6th Cir. 2012) (quoting *Boyle v. United States*, 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009)). "Racketeering activity" in turn means one of the acts indictable under the federal statutes enumerated in 18 U.S.C. § 1961(1)(B). Among the enumerated statutory offenses are mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, which are the two predicate offenses Plaintiffs allege here. Establishing a "pattern" of "racketeering activity" entails alleging that FCA and Cummins each engaged in two or more predicate acts of such conduct—that is, two acts of mail or wire fraud. *See Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 605 (E.D. Mich. 2015). Plaintiffs must also fulfill RICO's statutory standing requirements, which require them to plausibly allege (1) an injury to "business or property," that is (2) "by reason of violation of section 1962." 18 U.S.C. § 1964(c). The injury to "business or property" must be "concrete" rather than speculative or tangible. *Counts II*, 2018 WL 5264194 at *3 (citing *Saro v. Brown*, 11 F. App'x 387, 389 (6th Cir. 2001)).

### A. Plaintiffs have established a RICO injury created by the washcoat defect in 2013–2015 model year vehicles, and the flash defect in 2013–2016 vehicles.

[18] Plaintiffs have alleged facts establishing an injury to business or property. The premium Plaintiffs say they paid for the trucks under the misapprehension that they were lower-emitting and had better fuel economy and other qualities superior to similar gas vehicles satisfies RICO's injury requirement.

Sixth Circuit precedent allows Plaintiffs to demonstrate a cognizable RICO injury using overpayment theory. In *Reiter v.*

*Sonotone Corporation*, a case involving § 4 of the Clayton Act, the Supreme Court found the plaintiff's allegation that she had purchased a hearing aid at a price artificially inflated by the defendants' anticompetitive conduct sufficient to allege an injury to property. 442 U.S. 330, 337, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Like RICO, the Clayton Act authorizes any person who suffers an injury to "business or property" because of an antitrust violation to file suit. *Id.* Although *Reiter* was not a RICO case, the Sixth Circuit has observed that the opinion's "common-sense observation about § 4 applies with equal logical force to § 1964(c)," the civil RICO statute. *Jackson v. Sedgwick Claims Mgmnt. Servs., Inc.*, 731 F. 3d 556, 564 (6th Cir. 2013).

Courts in this district considering RICO standing in similar auto cases have approved the overpayment theory of damages advanced by Plaintiffs. The *Duramax* court was satisfied with plaintiffs' contention that they had paid a premium of nearly $9,000 for a diesel (rather than gas) car because of General Motors's allegedly fraudulent conduct. The court found that allegation enough to state a "cognizable out-of-pocket injury" traceable to the allegedly defective product. 298 F. Supp. 3d at 1071–72. Similarly, in *Counts II* another court in this district found the plaintiffs had established a RICO injury where they claimed to have paid a premium of $2,400 to purchase a diesel truck without receiving the benefit of their bargain. 2018 WL 5264194 at *4. The trucks' value, plaintiffs alleged, had been inflated by the defendant's allegedly fraudulent conduct. 2018 WL 5264194 at *4. *See In re Chrysler-Dodge-Jeep Litig.*, 295 F. Supp. 3d at 959 (holding that overpayment because of deceptive conduct states a RICO injury); *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litig.*, 349 F. Supp. 3d 881 (N.D. Cal. 2018) (holding that plaintiffs who allegedly overpaid to lease class vehicles by paying a premium

for something they did not receive stated a RICO injury to "business or property").

Unlike the plaintiffs in *In re: General Motors LLC Ignition Switch Litigation*, No. 14-MD-2543, 14-MC-2543, 2016 WL 3920353 (S.D.N.Y. Jul. 15, 2016), which Defendants rely on, the Plaintiffs in this case allege the class vehicles are currently defective because they emit more NOx than a reasonable consumer would expect (the washcoat defect), and underperform on fuel economy and other tasks (the flash defect) in comparison to what Plaintiffs reasonably expected based on Defendants' representations. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d at 964 (distinguishing cases alleging speculative, latent defects from those in which plaintiffs allege that a defect is currently present in all class vehicles). Overpayment for a vehicle at the point of purchase, as Plaintiffs allege here, is a cognizable RICO injury where plaintiffs allege that the defect is current—rather than latent—and affects all class vehicles.

Like in *Duramax* and *Counts II*, cases decided in this district, the premium Plaintiffs paid for the trucks, which they assert did not function as advertised, was also "determinable" at the point of purchase rather than contingent on "the vagaries of the free market" or some other speculative event. *In re Duramax Diesel Litig.*, 298 F. Supp. 3d at 1072. *See Gamboa*, 381 F. Supp. 3d at 878. *Cf. Counts II*, 2018 WL 5264194 at *4 (explaining that damages such as "future attempted repairs, future costs, and diminished future performance for value" are "too speculative" to constitute a RICO injury.). Plaintiffs have thus established a cognizable RICO injury in connection with the washcoat defect in the 2013–2015 trucks and the flash defect in the 2013–2016 trucks.

