# EXHIBIT 6

2021 WL 778913
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Eric GREGORIO, et al., Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

Case No. 20-11310
|
Signed 03/01/2021

**Synopsis**
**Background:** Car buyers who purchased their vehicles from manufacturer-authorized dealers in Arkansas, California, Colorado, Delaware, Florida, Michigan, New York, North Carolina, and Pennsylvania brought class action against the manufacturer, alleging the transmissions in their vehicles were defective, and asserting claims for fraudulent omission, breach of express and implied warranties, and unjust enrichment. Manufacturer filed motion to dismiss.

**Holdings:** The District Court, Laurie J. Michelson, J., held that:

[1] buyers sufficiently alleged a defect, as relevant to all claims asserted;

[2] buyers failed to plead knowledge of a defect as to original version of transmission, precluding certain fraudulent-omission claims;

[3] buyers sufficiently alleged manufacturer's knowledge of a defect as to updated version of transmission;

[4] allegations of some buyers were sufficient to plead failure of essential purpose as to a new vehicle limited warranty;

[5] buyers sufficiently alleged their vehicles were unfit for their ordinary purpose, as required for claims for breach of implied warranty of merchantability;

[6] some buyers' claims for breach of implied warranty of merchantability were not barred for lack of privity; and

[7] buyers could not proceed with claims for unjust enrichment.

Motion granted in part and denied in part.

West Headnotes (51)

**[1]     Sales**

Car buyers' allegations that the transmissions in their cars were adapted from smaller vehicles and that synchronizers were not able to move along the gear shaft quickly enough to properly engage the gears in the transmission, causing slipping, jerking, clashing, and difficulty or inability to shift, were sufficient to plead a defect, as relevant to the buyers' fraud and warranty claims against the manufacturer under the laws of several states, including California and Michigan. Fed. R. Civ. P. 12(b)(6).

**[2]     Antitrust and Trade Regulation**

The Michigan Supreme Court construes broadly the Michigan Consumer Protection Act's exemption for transactions and conduct specifically authorized under state or federal law, finding that the relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited. Mich. Comp. Laws Ann. § 445.904(1)(a).

**[3]     Antitrust and Trade Regulation**

Automobile manufacturer's motor vehicle sales were exempt from car buyers' claims asserted under the Michigan Consumer Protection Act, arising from alleged transmission defects; the Act did not apply to transactions or conduct specifically authorized by law, and manufacturer's sale of the cars was specifically authorized under state and federal law. Mich. Comp. Laws Ann. § 445.904(1)(a).

**[4]**   **Antitrust and Trade Regulation** 🔑

Letter sent to an automobile manufacturer by a car buyer more than 30 days before the buyer filed his action against the manufacturer based on alleged transmission defects satisfied the notice requirement for asserting a claim for damages under the California Consumers Legal Remedies Act (CLRA). Cal. Civ. Code § 1782(a).

**[5]**   **Fraud** 🔑

In the context of a fraudulent-omission claim, a plaintiff can succeed without the same level of specificity required by a normal fraud claim, but must still allege the who, what, when, where, and how of the omission. Fed. R. Civ. P. 9(b).

**[6]**   **Fraud** 🔑

A complaint alleging fraudulent omission can meet the requirements of alleging the who, what, when, where, and how of an omission if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect. Fed. R. Civ. P. 9(b).

**[7]**   **Fraud** 🔑

Car buyers' allegations that the manufacturer knew but failed to disclose transmission defects in their cars since the transmission was introduced, that the manufacturer failed to disclose the defect at the point of purchase or through advertisements, and that such disclosure would have influenced purchase decisions and purchase price were sufficient to plead the who, what, when, where, and how required for stating fraudulent-omission claims with particularity. Fed. R. Civ. P. 9(b).

**[8]**   **Fraud** 🔑

Knowledge is required not only to show what was allegedly omitted, but also to meet an additional requirement of a fraudulent-omission claim: establishing that the defendant had a duty to disclose. Fed. R. Civ. P. 9(b).

**[9]**   **Fraud** 🔑

For purposes of a fraudulent-omission claim under the laws of several states, including California, a duty to disclose can arise where (1) the parties have a fiduciary relationship, (2) the defendant has exclusive or superior knowledge of a material fact and such knowledge could not be discovered through reasonable diligence, (3) the defendant actively concealed a material fact, or (4) the defendant offers a partial disclosure but suppresses material facts.

**[10]**   **Antitrust and Trade Regulation** 🔑

Car buyers' allegations about a report by the National Highway Traffic Safety Administration (NHTSA) regarding transmission defects and customer complaints submitted to NHTSA after the date of the report were insufficient to support an inference that the manufacturer knew about alleged transmission defects after the date of the report, precluding fraudulent-omission claims under the consumer protection laws of several states, including California and New York; the report noted the actions taken by manufacturer to address concerns with the transmission and concluded that there was no unreasonable safety risk, so that the manufacturer reasonably could have concluded that it resolved the issues, and buyers provided only 36 NHTSA complaints for a nine-year span after the date of the report. Cal. Bus. & Prof. Code § 17200; N.Y. General Business Law § 349.

**[11]**   **Antitrust and Trade Regulation** 🔑

Car buyers' allegations regarding three service bulletins issued by the manufacturer, which noted an inability to shift into certain gears due to defects in an updated version of the transmission installed in the cars, were sufficient to plead the manufacturer's knowledge of the defects, as relevant to the buyers' fraudulent-

omission claims under the consumer protection laws of several states, including California and New York. Cal. Bus. & Prof. Code § 17200; N.Y. General Business Law § 349.

**[12]    Antitrust and Trade Regulation** 🔑

Car buyers' allegations about the manufacturer's service bulletins regarding transmission defects, demonstrating that the manufacturer was collecting evidence of transmission problems from internal sources available only to manufacturer, were sufficient to plead the manufacturer's superior knowledge of the defect giving rise to a duty to disclose, as relevant to the buyers' fraudulent-omission claims under the consumer protection laws of several states, including California and New York. Cal. Bus. & Prof. Code § 17200; N.Y. General Business Law § 349.

**[13]    Antitrust and Trade Regulation** 🔑

Car buyers' allegations that the manufacturer concealed transmission defects by directing replacement of defective parts with equally defective parts and that the manufacturer told customers their transmissions were not defective and denied them repairs were sufficient to plead active concealment giving rise to a duty to disclose, as relevant to the buyers' fraudulent-omission claims under the consumer protection laws of several states, including California and New York. Cal. Bus. & Prof. Code § 17200; N.Y. General Business Law § 349.

**[14]    Sales** 🔑

Michigan courts interpret the notice requirement for warranty claims strictly, requiring that upon discovering a breach, the buyer must provide reasonable pre-suit notice to even a remote manufacturer lest the buyer be barred from any remedy. U.C.C. § 2-607(3)(a).

**[15]    Sales** 🔑

A car buyer's allegations were insufficient to plead pre-suit notice, as required to assert warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in Michigan, arising from an allegedly defective transmission; the buyer did not plead that his vehicle had been inspected or repaired by a manufacturer-authorized dealership, but instead the buyer contacted two dealerships about issues with his vehicle, neither of which was able to schedule the vehicle for repairs before the buyer's complaint was filed, and the buyer did not plead that he notified the manufacturer about a breach of warranty in any manner. U.C.C. § 2-607(3)(a).

**[16]    Sales** 🔑

Car buyers' allegations that they brought their cars to a manufacturer-authorized dealership for repairs and that repair orders documented the buyers' complaints that they were experiencing issues when shifting gears were sufficient to create a fact question as to whether the manufacturer received pre-suit notice, as required to assert warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in Florida, arising from an allegedly defective transmission. U.C.C. § 2-607(3)(a).

**[17]    Sales** 🔑

Car buyers' filing of their complaint was sufficient to satisfy the pre-suit notice requirement for asserting warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in Pennsylvania, arising from an allegedly defective transmission. U.C.C. § 2-607(3)(a).

**[18]    Sales** 🔑

In Arkansas, pre-suit notice to the seller is required for warranty claims, and the filing of a complaint is not sufficient. U.C.C. § 2-607(3)(a).

**[19]** **Sales**

For purposes of the pre-suit notice requirement for warranty claims under Arkansas law, the content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. U.C.C. § 2-607(3)(a).

**[20]** **Sales**

A car buyer's allegation that he provided notice by twice bringing his vehicle to a manufacturer-authorized dealership was sufficient to create a fact question as to whether the manufacturer received pre-suit notice, as required to assert warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in Arkansas, arising from an allegedly defective transmission. U.C.C. § 2-607(3)(a).

**[21]** **Sales**

A car buyer's filing of his lawsuit was sufficient to create a fact question as to whether the manufacturer received pre-suit notice, as required to assert warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in Colorado, arising from an allegedly defective transmission. U.C.C. § 2-607(3)(a).

**[22]** **Sales**

For purposes of the pre-suit notice requirement for warranty claims, Colorado law requires timely notice to only the immediate seller, not remote manufacturer. U.C.C. § 2-607(3)(a).

**[23]** **Sales**

A car buyer who purchased his vehicle from a manufacturer-authorized dealer was not required to give pre-suit notice before asserting warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in California, arising from an allegedly

defective transmission; an exception to the pre-suit notice requirement existed under California law for a manufacturer with whom the buyer did not deal. U.C.C. § 2-607(3)(a).

**[24]** **Sales**

Delaware courts interpret the Uniform Commercial Code's (UCC) pre-suit notice requirement relatively leniently. 6 Del. Code § 2-607(3)(a).

**[25]** **Sales**

A car buyer, by twice bringing his vehicle to a dealer for repair, satisfied the pre-suit notice requirement for asserting warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in Delaware, arising from an allegedly defective transmission. 6 Del. Code § 2-607(3)(a).

**[26]** **Sales**

A car buyer, by twice bringing his vehicle to a dealer for repair, satisfied the pre-suit notice requirement for asserting warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in North Carolina, arising from an allegedly defective transmission. U.C.C. § 2-607(3)(a).

**[27]** **Sales**

In North Carolina, the pre-suit notice requirement for warranty claims is considered satisfied when a plaintiff presents his car to an authorized dealer for repair within the warranty period. U.C.C. § 2-607(3)(a).

**[28]** **Sales**

New York determines timely notice of breach of warranty based on a standard of reasonableness. U.C.C. § 2-607(3)(a).

**[29]  Sales**  ⚷

Under New York law, the sufficiency and timeliness of notice of a breach of warranty is a question of fact to be determined by the jury. U.C.C. § 2-607(3)(a).

**[30]  Sales**  ⚷

Under New York law, for purposes of the notice requirement for warranty claims, it is sufficient for a plaintiff to plead that he complained to the seller or requested service of notice of breach of warranty. U.C.C. § 2-607(3)(a).

**[31]  Sales**  ⚷

Allegations that one car buyer called a manufacturer-authorized dealer to complain about issues with his car but was told the behavior was normal, and that another buyer's vehicle was twice repaired by a dealer, were sufficient to create a fact question as to whether the manufacturer received pre-suit notice, as required to assert warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in New York, arising from an allegedly defective transmission. U.C.C. § 2-607(3)(a).

**[32]  Limitation of Actions**  ⚷

The limitations period for express and implied warranty claims in California, as well as for Magnuson-Moss Warranty Act claims, is four years. Federal Trade Commission Improvement Act § 101, 15 U.S.C.A. § 2301 et seq.; Cal. Com. Code § 2725.

**[33]  Limitation of Actions**  ⚷

The four-year statute of limitations applicable to a car buyer's warranty claims against the manufacturer under Article 2 of the Uniform Commercial Code (UCC), as adopted in California, and the Magnuson-Moss Warranty Act (MMWA), arising from an allegedly defective transmission, was not tolled based

on any fraudulent concealment by the manufacturer, absent plausible allegations that the manufacturer had knowledge about a transmission defect in the buyer's car. Federal Trade Commission Improvement Act § 101, 15 U.S.C.A. § 2301 et seq.; Cal. Com. Code § 2725.