**B. Plaintiffs have not plausibly alleged that FCA and Cummins shared a common purpose.**

[19] The Amended Complaint's factual allegations do not, however, support the existence of a "common purpose" shared by FCA and Cummins. Stating a RICO claim requires Plaintiffs to plausibly allege that the enterprise members who engaged in a pattern of racketeering activity were united in a "common purpose." 18 U.S.C. § 1962(c). *See United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Unlike a defeat-device case, where the common purpose of designing, marketing, and selling an engine or car with such a device installed is inherently deceptive, the allegations concerning the washcoat defect and flash defect establish nothing more than a business relationship. Plaintiffs' claim that FCA and Cummins were participating in the washcoat and flash enterprises together thus falls short of pleading a common unlawful purpose.

Courts have "overwhelmingly" rejected efforts to characterize ordinary business relationships as RICO enterprises. *Gomez v. Guthy-Renker, LLC*, No. EDCV 14-01425 JGB, 2015 WL 4270042, at *8 (C.D. Cal. Jul. 13, 2015) (collecting cases). *See Wuliger v. Liberty Bank, N.A.*, No. 3:02 CV 1378, 2004 WL 3377416, at *9 (N.D. Ohio Mar. 4, 2004) ("Participation in a business relationship without more does not equate to liability under § 1962(c)."); *Javitch v. Capwill*, 284 F. Supp. 2d 848, 856–57 (N.D. Oh. 2003) (same). To that end, several courts have distinguished between factual scenarios where the enterprise's common purpose was "to create, market, and sell . . . [an] inherently deceptive" product, and those in which parties engaged in a typical business relationship. *Duramax*, 298 F. Supp. 3d at 1080 n.25.

For example, in *Shaw v. Nissan North America, Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016), the plaintiffs alleged that defendants had participated in an enterprise "for the purpose of concealing the scope and nature of the . . . defects in order to sell more Subject Nissan Vehicles" with the additional shared purpose of "maximiz[ing] the revenue and profitability" through their design, manufacture, distribution, and testing the defective vehicles. The *Shaw* defendants, according to the plaintiffs, continued to sell the class vehicles despite their awareness of the alleged defect. *Id.* Yet in that case the court found no common purpose, "much less a fraudulent one." *Id.* at 1057. Rather, the allegations demonstrated only that the parties were "associated in a manner directly related to their own primary business activities." *Id.* at 1057. That the defendants at times reached "independent conclusions" about which remedial measures to take in response to discovery of the defect further swayed the court in favor of finding that plaintiffs had failed to plead the existence of a RICO enterprise with a common purpose. *See id.*

The Amended Complaint in this case describes two separate RICO enterprises that FCA and Cummins allegedly participated in: the "washcoat enterprise"; and the "flash enterprise." The purpose of the washcoat enterprise, according to Plaintiffs, was for FCA and Cummins to continue profiting from sales of the trucks while omitting disclosure of the washcoat defect to regulators and the public and continuing to market the trucks as compliant with emissions standards, "clean," and "the lowest emitting diesel engine ever produced." ECF No. 17, PageID.2587. The flash enterprise was allegedly informed by FCA and Cummins's shared purpose of designing a defective truck that would initially pass emissions standards but break down over time. ECF No. 17, PageID.2487. This, Plaintiffs allege, would necessitate that FCA dealerships "flash"

the trucks' Electronic Control Modules to divert more fuel to the DPF to burn off soot, passing on costs to the consumer by diminishing the trucks' fuel economy by approximately 25%. ECF No. 17, PageID.2587. An additional purpose of both enterprises, Plaintiffs claim, was misrepresenting or omitting information about the trucks' emissions levels to the EPA and CARB for the purpose of obtaining COCs and EOs. *See* ECF No. 17, PageID.2589, 2592–93.

Plaintiffs have not adequately pled the existence of the washcoat or flash enterprise because they do not provide specific allegations of a shared purpose between FCA and Cummins. The washcoat defect is not an inherently deceptive product, as compared to the defeat devices involved in *Duramax*, *Bledsoe I & II*, and numerous similar cases. Plaintiffs' allegations about FCA and Cummins's shared purpose involving the flash enterprise are similarly inadequate. They provide no specific allegations about how FCA and Cummins would have known about the flash defect at the time Cummins filed COC and EO applications, or how the Defendants' behavior evidences a "common purpose" of concealing the flash defect from consumers. Further, Plaintiffs do not specifically allege that FCA and Cummins designed, manufactured, marketed, and sold the trucks with a common purpose of misleading regulators and the public. Rather, Plaintiffs generally describe the process through which FCA and Cummins interacted in designing and manufacturing the trucks containing Cummins engines, and the process of obtaining COCs and EOs. This is consistent with the ordinary course of a business relationship between a supplier and manufacturer and cannot by itself establish a "common purpose" worthy of a RICO enterprise. *See Duramax*, 298 F. Supp. 3d at 1080 n.25.