**[34]  Sales**  ⚷

Car buyers' claims for breach of express warranty governed by Article 2 of the Uniform Commercial Code (UCC), as adopted in several states, including California and New York, premised on a new vehicle limited warranty were not subject to dismissal for alleging only design defects; the buyers were not required to commit to single theory of the origin of alleged transmission defects at the motion-to-dismiss stage, and just because the buyers pleaded allegations involving a class of vehicles did not preclude the possibility of a manufacturing defect. U.C.C. § 2-101 et seq.

**[35]  Sales**  ⚷

A car buyer's allegations that he called a manufacturer-authorized dealer to complain when he began to experience a transmission defect but was advised that the behavior was normal was sufficient to plausibly plead that the manufacturer's repair or replace warranty failed of its essential purpose under Article 2 of the Uniform Commercial Code (UCC), as adopted in New York. U.C.C. § 2-719.

**[36]  Sales**  ⚷

Car buyers' allegation that, because the manufacturer was unable to repair transmission defects in other vehicles, it would have been futile for the buyers to present their vehicles for repair was insufficient to plausibly plead that the manufacturer's repair or replace warranty failed of its essential purpose under Article 2 of the Uniform Commercial Code (UCC), as adopted in Colorado and Pennsylvania; the manufacturer's inability to repair one car said nothing about whether it could repair another car, and even if

the buyers' vehicles contained a common defect, the complaint did not adequately allege that the manufacturer was consistently unable to fix the defect. U.C.C. § 2-719.

**[37]    Sales** 🔑

Car buyers' allegations that the manufacturer was either unwilling or unable to fix defective transmissions in the vehicles were sufficient to plausibly plead that the manufacturer's repair or replace warranty failed of its essential purpose under Article 2 of the Uniform Commercial Code (UCC), as adopted in several states, including Arkansas and Florida. U.C.C. § 2-719.

**[38]    Sales** 🔑

A repair-or-replace warranty fails its essential purpose when the seller is either unwilling or unable to repair the vehicle. U.C.C. § 2-719.

**[39]    Sales** 🔑

To be fit for its ordinary purpose, as relevant to the implied warranty of merchantability, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects. U.C.C. § 2-314(2)(c).

**[40]    Sales** 🔑

Car buyers sufficiently alleged that transmission defects rendered their vehicles both unsafe and unreliable, such that they were unfit for their ordinary purpose, as required to assert claims against the manufacturer for breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code (UCC), as adopted in several states, including Pennsylvania and North Carolina; the alleged issues with gears slipping, jerking, and clashing, and the inability to shift into certain gears plausibly presented a safety hazard, because they affected the driver's ability to control the vehicle's acceleration and deceleration. U.C.C. § 2-314(2)(c).

**[41]    Sales** 🔑

A car buyer's claim against the manufacturer for breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code (UCC), as adopted in Arkansas, based on an allegedly defective transmission was not barred for lack of privity; in Arkansas, the lack of privity was not a defense in a warranty action brought against a manufacturer or seller of goods, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods. Ark. Code Ann. § 4-86-101; U.C.C. § 2-314.

**[42]    Sales** 🔑

A car buyer's claim against the manufacturer for breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code (UCC), as adopted in Pennsylvania, based on an allegedly defective transmission was not barred for lack of privity; in Pennsylvania, privity was not required for implied warranty claims. U.C.C. § 2-314.

**[43]    Sales** 🔑

Car buyers' claims for breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code (UCC), as adopted in Florida, based on an allegedly defective transmission were barred for lack of privity; Florida had a strict privity requirement, and the buyers bought their cars from a dealer rather than from the manufacturer. U.C.C. § 2-314.

**[44]    Sales** 🔑

A car buyer's claim against the manufacturer for breach of the implied warranty of merchantability under California's Song-Beverly Act based on an allegedly defective transmission was not barred for lack of privity; there was no

privity requirement under the Act. Cal. Civ. Code § 1792.

**[45]** **Sales** 🔑

In North Carolina, the general rule is that privity is required to assert a claim for breach of an implied warranty involving only economic loss.

**[46]** **Sales** 🔑

A car buyer's allegations were sufficient to plausibly plead that the buyer was the intended beneficiary of the contract between the manufacturer and its authorized dealership, as an exception to the privity requirement for asserting a claim against the manufacturer for breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code (UCC), as adopted in North Carolina, based on an allegedly defective transmission; the market for new cars was structured such that drivers had to buy from an authorized dealer, and the warranties the manufacturer provided were clearly meant to benefit the ultimate consumer, not the dealer. U.C.C. § 2-314.

**[47]** **Antitrust and Trade Regulation** 🔑

Car buyers' warranty claims against the manufacturer under the Magnuson-Moss Warranty Act (MMWA) based on allegedly defective transmissions could proceed as to the buyers who adequately pleaded state-law warranty claims. Federal Trade Commission Improvement Act § 101, 15 U.S.C.A. § 2301 et seq.

**[48]** **Implied and Constructive Contracts** 🔑

Under Michigan law, an unjust enrichment claim, which is a quasi-contract claim, does not lie when an enforceable, binding agreement exists defining the rights of the parties.

**[49]** **Implied and Constructive Contracts** 🔑

Under Michigan law, where the parties dispute the existence of a valid contract, an unjust enrichment claims may be pled in the alternative.

**[50]** **Implied and Constructive Contracts** 🔑

Under Michigan law, where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment.

**[51]** **Implied and Constructive Contracts** 🔑

Under the laws of several states, including Michigan, car buyers could not assert claims for unjust enrichment against the manufacturer based on allegedly defective transmissions, where a new vehicle limited warranty governed the parties' relationship and the manufacturer's duties to remedy defects.

**Attorneys and Law Firms**

Dennis A. Lienhardt, E. Powell Miller, Emily E. Hughes, Sharon S. Almonrode, William Kalas, The Miller Law Firm, Rochester, MI, Jason Henry Alperstein, Kopelowitz Ostrow, Ferguson Weiselberg Gilbert, Fort Lauderdale, FL, Cody R. Padgett, Tarek H. Zohdy, Trisha K. Monesi, Steven R. Weinmann, Capstone Law, APC, Los Angeles, CA, for Plaintiffs.

Derek J. Linkous, Grant A. Newman, Stephanie A. Douglas, Bush Seyferth PLLC, Troy, MI, for Defendant.

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [12]**

LAURIE J. MICHELSON, United States District Judge

**\*1** The 12 plaintiffs in this case are owners of Ford Mustangs who allege that Ford Motor Company sold them vehicles with inherent defects in the manual transmissions. Plaintiffs seek to represent a nationwide class and nine statewide classes of owners and lessors of 2011-to-2019-

model-year Ford Mustangs equipped with a MT82 manual transmission. Plaintiffs' 183-page, 667-paragraph Third Amended Complaint includes claims for fraudulent omission and breach of express and implied warranty under the laws of nine states, plus class-wide claims under the Magnuson-Moss Warranty Act and for unjust enrichment. Ford moves to dismiss the complaint for failure to state a claim. The Court grants in part and denies in part Ford's motion to dismiss as set out in the Table of Claims appended at the conclusion of this opinion.

## I. Background

The 12 named plaintiffs are owners of Ford Mustangs from model years 2014 through 2019. (*See* ECF No. 12-3.) Plaintiffs purchased their vehicles from authorized Ford dealers in nine different states: Arkansas, California, Colorado, Delaware, Florida, Michigan, New York, North Carolina, and Pennsylvania. (*Id.*)

Plaintiffs allege that the MT82 manual transmissions (which includes the MT82 and MT82-D4) in their Ford Mustangs have a common defect which existed at the time the vehicles left Ford's possession and control. Plaintiffs allege that the defect causes the transmission to slip, jerk, clash gears, and harshly engage while driving the vehicles. (ECF No. 10, PageID.22.)[1] Plaintiffs also allege that the defect causes "premature internal wear, increased shift efforts, inability to drive, and eventually ... a catastrophic failure" of the transmission. (PageID.22.)

To understand the alleged transmission defect, it is necessary to explain a bit how manual transmissions function. The gear shifter that the driver operates controls gear-selector forks. These forks are connected to collars that move along a shaft to engage different gears. In order to engage a gear, the teeth on the collar must mesh with the teeth on the gear. Synchronizers enable the teeth to engage by first synchronizing the speed of the collar and the relevant gear. (PageID.24.)

Plaintiffs allege "on information and belief" that the MT82 transmission was adapted from an application in smaller vehicles with much lower horsepower than the Mustang and is not sufficiently robust for the Mustang's horsepower. (PageID.24.) Plaintiffs believe that, among other problems, the insufficient robustness of the transmission causes the synchronizer to fail to move along the shaft quickly enough for the gears to mesh smoothly. (PageID.24.) Plaintiffs

allege that this defect not only affects their day-to-day driving experience, but also leads to premature wear, and eventually failure, of a number of the Mustangs' transmission parts. (PageID.25.) Moreover, allege Plaintiffs, the defect poses an unreasonable safety hazard because it affects "the driver's ability to control the vehicle's speed, acceleration, and deceleration." (PageID.59.)

**\*2** Plaintiffs allege that they have experienced symptoms of this defect to varying degrees. For example, Tyrone Morrow began experiencing shifting issues, including the vehicle popping out of gear and scratching gears when shifting, within the first few days of purchasing his 2019 Mustang. (PageID.31.) One week after purchasing the vehicle, and with less than 6,000 miles on the odometer, Morrow brought his vehicle to an authorized Ford dealer for repair. (PageID.31.) The car was in the shop for 27 days, and the technician found that a shift fork was broken and the teeth on two gears and a synchronizer were damaged. (PageID.33.) After picking up the vehicle, within 10 miles of driving, Morrow again observed the defect and brought his car back to the dealer for further repairs. (PageID.33.)

Another plaintiff, Dylon Zimmerli, reports that he began to experience problems with his transmission about 10 months after purchasing his vehicle. (PageID.38.) Yet he continued to drive his vehicle for about a year after noticing issues without seeking repair—even though he stated at the time of the filing of the complaint that he was planning to schedule an appointment to have his Mustang repaired. (PageID.38–39.)

A third plaintiff, Brendon Shunk, experienced a catastrophic failure of his transmission with under 7,000 miles on his Mustang. (PageID.48.) His car was towed to the dealer, where a technician documented that the car "has no 3rd or 4th gear." (PageID.48.) Shunk's car was kept at the dealer for 54 days and the transmission had to be replaced. (PageID.49.) Yet, a few months later, Shunk again noticed problems with his transmission. (PageID.49.) He brought his car back to the dealer where the transmission was again repaired and a shift fork was replaced. (*Id.*)

A fourth plaintiff, Evan Dickson, began experiencing problems with shifting in his Mustang about a month after purchasing it. (PageID.54.) Yet, at the time of the operative complaint 11 months later, Dickson had not brought the vehicle to a dealer for repair. (PageID.54.) He believed Ford representatives would tell him nothing was wrong. (PageID.54.)

Plaintiffs allege that Ford has been aware of the transmission defect since the introduction of the MT82 transmission and has failed to disclose and in fact actively concealed the defect. (PageID.26.) Plaintiffs point to numerous customer complaints reported to the National Highway Traffic Safety Administration (NHTSA) and in online forums and to the seven "technical service bulletins" (TSBs) and "special service messages" (SSMs) that Ford has issued since 2011 relating to shifting issues and other transmission defects in Mustangs. (PageID.26, 61–84, 84–87.) Plaintiffs also allege that Ford had exclusive knowledge of the defect through pre-release testing data, early consumer complaints, warranty claim data, aggregate data from Ford dealers, and communications with NHTSA. (PageID.59–60.)