Moreover, Plaintiffs allege that FCA and Cummins became aware of the washcoat defect only "as early as September 2014," after FCA began receiving an increasing number of related warranty claims. ECF No. 17, PageID.2481–82. Accordingly, any joint enterprise involving the washcoat defect could not have existed prior to September 2014. Plaintiffs also acknowledge that Cummins quickly began conducting emissions testing on the trucks and, after identifying a potential problem, promptly notified the EPA of a possible emissions defect in March 2015. ECF No. 36-1, PageID.5675. Plaintiffs imply that the delay between the initial discovery of the defect "as early as September 2014" and the EPA's 2018 announcement of the recall is indicative of a RICO enterprise that united FCA and Cummins in a common purpose. Yet the Amended Complaint also describes FCA and Cummins as being in total disagreement about which party was financially and logistically responsible for the washcoat recall from at least early 2015 through 2018. *See* ECF No. 17, PageID.2481–82. The fact that FCA and Cummins were in opposition to one another concerning allocating responsibility for the recall substantially undercuts the conclusion that they were operating to further the "common purpose" of the purported washcoat enterprise.

Plaintiffs' RICO claims must be dismissed because they have not specifically pled a "common purpose" uniting FCA and Cummins in the washcoat or flash enterprises. The Court is similarly unconvinced that the Amended Complaint adequately alleges the existence of separate single-entity enterprises by FCA and Cummins in connection with either defect.

## C. Plaintiffs have not adequately pled the scienter necessary to support predicate offenses.

An additional basis for dismissal of the RICO claims is Plaintiffs' failure to ade-

quately plead a "specific intent to defraud." The predicate RICO acts identified by Plaintiffs are mail and wire fraud. 18 U.S.C. §§ 1341, 1343. According to Plaintiffs, FCA and Cummins engaged in mail and wire fraud by using the United States mail and wires for the purpose of carrying out unlawful schemes to design, manufacture, market, and sell defective trucks to consumers by making misrepresentations and omissions.

[20–23]  To state a claim for mail or wire fraud, Plaintiffs must allege the following elements: "(1) devising or intending to devise a scheme to defraud (or to perform fraudulent acts); (2) involving the use of the mails; (3) for the purpose of executing the scheme or attempting to do so." *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013). The "scheme to defraud" must involve "misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Bender*, 749 F.2d at 1216 (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.1979)). Sixth Circuit precedent further requires that Plaintiffs allege FCA and Cummins each had the "specific intent to deceive or defraud." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997). Although Plaintiffs need not allege "actual reliance," they must plausibly claim that the misrepresentations or omissions were "material." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003).

[24]  Plaintiffs have not sufficiently alleged that FCA and Cummins each acted with "specific intent to defraud." The distinction between cases involving a defeat device and those arising from an alleged defect such as the washcoat defect is salient here. In defeat-device cases, courts have reasonably inferred a specific intent to defraud from the nature of the defeat-device scheme itself. As expressed by a court in the Northern District of Califor-

nia, "[n]o one to date … has sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's emission systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under normal driving conditions." *In re Volkswagen "Clean Diesel" Mktg, Sales Practices & Prods. Liab. Litig.*, MDL No. 2672 CRB, 2017 WL 4890594, at *15 (N.D. Cal. Oct. 30, 2017). In *Duramax* and *Counts II*, courts in this district found specific allegations of a defeat device indicative of "inherently deceptive" intent sufficient to demonstrate "specific intent to defraud." *See Duramax*, 298 F. Supp. 3d at 1083; *Counts II*, 2018 WL 5264194 at *7. *See also In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d at 977 (inferring specific intent to defraud from allegations of a defeat device because the defeat devices have a "deceitful purpose."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 WL 4890594 at *15 (finding intent to defraud based on manufacturer's use of a defeat device).

As has been stated, this is not a defeat-device case, nor do the facts as pled establish that the washcoat or flash defects are indicative of malintent on the part of FCA or Cummins in the way that defeat devices are widely understood to be. Accordingly, the Court does not immediately infer any specific intent to defraud on the part of FCA or Cummins. The Sixth Circuit has stated that specific intent to defraud or deceive exists only "if the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003). For example, in *Miller v. General Motors, LLC* another court in this district considered too conclusory allegations that "GM failed to disclose the [defect]" and "GM was aware of the [defect]

. . . when it marketed and sold the Class Vehicles." 2018 WL 2740240, at *13 (E.D. Mich. June 7, 2018). Such statements, the court held, were "plainly insufficient to establish knowledge" of the defect even under Rule 8's less stringent pleading standard. *Id.* Plaintiffs' allegations about FCA and Cummins's specific intent to defraud are similarly conclusory.

Plaintiffs allege that the gap between FCA and Cummins allegedly becoming aware of the washcoat defect "as early as September 2014" and commencement of the recall in 2018 establishes a specific intent to defraud on the part of Defendants. Among the other allegations Plaintiffs make regarding intent to defraud are that Defendants must have known about the washcoat defect "from the beginning, because they *would have* been required to test the Trucks for their useful life, and the [defect] *would have* manifested itself during these tests." ECF No. 17, PageID.2561 (emphasis added). Concerning the flash defect, Plaintiffs somewhat vaguely assert, "Defendants also knew about the Flash Defect for the same reason." ECF No. 17, PageID.2561. These allegations about Defendants' intent to defraud are distinctively lacking in particularity.