In their Third Amended Complaint, Plaintiffs bring 29 counts against Ford under federal law and the laws of the nine states where Plaintiffs bought their Mustangs. (ECF No. 10, PageID.21.) Ford filed a motion to dismiss all of Plaintiffs' claims. (ECF No. 12.)

## II. Legal Standard

Ford seeks dismissal under Federal Rule of Civil Procedure 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Under the plausibility framework of *Iqbal* and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court asks whether the factual allegations of Plaintiffs' Third Amended Complaint permit "the reasonable inference that [Ford] is liable[.]" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Whether Plaintiffs have presented enough factual matter to "nudg[e]" their claims "across the line from conceivable to plausible" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

## III. Discussion

**\*3** Although Plaintiffs bring claims under the laws of nine different states as well as federal law, for ease of discussion the claims can be broadly categorized as warranty, fraud, or consumer-protection claims. Ford argues there is a threshold pleading issue that warrants dismissal of the entire case, so the Court will address that argument before diving into the individual claims.

### A. Adequacy of the Defect Allegations

[1] Ford first argues that Plaintiffs' entire complaint fails because it does not adequately allege a defect as required by the Federal Rules. Ford says that Plaintiffs must specifically allege what is defective about their vehicle transmissions rather than relying on conclusory allegations. Further, argues Ford, it is not sufficient to allege only the symptoms of a defect, i.e., that the transmission "slips, jerks, clashes gears, and harshly engages; has premature internal wear, increased shift efforts, inability to drive, and eventually suffers a catastrophic failure." (ECF No. 12, PageID.228.)

First, it is not clear that Ford's position on what is required to plead a defect is correct. For the proposition that a defect cannot be defined predominantly by symptoms, Ford principally relies on a case from the Eastern District of California, *DeCoteau v. FCA US LLC*, No. 215CV00020MCEEFB, 2015 WL 6951296 (E.D. Cal. Nov. 10, 2015). The *DeCoteau* court dismissed the plaintiffs' complaint because they "allege[d] generally that there must be one or more defects" in their cars' transmissions without providing "more detailed factual allegations" required to identify a plausible defect. *Id.* at *3. But, in contrast, another California district court held that "Plaintiffs' allegation that 'the Manual Transmission contains one or more design and/or manufacturing defects,' combined with a description of the symptoms of the alleged defect ... provides Chrysler sufficient notice of the defect at issue." *Hardt v. Chrysler Grp. LLC*, No. SACV1401375SJOVBKX, 2015 WL 12683965, at *5 (C.D. Cal. June 15, 2015). This disagreement about what is required to plead a defect has not been settled by the Ninth Circuit Court of Appeals.

Nor does it seem to be a settled issue in any other circuit. Outside of the Ninth Circuit, Ford cites only one district court that supports the proposition that identifying the effects or

symptoms of an alleged defect is insufficient. *See McQueen v. BMW of N. Am., LLC*, No. 12-6674, 2013 WL 4607353, at *7 (D.N.J. Aug. 29, 2013) ("Plaintiff has not pled sufficient colorable information to plausibly establish that a defect even exists ... Plaintiff merely identifies the *effects* of the alleged defect.").

But the Court need not decide whether it is sufficient to plead symptoms of a defect because Plaintiffs allege more than just symptoms. The Court must read Plaintiffs' allegations as a whole, and in the light most favorable to Plaintiffs. And taking the well-pled factual allegations as true, Ford does not accurately represent the complaint. It is true that the Plaintiffs' complaint often discusses the "defect" using symptoms like slipping, jerking, and clashing, and a difficulty or inability to shift. (*See, e.g.*, ECF No. 10, PageID.22.) But Plaintiffs go on to explain, based on information and belief, what is causing these symptoms. Plaintiffs allege that the transmissions in their Mustangs were adapted from smaller vehicles and "because the synchronizers were designed for lower-horsepower applications, they are insufficiently robust for use in the high-horsepower Ford Mustang vehicles." (PageID.24.) So, essentially, Plaintiffs allege that the synchronizers are not able to move along the gear shaft quickly enough to properly engage the gears in the transmission, causing the symptoms discussed.

**\*4** These allegations go beyond a conclusory statement that the cars contain a defect and beyond a description of symptoms. This case is thus distinguishable from *DeCoteau*, *McQueen*, and the other cases Ford cites. Instead it is more like *Francis v. Gen. Motors, LLC*, where a judge in this District stated, "Plaintiffs here plead the 'mechanical details' of the alleged defect, explaining how Defendant's transmission system functions and why Plaintiffs believe the transmission systems in their vehicles are faulty." —— F.Supp.3d ——, ——, No. 19-11044, 2020 WL 7042935, at *15 (E.D. Mich. Nov. 30, 2020). And other cases in this District and beyond support the conclusion that allegations similar to Plaintiffs' are sufficient to plead a defect. *See, e.g.*, *Gant v. Ford Motor Co.*, No. 19-CV-12533, —— F.Supp.3d ——, ——, 2021 WL 364250, at *10 (E.D. Mich. Feb. 3, 2021) (finding allegations of "a variety of issues related to faulty transmissions, such as 'sudden and unexpected shaking,' 'delayed acceleration,' and 'hard decelerations' " sufficient); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 1382297, at *2 (E.D. Mich. Apr. 18, 2017) (finding plaintiffs adequately pled a defect that caused harm by pleading "the lack of a physical

indication of the gear selected, together with the absence of an 'auto park' feature"); *Loo v. Toyota Motor Sales, USA, Inc.*, No. 819CV00750VAPADSX, 2019 WL 7753448, at *4 (C.D. Cal. Dec. 20, 2019) (finding that allegations of symptoms including rough shifting and delayed acceleration, along with a description of the defect as a "PCM miscalibration" was sufficient to plead a defect).[2]

So the Court finds that Plaintiffs have adequately alleged that their vehicles suffer from a transmission defect that has caused them harm to meet the *Twombly/Iqbal* plausibility standard.

**B. The Fraud Claims**

Plaintiffs bring 10 claims under state consumer-protection statutes that, at heart, are claims of fraud (Counts 1, 4, 7, 10, 13, 16, 19, 21, 24, and 27). Plaintiffs allege that Ford committed fraud by selling vehicles it knew to be defective without disclosing that information to the consumers. Ford makes separate challenges to the claims under the Michigan Consumer Protection Act and the California Consumers Legal Remedies Act. And Ford seeks to dismiss all of Plaintiffs' fraud claims based on two arguments: the claims are insufficiently pled under Federal Rule of Procedure 9(b), and the claims do not meet the elements of the omission theory of fraud.[3]

**1. Michigan Consumer Protection Act Exemption**

First, the Court will address an argument Ford only makes against Count 1 of the complaint, a count for violation of the Michigan Consumer Protection Act (MCPA). Ford argues that the MCPA specifically exempts Plaintiffs' vehicle purchases from its protections.

**[2]** The MCPA "does not apply to [any] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). "The Michigan Supreme Court construes this exemption broadly, finding that 'the relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.' " *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 799 (E.D. Mich. 2019) (quoting *Liss v. Lewiston-*

*Richards, Inc.*, 478 Mich. 203, 732 N.W.2d 514 (2007)). But "the burden of proving an exemption from [the MCPA] is upon the person claiming the exemption." Mich. Comp. Laws § 445.904(4).

**[3]** Although Ford's argument is bare bones, the Court finds the case that Ford cites, and other recent case law, to be persuasive. Ford cites a recent unpublished case from the Michigan Court of Appeals, *Cyr v. Ford Motor Co.*, No. 345751, 2019 WL 7206100 (Mich. Ct. App. Dec. 26, 2019), *appeal denied*, 950 N.W.2d 51 (Mich. 2020),[4] which directly addressed whether the MCPA exemption applies to the manufacture, sale, and lease of automobiles by Ford. *Id.* at *2. Applying *Liss*, the court held that Ford's manufacture, sale, and lease of cars, and its provision of warranties for those cars, was specifically authorized under state and federal law, including Michigan licensure laws, the Michigan Vehicle Code, Michigan's "lemon law," the Magnuson-Moss Warranty Act, and the Motor Vehicle Safety Act. *Id.* at *2–3. Two recent cases in the Eastern District of Michigan came to the same conclusion. *Matanky*, 370 F. Supp. 3d at 800 ("The general transaction in this case (i.e., the sale of a new car by a licensed dealer) is one specifically authorized and regulated by law; thus, it is exempt from the MCPA." (internal citations omitted)); *Gant*, ––– F.Supp.3d at ––––, 2021 WL 364250, at *7 (same).

**\*5** Based on the Michigan Court of Appeals' current interpretation of the MCPA, and that of courts in this District, this Court finds that Ford's motor vehicle sales to Plaintiffs are exempt from the MCPA. So Count 1 for violation of the MCPA is dismissed.

## 2. Notice Under the California Consumers Legal Remedies Act

**[4]** Ford advances another argument unique to a single count. Count 7 alleges a violation of the California Consumers Legal Remedies Act (CLRA). Under the CLRA, a consumer must provide written notice to the potential defendant by certified or registered mail "[t]hirty days or more prior to the commencement of an action for damages." Cal. Civ. Code § 1782(a). Ford says that the California plaintiffs failed to provide timely notice. (ECF No. 12, PageID.258.)

The Court disagrees. Ford acknowledges it received a letter that meets these requirements on behalf of Eric Gregorio and the proposed California class. (ECF No. 12-7.) The letter

was sent on April 8, 2020. (*Id.*) The operative complaint in this case is the Third Amended Complaint filed on July 17, 2020. The California Court of Appeals has made clear that as long as the letter is sent 30 days before the operative complaint, the notice is sufficient to comply with the CLRA notice requirement. *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal.App.4th 1235, 99 Cal. Rptr. 3d 768, 790 (2009) ("Because plaintiffs in this case alleged that they sent the required notice to AT&T more than 30 days before they filed the third amended complaint and that AT&T failed to correct the alleged wrongs, the trial court erred by sustaining the demurrer for failure to comply the CLRA notice requirements.") Similarly, here, because Plaintiffs sent the required notice more than 30 days before filing the Third Amended Complaint, they complied with the CLRA's notice requirement, and Count 7 survives.

## 3. Adequacy of Plaintiffs' Fraud Allegations

Ford next argues that all of the remaining fraud-based claims must be dismissed because Plaintiffs failed to meet the pleading standard. Rule 9(b) provides a heightened pleading standard for fraud claims: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

**[5]** **[6]** In the context of a fraudulent-omission claim, the plaintiff "can succeed without the same level of specificity required by a normal fraud claim," *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751–52 (E.D. Mich. 2017) (internal citation omitted), but must still allege the "the who, what, when, where, and how" of the omission, *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). A complaint can meet these requirements "if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the defect." *See Wozniak v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) (citing *Beck*, 273 F. Supp. 3d at 751–52).

**[7]** Ford's arguments that Plaintiffs fail to allege the "who, what, when, where, and how" do not withstand scrutiny. As another court put it, "In short, the 'who' is Ford, the 'what' is its knowledge of a defect, the 'when' is prior to the sale of Class Vehicles, and the 'where' is the various channels of information through which Ford sold Class Vehicles."

*MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014); *see also Beck*, 273 F. Supp. 3d at 751–52 ("Beck has adequately pleaded the 'who' (FCA), the 'what' (knowing about, yet failing to disclose, the alleged rotary shifter system defect), the 'when' (from the time the vehicles were first placed on the market in 2012 to the present day), the 'where' (the various channels through which FCA sold the class vehicles, including the dealership in Carlsbad, California, where Beck purchased his vehicle), and the 'how' (if Beck and the class members had known of the alleged defect, they would have not purchased or leased the class vehicles, or they would have paid less for them).").