[25] Although Rule 9(b) permits that "[m]alice, intent, [and] knowledge . . . may be alleged generally," Sixth Circuit jurisprudence demands that plaintiffs at least allege the defendant "possesses the specific intent to deceive or defraud." *Frost*, 125 F.3d at 354. To say, as the Amended Complaint does, that Cummins and FCA simply "must have known" about the washcoat defect based on their useful-life testing is too speculative a foundation on which to support an inference that they specifically intended (through their allegedly material misrepresentations) to cause Plaintiffs to purchase defective trucks. Because pleading the requisite scienter is essential to

stating a claim for the predicate RICO offenses of mail and wire fraud, Plaintiffs' failure to allege a "specific intent to defraud" is fatal to their RICO claims.

## IV. Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

[26] Plaintiffs' claims under MMWA, 15 U.S.C. § 2301, also cannot stand because Plaintiffs have not alleged underlying state-law warranty claims. The MMWA creates a private right of action for consumers injured by the failure of a supplier, warrantor, or service contractor to comply with its obligations under a written or implied warranty, or service contract. 15 U.S.C. § 2310(d)(1). But the statute serves only to "supplement" state-law implied warranties by prohibiting their disclaimer in certain circumstances and providing a federal remedy for their breach. *Rokicsak v. Colony Marine Sales & Serv., Inc.*, 219 F. Supp. 2d 810, 817 (E.D. Mich. 2002) (quoting *Richardson v. Palm Harbor Homes, Inc.*, 254 F.3d 1321, 1325–26 (11th Cir. 2001)). A claim under the MMWA is therefore derivative of and "relies on the underlying state law claim." *Johansson v. Cent. Garden & Pet Co.*, 804 F. Supp. 2d 257, 265 (D. N.J. 2011) (citing *Bailey v. Monaco Coach Corp.*, 350 F. Supp. 2d 1036, 1040 (N.D. Ga. 2004)). This court has previously dismissed MMWA claims where the plaintiffs have not alleged any underlying state-law warranty claims. *Bledsoe II*, 378 F. Supp. 3d at 650. Plaintiffs have not convinced this Court it should rule differently under the facts of this case and in fact have agree to dismissal of their MMWA claims. *See* ECF No. 39, PageID.5789.

## V. Plaintiffs have adequately pled some of their state-law claims.

Some of Plaintiffs' state-law fraud and consumer-protection claims fall short of Rule 9(b)'s heightened pleading standard while others just meet it. *See Miller*, 2018

WL 2740240 at *14 (explaining that Rule 9(b) applies to state consumer-protection claims that sound in fraud). In contrast, Plaintiffs' breach of contract claims are insufficiently pled because they do not specifically allege that there was ever any contract between either FCA or Cummins and the Plaintiffs, or what specific provision Defendants allegedly breached. As to Plaintiffs' unjust enrichment claims, the Court will allow some to move forward, while others will be dismissed.

[27] As stated, the enormous Amended Complaint asserts claims against FCA and Cummins under the laws of 18 states (Michigan, Alabama, California, Colorado, Florida, Georgia, Idaho, Kentucky, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, and Washington). Yet they make little effort to support the validity of their fraudulent concealment, consumer protection, breach of contract, or unjust enrichment claims on a state-specific basis. Courts are not responsible for sua sponte raising and resolving legal questions not sufficiently briefed by the parties. *Counts I*, 237 F. Supp. 3d at 594. Nonetheless, the Court has thoroughly considered Plaintiffs' state-law claims and will allow some of them to proceed past the motion-to-dismiss phase.

## A. Fraudulent misrepresentation, omission, and consumer-protection statutes

[28, 29] Sixth Circuit precedent demands that claims for affirmative misrepresentations: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank*, 547 F.3d at 569. For claims involving fraudulent omissions, Rule 9(b) requires that Plaintiffs plead "the who, what, when, where, and how" of the al-

leged omission. *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). Specifically, a plaintiff must alleged "(1) precisely what was omitted; (2) who should have made the representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Id.* Stating a claim for fraudulent omission also requires pleading a duty to disclose. *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 665 (6th Cir. 2013).

### i. Plaintiffs have to some extent stated claims for fraudulent misrepresentation.

The Court will first consider Plaintiffs' claims for affirmative misrepresentation. The Amended Complaint includes a compilation of statements by FCA, and by Cummins, that Plaintiffs cast as misrepresentations. *See* ECF No. 17, PageID.2553–57. Those statements, pulled from Cummins's and FCA's sales brochures, news releases, YouTube videos, includes claims that Cummins offers "leading fuel economy for a lower cost of operation"; "environmentally clean engines"; "ultra low emissions systems"; and "compl[iance] with federal laws covering exhaust emissions." *Id.* at PageID.2553–55. Among the statements Plaintiffs point to as misrepresentations by FCA are its assertions that the trucks "are part of the low-cost of ownership equation"; "built to last for years"; "green by design"; and "fully compliant with recent federal mandates." *Id.* at 2555–56. Although Plaintiffs have specifically pled the "what," "who," "when," and "where" of these statements, and—considering their pleading as a whole—that those statements were generally false, many of the statements are non-actionable puffery.