**\*6** Similarly, Plaintiffs in this case allege that Ford knew about but failed to disclose the transmission defect in their Mustangs since the MT82 transmission was introduced. (ECF No. 10, PageID.25–26.) Plaintiffs further allege that Ford failed to disclose the defect "at the point of purchase or through advertisements" and that such disclosures "would have influenced purchase decisions and purchase price." (*Id.* at PageID.27.)

### 4. Ford's Knowledge

**[8]** The question of whether Ford knew about the alleged defect requires further discussion. Knowledge is required not only to show "what" was allegedly omitted, but also to meet an additional requirement of a fraudulent-omission claim: establishing that the defendant had a duty to disclose. *Miller v. Gen. Motors, LLC*, No. 17-CV-14032, 2018 WL 2740240, at \*11 (E.D. Mich. June 7, 2018) ("To state a claim for fraudulent omission, a plaintiff must also establish a duty to disclose." (citing *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 665 (6th Cir. 2013))).

**[9]** Although Plaintiffs' fraudulent-omission claims arise under the laws of nine different states, the parties have not identified any meaningful difference among the states' law. Neither party outlines what they believe are the required elements of fraudulent omission, but instead focus on whether the Plaintiffs have properly pled knowledge and a duty to disclose. The parties agree that in the states at issue, the situations where a duty to disclose can arise can be summarized as follows: (1) the parties have a fiduciary relationship, (2) the defendant has exclusive or superior knowledge of a material fact and such knowledge could not be discovered through reasonable diligence, (3) the defendant actively concealed a material fact, or (4) the defendant offers a partial disclosure but suppresses material facts. (ECF No. 12, PageID.247 (citing *Blissard v. FCA US LLC*, No. 1802765, 2018 WL 6177295, at \*11 (C.D. Cal. Nov. 9, 2018)); ECF No. 17, PageID.585–586.) All but the first situation are potentially relevant here.

All of these situations require that Ford knew of the transmission defect before Plaintiffs purchased their cars. Much of Ford's brief on this question focuses on the argument that Plaintiffs have not properly alleged a defect, i.e., they have not sufficiently defined "what" defect Ford allegedly knew about and failed to disclose. Rule 9(b) specifies that "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). And the Court has already determined that Plaintiffs properly pled a defect. Ford does not contest that it would be material to a car buyer that a transmission defect caused gears to clash, slip, jerk, and fail to engage. *See also Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 944 (C.D. Cal. 2012) (collecting cases finding plaintiffs plausibly pled a material fact based on an alleged defect that posed a safety risk). So Plaintiffs' allegations are also sufficient for purposes of Rule 9(b) to put Ford on notice as to "what" it allegedly failed to disclose: namely, that the MT-82 transmission was not robust enough for the high-power Mustang, which caused problems with shifting gears and internal damage to the transmission.

But even if Plaintiffs have alleged "what" the defect was, Ford maintains that Plaintiffs have not adequately pled that Ford knew about the defect before Plaintiffs bought their cars. In their complaint, Plaintiffs allege that Ford knew about the defect from a variety of sources: (1) Ford's communication with NHTSA regarding an investigation of the defect in 2011, (2) Ford TSBs and SSMs related to shifting problems, (3) consumer complaints sent to NHTSA and directly to Ford, and posted on online forums, (4) articles in trade publications discussing the defect, (5) pre-release testing data, and (6) data on repairs and warranty claims from Ford dealers. (ECF No. 10, PageID.59–86.)

**\*7** Before examining these potential sources of Ford's knowledge, it is worthwhile to note that Plaintiffs' allegations concern two different transmission designs: the MT82 introduced in the 2011 Mustang and the MT82-D4 introduced in the 2018 Mustang. Ford argues that "Plaintiffs have not plausibly pleaded a connection between complaints or data relating to the different transmissions in pre- and post-2018 Mustangs." (ECF No. 12, PageID.250.) To address this argument, the Court will discuss separately the

factual allegations related to the MT82 and the MT82-D4 transmissions.

For the MT82 transmission (in 2011 to 2017 model year vehicles), Plaintiffs offer all six categories of evidence listed above. First, consumer complaints posted on online forums and articles in trade publications are inadequate to show knowledge without any specific allegations about how Ford would have taken note of these sources. *See Smith v. General Motors LLC*, 988 F.3d 873, 885 (6th Cir. 2021) (holding that allegations of consumer complaints are speculative absent any supporting facts to suggest the manufacturer knew about the complaints).

Second, Courts often reject general allegations about testing and analysis conducted by the manufacturer. *See, e.g., Smith*, 988 F.3d at 885 (rejecting "theoretical results from pre-production tests without accompanying verification that the tests occurred and revealed a safety defect"); *Beck*, 273 F. Supp. 3d at 753 (rejecting "generic allegations of FCA's access to 'testing' and 'analysis' ... to support an inference that a defendant knew about a design defect at the product's time of sale."); *Roe v. Ford Motor Co.*, No. 18-12528, 2019 WL 3564589, at *6 (E.D. Mich. Aug. 6, 2019) (subsequent history omitted) (holdings that plaintiffs need "at least a hint as to the test results" to support allegations about testing and analysis).

Third, data on repairs and warranty claims from Ford dealers could be a relevant source of knowledge if, for example, Plaintiffs could show that Ford received data about a disproportionate number of repairs and warranty claims related to a certain part. But Plaintiffs make no such claims. Plaintiffs argue that aggregate data from dealers is in Ford's exclusive control. As with general allegations about testing, Plaintiffs must give some indication of the contents of dealer data to support their allegation that Ford knew of the transmission defect from that data.

That leaves the first three categories of evidence: the NHTSA investigation, TSBs and SSMs (collectively, "service bulletins"), and consumer complaints to NHTSA. The Court will consider the Plaintiffs' allegations for these sources.

### a. *The Original MT82 Transmission*

 **[10]**  In the case of the original MT82 transmission, it was not long after the release of the 2011 Mustang that issues began

to surface. In September 2010, Ford issued a service bulletin for the Mustang about "clutch pedal stayout" when shifting at high RPM. (ECF No. 10, PageID.85.) And in March 2011, Ford issued another service bulletin specifically about "increased shift efforts in cold ambient temperatures." (*Id.*) On August 3, 2011, NHTSA initiated an investigation into the manual transmission in 2011 and 2012 Mustangs based on 364 complaints submitted by consumers, over 300 of which were *provided by Ford*, that drivers were unable to shift into gear while driving. (ECF No. 10, PageID.60; ECF No. 12, PageID.252.)[5] The report noted complaints of "higher than expected shift efforts in cold ambient temperatures" and "increasing difficulty selecting gears along with gear clash or grinding." *PE 11-024 ODI Resume*, NHTSA (Dec. 14, 2011), https://perma.cc/R22R-FA3P. NHTSA closed the investigation after noting that Ford had addressed the complaints by issuing service bulletins instructing technicians on appropriate repairs and concluding: "There is no indication of loss of motive power or unreasonable safety risk associated with the alleged defect in the subject vehicles." *Id.*

 **\*8**  Since Ford itself provided over 300 complaints to NHTSA and was involved in the investigation process, it is clear that Ford had notice of a possible transmission defect at least by the spring of 2011, if not earlier. But according to the NHTSA investigation report, Ford addressed the shifting concerns raised in the consumer complaints by issuing a service bulletin instructing technicians to use lower-viscosity transmission fluid and designing a revised clutch plate fastener that was made available through a special service message. *Id.* And NHTSA explicitly found there was no unreasonable safety risk associated with the possible transmission defect. So the NHTSA report cannot be used to show Ford had knowledge of a material defect after the report was released in December 2011.[6] Without another source notifying Ford of continuing or new transmission issues, it would be reasonable for Ford to believe that it had fully resolved the transmission issues previously raised to NHTSA.

The only other potentially reliable source of information that Plaintiffs point to *after* the NHTSA investigation is customer complaints submitted to NHTSA. Plaintiffs provide a sample of complaints about Mustangs with the MT82 transmission from the NHTSA website written between 2011 and 2020. (ECF No. 10, PageID.63–82.) Plaintiffs note that these are just a sampling of the complaints, but do not indicate the total number of relevant complaints that appear on the NHTSA website.

Some courts have held that the mere existence of customer complaints to NHTSA is insufficient without a plausible allegation that the defendant actually saw the complaints. *See, e.g., Gotthelf v. Toyota Motor Sales, U.S.A., Inc.,* 525 F. App'x 94, 104 (3d Cir. 2013) (rejecting bare allegations of consumer complaints without any information about when or to whom the complaints were sent and finding insufficient factual support that Toyota knew about complaints filed with NHTSA. *But see Grodzitsky v. Am. Honda Motor Co.,* No. 2:12-CV-1142-SVW-PLA, 2013 WL 2631326, at *6 (C.D. Cal. June 12, 2013) (finding that a sampling of NHTSA complaints combined with the allegation that Honda monitored NHTSA databases was enough to "support a plausible inference that Defendant saw and reviewed the specific complaints."). Here Plaintiffs specifically plead that "automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects" and that "Ford and/or Ford personnel would review NHTSA's website for complaints." (ECF No. 10, PageID.62.)

But even assuming that Ford monitors NHTSA complaints, many courts, including this one, suggest that the volume of complaints about a specific issue must be significant enough to draw Ford's attention. *See, e.g., Roe,* 2019 WL 3564589, at *7 ("[F]or consumer complaints and repair logs to give fair notice to Ford that one particular part is consistently having problems, it must be that the number of complaints about and repairs of that specific part stood out."); *In re Nexus 6P Prod. Liab. Litig.,* 293 F. Supp. 3d 888, 909 (N.D. Cal. 2018) ("[A] handful of complaints do not, by themselves, plausibly show that Huawei or Google had knowledge of the defects and concealed the defects from customers."); *Beck v. FCA US LLC,* 273 F. Supp. 3d 735, 753 (E.D. Mich. 2017) ("Nor is there a plausible inference of knowledge based on FCA's purported review of the forty-three NHTSA complaints [ ] because Beck does not state how many of these complaints were filed before Beck purchased his [vehicle].").

In another case against Ford, this Court found it was insufficient for the plaintiffs to provide only 14 NHTSA complaints from a three-year period without more information about the total number of complaints or how Ford allegedly knew about the complaints. *Roe,* 2019 WL 3564589, at *7. Here, Plaintiffs provide approximately 36 NHTSA complaints from a 9-year span. Again, Plaintiffs give no indication of the total number of relevant complaints from

this period. And only some of these complaints pre-date when Plaintiffs purchased their vehicles.

**\*9** So Plaintiffs have not alleged sufficient facts to suggest that complaints about shifting issues were frequent enough or voluminous enough "that they were not lost in a sea of complaints and repairs amassing by the dozens each day." *Roe,* 2019 WL 3564589, at *7 (cited favorably by *Smith,* 988 F.3d at 885); *see also Woziak v. Ford Motor Co.,* No. 2:17-CV-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) ("Plaintiffs' general assertions of Defendant's knowledge without any alleged facts that Defendant was even aware of the complaints do not rise above mere speculation."); *McKee v. Gen. Motors LLC,* 376 F. Supp. 3d 751, 761 (E.D. Mich. 2019) ("Plaintiff's allegations of consumer complaints online or to the NHTSA are insufficient to support a finding of GM's knowledge.").

Because Plaintiffs have not adequately alleged facts to support the inference that Ford knew about the alleged defect in the MT82 transmission after December 2011, the following fraud claims are dismissed: Robert Escudero's claims for his 2015 Mustang under California's Consumer Legal Remedies Act (Count 7) and the California Business & Professions Code § 17200 (Count 10), Brandon Lemons' claim for his 2014 Mustang under the Florida Deceptive and Unfair Trade Practice Act (Count 16), Joseph Plis' claim for his 2017 Mustang under New York's General Business Law section 349 (Count 19), and Christopher Wooten's claim for his 2016 Mustang under the Delaware Consumer Fraud Act (Count 21). Wooten is the only named plaintiff who brought a claim under the Delaware Consumer Fraud Act; so Count 21 is dismissed as a whole. The other three counts have additional remaining plaintiffs.