[30] "Inherently subjective" statements cannot form the basis of a fraud

action. *Counts I*, 237 F. Supp. 3d at 598. Statements about the cleanliness of an engine or emissions system, for example, "clean diesel," have been categorized by courts—including this one—as puffery, as have claims that a vehicle is "efficient" or "reliable." *Id.; Gamboa*, 381 F. Supp. 3d at 875; *Bledsoe II*, 378 F. Supp. 3d at 648–650; *Ram Int'l Inc. v. ADT Sec. Servs., Inc.*, No. 11-10259, 2011 WL 5244936, at \*6 (E.D. Mich. Nov. 3, 2011). In contrast, this Court held in *Bledsoe II* that "statements that the trucks meet an ascertainable and quantifiable standard for fuel efficiency and emissions set in place by a third-party regulator . . . rise above nonactionable puffery." 378 F. Supp. 3d at 649. For example, quantifiable promises such as "meeting the 2010 emissions standards three years early" were deemed actionable representations. *Id.* at 649. Generally speaking, the more general the assertion, the more likely it is to be identified as puffery. *Counts I*, 237 F. Supp. 3d at 597. Similarly, statements that make "specific representations, especially numerically quantifiable representations," are more likely to be considered actionable. *Id.*

[31] Here, the representations Plaintiffs highlight by FCA and Cummins are almost all easily categorized as nonactionable puffery. Statements such as "leading fuel economy," "unprecedented performance and fuel economy," "environmentally clean," "low-cost of ownership" and "built to last for years" are general and nonquantifiable. The Court therefore considers them nonactionable puffery.

The only statements referenced by Plaintiffs that initially appear actionable are those by Cummins claiming that the company offers "[t]he smart way to get 3–6% better fuel economy," that the "6.7L Turbo Diesel produces an additional 15 lb.-ft of torque, while maintaining performance and EPA compliance," and the "Cummins after-treatment system allows your truck to comply with federal laws governing exhaust emissions . . . ." ECF No. 17, PageID.2553–55. On further inspection, however, the claim about "3–6% better fuel economy" in the Cummins brochure pertains to the SmartAdvantage Powertrain, which Plaintiffs have not alleged has anything to do with the trucks' SCR or DPF. *See* ECF No. 17-20, PageID.4577 ("Top 10 Ways Cummins is Redefining Value" Brochure). It also begs the question, 3–6% better fuel economy than what? And Cummins's statements about the 6.7L Turbo Diesel's 15 lb.-ft of torque, which relates to the 2015 trucks, cannot create a basis for Plaintiffs' fraud claims because they have not alleged that the statement is false. *See Frank*, 547 F.3d at 569 (explaining that to plead fraudulent misrepresentation, the plaintiff must plead that the statement at issue was false).

[32, 33] The statement that the "Cummins after-treatment system allows your truck to comply with federal laws governing exhaust emissions" is, however, actionable. CAA preemption does not apply because Plaintiffs are taking issue with Cummins's alleged misrepresentation about the trucks' emissions, not with the mere fact that the trucks do not meet federal emissions standards. Likewise, FCA's statement that the Cummins engine used in the 2013 trucks has an SCR system "that's fully compliant with recent federal mandates," likewise appears actionable. ECF No. 17, PageID.2556. Plaintiffs' affirmative misrepresentation claims rooted in these two statements by FCA and Cummins are thus sufficient to survive the motions to dismiss.

### ii. Plaintiffs have adequately pled state-law claims for fraudulent omission.

[34, 35] Turning to Plaintiffs' claims for fraudulent omission, each of the state

laws under which Plaintiffs assert claims require knowledge of the defect by the defendant, or at least an allegation that the defendant should have discovered the defect. *See Wozniak v. Ford Motor Co.*, 2019 WL 108845, at *4 n.5 (providing citations for the relevant state laws of Alabama, California, Colorado, Florida, Idaho, Kentucky, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Texas, Utah, and Virginia).[4] Defendants urge that Plaintiffs' fraud-based claims fail as a matter of law because they provide only conclusory allegations about Defendants' knowledge of the washcoat and flash defects. The Court agrees.

Courts considering fraudulent omission claims have found it insufficient under Rule 8 for plaintiffs to allege, in a conclusory manner, only that the manufacturer knew of a defect in the vehicle it sold them and failed to disclose that defect to plaintiffs before they purchased the vehicle. For example, in *Miller v. General Motors, LLC*, 2018 WL 2740240 at *13, the district court found plaintiffs' allegations that "GM failed to disclose the Power Liftgate Defect to [Plaintiff] before she purchased her vehicle, despite GM's knowledge of the defect" and that "GM was aware of the Power Liftgate Defect within the Class Vehicles when it marketed and sold the Class Vehicles" clearly insufficient to establish knowledge even under Rule 8's liberal pleading standard. Considered similarly insufficient by the *Miller* court were allegations that General Motors had known about the defect "since at least 2010," when it first issued technical service bulletins about the problem, and that it "likely had notice and knowledge of the defect prior to 2010" based on recalls by other

auto manufacturers who used liftgate struts from the same supplier. *Id.*

Allegations that a manufacturer "knew, or should have known" about a defect based on "pre-production testing, pre-production design failure mode effects analysis, production design failure mode effects analysis, early consumer complaint[s] made to [the manufacturer's] network of exclusive dealers and NHTSA [National Highway and Traffic Safety Administration]" have also been found generally insufficient to support an inference that the defendant knew about a defect at the time it sold the car. *Beck*, 273 F. Supp. 3d at 753 (collecting cases).