### b. *The MT82-D4 Transmission*

**[11]** That leaves the claims about the MT82-D4 transmission. For the 2018 model Mustang, Ford released a new version of the MT82 transmission, the MT82-D4. According to one commentator, the MT82-D4 "promise[d] to perform much better than its predecessor." Mircea Panait, *2018 Ford Mustang GT Features Upgraded MT82 Manual Transmission,* Auto Evolution (Nov. 10, 2017), https://perma.cc/798L-PPC6. Despite the promise of better performance, it was not long after the new model was released that issues again began to surface. On March 20, 2018, Ford issued a service bulletin about the "inability or difficulty to

shift into second gear" for 2018 Mustangs built on or before November 15, 2017. (ECF No. 10, PageID.85–86.) A few months later, Ford issued another service bulletin about the "inability to shift into 3rd or 4th gear" for all 2018 Mustangs. (*Id.* at PageID.86.) And just two months after that, Ford issued a bulletin for 2018 and 2019 Mustangs regarding "inability to drive in first and second gear." (*Id.*) These three service bulletins are supplemented with consumer complaints filed with NHTSA throughout 2018, 2019 and 2020.

Ford argues that service bulletins do not create a plausible inference that Ford was on notice of the alleged defect. But none of the cases that Ford cites actually hold that service bulletins that are *relevant* to the alleged defect and concern the model of car at issue cannot be used to plausibly show knowledge. *Cf. Miller*, 2018 WL 2740240, at *13– 14 (rejecting TSBs that related to different vehicles and different defects); *Hall v. Gen. Motors, LLC*, No. 19-10186, 2020 WL 1285636, at *7 (E.D. Mich. Mar. 18, 2020) (holding that TSBs that did not identify or mention any of the core features of the defect as defined by plaintiffs "do not support a plausible inference that GM knew about the [defect]."); *Fisher v. Honda N. Am., Inc.*, 2014 WL 2808188, at *6 (C.D. Cal. June 12, 2014) (TSBs unrelated to model year of plaintiff's vehicle and alleged defect are not plausible knowledge allegations). Although a service bulletin is not necessarily an admission of a defect, it leads to other inferences. Service bulletins are advisory notices sent to dealership service departments that relate to a common issue Ford has identified and "inform[ ] technicians of conditions that may occur on some vehicles, or provides information that could assist in proper vehicle service." *TECHNICAL SERVICE BULLETIN 5.0L - Manual Transmission - Inability Or Difficulty To Shift Into Second Gear - Built On Or Before 15-Nov-2017*, Ford Motor Company (Mar. 20, 2018), https:// perma.cc/9NFR-JQN3 (fine print). As explained by another court in this District, "TSBs advising of specific transmission issues support[ ] a fair inference that [the manufacturer] relied on an 'accretion of knowledge' collated from its own internal testing and engineering reports and complaints and data received exclusively by it through its dealer channels, which prompted it to issue those repair bulletins." *Francis v. Gen. Motors, LLC*, ––– F.Supp.3d ––––, ––––, No. 19-11044, 2020 WL 7042935, at *16 (E.D. Mich. Nov. 30, 2020); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014). So when Ford issues a service bulletin about the precise issue in the precise vehicle that a plaintiff complains of, it is common sense to infer that Ford had knowledge of that issue at the time of, and prior to, the

service bulletin. The caselaw supports this conclusion. *See, e.g.*, *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1093 (N.D. Cal. 2014); *Francis*, ––– F.Supp.3d at ––––, 2020 WL 7042935, at *14.

**\*10** So Plaintiffs have adequately alleged that Ford had knowledge of a MT82-D4 transmission defect beginning with the 2018 model year Mustang.

### c. *Duty to Disclose Regarding the MT82-D4*

Finally, the Court must determine whether Ford had a duty to disclose this knowledge. As discussed above, the parties agree that there are a number of ways Plaintiffs can demonstrate a duty to disclose.

**[12]** First, Plaintiffs allege that Ford had exclusive or superior knowledge of a material fact, namely the defect. Plaintiffs plead that Ford knew about the defect through sources not available to consumers, including pre-release testing data, consumer complaints to Ford and Ford dealers, warranty claim data, aggregate data on repairs from Ford dealers, testing conducted in response to complaints, and "other internal sources of aggregate information." (ECF No. 10, PageID.59–60.)

As discussed above, courts routinely reject bare allegations of internal testing and data analysis. But here the three 2018 service bulletins issued by Ford support the inference that Ford was collecting evidence of a transmission problem from internal sources long before the TSBs were issued. *See Francis*, ––– F.Supp.3d at ––––, 2020 WL 7042935, at *16. These sources of aggregate knowledge were in Ford's control and were not available even to consumers who conducted research on their vehicle before purchase. *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1096 (N.D. Cal. 2007) (finding that GM had exclusive knowledge because the record makes clear that GM was aware of a problem with speedometers that customers only became aware of when they experienced it first-hand). And just because consumers may have been able to find some information, like consumer complaints (or even service bulletins) online does not defeat the fact that Ford had exclusive knowledge. *See id.* at 1097 ("It is true that prospective purchasers, with access to the Internet, could have read the many complaints about the failed speedometers [ ]. Some may have. But GM is alleged to have known a lot more about the defective speedometers, including information unavailable to the public. Many customers would

not have performed an Internet search before beginning a car search. Nor were they required to do so."); *MyFord Touch*, 46 F.Supp.3d at 960 ("[A]s Ford conceded at the hearing, Plaintiffs would not have had full awareness of the TSBs because the full content of the TSBs was not publicly available on the NHTSA website.") So Plaintiffs have sufficiently plead that Ford had superior knowledge of the defect, a material fact which it was duty-bound to disclose to consumers.

[13] Plaintiffs also allege that Ford actively concealed the defect by directing replacement of the defective part with an equally defective part and telling customers their transmissions were not defective and denying them repairs. Other courts have found that both of these actions can support an inference of active concealment. *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1097 (N.D. Cal. 2007) (finding that GM replacing broken speedometers with the exact same model "might very well constitute active concealment of a systematic problem."); *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 384 (D.N.J. 2014) (finding that the allegation that "BMW advised dealers to make temporary repairs to ensure that the manifestation of the defects occurred outside the warranty period, thereby shifting financial responsibility for the defect onto consumers" created the plausible inference of active concealment); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1134 (N.D. Cal. 2010) (fraudulent concealment allegations sufficient where plaintiffs alleged that when they "contacted Sears for service of their defective Machines [they] were either told the Machines were not defective or denied free service or replacement of the defective parts."). So Plaintiffs have pled enough to allege active concealment.

*11 The final way to establish a duty to disclose, partial disclosure, was not briefed by either party so the Court will not address it at this time.

In sum, Plaintiffs who purchased 2018 and 2019 Mustangs have adequately pled that Ford committed fraud by failing to disclose a material fact about their vehicles' transmission. So the following claims survive the motion to dismiss: violation of the Arkansas Deceptive Trade Practices Act (Count 4) on behalf of Plaintiff Morrow; violation of California Consumers Legal Remedies Act (Count 7) on behalf of Plaintiff Gregorio; violation of California Business & Professions Code § 17200, *et seq.* (Count 10) on behalf of Plaintiff Gregorio; violation of the Colorado Consumer Protection Act (Count 13) on behalf of Plaintiff Zimmerli; violation of the Florida Deceptive and Unfair Trade Practice Act (Count 16) on behalf of Plaintiff

John Walker; deceptive acts or practices in violation of New York's General Business Law § 349 (Count 19) on behalf of Plaintiff Shunk; violation of the North Carolina Unfair and Deceptive Acts and Practices Act (Count 24) on behalf of Plaintiff Steven Swayne; and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count 27) on behalf of Plaintiff Dickson.

## C. Warranty Claims

Before discussing the substance of the express- and implied-warranty claims, the Court will address two preliminary points.

### 1. Preliminary Issues

First, Ford argues that all of Plaintiffs' warranty claims should be dismissed because Plaintiffs failed to give Ford adequate pre-suit notice of a breach. And for Plaintiff Escudero only, Ford argues that his warranty claims must also be dismissed because they are time barred.

#### a. *Pre-Suit Notice*

The Uniform Commercial Code requires that a buyer "must *within a reasonable time* after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." U.C.C. § 2-607(3)(a) (emphasis added) Although the relevant states have all adopted U.C.C. § 2-607(3)(a), states differ on what constitutes reasonable notice and to whom notice must be given.

[14] *Michigan*. Michigan courts interpret the notice requirement strictly, requiring that "upon discovering a breach, the buyer must provide reasonable pre-suit notice to even a remote manufacturer lest the buyer be barred from any remedy." *Johnston v. PhD Fitness, LLC*, No. 16-CV-14152, 2018 WL 646683, at *3 (E.D. Mich. Jan. 31, 2018) (citing *Gorman v. Am. Honda Motor Co., Inc.*, 302 Mich.App. 113, 839 N.W.2d 223, 232 (2013)). Another court in this District recently held that, where a Michigan plaintiff had presented his vehicle for repair to an authorized dealership, the issues of timeliness and sufficiency of the notice were questions of fact. *Francis*, ––– F.Supp.3d at ––––, 2020 WL 7042935, at *12. There, the Court found it was at least plausible that the

manufacturer had received notice of the problems with the plaintiff's vehicle through the repair order or warranty claim.

**[15]** But in this case, the sole Michigan plaintiff, Garrett Daniel, does not plead that his vehicle has been inspected or repaired by a Ford dealership. Daniel contacted two different Ford dealers about issues with his vehicle, but neither was able to even schedule the vehicle for repairs before the Third Amended Complaint. (ECF No. 10, PageID.30–31.) And Daniel does not plead that he notified Ford about a breach of his warranty in any other manner. Since Michigan law requires pre-suit notice to Ford to maintain a breach of warranty claim, Daniel's warranty claims fail. Thus, Daniel's warranty claims are dismissed. And because he is the only plaintiff from Michigan, the entirety of Counts 2 and 3 are dismissed.

**\*12** *Florida*. Courts are divided on whether Florida law requires notice to a remote manufacturer or just to the seller, here a Florida car dealership. *Compare In re FCA US LLC Monostable Elec. Gearshift Litig.*, 446 F. Supp. 3d 218, 227 (E.D. Mich. 2020) (holding that the rationale for pre-suit notice articulated by the Florida Court of Appeals supports requiring notice to car manufacturer), *with Felice v. Invicta Watch Co. of Am., Inc.*, No. 16-CV-62772-RLR, 2017 WL 3336715, at \*6 (S.D. Fla. Aug. 4, 2017) ("Florida courts recognize 'that notice is required to be given to the seller, not the manufacturer, under Florida law.' ").

**[16]** The Court need not resolve this question here because the Florida plaintiffs' pleadings create a question of fact whether Ford received notice of the issues with their cars. Both Lemons and Walker brought their cars to a Ford dealer for repair where repair orders were generated. (*See* ECF No. 10, PageID.42–44.) The repair orders documented complaints by Lemons and Walker that they were experiencing issues when shifting gears. (*Id.*) Further development of the record can help elucidate what documentation, if any, Ford received regarding these repair orders. So the Florida warranty claims will not be dismissed for lack of pre-suit notice at this time.