In yet another case in this district, *Hall v. General Motors, LLC*, No. 19-cv-10186, 2020 WL 1285636, at *3 (E.D. Mich. 2020) (Leitman, J.), the court found "too vague" and at "too high a level of generality" allegations that:

> "as early as 2007, if not before, Defendant acquired its knowledge of the [defect] though sources not available to Plaintiffs . . . including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Defendants' network of dealers and directly to Defendant . . . testing conducted by Defendant in response to consumer complaints, and repair order and parts data received by Defendant from Defendant's network of dealers."

Courts routinely reject generalized allegations about 'testing' and manufacturer 'analyses' made in support of finding

---

4.  The other states' laws Plaintiffs assert fraudulent omission claims under (Georgia, Mississippi, Oklahoma, and Washington) also require specific allegations of knowledge on the part of the defendant. *See Sun Nurseries, Inc. v. Lake Erma, LLC*, 316 Ga.App. 832, 730

S.E.2d 556, 561 (2012); *Lacy v. Morrison,* 906 So. 2d 126, 129 (Miss. Ct. App. 2004); *Gish v. ECI Servs. of Okla., Inc.,* 162 P.3d 223, 228 (Okla. Civ. App. 2006); *Adams v. King Cty.,* 164 Wash.2d 640, 192 P.3d 891, 902 (2008).

knowledge of a defect." *McKee*, 376 F. Supp. 3d at 761 (citing *Beck*, 273 F. Supp. 3d at 753).[5] For example, in *McKee v. General Motors, LLC*, the court found that allegations by plaintiffs that General Motors should have known about the transmission defect at issue based on testing it conducted in bringing the vehicles to market fell short of stating a claim. *McKee*, 376 F. Supp. 3d at 761, Similarly, allegations about complaints consumers made about the defect to the National Highway and Traffic Safety Administration were found to have no bearing on *General Motors's* knowledge of the defect. *Id.* Similarly, in *Grodzitsky v. Am. Honda Motor Co., Inc.*, No. 2:12-cv-1142-SVW-PLA, 2013 WL 690822, at *6 (C.D. Cal. Feb. 19, 2013), the court dismissed fraud claims where the plaintiffs made only "generalized" assertions that unspecified pre-release testing data and aggregate data from Honda dealers should have made the manufacturer aware of the defect.

Considering relevant precedent, to adequately plead fraudulent omission Plaintiffs must allege that Defendants knew at the time they sold the trucks that the washcoat defect and flash defect caused the trucks' aftertreatment system and fuel economy to be less effective than a reasonable consumer would have expected given Defendants' representations about the trucks. *See Miller*, 2018 WL 2740240 at *14 (citing *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551 (6th Cir. 2012)).

The Amended Complaint's allegations are plainly insufficient to establish FCA's or Cummins's knowledge of the washcoat defect in 2013–2015 trucks and the flash defect in 2013–2016 trucks. The pleading alleges that FCA and Cummins became aware of the washcoat defect "as early as

September 2014" and suggests the Court should infer knowledge or malicious intent from the fact that the EPA-supervised recall did not begin until 2018. ECF No. 17, PageID.2485. But Plaintiffs' pleading also acknowledges that Cummins, which held the COCs and EOs, began testing potentially affected vehicles after FCA received an increasing number of emissions-related warranty claims from customers in 2014. *See* ECF No. 17, PageID.2564–65, 2567–68. By March 2015, a mere six months later, Cummins had completed its testing and submitted an Emissions Defect Information Report to the EPA. ECF No. 17, PageID.2568. *See* ECF No. 36-1, PageID.5675.

Here, concerning the washcoat defect, Plaintiffs claim that Defendants must have known about the defect "from the beginning, because they *would have* been required to test the Trucks for their useful life, and the [defect] *would have* manifested itself during these tests." ECF No. 17, PageID.2561 (emphasis added). Such allegations do not warrant the inference that Defendants knew about the washcoat defect when they sold the trucks. Similarly, when it comes to the flash defect, Plaintiffs' even thinner assertions that "Defendants also knew about the Flash Defect for the same reason [as they knew about the washcoat defect]" are insufficient to establish Defendants' knowledge of the flash defect. ECF No. 17, PageID.2561. There are likewise no specific allegations in Plaintiffs' pleading that Cummins participated in, or knew anything about, the "flash" reprogramming FCA dealerships were using to remedy issues with the clogged DPF. Because the Amended Complaint does not contain allegations about the Defendants' knowledge of the wash-