**[17]** *Pennsylvania*. On the other end of the spectrum, in Pennsylvania "[t]he filing of a complaint has been held to satisfy the notice requirement for a breach of warranty claim." *Precision Towers, Inc. v. Nat-Com, Inc.*, No. 2143, 2002 WL 31247992, at \*5 (Pa. Com. Pl. Sept. 23, 2002) (internal citations omitted); *see also Bednarski v. Hideout Homes & Realty, Inc.*, 709 F. Supp. 90, 92–93 (M.D. Pa. 1988) (recognizing that a third party complaint may serve

as adequate notice and that the issue of whether such notice was provided within a reasonable time is a jury question); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 977 (N.D. Cal. 2014). So the Pennsylvania warranty claims (Counts 28 and 29) will not be dismissed on this basis.

**[18]    [19]** *Arkansas*. In Arkansas, pre-suit notice to the seller is required, and the filing of a complaint is not sufficient. *See Williams v. Mozark Fire Extinguisher Co.*, 318 Ark. 792, 888 S.W.2d 303, 305–06 (1994). But "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." *In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. 03-4558, 2008 WL 4126264, at \*9 (D.N.J. Sept. 2, 2008) (quoting *Jackson v. Swift-Eckrich*, 830 F. Supp. 486, 491 (W.D. Ark. 1993)).

**[20]** Plaintiff Tyrone Morrow alleges that he provided notice by twice bringing his vehicle to a Ford dealer for repair. (ECF No. 10, PageID.32–33.) Morrow's pleadings are sufficient to create a question of fact whether bringing his vehicle to the dealer for repairs was sufficient pre-suit notice such that he has stated a plausible breach of warranty claim. *See Jarrett v. Panasonic Corp. of N. Am.*, 8 F. Supp. 3d 1074, 1083 (E.D. Ark. 2013); *L. A. Green Seed Co. of Ark. v. Williams*, 246 Ark. 463, 438 S.W.2d 717, 720 (1969).

**[21]    [22]** *Colorado*. Colorado law requires timely notice to only the immediate seller, not a remote manufacturer. *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 741 (Colo. 1991). And the Colorado Supreme Court also held that "[t]he filing of a lawsuit is sufficient notice to encourage settlement of claims, and applicable statutes of limitation protect manufacturers from the difficulties of defending against stale claims." *Id.* (internal citations omitted); *see also Wallman v. Kelley*, 976 P.2d 330 (Colo. App. 1998), *as modified on denial of reh'g* (Sept. 17, 1998). Thus, it is a question of fact whether the filing of this lawsuit provided sufficient and reasonable notice to sustain Plaintiff Zimmerli's warranty claims. *See Wallman*, 976 P.2d at 333 ("While the statute requires buyers to give notice to sellers of claimed breaches, the issues of sufficiency and reasonableness of the notice require a factual determination.").

**\*13    [23]** *California*. Although the California Commercial Code incorporates the U.C.C. and requires pre-suit notice to sellers, the California Supreme Court carved out an exception for a manufacturer with whom the purchaser did not deal. *See In re Toyota Motor Corp. Unintended Acceleration Mktg.,*

*Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1180 (C.D. Cal. 2010) (notice not required in action against a manufacturer and by purchasers "against [a] manufacturer[ ] with whom they have not dealt." (quoting *Greenman v. Yuba Power Prods.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 900 (1963))). Because Gregorio purchased his car from an authorized dealer rather than from Ford directly, he is not required to give pre-suit notice to Ford.

 **[24]** *Delaware*. "Delaware courts interpret the UCC's notice requirement relatively leniently." *Lincoln v. Ford Motor Co.*, No. CV JKB-19-2741, 2020 WL 5820985, at *10 (D. Md. Sept. 29, 2020) (citing *Cline v. Prowler Indus. of Md.*, 418 A.2d 968 (Del. 1980) ("The requirement of notice has been greatly liberalized to reflect the differences between commercial buyers and consumers"); Official Cmts. 4 and 5 to Del. Code Ann. 6 § 2–607(3)(a) ("[T]he rule requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy ...")).

 **[25]** The court in *Lincoln* found that the plaintiff's pleading satisfied the notice requirement where the plaintiff alleged he had informed a Ford dealer of his experience with the defect and "informed Ford itself of this issue by filing this lawsuit about a year later." 2020 WL 5820985, at *11. And in another case, the Superior Court of Delaware, found that, where the plaintiff brought his vehicle to a dealer for repair, fact questions existed as to whether the defendants received timely notice. *Smith v. Daimlerchrysler Corp.*, No. 94C-12-002, 2002 WL 31814534, at *4 (Del. Super. Ct. Nov. 20, 2002).

Wooten twice brought his Mustang to a dealer for repair (ECF No. 10, PageID.40–41), so his warranty claims will not be dismissed.

 **[26]** **[27]** *North Carolina*. In North Carolina, the notice requirement is considered satisfied when a plaintiff presents his car to an authorized dealer for repair within the warranty period. *Riley v. Ken Wilson Ford, Inc.*, 109 N.C.App. 163, 426 S.E.2d 717, 721 (1993); *see also Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 972 (N.D. Cal. 2018). Plaintiff Swayne twice brought his vehicle to a dealer for repairs, so he too satisfied the notice requirement. (ECF No. 10, PageID.51–52.)

 **[28]** **[29]** **[30]** *New York*. New York determines timely notice based on a "standard of reasonableness." *Cliffstar Corp. v. Elmar Indus., Inc.*, 254 A.D.2d 723, 723, 678 N.Y.S.2d 222 (1998). "[T]he sufficiency and timeliness of notice of a breach of warranty was a question of fact to be determined by the jury." *Hubbard v. Gen. Motors Corp.*, No. 95 CIV. 4362, 1996 WL 274018, at *4 (S.D.N.Y. May 22, 1996). It is sufficient for a plaintiff to plead that he complained to the seller or requested service. *Cliffstar*, 254 A.D.2d at 723, 678 N.Y.S.2d 222; *see also Panda Capital Corp. v. Kopo Int'l, Inc.*, 242 A.D.2d 690, 692–93, 662 N.Y.S.2d 584 (1997) (holding that the complaint in the action itself constituted notice, as did prior complaints to the seller); *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 972 (N.D. Cal. 2018) (holding that under New York law "the notice requirement is satisfied by presenting the car to an authorized dealership for warranty service even if a breach is not specifically alleged.").

 ***14** **[31]** Both New York plaintiffs have pled sufficient facts to, at a minimum, establish a question of fact whether they provided timely and reasonable notice to Ford. Plis called his local Ford dealer to complain about issues with his car but was told the behavior was normal. (ECF No. 10, PageID.46.) And Shunk's vehicle was twice repaired by a local Ford dealer. (*Id.* at PageID.48–49.) So the New York warranty claims will not be dismissed for lack of notice.

**b. *Statute of Limitations for Plaintiff Escudero***

 **[32]** Ford argues (in a footnote) that California plaintiff Escudero's warranty claims are untimely because they began to accrue at the time of original tender of his vehicle, September 2015. The limitations period for express and implied warranty claims, as well as Magnuson-Moss Warranty Act claims, is four years in California. *See Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 WL 2797810, at *11–13 (N.D. Cal. June 28, 2017) (citing Cal. Com. Code § 2725). This case was filed in May 2020, more than four years after Escudero purchased his car.

 **[33]** But Escudero argues that the statutes of limitations were tolled because Ford fraudulently concealed the defect. In order to plead fraudulent concealment, Escudero must show that Ford knew about the transmission defect in his 2015 Mustang. But, as discussed above, the Court already ruled that Plaintiffs have not plausibly pled that Ford had knowledge of the transmission defect in the 2015 Mustang. So Escudero's warranty claims under Count 8, Count 9, and Count 11 are dismissed.

## 2. Express Warranty Claims

Plaintiffs bring breach of express warranty claims premised on Ford's New Vehicle Limited Warranty (the "NVLW"). Under the NVLW, each vehicle's powertrain (which includes the transmission) is covered for the lesser of five years or 60,000 miles from its original purchase. (ECF No. 12, PageID.225; ECF No. 12-4, PageID.281.) In the NVLW, Ford promises to "repair, replace, or adjust" at no cost covered powertrain parts (including the transmission) "that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long as the vehicle was "properly operated and maintained" and "taken to a Ford dealership for a warranted repair during the warranty period." (ECF No. 12-4, PageID.320–321.) Although Ford refers to the NVLW as a "repair or replace promise," it is an express warranty by its own terms. (*See* ECF No. 12-4, PageID.358 ("The warranties in this booklet are the only express warranties applicable to your vehicle."); *see also Miller v. Gen. Motors, LLC*, No. 17-CV-14032, 2018 WL 2740240, at *5 (E.D. Mich. June 7, 2018) (noting "the distinction between an express UCC warranty and a promise to repair or replace is largely a semantic decision").

Ford attacks Plaintiffs' express warranty claims on two bases: (1) Plaintiffs only plead a design defect and Ford's express warranty does not cover design defects, and (2) Ford has complied with its obligations under the warranty.

### a. *Warranty Coverage for Design Defects*

[34] Ford argues that Plaintiffs plead a design defect and that the NVLW covers only manufacturing defects and not design defects. Neither of these arguments is convincing at the motion-to-dismiss stage. Although Plaintiffs' express warranty claims arise under the laws of nine states, neither party argues that the law governing express warranties in these states is materially different.

*15 Plaintiffs contend that they allege not only a design defect, but also manufacturing and materials defects. (*See* ECF No. 10, PageID.56 ("The Transmission is defective in its design, manufacturing, and or materials ...").) Plaintiffs are not required to commit to a single theory of the origin of the defect at this time. *See Gant v. Ford Motor Co.*, No. 19-CV-12533, ––– F.Supp.3d ––––, ––––, , 2021 WL 364250,

at *3 (E.D. Mich. Feb. 3, 2021) ("At this early stage of the case, without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of 'design' or 'manufacturing.' " (quoting *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1011 (E.D. Mich. 2017))). And just because Plaintiffs plead allegations involving a class of vehicles does not preclude the possibility of a manufacturing defect. *See Francis v. Gen. Motors, LLC*, ––– F.Supp.3d ––––, ––––, No. 19-11044, 2020 WL 7042935, at *6 (E.D. Mich. Nov. 30, 2020) ("The defendant insists that if 'all' of its transmissions are affected, then the defect necessarily must be one caused by design and not method of manufacture. But it is logically possible that either could be the case; perhaps the transmissions work badly even though built as designed; or maybe they *all* were badly built, even though well-patterned."); *Alin v. Am. Honda Motor Co.*, No. CIV A 08-4825 KSH, 2010 WL 1372308, at *6 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives."). So the issue of what type of defect Plaintiffs allege will be left for another day. For now, Plaintiffs' express warranty claims will not be dismissed on this basis.

### b. *Whether Ford Complied with the Warranty*

Plaintiffs allege that Ford breached its express warranty by refusing to effectively repair or replace their defective transmissions. Ford argues that Plaintiffs cannot show a breach of the NVLW because (1) three of the remaining named plaintiffs, Zimmerli, Plis, and Dickson, failed to present their vehicles to an authorized Ford dealer for repair, and (2) for those plaintiffs that properly presented their vehicles, Ford honored its warranty by providing necessary repairs free of charge.

The express language of the NVLW states that Ford will provide warranty coverage if the owner's "Ford vehicle is properly operated and maintained, and was taken to a Ford dealership for a warranted repair during the warranty period." (ECF No. 12-4, PageID.279–280.) Zimmerli, Plis, and Dickson try to get around this precondition for warranty

coverage by arguing that the warranty failed its essential purpose.