---

**5.** *McKee* applied *Beck's* analysis of what is required to plead exclusive knowledge in the fraudulent omission context to assessing whether plaintiffs specifically pled knowledge

more generally. *McKee*, 376 F. Supp. 3d at 761 n.13 (citing *Beck*, 273 F. Supp. 3d at 753).

coat defect or flash defect sufficient to satisfy Rule 8 or Rule 9(b), Plaintiffs' state-law omission-based fraud claims fail as a matter of law. Their state-law consumer protection claims fail for the same reason, as Rules 8 and 9(b) also apply to consumer-protection claims that sound in fraud. *Miller*, 2018 WL 2740240 at \*14.

**B. Breach of contract**

[36]  Claims for breach of contract by their nature require the existence of an underlying contract. Plaintiffs do not allege they were a party to any contract with Cummins or FCA. As stated by the Sixth Circuit, "[i]t is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Northampton Restaurant Grp., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 522 (2012) (citation omitted). Plaintiffs have not met that threshold here. They have not identified any agreement that existed between Plaintiffs and FCA or Cummins, let alone any specific contract term that either Defendant breached. Plaintiffs' assertion that "[e]ach and every sale or lease of a Truck constitutes a contract between FCA and the purchaser or lessee" is unsupported by binding precedent. ECF No. 17, PageID.1659. Certainly, Plaintiffs have not alleged any factual basis for finding a contract between Cummins and the Plaintiffs. Plaintiffs' breach-of-contract claims against both Defendants will be dismissed.

**C. Unjust enrichment**

[37]  Claims for unjust enrichment by their nature seek equitable relief. Although Plaintiffs have not gone out of their way to provide the Court with statutory law or precedent from the 18 states whose laws they assert unjust enrichment claims under, the Court finds that Plaintiffs have largely carried their burden of pleading

specific facts that would entitle them to relief under unjust-enrichment law. The particular elements of unjust enrichment may vary somewhat from state to state, but the essence of such a claim is that it requires plaintiffs to allege facts showing that defendants "received a benefit and under the circumstances of the case, retention of the benefit would be unjust." *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1014 (E.D. Mich. 2014). Put another way, the typical elements of a state-law claim for unjust enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted the benefit; and (3) injustice would occur if the defendant did not pay the plaintiff for the value of the benefit. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1007–08 (quoting *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000)).

In the Amended Complaint Plaintiffs allege, broadly, that FCA and Cummins convinced Plaintiffs to pay a premium for vehicles that were higher-emitting and less fuel-efficient than they were led to believe by Defendants. That premium was, according to Plaintiffs, unjustly retained by FCA and Cummins.

[38, 39]  With the exception of Plaintiffs' claims under California and Texas law, which do not recognize unjust enrichment as a cause of action, the factual allegations in the Amended Complaint, taken as true, thus create a reasonable inference of unjust enrichment, regardless of the pleading particularities of applicable law in Alabama, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Utah, Virginia, and Washington. *See Avis Rent A Car Sys., Inc. v. Heilman*, 876 So.2d 1111, 1122–23 (Ala. 2003) (stating that under Alabama law, "[t]o prevail on a claim of unjust enrich-

ment, the plaintiff must show that the "defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to the defendant because of mistake or fraud.") (internal quotations and emphasis omitted); *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307, 128 Cal.Rptr.3d 109 (Cal. Ct. App. 2011) ("Unjust enrichment is not a cause of action, just a restitution claim."); *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) ("[A] party claiming unjust enrichment must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation."); *Florida Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n.4 (Fla. 2004) ("The elements of an unjust enrichment claim are 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.' "); *Campbell v. Ailion*, 790 S.E.2d 68, 73 (Ga. Ct. App. 2016) ("Thus, a claim for unjust enrichment exists where a plaintiff asserts that the defendant induced or encouraged the plaintiff to provide something of value to the defendant; that the plaintiff provided a benefit to the defendant with the expectation that the defendant would be responsible for the cost thereof; and that the defendant knew of the benefit being bestowed upon it by the plaintiff and either affirmatively chose to accept the benefit or failed to reject it."); *Vanderford Co., Inc. v. Knudson*, 144 Idaho 547, 165 P.3d 261, 272 (2007) ("A prima facie case of unjust enrichment consists of three elements: (1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that that would be ineq-

uitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof."); *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) ("For a party to prevail under the theory of unjust enrichment, they must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value"); *Bowlers' Alley, Inc. v. Cincinnati Ins. Co*, 32 F. Supp. 3d 824, 833 (E.D.Mich.2014) ("Under Michigan law, to plead a claim of unjust enrichment, a plaintiff must establish that the defendant has received and retained a benefit from the plaintiff and inequity has resulted."); *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331, 342 (Miss. 2004) ("Mississippi law provides that, in an action for unjust enrichment, the plaintiff need only allege and show that the defendant holds money which in equity and good conscience belongs to the plaintiff"); *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 641 A.2d 519, 526 (1994) ("To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust."); *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C.App. 390, 537 S.E.2d 248, 266 (2000) ("[A] plaintiff must allege that property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received but that the defendant has failed to make restitution for the property or benefits."); *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 465 N.E.2d 1298, 1302 (1984) (explaining that to establish unjust enrichment under Ohio law, a plaintiff must alleged: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defen-