The four states at issue have adopted the Uniform Commercial Code's provision regarding essential purpose: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." U.C.C. § 2-719. And many courts hold that "[t]o prove that a repair and replacement remedy failed in its essential purpose, the buyer must show that the seller was either unwilling or unable to repair the vehicle." *Miller*, 2018 WL 2740240, at *6; *see also Baney Corp. v. Agilysys NV, LLC*, 773 F. Supp. 2d 593, 605 (D. Md. 2011) ("[A] repair remedy fails of its essential purpose when the seller 'has refused to make repairs as he was required or where he cannot repair the product.' " (quoting *Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043, 1046 (4th Cir. 1989))); *In re Myford Touch Consumer Litig.*, 2015 WL 5118308, at *4 (N.D. Cal. Aug. 31, 2015) ("[A] plaintiff claiming breach of an express warranty [must] give the seller the opportunity to repair or replace the product *before* the exclusive repair and replace remedy is considered to have failed of its essential purpose."); *Wozniak v. Ford Motor Co.*, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019). *But see Benkle v. Ford Motor Co.*, No. 161569, 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017) (finding that because plaintiffs alleged a design defect common to all vehicles at issue and alleged that a repair would have been inadequate, plaintiffs were not required to allege that they presented their vehicles for repairs).

Plaintiffs themselves seem to acknowledge that before a warranty can fail its essential purpose, Ford must have at least been given an opportunity to repair or replace the defective transmission. (ECF No. 17, PageID.573 (citing favorably *Wozniak* and *Miller*).) The Court agrees that Ford needed to have an opportunity to repair or replace. So the question becomes whether Zimmerli, Plis, and Dickson gave Ford that opportunity.

**\*16**  **[35]**  Although Plis did not take his Mustang to a Ford dealer as the NVLW requires, he *did* give Ford an opportunity to repair or replace his defective transmissions. Plis called his local Ford dealer to complain when he began to experience the transmission defect but was advised that the behavior was normal. (ECF No. 10, PageID.46.) Thus, Plis has plausibly pled that Ford's repair or replace warranty failed him because his authorized Ford dealer was unwilling to repair his vehicle.

**[36]**  But it cannot be argued that Zimmerli and Dickson gave Ford any opportunity to repair or replace because, at the time of the complaint, they had never contacted Ford or an authorized Ford dealer about the transmission defect in their vehicles. (*See* ECF No. 10, PageID.39, 54.) Although their response brief is not entirely clear, it seems that Zimmerli and Dickson (and perhaps other plaintiffs too) make some form of futility argument, i.e., because Ford was unable to repair the transmission defect in other Mustangs, it would have been futile for Zimmerli and Dickson to present their cars for repair.

Like the court in *MyFord Touch*, this Court holds that that "[e]ven assuming a futility argument is theoretically possible, here, there are insufficient allegations in the complaint to make futility plausible." 46 F. Supp. 3d. at 971.

The Court reaches this conclusion for a few reasons. First, as discussed above, it is not yet clear whether Plaintiffs allege a design defect common to all purported class vehicles. If Plaintiffs' cars do not contain the same defect, Ford's inability to repair car A says nothing about whether it can repair Car B. Second, even if Plaintiffs' vehicles contain a common defect, the Complaint does not adequately allege that Ford was consistently unable to fix the defect. Although some plaintiffs allege that attempts were made to repair their Mustang but the problem remained (*see e.g.*, ECF No. 10, PageID.39 (Plaintiff Wooten); PageID.49 (Plaintiff Shunk); PageID.52 (Plaintiff Swayne)), others do not clearly allege that the defect remains unremedied after repairs were completed (*see e.g.*, *id.* at PageID.31 (Plaintiff Morrow)). And other evidence suggests that, at least in some cases, Ford has been able to adequately fix the issue (i.e. the NHTSA investigation report concluding that Ford adequately addressed the issue). So it is unclear whether the experience of plaintiffs whose cars continued to exhibit the defect after repair attempts are "commonplace, unique [ ], or somewhere in between." *MyFord Touch*, 46 F. Supp. 3d at 971. The personal experiences of a small number of plaintiffs is not sufficient to plausibly plead futility.

Because Zimmerli and Dickson did not comply with the preconditions of Ford's warranty coverage, did not provide Ford an opportunity to repair or replace their defective transmission, and have not plausibly pled that doing so would have been futile, their express warranty claims (Count 14 and Count 28) are dismissed.

**[37]**  For the remaining plaintiffs' express warranty claims, Ford argues that it fully complied with its warranty by providing necessary repairs free of charge. It is true that "Ford

did not promise that Plaintiffs' powertrains were defect-free; Ford merely promised that (if certain conditions were met) it would 'repair, replace, or adjust' powertrain parts ... free of charge." *Roe*, 2019 WL 3564589, at \*11. Here, Plaintiffs again respond with the argument that the warranty has failed its essential purpose.

**\*17** **[38]** As discussed above, a repair-or-replace warranty fails its essential purpose when the seller is either unwilling or unable to repair the vehicle. *See Miller*, 2018 WL 2740240, at \*6; *see also Roe*, 2019 WL 3564589, at \*11 ("[R]epair-or-replace warranties usually fail their essential purpose when, after several tries, the manufacturer is not able to bring the product up to snuff."); *Benkle v. Ford Motor Co.*, No. 161569, 2017 WL 9486154, at \*12 (C.D. Cal. Dec. 22, 2017) ("Plaintiffs have plausibly alleged a breach of express warranty on the theory that Defendant failed to provide adequate repairs under the terms of its Limited Warranty.").

All of the remaining plaintiffs have adequately pled that Ford was either unwilling or unable to fix their defective transmission. (ECF No. 10, PageID.33–35, 40–41, 43–46, 48–49, 51–52.) So it is plausible that Ford's express warranty failed its essential purpose and that Ford is liable to the remaining Plaintiffs for breach of express warranty. As such, the following breach-of-express-warranty counts survive the motion to dismiss: Count 5 (Arkansas), Count 9 (California) as to Gregorio only, Count 17 (Florida), Count 20 (New York), Count 22 (Delaware), and Count 25 (North Carolina).

### 3. Implied Warranty Claims

Plaintiffs claim that Ford breached the implied warranty of merchantability under the laws of eight states (Plaintiffs do not bring an implied warranty claim under New York law). Ford challenges Plaintiffs' implied warranty claims on two grounds: (1) Plaintiffs fail to plead that their vehicles were unfit for their ordinary purpose, and (2) Plaintiffs lack privity with Ford.

#### a. *Fitness for Ordinary Purpose*

Ford argues that all of Plaintiffs' implied warranty claims should be dismissed because Plaintiffs have not sufficiently pled that their vehicles were unfit for their ordinary purpose. The U.C.C. provides for an implied warranty of merchantability. U.C.C. § 2-314. To be merchantable, goods

must be "fit for the ordinary purposes for which such goods are used." U.C.C. § 2-314(2)(c). The parties agree that this definition applies in all of the relevant states.

**[39]** Ford argues that the ordinary purpose for its vehicles is to provide transportation. And according to Ford, all of Plaintiffs' vehicles are drivable. But Ford defines too generally what it means for a vehicle to be fit for its ordinary purpose. Courts routinely hold that "to be fit for its ordinary purpose, a standard road vehicle must be able to provide safe and reliable transportation and be substantially free of defects." *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019) (internal citations omitted); *see also Francis v. Gen. Motors, LLC*, No. 19-11044, ---- F.Supp.3d ----, ----, 2020 WL 7042935, at \*7 (E.D. Mich. Nov. 30, 2020) (holding that for a vehicle to be merchantable it must not only provide transportation, "but also do so in a reasonably safe and reliable manner."); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1015 (E.D. Mich. 2017) (citing *Troup v. Toyota Motor Corp.*, 545 Fed. Appx. 668, 669 (9th Cir. 2013)); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 946–47 (N.D. Cal. 2018).

**[40]** Here, Plaintiffs have sufficiently alleged that the transmission defect rendered their vehicles both unsafe and unreliable. In particular, the alleged issues with gears slipping, jerking, and clashing, and the inability to shift into certain gears plausibly present a safety hazard because they affect the driver's ability to control the vehicle's acceleration and deceleration. (*See* ECF No. 10, PageID.59.) Courts faced with similar defect allegations have concluded that such allegations support a finding that the vehicle is not fit for its ordinary purpose. *See, e.g., In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 113 (E.D. Mich. 2019) ("A fact-finder reasonably could conclude that such a design, which inhibits a majority of drivers from reliably selecting the desired direction of movement (or stopping the car from moving), is not one that is reasonably suited for safe and reliable transportation."); *Parrish v. Volkswagen Grp. of Am., Inc.*, 463 F. Supp. 3d 1043, 1065 (C.D. Cal. 2020) ("[A] vehicle that repeatedly makes a 'coffee grinder noise' or a 'clunk noise' [ ] might shock or surprise not only the driver of the vehicle, but also other drivers on the road, causing distractions and safety hazards."); *Hardt v. Chrysler Grp. LLC*, No. SACV1401375SJOVBKX, 2015 WL 12683965, at \*6 (C.D. Cal. June 15, 2015) ("This Court finds that Manual Transmission vehicles with an allegedly inoperative clutch are rendered unmerchantable."); *Gant v. Ford Motor Co.*, No.

19-CV-12533, —— F.Supp.3d ——, 2021 WL 364250, at \*4 (E.D. Mich. Feb. 3, 2021) (finding that allegations of a similar transmission defect in Ford vehicles was sufficient to suggest that the defect seriously compromised the safety of the vehicles); *Francis*, —— F.Supp.3d at ——, 2020 WL 7042935, at \*8 (finding sufficient allegations based on "abrupt, unpredictable, and uncontrollable acceleration or deceleration caused by the transmissions' failure to engage or maintain appropriate drive gear settings.").

**\*18** Plaintiffs have plausibly plead that their vehicles are unfit for their ordinary purpose and their implied warranty claims will not be dismissed on this basis.

#### b. *Privity with Ford*

In some states, contractual privity between the plaintiff and the defendant is required to bring an implied warranty claim. Ford argues that the implied warranty claims of Lemons, Walker, Morrow, Gregorio, Swayne, and Dickson should be dismissed because they lack contractual privity with Ford. These claims arise under the laws of Florida (Lemons and Walker), Arkansas (Morrow), California (Gregorio), North Carolina (Swayne), and Dickson (Pennsylvania).

**[41]** *Arkansas*. The Arkansas legislature "eliminated lack of privity as a defense in any action brought against the manufacturer or seller of goods for breach of warranty, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume or be affected by the goods." *Mack Trucks of Ark., Inc. v. Jet Asphalt & Rock Co.*, 246 Ark. 101, 437 S.W.2d 459, 462 (1969) (citing Ark. Code Ann. § 4–86–101); *see also Bluewater Yacht Sales, Inc. v. Liberty Coach, Inc.*, No. CIVIL 07-3039, 2009 WL 1684454, at \*4 (W.D. Ark. June 12, 2009) ("[P]rivity is not required in an action for breach of warranty."). So Morrow's claim for breach of implied warranty (Count 6) will not be dismissed.

**[42]** *Pennsylvania*. Privity is also not required for implied warranty claims in Pennsylvania. *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 620 (N.D. Ohio 2016) ("[Pennsylvania] cases show that privity is no longer required for breach of implied warranty of merchantability claims.") (citing *Kassab v. Central Soya*, 246 A.2d 848, 852 (Pa. 1968) (eliminating the requirement of privity in breach of implied warranty cases)). So Dickson's implied warranty claim (Count 29) also survives.

**[43]** *Florida*. Florida, on the other hand, has a strict privity requirement. The Florida plaintiffs cannot maintain implied warranty claims against Ford because they bought their cars from a dealer rather than Ford itself. *See Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV-MORENO, 2018 WL 3405245, at \*10 (S.D. Fla. July 12, 2018) ("Ford is an automotive distributor, not a dealer ... Plaintiffs lack privity with Ford and the implied warranty claim must fail."); *Bailey v. Monaco Coach Corp.*, 168 F. App'x 893, 894 n.1 (11th Cir. 2006) (affirming a dismissal when plaintiff purchased a motor home from a dealer and not from the manufacturer); *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 760 (E.D. Mich. 2019) (internal citations omitted). So Lemons and Walker's implied warranty claims (Count 18) are dismissed.