dant under circumstances where it would be unjust to do so without payment".); *Pope v. Fulton*, 310 P.3d 1110, 1113 (Okla. Civ. App. 2013) ("Unjust enrichment arises when there is an expenditure by one person that adds to the property of another, coupled with a resulting injustice."); *Mitchell v. Moore*, 729 A.2d 1200, 1203–04 (Pa. Super. Ct. 1999) ("The elements necessary to prove unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."); *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App. 2006) ("Unjust enrichment is not an independent cause of action but rather characterizes the result of failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."), *rev'd on other grounds*, 240 S.W.3d 869 (Tex. 2007); *Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582 (Utah 2000) (explaining that to establish unjust enrichment under Utah law, there must be: (1) "a benefit conferred on one person by another"; (2) "the conferee must appreciate or have knowledge of the benefit"; and (3) there must be "acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."); *James G. Davis Constr. Co. v. FTJ, Inc.*, 841 S.E.2d 642, 650 (Va. 2020) ("We have adopted a three-part test to govern unjust enrichment claims: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value."); *W.H. Hughes, Jr., Co., Inc. v. Day*, No. 65352-1-I, 2011 WL 3278659, at *1 (Wash. Ct. App. 2011) ("Three elements are necessary to establish a claim for unjust enrichment: (1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment.") (internal quotations omitted).

For these reasons, the Court finds that Plaintiffs have adequately stated claims for unjust enrichment under the laws of Alabama, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Utah, Virginia, and Washington (but not California or Texas).

## CONCLUSION

For these reasons, Defendant FCA US LLC's motion to dismiss (ECF No. 35) is **GRANTED IN PART AND DENIED IN PART**. Defendant Cummins, Inc.'s motion to dismiss (ECF No. 34) is also **GRANTED IN PART AND DENIED IN PART**.

To summarize, as to Plaintiffs' federal causes of action, their claims against FCA and Cummins for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' claims for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, by FCA and Cummins are also **DISMISSED WITHOUT PREJUDICE**.

Turning to the state-law causes of action, all of Plaintiffs' claims against FCA and Cummins for breach of contract are **DISMISSED WITHOUT PREJUDICE**. Plaintiff's unjust enrichment claims asserted under the laws of California and Texas are **DISMISSED WITH PREJUDICE**. All of Plaintiffs' state-law claims for fraudulent omission against FCA and Cummins are **DISMISSED WITHOUT PREJUDICE**. All of Plaintiffs' claims against

FCA and Cummins asserted under state consumer-protection statutes are likewise **DISMISSED WITHOUT PREJUDICE.**

The surviving claims are Plaintiffs' claims for unjust enrichment under Alabama, Colorado, Florida, Georgia, Idaho, Kentucky, Michigan, Mississippi, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, Utah, Virginia, and Washington state law. Likewise, Plaintiffs' state-law claims against FCA and Cummins for affirmative misrepresentation all survive to the extent they do not rest on alleged misrepresentations specifically found by the Court in this Order to be puffery or otherwise non-actionable.

Plaintiffs lack standing to assert claims arising from the alleged washcoat defect in the 2016 and 2017 model year Dodge 2500 and 3500 Ram trucks with Cummins 6.7-liter diesel engines. Their claims are thus **DISMISSED WITHOUT PREJUDICE** insofar as they involve the alleged washcoat defect in the 2016 and 2017 trucks.

Additionally, because Plaintiff Gary Gaster lacks standing to pursue claims related to the flash defect, his claims are **DISMISSED WITHOUT PREJUDICE** to the extent they are rooted in that alleged defect.

**SO ORDERED.**



UNITED STATES of America,
Plaintiff,

v.

Thomas Rodell-Harold MILLS,
Defendant (1).

Case No. 13-cr-20487

United States District Court,
E.D. Michigan, Southern Division.

Signed 07/31/2020

**Background:** Defendant plead guilty to being a felon in possession of a firearm and was sentenced to 42 months' imprisonment and three years supervised released. Following three violations of the conditions of his supervised release, defendant was sentenced to a further 12 months' imprisonment. Defendant moved for compassionate release in light of COVID-10 pandemic.

**Holdings:** The District Court, Gershwin A. Drain, J., held that:

(1) defendant exhausted administrative remedies;

(2) defendant showed extraordinary and compelling reasons for compassionate release;

(3) consideration of sentencing factors weighed in favor of compassionate release; and

(4) defendant was not a danger to the community.

Motion granted.

**1. Sentencing and Punishment** ⬥2270

Defendant exhausted his administrative remedies, as required under First Step Act for him to bring motion for compassionate release in light of COVID-19 pandemic, where defendant had petitioned warden at facility where he was imprisoned for consideration for compassionate