**[44]** *California*. Gregorio's implied warranty claim under California law is premised on the Song-Beverly Act, California Civil Code § 1729. There is no privity requirement for implied warranty claims under the Song-Beverly Act. *See Ehrlich v. BMW of N. Am., LLC*, 801 F.Supp.2d 908, 921 (C.D. Cal. 2010) (noting that the "weight of authority" states "the plain language of section 1792 of the Song–Beverly Act does not impose a ... vertical privity requirement."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 982 (N.D. Cal. 2014). So Gregorio's implied warranty claim (Count 8) will not be dismissed.

**\*19** **[45]** *North Carolina*. In North Carolina, "the general rule is that privity is required to assert a claim for breach of an implied warranty involving only economic loss." *Energy Inv'rs Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 525 S.E.2d 441, 446 (2000) (internal citations omitted). Some courts find that the only exception to this rule is for products liability claims expressly carved out by the North Carolina Legislature in N.C. Gen. Stat. Ann. § 99B-2. *See, e.g., Short v. Hyundai Motor Co.*, No. C19-0318JLR, 2020 WL 6132214, at \*9 (W.D. Wash. Oct. 19, 2020) (citing *Sharrard, McGee & Co., P.A. v. Suz's Software, Inc.*, 100 N.C.App. 428, 396 S.E.2d 815, 818 (1990) ("[O]utside the exceptions created by G.S. Chapter 99B, the general rule is that privity is required to assert a claim for breach of an implied warranty involving only economic loss.")). But other cases hold that there is also a third-party beneficiary exception based on another case from the North Carolina Court of Appeals issued the following year, *Coastal Leasing Corp. v. O'Neal*, 103 N.C.App. 230, 405 S.E.2d 208 (1991).

Even among courts that find there is a third-party beneficiary exception, there is disagreement about the scope of the exception. Some courts, mainly relying on *Coastal Leasing Corp. v. O'Neal*, 103 N.C.App. 230, 405 S.E.2d 208 (1991), interpret the exception as follows: "If the third party is an intended beneficiary, the law implies privity of contract." *Id.* at 212 (citing *Johnson v. Wall*, 38 N.C.App. 406, 248 S.E.2d 571, 574 (1978)); *see, e.g., In re MyFord Touch Consumer Litig.*, 46 F. Supp.3d 936, 985 (N.D. Cal. 2014) (holding that the third-party beneficiary exception applies to buyers of Ford vehicles). Another California district court adjudicating a case against an auto manufacturer also recognized the third-party beneficiary exception, but held that the plaintiffs were required to show that "the contracts between Mazda and its dealers were entered into for the 'direct, and not incidental, benefit' of plaintiffs and other Mazda consumers" (and failed to do so). *Gonzalez v. Mazda Motor Corp.*, No. 16-CV-02087-MMC, 2017 WL 3283957, at *6 (N.D. Cal. Aug. 1, 2017).

But another district court rejected the idea that *Coastal Leasing* created a general third-party beneficiary exception to privity. *Kelly v. Georgia-Pac. LLC*, No. 7:08-CV-197-D, 2010 WL 11579013, at *6 (E.D.N.C. Aug. 31, 2010). Instead, *Kelly* reasoned that *Coastal Leasing* is limited to its unique facts where the plaintiff directly participated in the negotiation of the sales transaction between the manufacturer and the lessor of the equipment and where the plaintiff was an intended, direct third-party beneficiary to the contract between the manufacturer and the leasing company. *Id.* at *7. The *Kelly* court concluded that the *Coastal Leasing* exception should not be extended to a case where homebuyers were suing the manufacturer of building materials for economic damages they suffered due to their builder's use of the materials in the buyers' houses. *Id.*

[46] The Court finds the reasoning of *MyFord Touch* more convincing in the auto-manufacturer context. The market for new cars is structured such that drivers must buy from an authorized dealer and do not have the option to buy directly from Ford. And the warranties Ford provides are clearly meant to benefit the ultimate consumer, not the dealer. *Cf. Francis*, ––– F.Supp.3d at ––––, 2020 WL 7042935, at *9 ("New York recognizes a third-party beneficiary exception to the privity requirement, which is particularly apposite in the context of cases involving a manufacturer with an extensive established network of authorized dealers that sell its cars."); *Morales v. Toyota Motor Sales, U.S.A., Inc.*, No. 19-01611, ––– F.Supp.3d ––––, ––––, 2020 WL 6440486, at *6 (C.D. Cal. Oct. 14, 2020) ("Plaintiff claims that Toyota has contracts

with its dealerships that were designed for and intended to benefit the ultimate customers only. These allegations, which concern the existence of a contract as well as a sufficiently immediate benefit intended for Plaintiff, are sufficient to establish that Plaintiff is an intended third-party.") (citations omitted).

**\*20** At minimum, Plaintiffs have plausibly pled that Swayne was the intended beneficiary of the contract between Ford and its authorized dealership. So Swayne's implied warranty claim (Count 26) survives.

### D. Magnuson-Moss Warranty Act Claims

[47] Plaintiffs bring a global claim for all proposed class members under the Magnuson-Moss Warranty Act (MMWA). The MMWA provides a federal cause of action for consumers damaged by a defendant who fails to comply with an obligation under a written or implied warranty. The parties agree that Plaintiffs' MMWA claims rise and fall with their warranty claims. *See also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp.3d 975, 1017 (E.D. Mich. 2017); *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015).

All of the named plaintiffs, except for Escudero and Daniel, have at least one surviving warranty claim. So the Magnuson-Moss claims are dismissed for Escudero and Daniel, but the remaining 10 plaintiffs may proceed with their claims under Count 11.

### E. Unjust Enrichment Claims

Finally, all Plaintiffs bring a claim for unjust enrichment. Ford argues that Plaintiffs cannot maintain unjust enrichment claims because the NVLW governs.

[48] [49] In many states, an unjust enrichment claim, which is a quasi-contract claim, "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). But where the parties dispute the existence of a valid contract, the unjust enrichment claims may be pled in the alternative. *See Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 797 (6th Cir. 2016); *Johnston v. PhD Fitness, LLC*, 2018 WL 646683, at *6 (E.D. Mich. Jan. 31, 2018) (holding that where the defendant

"disputed the existence of an express agreement, at this stage there is nothing infirm about [the plaintiff] pleading unjust enrichment in the alternative.").

Here, the parties do not dispute that the NVLW is an express contract that governs the same subject matter as Plaintiffs' unjust enrichment claim – namely Ford's duties to repair or replace a defect in Plaintiffs' vehicles. The dispute is instead over what types of defects Ford is required to repair or replace under the warranty.

 **[50]** As is the case here, "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel and unjust enrichment." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 181 (6th Cir. 1996). And "[c]ourts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims." *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 634 (E.D. Mich. 2019); *see also McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 762 (E.D. Mich. 2019); *Hall v. Gen. Motors, LLC*, No. 19-CV-10186, 2020 WL 1285636, at *9 (E.D. Mich. Mar. 18, 2020), *appeal dismissed*, No. 20-1321, 2020 WL 6140402 (6th Cir. Sept. 28, 2020); *Gant v. Ford Motor Co.*, No. 19-CV-12533, — F.Supp.3d —, —, 2021 WL 364250, at *11 (E.D. Mich. Feb. 3, 2021). *But see Francis*, — F.Supp.3d at —, 2020 WL 7042935, at *23 (allowing unjust enrichment claims to survive in the alternative); *Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *6 (E.D. Mich. July 16, 2018) (same).

 **\*21** **[51]** Because the NVLW governs the parties' relationship and Ford's duties to remedy defects, Plaintiffs' unjust enrichment claims are dismissed.

As a final note, because all of the claims of Michigan plaintiff Daniel and Plaintiff Escudero have been dismissed, Escudero and Daniel, as well as the proposed Michigan sub-class, are dismissed in their entirety.

## IV. Conclusion

For the reasons stated above, Ford's motion to dismiss (ECF No. 12) is granted in part and denied in part as reflected in the appended Table of Claims below.

SO ORDERED.

## APPENDIX

**TABLE OF CLAIMS**

| | | Fraud | Express Warranty | Implied Warranty | MMWA (Count 11) | Unjust Enrichment (Count 12) |
|---|---|---|---|---|---|---|
| AR | Morrow | SURVIVES (Count 4) | SURVIVES (Count 5) | SURVIVES (Count 6) | SURVIVES | |
| CA | Gregorio | SURVIVES (Counts 7 & 10) | SURVIVES (Count 9) | SURVIVES (Count 8) | SURVIVES | |
| CA | Escudero | DISMISSED (Counts 7 & 10) | DISMISSED (Count 9) | DISMISSED (Count 8) | DISMISSED | |
| CO | Zimmerli | SURVIVES (Count 13) | DISMISSED (all Count 14) | SURVIVES (Count 23) | | |
| DE | Wooten | DISMISSED (all Count 21) | SURVIVES (Count 22) | SURVIVES (Count 23) | SURVIVES | |
| FL | Lemons | DISMISSED (Count 16) | SURVIVES (Count 17) | DISMISSED (all Count 18) | SURVIVES | DISMISSED |
| FL | Walker | SURVIVES (Count 16) | SURVIVES (Count 17) | SURVIVES | | |
| MI | Daniel | DISMISSED (all Count 1) | DISMISSED (all Count 2) | DISMISSED (all Count 3) | DISMISSED | |
| NY | Plis | DISMISSED (Count 19) | SURVIVES (Count 20) | NO CLAIM | SURVIVES | |
| NY | Shunk | SURVIVES (Count 19) | SURVIVES (Count 20) | NO CLAIM | SURVIVES | |
| NC | Swayne | SURVIVES (Count 24) | SURVIVES (Count 25) | SURVIVES (Count 26) | SURVIVES | |
| PA | Dickson | SURVIVES (Count 27) | DISMISSED (all Count 28) | SURVIVES (Count 29) | SURVIVES | |

**All Citations**

--- F.Supp.3d ----, 2021 WL 778913

## Footnotes

1   All subsequent record citations in this section refer to ECF No. 10, the Third Amended Complaint, unless otherwise specified.

2   Ford also argues in this section of its brief that Plaintiffs have not and cannot allege that there is a common defect among the cars in the class they seek to represent because both parties agree that for model years 2018 and newer, Ford updated the transmission from a MT82 to a MT82-D4. To the extent that Ford wishes to challenge commonality, that can be addressed at the class-certification stage.

3   Ford also argued that Plaintiffs cannot make out a viable fraudulent-misrepresentation claim, but Plaintiffs clarified in their response that they only allege fraudulent omission and are not pursuing claims for misrepresentation.

4   The Michigan Attorney General recently asked the Michigan Supreme Court to reconsider its decision to deny appeal of *Cyr*, but as of the date of this opinion, the Supreme Court has not agreed to hear the appeal. *See AG Nessel Asks*

*Supreme Court to Hear Ford Lawsuit, Revisit Erroneous Interpretation of Michigan Consumer Protection Act*, Michigan Department of Attorney General (Feb. 12, 2021), https://perma.cc/9VQY-VC5B.

5    In its motion to dismiss, Ford provided a link to the investigation report that Plaintiffs referenced in their complaint: *PE 11-024 ODI Resume*, NHTSA (Dec. 14, 2011), https://perma.cc/R22R-FA3P. The Court takes judicial notice of the report as a public record. *See Purry v. State Farm Fire & Cas. Co.*, 350 F. Supp. 3d 631, 634 (E.D. Mich. 2018) (can take notice of public records and documents from reliable internet sources).

6    Consumers who bought a 2011 or 2012 Mustang before December 2011 could plausibly plead that Ford had knowledge of a defect in their transmission before they purchased their cars based on the NHTSA report. But there are no named plaintiffs who own either a 2011 or a 2012 Mustang.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.