# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

CLAIR REYNOLDS, MONICA
MARTIRANO, BRADY LAING,
JARED THOMAS PINEDA,
WILLIAM MARTIN POWERS,
TRINA HANCOCK, MELINDA
MARTINEZ, and KEN SCHAFER,
on behalf of themselves and all
others similarly situated,

   Plaintiff,

 v.

FCA US, LLC,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  2:19-cv-11745-AJT-EAS

Hon. Arthur J. Tarnow

Magistrate Judge Elizabeth A. Stafford

## PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

i

Plaintiffs Clair Reynolds, Monica Martirano, Brady Laing, Jared Thomas Pineda, William Martin Powers, Trina Hancock, Melinda Martinez, and Ken Schafer bring this action against Defendant FCA US LLC, ("Defendant" or "FCA"), by and through their attorneys, individually and on behalf of all others similarly situated, allege as follows:

## **INTRODUCTION**

1.     This is a class action lawsuit brought by Plaintiffs on behalf of themselves and classes of current and former owners of model year 2018–2020 Jeep Wrangler and 2020 Jeep Gladiator vehicles (hereinafter referred to collectively as the "Class Vehicles"). FCA designed, manufactured, marketed and warranted the Class Vehicles.[1]

2.     The Class Vehicles contain a defectively designed and/or manufactured solid front axle suspension and damping system that causes the steering wheel to shake violently after encountering common and expected road variations while operating at highway speeds. This phenomenon is referred to as the Jeep "Death Wobble," a term known to FCA and commonly used among Jeep owners to identify this condition.

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

3.     The "Death Wobble" is the seemingly uncontrollable side-to-side shaking of the Class Vehicles' front-end steering components and – by extension – its steering wheel presenting a serious safety hazard to the driver of the Class Vehicle and surrounding drivers. The "Death Wobble" makes the Jeep unsafe to operate by impairing the operator's ability to steer and control the Class Vehicle while presenting a safety risk to the occupants and others on the road.[2]

4.     FCA knowns the "Death Wobble" has plagued its Jeep Wrangler line of vehicles for over a decade.  Unable to provide owners an adequate remedy, FCA consistently provides customers inadequate warranty repairs designed to temporarily and repeatedly mask the "Death Wobble" until the warranty coverage expires.  FCA does this knowing these temporary remedies do not remediate the defects that manifest as the "Death Wobble."  Beginning in the 2018 Jeep Wrangler model year, FCA modified portions of the steering system, but the defects causing the "Death Wobble" remained.

5.     After receiving thousands of steering related complaints on the Class Vehicles by 2019, FCA circulated Customer Satisfaction Notification ("CSN") V41 to its captive dealer network in or before June 2019, which internally acknowledged

---

[2] Exhibit 1, Matt Konkle, *Jeep Death Wobble: How to Properly Handle, Diagnose and Fix*, Quadratec (Mar. 16, 2018), *See* https://www.quadratec.com/c/blog/jeep-death-wobble-how-to-fix (last visited July 26, 2021).

the existence of the defect causing the "Death Wobble," and identified

approximately 192,000 Class Vehicles, stating:

> The front suspension steering damper on about 192,000 of the above
> [2018-2019 Jeep Wrangler] vehicles may not effectively damp
> oscillation of the steering system, resulting in a sustained shake or
> shimmy in the steering wheel. This can be more noticeable when
> driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers
> Per hour (KPH) after contacting a bumpy road surface and in
> temperatures below 40° Fahrenheit (5° Celsius).[3]

6.    Pursuant to CSN V41, Defendant requires each vehicle receive the

following repair: "Replace the front suspension steering damper on all the above

involved vehicles." Figure 1 – Steering Damper from CSN V41 is depicted below:



**Figure 1 – Steering Damper**

---

[3] Exhibit 2, Customer Satisfaction Notification ("CSN") V41 Steering Damper –
Dealer Service Instructions – Rev. 2, June 2019.

7.     Although an estimated population of 270,000 MY 2018-2019 Class Vehicles exist, Defendant identified approximately 192,000 owners and their Class Vehicles known to suffer from the defects that manifest as the "Death Wobble." According to CSN V41, FCA began notifying Plaintiffs and other owners of Class Vehicles in Summer 2019 that this Customer Satisfaction Notice required the repair set forth in CSN V41 in an effort to remediate the "Death Wobble."

8.     But just as FCA's previous efforts to remediate the "Death Wobble" failed over the past decade, its most recent temporary fix under CSN V41 does not remediate the Class Vehicles' defects to prevent the "Death Wobble."  Each of Plaintiffs' Class Vehicles that have undergone the repair set forth in CSN V41 have again suffered the "Death Wobble."

9.     At all material times, FCA had knowledge of the defective condition existing in the Class Vehicles that manifest as the "Death Wobble." Rather than address this defective condition – or disclose its possibility and/or warn drivers at the point of sale – FCA claims the "Death Wobble" is *not* a "safety issue" and that it "can happen with any vehicle that has a solid front axle (rather than an independent front suspension), such as the Wrangler."[4] This explanation strategically allows

---

[4]   Exhibit 3, Eric Lawrence, *Jeep Wrangler drivers report 'death wobble' on highways*, Detroit Free Press (Nov. 19, 2018), https://www.freep.com/story/money/cars/chrysler/2018/11/19/jeep-wrangler-death-wobble-nhtsa/2028633002 (last visited July 26, 2021).

Defendant to continue with failed repair efforts until the warranty expires, at which point the problem rests exclusively with the owner.

10.  The "Death Wobble" problem has become so pervasive that Defendant routinely buys back Class Vehicles when presented with "Death Wobble" claims pursuant to states' Lemon Laws. Upon information and belief, Defendant has embarked upon and adopted a secret recall and warranty program of Class Vehicles subject to CSN V41 that is concealed from governing authorities and the State Sub-Classes.

11.  As a direct result of Defendant's wrongful conduct, Plaintiffs and members of the Classes have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

12.  Specifically, Plaintiffs seek: buyback of the Class Vehicles; compensation for the loss in value and depreciation of the Class Vehicles due to the "Death Wobble"; reimbursement for parts and labor costs incurred by Class Members who paid third parties to remedy the "Death Wobble" problem, as well as replacement of any components materially damaged by the "Death Wobble"; provision of a temporary replacement vehicle while repair is pending; punitive damages for FCA's knowing fraud that put drivers and members of the public

5

nationwide at risk; and an order requiring FCA to issue a formal recall and repair of the Class Vehicles, including a notice campaign informing Class Members about the recall.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

14.     Venue properly lies in this District and vicinage pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendant maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendant conducts a substantial amount of business in this District. Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in this District and venue is proper.

## PARTIES

### Plaintiff Clair Reynolds

15.     Plaintiff Clair Reynolds is a citizen and resident of the State of New Jersey.

16.     Plaintiff Reynolds owns a 2018 Jeep Wrangler Unlimited Sport 4 x 4 for personal use that she purchased new from Johnson Dodge Chrysler Jeep Ram ("Johnson Jeep") in Bud Lake, Morris County, New Jersey on July 14, 2018 for approximately $36,000. The VIN of her Class Vehicle is: 1C4HJXDGJW127339.

17.     By December 2018, Plaintiff Reynolds began to experience the "Death Wobble," which was not able to be fixed even after multiple repair attempts by Johnson Jeep.

18.     On or about December 27, 2018, Plaintiff Reynolds returned the vehicle to the Johnson Jeep complaining about the "Death Wobble."

19.     After being at Johnson Jeep for approximately two weeks, Plaintiff Reynolds' Jeep Wrangler was returned to her on January 10, 2019.  Her service records indicate that the cause of the wobble was a leaking and/or weak steering damper. Johnson Jeep replaced the steering damper on Plaintiff Reynolds' vehicle. As expected, the "Death Wobble" returned within only a few days.

20.     After several attempts, Plaintiff Reynolds obtained an appointment at Johnson Jeep for February 22, 2019.  Johnson Jeep returned the Jeep after six (6)

days, on February 28, 2019, after, again, replacing the steering damper. The technician's notes indicate that he "test drove on highway for 19 miles inspected on lift everything working as designed." Not unsurprisingly, the "Death Wobble" manifested again within days.

21.     On March 15, 2019, Plaintiff Reynolds wrote to FCA pursuant to New Jersey's Lemon Law (N.J.S.A. §§ 56:12-29-49) informing FCA of the ongoing problems, notifying FCA that the problem "substantially impair[s] the use, value or safety of [her] vehicle" and that the issue could likely "cause death or serious bodily injury." She gave FCA "one final opportunity to repair the vehicle" or she would demand a refund.

22.     FCA responded to Plaintiff Reynolds through its outside counsel Rose & Waldorf, Albany, New York, on April 3, 2019.  FCA's lawyers told Plaintiff Reynolds to "drop the subject vehicle off at Johnson Dodge Chrysler Jeep Ram…to utilize its resources to fully repair your vehicle…"

23.     Plaintiff Reynolds sought to return the vehicle to Johnson Dodge, but it did not have a loaner vehicle that she could use to transport her infant child.  Johnson Jeep placed her on a waiting list for such a loaner.

24.     On April 5, 2019, FCA's counsel, Rose & Waldorf, again wrote to Plaintiff Reynolds notifying her that Johnson Jeep informed FCA that the vehicle

8

"was not dropped off immediately as requested" and that "FCA US LLC's written limited warranty does not provide for loaner or rental vehicles."

25.    In response to FCA's threat, Plaintiff returned to Johnson Jeep on April 8, 2019, again, complaining about the "Death Wobble."  Again, no loaner car was made available, so Plaintiff Reynolds left her Class Vehicle and rented a car that she paid for out of pocket without reimbursement from FCA or Johnson Jeep.

26.    On April 12, 2019, a representative from Johnson Jeep left a voicemail for Plaintiff Reynolds, indicating that she test drove the vehicle and that the Jeep's "Death Wobble" "*is trying to kill [her] again and I'm sure you as well…*" (emphasis added).

27.     Yet, on April 15, 2019, Johnson Jeep, again, returned Plaintiff Reynolds' Jeep after replacing the steering damper *for the third time* in less than six (6) months. The service record indicates that at the time of the return the "vehicle [was] operating as designed at this time."

28.     From late-December 2018 to mid-April 2019, Plaintiff Reynolds was without her 2018 Class Vehicle for approximately one month while unsuccessful repair efforts to remediate the "Death Wobble" occurred.

29.     In August 2019, FCA mailed Plaintiff Reynolds Customer Satisfaction Notice for CSN V41, which identified the reason repairs were necessary as follows:

> The frontal suspension steering damper on your vehicle may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers Per Hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).

30.     After receipt of the CSN above, Plaintiff Reynolds contacted Johnson Dodge to schedule the repair work pursuant to CSN V41. She was advised the work set forth in CSN V41 was completed during her April 2019 service, and no outstanding recall work was necessary for her vehicle.

31.     Plaintiff Reynolds' Class Vehicle continues to suffer from the "Death Wobble" since the April 2019 service and replacement of the steering damper pursuant to CSN V41.

32.     On April 13, 2021, Plaintiff Reynolds' Class Vehicle was again brought into Johnson Jeep because her Class Vehicle "shakes at highway speeds when hit a bump." Johnson Jeep "confirmed" this complaint during a test drive and inspection, and determined the Class Vehicle again needed the steering dampers replaced.

33.     Plaintiff Reynolds no longer enjoys the marketed capabilities of her Class Vehicle to avoid the recurring "Death Wobble." She no longer utilizes her Class Vehicle off-road, avoids traditional highway speeds, ensures any roadway irregularity is avoided or struck at slow speed. The utility of the Class Vehicle for which she paid is greatly diminished if not completely extinguished.

34.     A video of the "Death Wobble" in Plaintiff Reynolds' Class Vehicle has been preserved.

35.     Had Plaintiff Reynolds known or otherwise been made aware, of the Class Vehicles' "Death Wobble" problem and FCA's inability to repair or cure it, she would not have purchased her Jeep or otherwise would have paid significantly less for it.

36.     When Plaintiff purchased her Jeep, she reasonably relied on the reasonable expectation that her Class Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and eradicate any such defects.

11

37.     At all times relevant herein, Plaintiff Reynolds operated her 2018 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used, but can no longer do so given the recurring "Death Wobble."

38.     Plaintiff Reynolds has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of her Class Vehicle.

39.     Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff Reynolds of the "Death Wobble" and associated safety risk prior to the purchase or lease of the Class Vehicles.

**Plaintiff Monica Martirano**

40.     Plaintiff Monica Martirano is a citizen and resident of the State of New Jersey.

41.     Plaintiff Martirano leased a 2018 Jeep Wrangler Unlimited 4x4 for personal use from Manahawkin Chrysler in Manahawkin, New Jersey on March 30, 2019 for approximately $42,000. The VIN for Plaintiff Martirano's Class Vehicle is 1C4HJXDN6JW201172.

42.     By May 2019, Plaintiff Martirano was experiencing the "Death Wobble" and first brought her Class Vehicle to Manahawkin Chrysler on May 13,

2019 expressing concerns that her Class Vehicle continued to have steering issues, stating that it was very hard to control her Class Vehicle and stay in the lane at higher speeds. In response, Manahawkin Chrysler removed and replaced her Class Vehicle's front track bar and assembly. The Class Vehicle was returned to Plaintiff Martirano on May 15, 2019.

43.     Days later, on May 20, 2019, Plaintiff Martirano's Class Vehicle continued to suffer from the "Death Wobble" so she went to Global Automall in Plainfield, New Jersey complaining the when driving over 40 MPH the steering becomes very loose and difficult to control the vehicle. Global Automall concluded after a test drive that the steering damper should be replaced due to loss of stability in the steering column. The Class Vehicle was returned to Plaintiff Martirano on May 22, 2019.

44.     Days later, on June 4, 2019, Plaintiff Martirano's Class Vehicle continued to suffer from the "Death Wobble" so she went back to Global Automall expressing the same concern as stated on May 20, 2019. The service technician stated he was unable to reproduce Plaintiff Martirano's concern and performed no repair. Despite CSN V41 having been issued to FCA's dealer network at this time, Plaintiff Martirano's Class Vehicle was returned to her on June 5, 2019 with the "Death Wobble" still present.

45.    In August 2019, FCA mailed Plaintiff Martirano a Customer Satisfaction Notice for CSN V41, which identified the reason repairs were necessary as follows:

> The frontal suspension steering damper on your vehicle may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers Per Hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).

46.    Plaintiff Martirano returned to Global Automall where the recall repair work was performed pursuant to CSN V41 on November 14, 2019.  The new steering damper and repair set forth in CSN V41 failed to remedy the defects causing the "Death Wobble," with continues today.

47.    A video of the "Death Wobble" in Plaintiff Martirano's Class Vehicle after the recall repair set forth in CSN V-41 has been preserved.

48.    Had Plaintiff Martirano known, or otherwise been made aware, of the Class Vehicles' "Death Wobble" problem and FCA's inability to repair or cure it, she would not have purchased her Jeep or otherwise would have paid significantly less for it.

49.    When Plaintiff Martirano purchased her Jeep, she reasonably relied on the reasonable expectation that her Class Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and eradicate any such defects. Had FCA disclosed that the "Death

Wobble" it knew or should have known would occur in its Class Vehicles without a remedy, Plaintiff Martirano would not have purchased her 2018 Jeep Wrangler, or would have paid substantially less for it.

50.     At all times relevant herein, Plaintiff Martirano operated her 2018 Jeep Wrangler in a reasonably foreseeable manner and as it was intended to be used.

51.     Plaintiff Martirano has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of her Class Vehicle.

52.     Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff Martirano of the "Death Wobble" and associated safety risk prior to the purchase or lease of the Class Vehicles.

53.     Plaintiff Martirano provided Defendant and its agent dealerships repeated opportunities to repair and remediate the "Death Wobble," but they were unable to do so.  Because the "Death Wobble" continued and Plaintiff Martirano feared for her safety, she traded-in her Class Vehicle and suffered a significant monetary loss.

**Plaintiff Brady Laing**

54.     Plaintiff Brady Laing is a citizen and resident of the State of Minnesota.

55.    Plaintiff Laing purchased a 2018 Jeep Wrangler Sahara JLU for personal use from Coon Rapids Jeep in Coon Rapids, MN on approximately October 15, 2018 for approximately $44,400. The VIN for Plaintiff Laing's Class Vehicle is 1C4HJXEG6JW311428.

56.    On approximately October 28, 2019, Plaintiff Laing was driving on the interstate at approximately 65 mph when his Class Vehicle began to violently shake. The Death Wobble continued until he slowed his Class Vehicle's speed to approximately 45 mph.

57.    In approximately November 2019, Plaintiff Laing received a Customer Satisfaction Notice for CSN V41, which identified the reason repairs were necessary as follows:

> The frontal suspension steering damper on your vehicle may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers Per Hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).

58.    After receiving this notice, in early December 2019, Plaintiff Laing brought his Class Vehicle to Ryan Chrysler Dodge Jeep Ram of Monticello in Monticello, MN to receive the recall repair.

59.    After receiving the recall repair in December 2019, Plaintiff Laing has not experienced the full-blown Death Wobble, but does still feel slight shaking at certain points that he can minimize by slowing his vehicle's speed.

60.     Had Plaintiff Laing known or otherwise had been made aware of the Class Vehicles' "Death Wobble" problem and FCA's inability to repair or cure it, he would not have purchased his Jeep or otherwise would have paid significantly less for it. Prior to purchasing his 2018 Jeep, Plaintiff Laing performed research on the vehicle, including its pricing. None of the materials he reviewed contained any disclosure relating to the "Death Wobble," FCA's inability or unwillingness to fix properly repair it, and/or the associated safety risks.

61.     When Plaintiff Laing purchased his Jeep, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and eradicate any such defects. Had FCA disclosed that the "Death Wobble" it knew or should have known would occur in its Class Vehicles without a remedy, Plaintiff Laing would not have purchased his 2018 Jeep Wrangler, or would have paid substantially less for it.

62.     At all times relevant herein, Plaintiff Laing operated his 2018 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used.

63.     Plaintiff Laing has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death

Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

64.    Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff Laing of the "Death Wobble" and associated safety risk prior to the purchase of his Class Vehicles.

**Plaintiff Thomas Jared Pineda**

65.    Plaintiff Thomas Pineda is a citizen and resident of the State of Tennessee.

66.    Plaintiff Pineda owns a 2018 Jeep Wrangler for personal use. On April 14, 2018, Pineda leased his vehicle new from Chrysler Dodge Jeep Ram of Franklin ("Franklin Jeep"), located in Franklin, Tennessee, for approximately $48,232.08 (including monthly payments of $661.43). The VIN of his Class Vehicle is 1C4HJXDG5JW134310.

67.    By August 2018, Plaintiff Pineda began to experience the "Death Wobble" in his Jeep Wrangler, which was not able to be fixed even after multiple attempts to diagnose and repair the issue.

68.    Plaintiff Pineda experienced the "Death Wobble" while the vehicle was driven on the interstate within the normal speed limits.

69.     As a result of the "Death Wobble," Plaintiff Pineda altered his daily route to work and the route taken to his son's school in order to avoid interstate driving that would cause the "Death Wobble."

70.     Plaintiff Pineda brought his vehicle back to Franklin Jeep, where he was told numerous times that the issue could not be recreated by the dealership and where he was accused of fabricating the problem. He was also told by the Franklin Jeep that no other owner had complained of a similar problem.

71.     On October 3, 2018, Plaintiff Pineda brought his vehicle to Franklin Jeep and informed them that he had experienced the "Death Wobble." Franklin Jeep brushed off his concerns as a one-time occurrence due to the rough road conditions present due to highway construction.

72.     During November 2018, Plaintiff Pineda began to regularly experience the "Death Wobble" issue. Plaintiff Pineda researched whether other Jeep Wrangler owners experienced the same issue, and determined other Jeep Wrangler owners were having the same experiences having located November 20, 2018 article at www. Motor1.com.[5]

---

[5] Exhibit 4, Christopher Smith, *New Jeep Wrangler Owners Reporting "Death Wobble" on Highway*, motor1.com (Nov. 20, 2018), https://www.motor1.com/news/276958/jeep-wrangler-owners-death-wobble/ (last visited July 26, 2021).

73.     On December 17, 2018, Plaintiff Pineda again brought his Jeep Wrangler to Franklin Jeep asking that they repair the "Death Wobble" issue. At that visit, Plaintiff Pineda informed Franklin Jeep about the article he saw that indicated others had experienced the "Death Wobble" as well. The service record for this date indicates the Franklin Dealership found there were "no loose/damaged/or faulty front suspension components", there were no "frame or weld issues", and that the vehicle "drives in a normal fashion, no abnormal steering or driving conditions experienced."

74.     Shortly thereafter, Plaintiff Pineda again brought his Jeep Wrangler to Franklin Jeep to address the "Death Wobble" issue. A representative from Franklin Jeep indicated that they remembered the "Death Wobble" complaint, performed a cursory check, and once again claimed there was no issue with Plaintiff Pineda's vehicle.

75.     After April 25, 2019, after Franklin Jeep failed to identify and repair the "Death Wobble" issue affecting Plaintiff Pineda's vehicle, Plaintiff Pineda took his vehicle to another dealership, Bob Frensley Chrysler Jeep Dodge ("Frensley Jeep"). Frensley Jeep tested and immediately identified the "Death Wobble" problem affecting Plaintiff Pineda's vehicle.

76.     As reflected in an April 25, 2019 service invoice from Frensley Jeep, Plaintiff Pineda complained of "violent wobble while driving at interstate speeds and

20

hitting a pothole." Frensley Jeep's service records indicate the issue was resolved by replacement of a "steering damper."

77.    The "Death Wobble" problem recurred in Plaintiff Pineda's vehicle a week following the supposed fix performed by Frensley Jeep on April 25, 2019.

78.    On June 25, 2019, Plaintiff Pineda brought his vehicle back to Frensley Jeep to address the "Death Wobble" issue yet again. The service records from Frensley Jeep note that Plaintiff Pineda reported "bad vibration in front end (Death Wobble)" and that for the second time, the "steering damper" was replaced with an updated design as a fix for the issue.

79.    Despite this second supposed fix, Plaintiff Pineda's vehicle still exhibits "Death Wobble."

80.    In August 2019, FCA mailed Plaintiff Pineda a Customer Satisfaction Notice for CSN V41, which identified the reason repairs were necessary as follows:

> The frontal suspension steering damper on your vehicle may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers Per Hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).

81.    Plaintiff Pineda returned to Frensley Jeep where the recall repair work was performed pursuant to CSN V41 in November 2019. The new steering damper and repair set forth in CSN V41 failed to remedy the defects causing the "Death Wobble," with continues today.

82.     Had Plaintiff Pineda known or otherwise been made aware of the Class Vehicles' "Death Wobble" problem and FCA's inability to repair or cure it, he would not have leased his Jeep or otherwise would have paid significantly less for it. Prior to leasing his 2018 Jeep, Plaintiff Pineda performed research on the vehicle, including its pricing. None of the materials he reviewed contained any disclosure relating to the "Death Wobble," FCA's inability or unwillingness to fix properly repair it, and/or the associated safety risks.

83.     When Plaintiff Pineda leased his Jeep, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and eradicate any such defects.  Had FCA disclosed that the "Death Wobble" it knew or should have known would occur in its Class Vehicles without a remedy, Plaintiff Pineda would not have leased his 2018 Jeep Wrangler, or would have paid substantially less for it.

84.     At all times relevant herein, Plaintiff Pineda operated his 2018 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used.

85.     Plaintiff Pineda has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death

Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

86.     Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff Pineda of the "Death Wobble" and associated safety risk prior to the lease of his Class Vehicles.

**Plaintiff William Martin Powers**

87.     Plaintiff William Martin Powers is a citizen of Colorado.

88.     In February 2018, Plaintiff Powers purchased a 2018 Jeep Wrangler Unlimited for approximately, $56,045.70 from AutoNation Chrysler Jeep Broadway ("AutoNation"), located in Littleton, Colorado. The VIN of his Class Vehicle is VIN 1C4HJXEG3JW106214.

89.     In or around December 2018, and during the warranty period, Plaintiff Powers began to experience the "Death Wobble" with approximately 14,588 miles on the Jeep.

90.     As reflected in the service records, Plaintiff Powers returned to AutoNation on February 15 and February 23, 2019 and complained that when the Jeep was "on the highway, going over 60 . . . it violently shakes and shutters. Ha[ve] to slow down to 50. It is not when taking turns, it is when going highway speeds of 60 or above and following the curves."

91.     AutoNation returned the Jeep to Plaintiff Powers on March 7, 2019, with a replaced steering damper.

92.     On April 1, 2019, only weeks after the steering damper replacement, Plaintiff Powers returned again to AutoNation following a reoccurrence of the "Death Wobble."

93.     Over the next month, Plaintiff Powers made multiple unfulfilled requests to AutoNation to provide a rental car or a satisfactory repair for the Jeep. On May 2, 2019, Plaintiff Powers returned to AutoNation requesting an in-person meeting with AutoNation's General Manager.

94.     During the May 2, 2019 conversation, the AutoNation Service Manager ultimately admitted to Plaintiff Powers that "parts are not available" to fix the Jeep's "Death Wobble" problem and offered to use "aftermarket" products or take them off of a Jeep on the AutoNation lot.

95.     AutoNation's service manager, Brandy, advised at that time that she believed the problem with the Jeep was the steering damper, but FCA does not have a replacement steering damper available to remedy the problem.

96.     Plaintiff Powers submitted a complaint to FCA for consideration of a total buy back.  After not receiving a response, he attempted to follow-up with FCA multiple times and ultimately found that FCA closed the file.  Another escalation

was initiated in which the FCA representative called the AutoNation store, received the information and rejected the escalation request.

97.     Without any satisfaction, Plaintiff Powers left his Jeep Wrangler at AutoNation as of May 2, 2019 and sought relief through a non-binding arbitration complaint against FCA seeking a re-purchase of the Jeep. On July 11, 2019, a non-binding arbitration hearing was held, attended by Plaintiff Powers, Plaintiff Powers' sister, and on behalf of FCA via speakerphone, David Kinzer.

98.     On July 18, 2019, after the informal hearing, the arbitrator issued a decision denying Plaintiff's request that FCA repurchase the Jeep.  The arbitrator reasoned that (1) there had not been an unreasonable amount of repair attempts and (2) that Plaintiff Powers had not given FCA an opportunity to fix the problem since new parts had become available.

99.     On August 12, 2019, Plaintiff Powers notified FCA that he formally rejected the arbitrator's decision, thereby leaving Plaintiff Powers free to pursue other legal remedies.

100.   In September 2019, FCA mailed Plaintiff Powers a Customer Satisfaction Notice for CSN V41, which identified the reason repairs were necessary as follows:

> The frontal suspension steering damper on your vehicle may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH)

88 Kilometers Per Hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).

101. On October 3, 2019, Plaintiff Powers made a request to AutoNation for the status of his Jeep, which has been in AutoNation's possession since May – six months.

102. On December 18, 2019, Plaintiff Powers' Class Vehicle was picked up from AutoNation where it had been since May 2, 2019. It was taken to Medved Chrysler Dodge Jeep Ram ("Medved") and delivered for replacement of the steering damper pursuant to CSN V41 that same day.

103. The work was completed and Plaintiff Powers picked up his Class Vehicle from Medved on December 23, 2019, but the "Death Wobble" returned on the drive home from Medved. Plaintiff Powers immediately returned to Medved that same day, December 23, 2019, where additional service was provided relating to an air bleeding process per FCA direction. The "Death Wobble" however remains in Plaintiff Powers' Class Vehicle.

104. Had Plaintiff Powers known or otherwise been made aware of the Class Vehicles' "Death Wobble" problem and FCA's inability to repair or cure it, he would not have purchased his Jeep or otherwise would have paid significantly less for it. Prior to purchasing his 2018 Jeep, Plaintiff Powers performed research on the vehicle, including its pricing. None of the materials he reviewed contained any

disclosure relating to the "Death Wobble," FCA's inability or unwillingness to fix properly repair it, and/or the associated safety risks.

105.   When Plaintiff Powers purchased his Jeep, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and eradicate any such defects.  Had FCA disclosed that the "Death Wobble" it knew or should have known would occur in its Class Vehicles without a remedy, Plaintiff Powers would not have purchased his 2018 Jeep Wrangler or would have paid substantially less for it.

106.   At all times relevant herein, Plaintiff Powers operated his 2018 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used.

107.   Plaintiff Powers has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

108.   Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff Powers of the "Death Wobble" and associated safety risk prior to the purchase of his Class Vehicles.

27

**Plaintiff Trina Hancock**

109.    Plaintiff Trina Hancock is a citizen and resident of the State of Georgia.

110.    On October 19, 2018 Plaintiff Hancock purchased a used 2018 Jeep Wrangler for personal use from Mountain Valley Motors in Blueridge, Georgia for approximately $38,395. The VIN for Plaintiff Hancock's Class Vehicle is 1C4HJXDG3JW112502. The vehicle had 1,640 miles on the odometer at the time of purchase.

111.    In or around September 2019, FCA mailed Plaintiff Hancock a Customer Satisfaction Notice for CSN V41, which identified the reason repairs were necessary to her Vehicle as follows:

> The frontal suspension steering damper on your vehicle may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers Per Hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).

112.    On October 9, 2019 Plaintiff Hancock's Class Vehicle was repaired at Mountain Valley Motors in Blueridge, Georgia pursuant to the Customer Satisfaction Notice.

113.    On October 10, 2019, Plaintiff Hancock began to notice an intermittent shimmy of the entire front end of her Class Vehicle. Plaintiff Hancock intended to take her vehicle back to Mountain Valley Motors for a subsequent repair, but was unable to do so due to a pending trip to Pennsylvania.

114.   In November 2019, Plaintiff Hancock experienced a manifestation of the Death Wobble defect while traveling from her home to Pennsylvania. She was traveling in the far-left lane of Highway 81 at between 70 and 75 miles per hour when her Class Vehicle began violently shaking to such a degree that Plaintiff Hancock believed the tires were separating from her Class Vehicle.

115.   Despite barely maintaining control of the steering wheel, Plaintiff Hancock was able to maneuver her vehicle across four occupied lanes of traffic before decelerating and stopping her vehicle, at which point the Class Vehicle ceased wobbling.  Plaintiff Hancock, an experienced driver, indicates that the manifestation of the Death Wobble defect was the most frightening experience of her life.

116.   Plaintiff Hancock proceeded to drive her Class Vehicle to Miller's Chrysler Dodge Jeep Ram in Martinsburg, West Virginia in order to have her vehicle repaired. Plaintiff Hancock did not want to continue driving her vehicle but was forced to do so out of necessity.  When Plaintiff Hancock initially contacted Miller's Chrysler Dodge Jeep Ram, she was told by an employee and/or representative that she had experienced the "Death Wobble" defect.

117.   On November 14, 2019 Plaintiff Hancock's Vehicle was repaired at Miller's Chrysler Dodge Jeep Ram.  At the time, Plaintiff Hancock was told by an employee and/or representative of Miller's Chrysler Dodge Jeep Ram that the steering damper installed on October 9 by Mountain Valley Motors was installed

upside down.  The November 14, 2019 repair consisted of removing and re-installing the steering damper that was in place at the time.

118.   When Plaintiff Hancock called Mountain Valley Motors to inform the dealership that she was told the damper in her vehicle was installed upside down, she was informed by an employee and/or representative of Mountain Valley Motors that the damper in Plaintiff's Vehicle was installed pursuant to FCA's instructions, and that these instructions had been subsequently revised by FCA approximately six (6) times.

119.   After Plaintiff Hancock's vehicle was repaired at Miller's Chrysler Dodge Jeep Ram, she proceeded to drive her vehicle to Asheville, North Carolina in order to meet her husband.  At that point in time, Plaintiff Hancock's husband drove Plaintiff Hancock's vehicle back to their home in Georgia because Plaintiff no longer felt safe driving her vehicle, and had experienced severe mental anxiety and trauma from the manifestation of the Death Wobble defect.   Since this time, Plaintiff Hancock refused to drive her Vehicle for fear of the Death Wobble defect manifesting.

120.   Upon returning to their home in Georgia, Plaintiff Hancock's husband proceeded to drive Plaintiff's Vehicle to Mountain Valley Motors for the installation of a new steering damper.  Plaintiff was subsequently informed by an employee and/or representative of Mountain Valley Motors that numerous vehicles

experiencing the Death Wobble defect had come into the dealership for repairs, including vehicles that had been repaired multiple times.

121.   On November 20, 2019, Plaintiff Hancock traded in her Vehicle at Mountain Valley Motors because she no longer felt safe driving it.  At the time Plaintiff Hancock traded in her vehicle, the odometer reading was 13,543 miles.  The Death Wobble defect continued to exist in Plaintiff Hancock's Class Vehicle at the time it was traded in and returned to Defendant's agent, Mountain Valley Motors.

122.   Plaintiff Hancock was forced to trade in her vehicle at a loss for a discounted price due to the manifestation of the Death Wobble defect.  Defendant was unable to remediate the Death Wobble, despite multiple opportunities to do so, before Plaintiff Hancock traded in her Class Vehicle, and the Death Wobble remained at the time she traded in her Class Vehicle.

123.   Plaintiff Hancock purchased her Class Vehicle because of the Wrangler's reputation as a rugged vehicle that could operate in inclement, all-terrain conditions.  Had FCA disclosed the Class Vehicles' "Death Wobble" problem to Plaintiff Hancock and FCA's inability to repair or cure it, she would not have purchased her Jeep or otherwise would have paid significantly less for it.

124.   When Plaintiff Hancock purchased her Jeep, she reasonably relied on the reasonable expectation that her Class Vehicle would be equipped with a steering

31

system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and remedy any such defects.

125.   At all times relevant herein, Plaintiff Hancock operated her 2019 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used.

126.   Plaintiff has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of her Class Vehicle.

127.   Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff Hancock of the "Death Wobble" and associated safety risk prior to the purchase of the Class Vehicle.

**<u>Plaintiff Ken Schafer</u>**

128.   Plaintiff Ken Schafer is a citizen and resident of the State of North Carolina.

129.   Plaintiff Schafer purchased a 2019 Jeep Wrangler for personal use from Leith Honda in Raleigh, North Carolina on or about February 28, 2019 for approximately $30,174.   The VIN for Plaintiff Schafer's Class Vehicle is 1C4GJXAG7KW569749.  The Class Vehicle had approximately 5,500 miles on it.

130.    Shortly after purchase, Plaintiff Schafer began experiencing the "Death Wobble," which has occurred twice thus far. Both times, he was travelling on Interstate Highways between 65-75 mph when his Class Vehicle's steering system violently began shaking from the steering wheel through the entire front end of the Class Vehicle.

131.    During the first incident, Plaintiff Schafer decelerated to regain control of the Class Vehicle.  At that time, the violent shaking ceased. Plaintiff Schafer then pulled off the roadway, stopped, and made a visual inspection of his Vehicle to determine whether any observable damage existed.

132.    The second incident was almost identical to the first. Plaintiff Shafer was forced to pull the Class Vehicle off to the side of the Interstate, while vehicles were going by at high speeds.  Again, he inspected and observed the Class Vehicle to ensure that there were no observable damage or issues with the Class Vehicle.

133.    In or around late summer 2019, FCA mailed Plaintiff Schafer a Customer Satisfaction Notice for CSN V41, which identified the reason repairs were necessary as follows:

> The frontal suspension steering damper on your vehicle may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers Per Hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).

134.   Plaintiff brought his Vehicle to the dealer on December 3, 2019 as a result of the Death Wobble incidents.  The dealership replaced the steering damper as required pursuant to CSN V41.  While at the dealership, the lead technician downplayed the problem, but later admitted that there is a defect.

135.   Plaintiff Shafer is now hesitant to drive his Class Vehicle, especially for long distances, due to concerns over the recurring "Death Wobble."

136.   Had FCA disclosed or Plaintiff Schafer had otherwise been made aware of the Class Vehicles' "Death Wobble" problem and FCA's inability to repair or cure it, he would not have purchased her Jeep or otherwise would have paid significantly less for it.

137.   When Plaintiff Schafer purchased his Jeep, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or Jeep could, and would, properly repair and eradicate any such defects.

138.   At all times relevant herein, Plaintiff Schafer operated his 2019 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used.

139.   Plaintiff Shafer has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death

Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

140.    Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff Schafer of the "Death Wobble" and associated safety risk prior to the purchase of the Class Vehicle.

**Plaintiff Melinda Martinez**

141.    Plaintiff Melinda Martinez is a citizen and resident of the State of California.

142.    Plaintiff Martinez owns a 2018 Jeep Wrangler for personal use that she purchased new in March 2019 from the Jeep Chrysler Dodge RAM FIAT dealership of Ontario in Ontario, California, for approximately $43,000.

143.    After purchasing her vehicle, Plaintiff Martinez experienced the "Death Wobble" multiple times.  On one occasion, Plaintiff Martinez was driving with her child on a freeway overpass when her Jeep's steering wheel began to violently shake, consistent with the "Death Wobble." The shaking was so severe that Plaintiff Martinez believed she was going to lose control of her vehicle.  Needless to say, Plaintiff was absolutely terrified, fearing for her safety and the safety of her child.

144.    As a result, Plaintiff Martinez took her Jeep to the Jeep Chrysler Dodge RAM FIAT dealership of Ontario in late January 2020 to have the "Death Wobble" defect fixed.  When Plaintiff Martinez arrived at the Jeep dealership, she described

to a dealership employee the "Death Wobble" issue plaguing her vehicle.    In response, the employee laughed and explained that the issue is known as the "death shake" and "it happens."

145.    Thereafter, Plaintiff Martinez's Jeep received the purported repair set forth in CSN V41.    However, after having the repair performed, Plaintiff still experienced the "Death Wobble," which the repair was falsely represented to remediate.

146.    As a result, in July 2020, Plaintiff Martinez—once again—returned to the Jeep Chrysler Dodge RAM FIAT dealership of Ontario, which—once again— replaced her Jeep's steering damper.

147.    Unfortunately, Plaintiff Martinez continues to experience the "Death Wobble" when driving her Jeep despite it having received multiple "repairs."

148.    Had Plaintiff Martinez known or otherwise been made aware of the "Death Wobble" defect and FCA's inability to repair or cure it, she would not have purchased her Jeep or otherwise would have paid significantly less for it.

149.    When Plaintiff Martinez purchased her Jeep, she reasonably relied on the reasonable expectation that her Class Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or that Jeep could, and would, properly repair and eradicate any such defects.

36

150.   At all times relevant herein, Plaintiff Martinez operated her 2018 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used, but can no longer do so given the recurring "Death Wobble."

151.   Plaintiff Martinez has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of her Class Vehicle.

152.   Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff of the "Death Wobble" and associated safety risk prior to Plaintiff Martinez's purchase of the Class Vehicle.

**Defendant**

153.   Defendant FCA U.S., LLC is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan.  The Class Vehicles at issue here are part of the FCA U.S., LLC family of companies, which is, in turn, part of Fiat Chrysler Automobiles N.V.

154.   At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles throughout the United States.  Defendant and/or its agents designed, caused, manufactured, the Jeep knowing about the "Death Wobble" problem, without either disclosing it at the

time of sale or attempting to remedy it.  Defendant and/or its agents also developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials relating to the Jeep.

## FACTUAL ALLEGATIONS

### A.    The Death Wobble Defect

155.   FCA designs, engineers, manufactures, and sells vehicles under the Chrysler, Jeep, Dodge, Ram, Fiat, and Maserati brands in this District and throughout the United States.  FCA designs, manufactures, distributes, and sells motor vehicles and parts through its network of authorized motor vehicle dealers.

156.   Due to the solid front axle and four-link suspension, the Class Vehicles experience premature suspension bushing and component wear that results in an inability to absorb natural vibrations, harshness, and bumps associated with normal and anticipated driving conditions.

157.   As background, a typical solid axle system is comprised of a solid axle that runs from one side of the vehicle to the other (pictured below). This system uses only the leaf springs to locate the axle and resist forward, sideways, vertical, and torsional motion. When the axle hits an obstacle, the leaf spring compresses, getting flatter and longer. Advantages of this system include fewer moving components and thereby decreasing the number of wear items within the suspension system.  To further emphasize this point, the below diagram includes only four (4) pivot points

that manage the forward, sideways, vertical, and torsional location of the front solid axle. Since each pivot point also contains a bushing, this system translates into fewer wear items within the suspension system.



158.   The Class Vehicles do not contain a typical solid axle suspension system. Instead of utilizing leaf springs, the Class Vehicles utilize coil springs (simulation pictured below).  Because the coil springs are unable to locate the axle as in the traditional system, the Class Vehicles use four links for front-to-rear positioning of the axle. To keep the axle from moving side to side (or centered), the Class Vehicles must also utilize a track bar. The significant disadvantage of this system is that it incorporates many moving components and thereby increases the number of wear items (including bushings) within the suspension system. To further emphasize this point, the below diagram includes ten (10) pivot points that manage the forward, sideways, vertical, and torsional location of the front solid axle. Since

each pivot point also contains a bushing, this system translates into a greater number of wear items within the suspension system.



159.   In addition to a four-link front suspension, the Class Vehicles also incorporate a steering damper (or steering stabilizer). A steering damper operates on the same principle as a shock absorber, the main difference being the system it effects. While a typical shock absorber is designed to absorb impacts from things like potholes or other road hazards in order to provide a smoother ride, a steering damper reduces vibration and the transfer of energy from the suspension into the steering wheel, which helps to eliminate driver fatigue as well as to improve vehicle drivability. However, even a properly functioning steering damper is unable to absorb the forces generated by a malfunctioning underlying suspension system.

160.   Due to the front suspension design in the Class Vehicles, they will experience increased vibrations and forces thereby requiring high quality suspension

components, including bushings, that are not susceptible to premature wear and failure.  When the suspension system components, including bushings, wear prematurely or fail, the energy, vibrations, and forces that would have been absorbed and deflected by a properly functioning suspension system is transferred to the steering wheel.  This vibration transfer to the steering wheel presents a safety issue to the vehicle operator and passengers.

161.   As explained above, the Class Vehicles contain numerous pivot points within the front suspension system.  These pivot points are subject to extreme load, deflection and repeated movement.  The Class Vehicles contain inadequate rubber bushings that experience tearing, premature wear and failure.  These rubber bushings are unable to withstand the operational environment of the front suspension system as designed.  A steering damper will likewise prematurely wear and fail in this operational environment, and it only serves to temporarily mask the Class Vehicles' defects, but does not remedy the "Death Wobble."

162.   As a result of the defect described above, which occurs most often when traveling at speeds over 45 mph, and the front suspension system and steering components can become jarred out of equilibrium when the Class Vehicles encounter customary and expected variations in the roadway.

163.   The resulting shaking of the steering wheel and front of the Class Vehicles is a serious safety concern.  For the unsuspecting driver, this unexpected

violent shaking of the steering column at highway speeds is both alarming and dangerous.  To eradicate the problem, the suspension components, and bushings need to be inspected and replaced, often at a significant cost.

164.   In a report dated October 31, 2019, a journalist for CBS News in Boston video recorded the "Death Wobble" experience in James Squires Class Vehicle, which clearly demonstrates the safety concerns of the "Death Wobble" and the severity of this defect.[6]

165.   Defendant has attempted to mask the suspension defect through the use and redesign of a steering damper; however, as explained above, even a properly functioning steering damper is unable to adequately compensate for a suspension system that is prematurely worn and in need of repair.

B.     FCA's Longstanding Knowledge of the Defect

1.     2012 Reporting on Jeep's "Death Wobble" Problem

166.   Defendant received numerous complaints about the Jeep's "Death Wobble" for years and failed to take action to remedy it or inform its customers of its potential to occur at high speed travel.

167.   In a 2012 news report from ABC7 in San Francisco, two Jeep owners

---

[6] Exhibit 5, Christina Hager, *I-Team: 'Jeep Wobble' Has Federal Investigators Looking at Safety*, CBS Boston (Oct. 31, 2019), https://boston.cbslocal.com/2019/10/31/jeep-wobble-federal-investigators-safety-wbz-iteam/  (last viewed July 26, 2021).

from California reported that "the whole front end of the vehicle shakes back and forth" and that "[i]t literally feels like the front of your vehicle is going to shake apart."[7]

168.   The reporter asked one of the owners featured in the story if she would have bought the Jeep if she had known about the problem, she responded, "No, absolutely not. I drive my son to school and this is my primary form of transportation for my son and I."[8]  She went further, "[t]his is something that I purchased to drive at freeway speeds; *there was no waiver or disclosure* at the time associated with it that I should have to be concerned driving it at normal speed…"[9]

169.   In response to the ABC7 news story, FCA "declined a request to go on camera, but Corporate Communications…issued a statement saying 'vehicles equipped with a solid axle can be susceptible to this condition.'"  Refusing to accept responsibility, FCA went further and blamed its customers by claiming that "most reported incidents…are often linked to poorly installed or maintained after-market equipment."

170.   But, as the reporter pointed out, neither of the Jeeps at issue for the story—*nor the Plaintiffs here*— have any after-market equipment.[10]

---

[7] Exhibit 6, Dan Noyes, Jeep 'death wobble' leaves drivers shaken, ABC News, https://abc7news.com/8224/ (last viewed July 26, 2021).

[8] *Id*.

[9] *Id*. (emphasis added).

[10] *Id*.

171.   FCA also told ABC7 that the "Death Wobble" can be corrected with "a change of tires or installation of a simple steering dampener."  Again, consistent with Plaintiffs' experiences, the report indicates that one Jeep owner "replaced the dampener and was hit by the wobble again."[11]

172.   Following this report in 2012, California Congressional Representatives Henry Waxman and Anna Eshoo wrote a letter to FCA in July 2012 urging it to launch a campaign informing its customers that the Jeeps they own could suffer from a safety risk called the "Death Wobble."

173.   Specifically, the lawmakers wrote that they "believe[d] Chrysler should undertake an outreach campaign to its customers, such as a Customer Satisfaction Campaign, to notify Jeep owners of the risk of the 'wobble' condition, also described as a 'vibration' or 'shimmy,' and the possible methods for repairing and preventing the problem," and to "advise customers how to stop the wobble if they experience it while driving."[12]

174.   In response, in August 2012, FCA issued a technical service bulletin to its dealerships acknowledging the issues with Jeep's steering and suspension components and outlining just what dealers should be looking for when someone

_____

[11] *Id*.

[12] Exhibit 7, Pete Kasperowicz, *Dems press Chrysler to help its customers fix "Jeep Death Wobble,"* The Hill (July 6, 2012), https://thehill.com/blogs/floor-action/house/236483-dems-press-chrysler-to-help-its-customers-fix-jeep-death-wobble (last visited July 26, 2021).

comes in complaining of front end shaking, including a detailed inspection of the steering controls and components as well as the tires.  However, FCA would not agree to pay for any such repairs for vehicles outside of the factory warranty period.

175.   In November 2018, as reported in the Detroit Free Press, a Jeep owner from Massachusetts who purchased a 2018 stock Jeep Sport model with some basic comfort and convenience options for just under $38,000, experienced the "Death Wobble" on I-495 while taking one of his children to a basketball tournament.[13]

176.   In the report, the owner described the incident, "I hit a bump that should have been nothing and all of a sudden I thought I had a flat tire or something else bad because the whole car and steering wheel start[ed] shaking.  I slowed down and was getting ready to pull over and then it went away when I slowed down enough (probably around 50 mph)."  "It was concerning, but right that second I just brushed it off," but then, the "[s]ame thing happened once or twice more that weekend on the highway and then once again Monday or Tuesday on the way to work" so he made a service appointment.[14]

177.   The report states that he was told by the dealership that the steering stabilizer was "shot and had no pressure" and that contrary to the claims of FCA otherwise, the dealership told him *it was a safety issue, and he should not be driving*

---

[13] Exhibit 3.
[14] *Id*.

*the vehicle*.[15]

178.   In the story, the owner rejected FCA's claims that the "Death Wobble" did not present a safety issue, stating that "[h]aving to rapidly slowdown in the center lane of a highway while going 70 mph definitely is unsafe and the amount of vibration happening from this is just bound to break something eventually…"[16]

### 2.     Reports to NHTSA and FCA's Technical Service Bulletins

179.   The National Highway Traffic Safety Administration ("NHTSA") has received numerous complaints about Jeep's "Death Wobble" problem.  In 2018, it was reported that the NHTSA is looking into the "Death Wobble" reports.[17]

180.   Prior to Plaintiffs' purchases, and even before public news reports, FCA was internally aware of the complaints about the Class Vehicles' "Death Wobble." In fact, in an October 28, 2010, Technical Service Bulletin (02-003-10), FCA instructed its dealerships that for Jeep Wranglers built between 2007-2009, when customers complain about "vibration from rough surfaces" they should replace "the steering damper and steering damper bracket."

---

[15] *Id.*

[16] *Id.*

[17] *Id.*

181.   But, just as with Plaintiffs, owners posting in various online forums

discussing the Class Vehicle's "Death Wobble" report that replacing the damper

only masks the problem.   One Jeep owner wrote on www.wranglerforum.com in



April 2011:[18]



182.   To which, another member of the forum posted:[19]

183.   Currently,  the  NHTSA  online  complaint  database  is  replete  with

complaints, below are only a few examples of those made just in 2019:

       **NHTSA ID Number**: 11208173
       **Incident Date** January 1, 2019
       **Consumer Location** Unknown
       **Vehicle Identification Number** 1C4HJXDG0JW****
       **Summary of Complaint**

---

[18]  Exhibit 8, WranglerForum.com,  https://www.wranglerforum.com/f202/steering-damper-replacement-death-wobble-89608.html (last visited July 26, 2021).
[19] *Id.*

*WHILE TRAVELING ON THE FREEWAY AT SPEEDS FROM 65-75 MY JEEP WILL START TO "DEATH WOBBLE" WHEN YOU HIT A BUMP OR UNEVEN SPOT ON THE ROAD REQUIRING ME TO DECELERATE OR COME TO A COMPLETE* STOP. MY VEHICLE HAS BEEN BACK TO THE DEALER 5 TIMES SINCE MY PURCHASE IN NOV OF 2018. FIVE DIFFERENT THINGS HAVE BEEN REPLACED AND *ONE OF THE DAMPENERS HAS BEEN REPLACED TWICE NOW.* IT'S BEEN AT THE DEALER FOR 3 WEEKS STRAIGHT NOW. CHRYSLER SAYS THAT THERE IS NOTHING THAT THEY CAN DO AT THIS TIME AND REFERRED ME BACK TO THE DEALER, THE DEALER SUGGESTED I GET AN ATTORNEY SPECIALIZING IN THE LEMON LAW. I HAVE DONE SO AND ALSO WILL BE TALKING TO THE FEDERAL TRADE COMMISSION. SO FAR I HAVE LOST A DAYS WORK AND FIVE 30 MILE TRIPS TO AND FROM THE DEALERSHIP ONLY TO FIND OUT THAT THE PROBLEM STILL PERSISTS. IT'S VERY DANGEROUS TO DRIVE. THE DEALERSHIP SAID THAT THE NEW ONES WILL SOMETIMES HAVE A LITTLE "WIGGLE" TO THEM AT TIMES AND I INFORMED HIM THAT IF I HAD KNOW THIS *I WOULD NOT HAVE BOUGHT IT HAD I KNOW THIS.* I AM VERY UPSET WITH CHRYSLER AT THE MOMENT. I HAVE NEVER HAD A PROBLEM OUT OF MY 2015 JEEP WRANGLER SAHARA UNLIMITED OR MY 2009 JEEP ALI WRY. I AM VERY DISAPPOINTED IN JEEP.[20]

**HTSA ID Number:** 11206377

---

[20]     Exhibit     9,     *2018     Jeep     Wrangler*,     NHTSA, https://www.nhtsa.gov/vehicle/2018/JEEP/WRANGLER/SUV/4WD%252520Late r%252520Release#complaints (emphasis added) (last visited July 26, 2021).

**Incident Date January 1, 2019**

**Consumer Location** RICHMOND, TX
**Vehicle Identification Number** 1C4HJXEG4JW****
**Summary of Complaint**

***VIOLENT STEERING WHEEL SHAKING AND FRONT END STEERING SHAKING WHEN DRIVING OVER ROAD IMPERFECTIONS OVER 60 MPH***. LOOSE AND WANDERING STEERING RESULTING IN MULTIPLE STEERING CORRECTIONS TO REMAIN STRAIGHT IN LINE ON A FLAT STRAIGHT AND LEVELED SURFACE. WRANGLER WAS IN DEALERSHIP FOR MORE THAN 40 DAYS TOTAL FOR BACKORDERED PARTS AND REPAIRS. WRANGLER PICKED UP TODAY AFTER 3RD VISIT. ***STEERING DAMPER REPLACED FOR 2ND TIME***. DRIVER SIDE SHOCK ABSORBER REPLACED. VIOLENT SHAKING HAS BEEN RESOLVED SO FAR. BUT LOOSE AND INDIRECT STEERING IS STILL PRESENT. VIDEOS AVAILABLE UPON REQUEST.[21]

**NHTSA ID Number:** 11205859
**Incident Date May 3, 2019**
**Consumer Location** PRESCOTT, AZ
**Vehicle Identification Number** 1C4HJXFG7JW****
**Summary of Complaint**

AFTER INSTALLATION OF THE JEEP MANUFACTURED AND WARRANTIED 2 INCH MOPAR LIFT KIT AT THE JEEP DEALERSHIP, THE ***VEHICLE'S STEERING WHEEL AND FRONT END WILL VIOLENTLY SHAKE AFTER HITTING A BUMP AT SPEEDS OF 50 MILES PER HOUR AND ABOVE.*** THIS WAS MOST COMMONLY SEEN WHEN DRIVING OVER BRIDGES AT SPEEDS OF AROUND 50 MPH. THE VEHICLE WAS TAKEN TO

---

[21] *Id.*

THE DEALER WHEN THEY CLAIMED THEY COULD NOT DUPLICATE THE RESULTS. I THEN HAD TO RISK MY OWN SAFETY TO DEMONSTRATE TO A TECHNICIAN THAT THE PROBLEM WAS INDEED HAPPENING. THIS OSCILLATION OF THE STEERING AND SUSPENSION COMPONENTS IS EXTREMELY DANGEROUS AND REQUIRES ME TO COME TO A COMPLETE STOP BEFORE THE VEHICLE WILL STOP SHAKING. I ALSO HAVE LITTLE TO NO CONTROL OVER THE VEHICLE WHEN THIS HAPPENS UNTIL THE VEHICLE HAS BEEN SLOWED DOWN SUBSTANTIALLY. THE PROBLEM IS ONGOING AND HAS YET TO BE SOLVED.

**NHTSA ID** Number: 11205782
**Incident Date May 4, 2019**
**Consumer Location** CHESTER, NJ
**Vehicle Identification Number** 1C4HJXDG9JW****
**Summary of Complaint**

*WHILE DRIVING AT NORMAL HIGHWAY SPEEDS (60MPH AND ABOVE) EACH OVERPASS, SEAM OR POTHOLE IN THE ROAD CAUSES MY 2018 WRANGLER TO SHAKE AND VIBRATE UNCONTROLLABLY*. AT TIMES THIS "DEATH WOBBLE" IS SO VIOLENT THAT THE ONLY WAY TO MAKE IT STOP IS TO PULL OVER AND COME TO A COMPLETE STOP. IMAGINE TRYING TO KEEP CONTROL OF YOUR JEEP WHILE IT'S SHAKING UNCONTROLLABLY AND YOU HAVE TO CROSS 3 LANES OF TRAFFIC TO PULL OVER. THIS WAS MY EXPERIENCE ON 5.4.19. THIS WAS NOT THE FIRST TIME. *THIS IS ALSO AFTER THE DEALERSHIP AND MANUFACTURER HAVE "REPAIRED" THE ISSUE ON 3 PREVIOUS OCCASIONS.*

**NHTSA ID** Number: 11205408
**Incident Date May 2, 2019**

**Consumer Location** ESSEX, VT
**Vehicle Identification Nu**mber 1C4HJXEN6JW****
**Summary of Complaint**

WHILE DRIVING ABOUT 65 MILES PER HOUR I RAN OVER A BRIDGE EXPANSION JOINT ON A BRIDGE APPROXIMATELY TEN OR MORE TIMES DURING MY TRIP. ***ON THREE OCCASIONS WHEN I RAN OVER THE EXPANSION JOINT THE FRONT OF THE VEHICLE BEGAN TO SHAKE VIOLENTLY UP THROUGH THE STEERING WHEEL CAUSING ME TO LEAVE MY LANE OF TRAVEL***. I FEEL IF A CAR WAS NEXT TO ME AT THE TIME I COULD HAVE CRASHED. APPLYING BRAKES AND SLOWING ENDED THE PROBLEM EACH TIME.

184. On October 24, 2018, a citizen petition was filed with NHTSA requesting that it initiate a safety defect investigation concerning 2018 Jeep Wranglers, which the NHTSA's Office of Defects Investigation ("ODI") opened for evaluation on November 16, 2018. A Defect Petition was opened by ODI on November 16, 2018.[22]

185. On March 8, 2019, ODI wrote Defendant seeking information concerning this safety defect investigation, and defined the alleged defect to include: "Concerns related to the steering system such as: … Vibration, oscillation or wobbling while driving, including after encountering bumps, potholes or other irregular roadway surfaces." ODI requested documents detailing steering related complaints received by FCA complaint

---

[22] Exhibit 10, ODI Resume, Investigation: DP 18004.

51

186.   In response ODI's information demand of March 8, 2019, FCA identified 3,566 distinct "Steering related complaints, including steering shimmy/wobble, intermittent lock-up, and looseness/wandering" concerning the 2018-2019 Jeep Wranglers.  While ODI had only received 608 of these complaints, FCA had already received 3,255 additional, separate steering complaints on the Class Vehicles by Summer 2019.

187.   While ODI proceeded with its Defect Investigation of these alleged defects, FCA orchestrated the ineffective CSN V41 campaign to again unsuccessfully remediate the defects that cause the "Death Wobble."  This campaign began with a confidential Dealer Notification Program that began soon after FCA received the March 8, 2019, letter from ODI demanding information relating to steering concerns frequently described as the "Death Wobble."   This Dealer Notification Program was established by FCA prior to June 2019, and has been modified several times since.

188.   FCA intended to notify owners of Class Vehicles it identified that the repair work set forth in CSN V41 was required to remedy the defects that manifest as the "Death Wobble."  FCA required notification to all specifically identified Class Vehicle owners, which FCA identified as about 192,000 owners out of an estimated population of approximately 270,000 2018-2019 Jeep Wrangler vehicles.

189.   In or around August 2019, Defendant began to mail individual notices

to approximately 192,000 owners of 2018-2019 Class Vehicles conceding the existence of the defect alleged herein, and requiring the repair set forth in CSN V41. The mandated repair is the replacement of steering damper (580AC) with steering damper (580AE).  As Plaintiffs allege, the replacement steering damper (580AE) and repair required by CSN V41 does not remediate the defects that cause the "Death Wobble."

190.    On September 16, 2019, ODI concluded that a Preliminary Evaluation was necessary based on its investigation pursuant to Defect Petition DP 18-004.  ODI then opened Preliminary Evaluation PE 19-012 and closed DP 18-004 the next day, September 17, 2019.[23]  In opening the Preliminary Evaluation, ODI concluded further evaluation was necessary concerning "Various frame weld quality concerns, such as excessive slag, lack of and/or over penetration, overweld or weld drip, weld splash and porous welds, and steering related issues that may be a result of the aforementioned weld quality concerns."[24]  ODI further stated it "need[ed] to further evaluate the alleged steering-related defects reported through MY 2019 and the alleged defects' relation to weld quality."[25]

191.    In conclusion, the ODI stated: "The petition was granted on September 16, 2019.  Preliminary Evaluation PE19-012 has been opened to further assess the

---

[23] *See* Exhibit 10.
[24] Exhibit 11, NHTSA, ODI Investigation: PE 19-012.
[25] Exhibit 10.

scope, frequency, and potential safety-related consequences of alleged weld quality deficiencies and steering related concerns on the MY 2018-2019 'JL' Jeep Wrangler vehicles."[26]

192.   After Plaintiff Reynolds filed her initial Complaint in June 2019, Mark Chernoby, FCA Chief Technical Compliance Officer, was interviewed by the Detroit Free Press and admitted the existence of the "Death Wobble" defect, comparing it to a tuning fork, stating:

> "if you bang it with that frequency it'll just sit there and keep going forever. It won't slow down, it won't dissipate, and that's essentially what we're talking about here with the vibration in the new Wrangler. […]  When you hit a bump in the road, if everything is just right, this suspension can set off that resonance and what we started seeing is as soon as it got cold this past fall, early winter, we started seeing complaints."[27]

193.   Mr. Chernoby continued, describing the failure that causes the "Death Wobble" in the steering damper as "air getting into the damper on the front suspension of the Wrangler during cold temperatures, when oil becomes 'thick like molasses' and air bubbles take a long time to get out of the oil."[28]

194.   When asked whether the existing steering dampers (580AC) are

---

[26] *Id.*
[27] Exhibit 12, Eric Lawrence, *Fiat Chrysler Automobiles says it has fix for Jeep 'Death Wobble,'* Detroit Free Press (Aug. 10, 2019), https://www.freep.com/story/money/cars/chrysler/2019/08/10/jeep-death-wobble-fix/1969368001/ (last visited July 26, 2021).
[28] *Id.*

defective, Mr. Chernoby stated: "It was a combination of design and manufacturing process."[29]

195.   The new damper is produced by the same supplier as the old damper, who Mr. Chernoby declined to identify.  Instead, Mr. Chernoby quipped over this serious safety concern stating:  "*We steer away* ... from any kind of blame game or even open discussion on suppliers even on safety recalls,"[30]

196.   On November 20, 2019, Defendant extended these issues to the 2020 Jeep Wrangler and 2020 Jeep Gladiator pursuant to Service Bulletin No. 19-002-19 relating to "Shimmy In The Steering Wheel After Hitting An Irregularity On The Road Surface" and refers service technicians to an available video instructing them "on how to properly diagnosis [sic] and repair this issue."[31]  The Service Bulletin again acknowledges the defect, recognizing that "[t]he customer may notice a shimmy in the steering wheel after hitting an irregularity on the road surface such as an expansion joint, pothole or bump."[32]

197.   FCA, through (1) its public acknowledgement of the problem; (2) its own records of customers' complaints; (3) dealership repair records; (4) records from the National Highway Traffic Safety Administration (NHTSA); (5) warranty

---

[29] *Id.*
[30] *Id.*
[31] Exhibit 13, Service Bulletin No. 19-002-19.
[32] *Id.*

and post-warranty claims; (6) internal pre-sale durability testing and internal investigations; and (7) other various sources, has always known or should have known the MY 2018-2019 and later defects in the Class Vehicles manifest as the "Death Wobble." Yet, at no time has FCA disclosed these defects or the "Death Wobble" to consumers or warned of the "Death Wobble" despite knowing the defects persist today with no known way to remediate the existing Class Vehicles.

198.   Defendant failed to adequately research, design, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and/or selling them as suitable and safe for use in an intended and/or reasonably foreseeable manner. And despite actual knowledge of the "Death Wobble," Defendant failed to remediate the defect or replace the defective parts to cure the defect.

199.   Defendant is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendant conducts tests, including pre-sale durability testing, to verify the vehicles it sells are free from defect and align with Defendant's specifications and intended use of the Jeep, including routine highway travel.

200.   Upon information and belief, Defendant performs a four-part durability evaluation on its vehicles before they are released for sale to the general public.  The four steps are a virtual analysis, data acquisition, bench testing, and road testing.

201.   The virtual analysis stage is conducted by FCA engineers. It is designed to identify risk areas early in the development process by using software simulations to identify potential part failures by using advanced mathematical models.  This process allows FCA to identify and correct any issues with its vehicles before they are produced and when it is the least costly to remedy.

202.   The data acquisition stage is also conducted by FCA engineers. FCA engineers collect and analyze road load data (data regarding the expected load the vehicles will undergo during their anticipated lifetime).

203.   Bench testing involves testing individual components of the vehicle to simulate real world conditions.  Bench testing is designed to verify the overall soundness of a design under controlled conditions.  The testing performed typically includes testing various component parts to failure.

204.   Finally, FCA's presale durability road testing system is nicknamed DUMBO, which stands for Durability Monitoring Box and Off-board.

205.   The purpose of DUMBO is to detect preliminary degradation of vehicle component parts.  Road testing of the vehicles is conducted and data is logged through an on-board unit within the vehicle, which is then transferred to a server for analysis.  The DUMBO system is used to verify the correct execution of durability tests, to monitor any performance losses, and to collect data.  The collected data is then run through various event recognition, event validation, and performance

evaluation algorithms to identify any loss of performance.

206.   FCA knew of the "Death Wobble" and its associated defects when performing these quality control metrics on the Class Vehicles and made no substantive design modifications to eliminate the defects in the Class Vehicles that manifest as the "Death Wobble."

### C.   FCA Provides No Disclosure or Warning About the "Death Wobble"

207.   Despite its knowledge, FCA failed to warn consumers about the "Death Wobble" and how to safely gain control of the vehicle should it occur at highway speed.

208.   Yet, in the 2018 Jeep Wrangler owner's manual, FCA does include a section titled "On-Road Driving Tips" and warns drivers about higher ground clearances and that the driver should "[a]void sharp turns and abrupt maneuvers" and that "failure to operate th[e] vehicle correctly may result in loss of control or vehicle rollover."[33]

209.   FCA took it upon itself to speak and warn about safe operation of the Jeep.  With its long standing knowledge of the Jeep's "Death Wobble," FCA had a similar duty to not only warn its consumers both before and after purchase, but also

---

[33] Exhibit 14, 2018 Jeep All New Wrangler Owners Manual at 359 (available at https://www.jlwranglerforums.com/downloads/guides/2018-Jeep-Wrangler-JL-JLU-Owners-Manual.pdf) (last visited July 26, 2021).

to provide similar precautions, warnings, and instructions on how to safely operate the vehicle during the "Death Wobble" and bring the vehicle back to normal operating conditions.

### D.    FCA Touts Safety in its Marketing and Advertising

210.    FCA has touted its "commitment" and "dedication" to "transportation safety includ[ing] engineering active and passive features for diverse drivers and vehicle segments."[34]  Amid worsening reliability ratings and recall investigations from NHTSA,[35] FCA's head of vehicle safety and regulatory compliance assured the market in 2014 that "safety considerations are baked into every component of every product we make."[36]

211.    On its website, FCA represents that its "objective is to ensure vehicle quality and safety."[37]  Defendant informs consumers that FCA "vehicles meet the highest standard in terms of safety, ecological profile, driving performance and

---

[34] Exhibit 15, FCA 2015 Sustainability Report, https://www.fcagroup.com/en-US/investors/financial_information_reports/sustainability_reports/sustainability_reports/2015_Sustainability_Report.pdf (last visited July 26, 2021).

[35] Exhibit 16, Michael Wayland, *Quality Chief Leaves FCA Amid Recalls, Poor Reliability*, THE DETROIT NEWS (Oct. 29, 2014), https://www.detroitnews.com/story/business/autos/chrysler/2014/10/28/fiat-chrysler-replaces-longtime-quality-chief/18052121/ (last visited July 26, 2021).

[36] Exhibit 17, Sandy Smith, *Sandy Says: Are You a Safety Advocate?*, EHS TODAY, (Feb. 4, 2016), http://ehstoday.com/safety-leadership/sandy-says-are-you-safety-advocate (last visited July 26, 2021).

[37] Exhibit 18, FCA Media Center, https://www.fcagroup.com/en-US/media_center/insights/Pages/quality_lifecycle.aspx. (last visited July 26, 2021).

quality."[38]  Specifically, FCA's website focuses on Defendant's purported rigorous

testing and quality control:

> To ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, every mechanical and electronic component, body part and trim element is rigorously tested. The designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality.[39]

212.   On its webpage advertising the 2018 Jeep Wrangler, FCA states that it

"builds on a proven tradition of smart design combined with preventative features to

help keep you safe and secure."[40]  It also says that the 2018 Jeep Wrangler "has been

designed to make your life easier, more convenient, safer, and more secure."[41] FCA

made these claims and advertisements touting its dedication to safety to boost sales

of the Class Vehicles even though it knew the "Death Wobble" presented a safety

risk on these vehicles.

### E.    Warranties Related to the Defect

213.   The Class Vehicles come with a three-year/36,000 mile Basic Limited

Warranty.  The Basic Limited Warranty lasts for three years from the date delivery

of the Class Vehicle is taken, or for 36,000 miles on the odometer, whichever occurs

---

[38] *Id.*

[39] *Id.*

[40] Exhibit 19, Jeep Wrangler webpage, https://www.jeep.com/wrangler/safety-security.html. (last visited Jan. 26, 2020).

[41] *Id.*

first. The Class Vehicles also come with a five-year/60,000 mile Powertrain Warranty. The Powertrain Warranty covers the engine, transmission, and drive systems.

214. FCA instructs vehicle owners and lessees to bring their vehicles to an FCA dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to FCA dealerships with complaints about the Death Wobble.

215. Despite FCA's knowledge of the problem—and presumably its knowledge of how to appropriately remediate and prevent the "Death Wobble" from recurring (replacing suspension systems ball joints, track bar and upper inner tie rods)—FCA refuses to provide appropriate warranty coverage, instead opting only to replace the Jeep's steering damper pursuant to the warranty or suggesting to the consumer that they have their tires aligned, rotated, or purchase new tires altogether. None of FCA's suggestions are covered by the warranty nor will they remediate the defect to solve the "Death Wobble" problem.

## **CLASS ALLEGATIONS**

216. Plaintiffs bring this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed State Subclasses:

> **New Jersey Subclass:**
> All persons or entities who purchased or leased a Class Vehicle in New Jersey.

**Colorado Subclass:**
All persons or entities who purchased or leased a Class Vehicle in Colorado.

**Georgia Subclass:**
All persons or entities who purchased or leased a Class Vehicle in Georgia.

**Tennessee Subclass:**
All persons or entities who purchased or leased a Class Vehicle in Tennessee.

**Minnesota Subclass:**
All persons or entities that purchased or leased a Class Vehicle in Minnesota.

**North Carolina Subclass:**
All persons or entities that purchased or leased a Class Vehicle in North Carolina.

**California Subclass:**
All persons or entities that purchased or leased a Class Vehicle in California.

217. Excluded from the Class are FCA, its employees, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; FCA dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

218. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim. Defendant has identified uniformity in approximately 192,000 Class Vehicles through the CSN V41 effort to remediate the "Death Wobble."

219. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

220. <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Defendant, at a minimum, has specifically identified about 192,000 2018-2019 Class Vehicles that are identified in Defendant's DealerCONNECT Global Recall System (GRS) and Vehicle Information Plus (VIP). Additional Class Vehicles may be identified during the pendency of this action and all owners and lessors notified by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class members may be easily derived from Jeep sales records.

221. <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which

predominate over any questions affecting individual Class members, including, without limitation:

    a.  Whether FCA engaged in the conduct alleged herein;

    b.  Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

    c.  Whether the "Death Wobble" constitutes a safety defect;

    d.  Whether FCA knew about the "Death Wobble" at the time of Plaintiffs and the Class members purchase the Class Vehicles and failed to disclose the risk of the Death Wobble;

    e.  Whether FCA designed, manufactured, marketed, and distributed the Class Vehicles knowing that the "Death Wobble" could and would occur;

    f.  Whether FCA's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

    g.  Whether FCA owed a duty to warn Plaintiffs and Class Members about the "Death Wobble" and how to safely stop it when operating their Class Vehicles at highway speeds;

    h.  Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

    i.  Whether FCA breached the warranty by failing to properly inspect and repair the Class Vehicles' suspension system after Plaintiffs and Class Members complained about the "Death Wobble";

    j.  Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

    k.  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

222.   <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.

223.   <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and her counsel.

224.   <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): FCA has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

225.   <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims

against FCA, so it would be impracticable for the members of the Class to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT,
### 15 U.S.C. § 2301, *et seq*. ("MMWA")
### On Behalf of Each State Sub-Class

226. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

227. The MMWA provides a private right of action by purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of an implied or written warranty-. 15 U.S.C. § 2310(d)(1). As alleged herein, FCA has failed to comply with its implied warranty of merchantability with regard to the Class Vehicles.

228. The Class Vehicles are consumer products, as that term is defined in 15 U.S.C. § 2301(1).

66

229.   Plaintiffs and the members of each State Sub-Class are consumers, as that term is defined in 15 U.S.C. § 2301(3).

230.   FCA is a supplier and warrantor, as those terms are defined in 15 U.S.C. § 2301(4)-(5).

231.   The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1).  FCA breached its express and/or the implied warranty of merchantability for the Class Vehicles, as alleged herein, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to by failing to remediate the Death Wobble and failing to provide merchantable goods.  Plaintiffs have suffered damages as a result of FCA's breach of its express warranty and the implied warranty of merchantability as set forth herein. 15 U.S.C. § 2310(d)(1)-(2).

232.   FCA was provided notice of the claims raised by Plaintiffs and was afforded a reasonable opportunity to cure.  FCA failed to cure in that it only replaced the vehicles steering damper with knowledge that the cause of the "Death Wobble" is due to loosening or weakening of the suspension system.   Until Plaintiffs' representative capacity is determined, notice and opportunity to cure through Plaintiffs, and on behalf of each State Sub-Class, can be provided under 15 U.S.C. § 2310(e).

233.   FCA's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or

practices in or affecting commerce," and they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

234.   Plaintiffs and the members of the Sub-Classes have suffered, and are entitled to recover, damages as a result of FCA's breach of express and/or implied warranties and violations of the MMWA.

235.   Plaintiffs also seek an award of costs and expenses, including attorneys' fees, under the MMWA to prevailing consumers in connection with the commencement and prosecution of this action. 15 U.S.C. § 2310(d)(2).  Plaintiffs and the prospective Sub-Classes intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## CLAIMS BROUGHT ON BEHALF OF THE NEW JERSEY SUBCLASS

### SECOND CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### On Behalf of the New Jersey Subclass

236.   Plaintiffs Clair Reynolds and Monica Martirano ("Plaintiffs," for purposes of all New Jersey Subclass Counts) hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

237.   FCA manufactured and distributed Class Vehicles throughout the United States for sale to Plaintiffs and the Sub-Class Members.

238.   FCA impliedly warranted to Plaintiffs and members of the Sub-Class that their Class Vehicles were free of defects, and were merchantable and fit for their ordinary purpose for which such goods are used.

239.   As alleged herein, FCA breached the implied warranty of merchantability because the Class Vehicles suffer from defects that cause the "Death Wobble" when operated at normal highway speeds.   The Class Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

240.   After Plaintiffs experienced the "Death Wobble" on numerous occasions and returned the vehicle to the dealership on multiple occasions without relief, Plaintiffs gave reasonable and adequate notice to FCA that the Class Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

241.   Due to the defects that manifest as the "Death Wobble," Plaintiffs and the members of each Sub-Class are unable to operate their vehicles as intended in a safe condition, substantially free from defects.   The Class Vehicles do not provide safe and reliable transportation to Plaintiffs and Sub-Class members under conditions acknowledged by Defendant.   As a result, Plaintiffs and members of the Sub-Classes are unable to safely drive their Class Vehicles without manifestation, or imminent threat of manifestation, of the "Death Wobble."

242.   Plaintiffs did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions

69

and limitations of remedies.  Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Sub-Classes.  Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.  As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and members of the Sub-Classes have been injured in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
### On Behalf of the New Jersey Subclass

243.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

244.   Defendant provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became part of the basis of the bargain.

245.   The parts affected by the "Death Wobble" were distributed by Defendant in the Class Vehicles and are covered by the warranties Defendant provided to all purchasers and lessors of Class Vehicles.

246.   Defendant breached these warranties by selling and leasing Class Vehicles with the Death Wobble, requiring repair or replacement within the

applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

247.   Plaintiffs notified Defendant of the breach within the warranty period, but Defendant already knew of defects causing the "Death Wobble" and yet chose to conceal it and to failed to comply with its warranty obligations, including the ineffective repair detailed in CSN V41.

248.   Defendant's Chief Technical Compliance Officer, Mark Chernoby, attributed the defects causing the "Death Wobble" as ones that resulted from "a combination of design and manufacturing process."

249.   As a direct and proximate cause of Defendant's breach, Plaintiffs and the members of the New Jersey Sub-Class bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and New Jersey Sub-Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the "Death Wobble."

250.   Defendant's attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

251.   Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

252.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the New Jersey Sub-Class.   The repeated band-aid repairs by replacing the steering damper are designed to push the "Death Wobble" issue beyond the warranty period shifting the repair burden to Plaintiffs and Sub-Class members. A gross disparity in bargaining power existed between Defendant and the Sub-Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

253.   Plaintiffs and the New Jersey Sub-Classes Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. § 56:8-2, *et seq.* ("CFA")
### On Behalf of the New Jersey Sub-Class

254.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

255.   Plaintiffs and other members of the New Jersey Sub-Class are "consumers" within the meaning of the New Jersey Consumer Fraud Act.

256.   The Class Vehicles are "merchandise" within the meaning of the CFA, as they are goods that are offered directly or indirectly to the public for sale.

72

257.   At all relevant times, Defendant conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

258.   The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under other remedies.

259.   Defendant has engaged in deceptive, unconscionable, unlawful, unfair, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion, and sale of Class Vehicles without disclosing the probability of the "Death Wobble."

260.   Defendant knew of the probability that the "Death Wobble" would occur when the Class Vehicles are operated at routine highway speeds and did not disclose it to consumers like Plaintiffs and did not provide any warning to protect consumers like Plaintiffs or instructions on how to safely operate the vehicle during the "Death Wobble" or how to return the vehicle to normal operating conditions once the "Death Wobble" ensued.

261.   Defendant had knowledge of the Class Vehicles' propensity to "Death Wobble" at the time of sale.  The causes of the "Death Wobble" in the Class Vehicles are latent and are not something that Plaintiffs or New Jersey Sub-Class members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

73

262.   Defendant intended that consumers like Plaintiffs and members of the New Jersey Sub-Class rely on its deceptive, false and misleading misrepresentations or omissions of material fact in order to increase its sales and profits.

263.   Defendant intended that Plaintiffs and the other members of the New Jersey Sub-Class to rely on its acts of concealment and omissions by purchasing the Class Vehicles at full price rather than paying less or purchasing a competitors' vehicle.

264.   Had Defendant disclosed all material information regarding the Death Wobble to Plaintiffs and other members of the New Jersey Sub-Class, they would not have purchased the Class Vehicles, or they would have paid less for them.

265.   Plaintiffs have provided Defendant multiple opportunities to remedy the defects alleged here and cure the "Death Wobble" in their Class Vehicles, but each repair effort failed and Defendant has not provided a remedy under the terms of any warranty available to Plaintiffs and the New Jersey Sub-Class.

266.   Defendant's conduct had an impact on the public interest because the acts were part of a generalized course of conduct affecting numerous consumers.

267.   As a result of the foregoing acts, omissions, and practices, Plaintiffs and other members of the New Jersey Sub-Class have suffered an ascertainable loss by purchasing defective Class Vehicles they would not have otherwise purchased or paid less for, which are unable to perform their essential function for their expected

useful life, have lost value as a result of the Death Wobble, and present a risk of safety to Plaintiffs and members of the New Jersey Sub-Class. Plaintiffs are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees, and costs of suit.

## CLAIMS BROUGHT ON BEHALF OF THE TENNESSEE SUBCLASS

### FIFTH CAUSE OF ACTION
### VIOLATIONS OF THE TENNESEE CONSUMER PROTECTION ACT
### Tenn. Code Ann. § 47-18-101, et seq.
### On Behalf of the Tennessee Subclass

268.    Plaintiff Thomas Jared Pineda ("Plaintiff," for purposes of all Tennessee Subclass Counts) hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

269.    Plaintiff brings this action on behalf of himself and the Tennessee Sub-Class against Defendant.

270.    Plaintiff and the Tennessee Sub-Class are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2). Defendant is a "person[s]" within the meaning of Tenn. Code § 47-18-103(9).

271.    Defendant is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

272.    The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.

273.   Defendant has engaged in deceptive, unconscionable, unlawful, unfair, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion, and sale of Class Vehicles without disclosing the probability of the "Death Wobble."

274.   Defendant knew of the probability that the "Death Wobble" would occur when the Class Vehicles are operated at routine highway speeds and did not disclose it to consumers like Plaintiff and did not provide any warning to protect consumers like Plaintiff or instructions on how to safely operate the vehicle during the "Death Wobble" or how to return the vehicle to normal operating conditions once the "Death Wobble" ensued.

275.   Defendant had knowledge of the Class Vehicles' propensity to "Death Wobble" at the time of sale. The causes of the "Death Wobble" in the Class Vehicles are latent and are not something that Plaintiff or the Tennessee Sub-Class members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

276.   Defendant intended that consumers like Plaintiff and members of the Tennessee Sub-Class rely on its deceptive, false and misleading misrepresentations or omissions of material fact in order to increase its sales and profits.

277.   Defendant intended that Plaintiff and the other members of the Tennessee Sub-Class to rely on its acts of concealment and omissions by purchasing

the Class Vehicles at full price rather than paying less or purchasing competitors' vehicle.

278.  Had Defendant disclosed all material information regarding the Death Wobble to Plaintiff and other members of the Tennessee Sub-Class, they would not have purchased the Class Vehicles, or they would have paid less for them.

279.  Defendant's conduct had an impact on the public interest because the acts were part of a generalized course of conduct affecting numerous consumers.

280.  As a result of the foregoing acts, omissions, and practices, Plaintiff and other members of the Class have suffered an ascertainable loss by purchasing defective Class Vehicles that are unable to perform their essential function for their expected useful life and present a risk of safety to Plaintiff and members of the Class. Plaintiff is entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees, and costs of suit.

## CLAIMS BROUGHT ON BEHALF OF THE COLORADO SUBCLASS
### SIXTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
### (COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-210)
### On Behalf of the Colorado Subclass

281.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

282.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3); and is a seller of motor vehicles under Colo. Rev. Stat. § 4-2-103(1)(d).

283.   With respect to leases, Defendant is and was at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

284.   In connection with the purchase or lease of a Class Vehicle, Defendant provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials and workmanship."

285.   Defendant states the defects causing the Death Wobble result from a "combination of design and manufacturing process." Nonetheless, Defendant failed to inform Plaintiff and the Colorado Sub-Class that the Class Vehicles were defectively designed and/or manufactured.

286.  Defendant breached the express warranty promising to repair and correct the defects alleged herein that manifest as the "Death Wobble," including Defendant's failed attempt to remediate the "Death Wobble" through CSN V41.

287.   Plaintiff afforded Defendant multiple opportunities to cure its breach of warranty, and FCA has been unable to do so after each opportunity.  Further opportunities to cure would be futile.

288.   As alleged herein, at the time Defendant warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to Defendant's warranties and were inherently defective, and Defendant wrongly and fraudulently concealed the material facts regarding its Class Vehicles.  Plaintiff and other Colorado Sub-Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

289.   Due to Defendant's failure and/or continued failure to provide any remedy within a reasonable time, any limitation on Plaintiff and the Colorado Sub-Class members' remedies would be insufficient to make Plaintiff and the other Colorado Sub-Class members whole.

290.   Defendant was provided notice of these issues by Plaintiff, numerous complaints against it, including those submitted to NHTSA and FCA, within a reasonable amount of time after the defect was discovered.  Further, the investigation launched by NHTSA provided ample notice of these defects.

291.   As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and the Colorado Sub-Class have been damaged in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## (COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-212)
## On Behalf of the Colorado Subclass

292.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

293.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3); and is a seller of motor vehicles under Colo. Rev. Stat. § 4-2-103(1)(d).

294.    With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

295.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. § 4-2-105(1) and 4-2.5-103(1)(h).

296.    A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles include defects that manifest as the "Death Wobble" while driving as described above.

297.    Defendant was provided notice of these issues by Plaintiff, as well as by numerous complaints against it, including those submitted to NHTSA and FCA, within a reasonable amount of time after the defect was discovered.  Further, the investigation launched by NHTSA provided ample notice of these defects.

298.   As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff and the Colorado Sub-Class have been damaged in an amount to be determined at trial.

## CLAIMS ON BEHALF OF THE MINNESOTA SUBCLASS

**EIGHTH CLAIM FOR RELIEF**
**BREACH OF EXPRESS WARRANTY**
**(Minnesota Stat. § 336.2-313, et seq.)**
**On Behalf of the Minnesota Sub-Class**

299.   Plaintiff Brady Laing ("Plaintiff," for purposes of all Minnesota Subclass Counts) hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

300.   Plaintiff and members of the Minnesota Sub-Class are persons as defined under Minnesota Stat. § 336.1-201(27).

301.   Defendant is a seller of the Class Vehicles and sold the Class Vehicles in Minnesota to Plaintiff and the Minnesota Sub-Class with the defects alleged herein that manifest as the "Death Wobble."

302.   Defendant provides an express warranty with each Class Vehicle sold to Plaintiff and the Minnesota Sub-Class, which was breached when the Class Vehicles were sold with the defects and no remedy provided to Plaintiff or the Minnesota Sub-Class under the terms of the express warranty.

303.   As a direct and foreseeable result of this breach, Plaintiff and the Minnesota Sub-Class have suffered injury.

81

304.   Plaintiff provided Defendant notice of his breach of warranty claim, both express and implied.

## NINTH CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Minn. Stat. § 336.2-314)
### On Behalf of the Minnesota Subclass

305.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

306.   Plaintiff and members of the Minnesota Sub-Class are persons as defined under Minnesota Stat. § 336.1-201(27).

307.   Defendant is a merchant under Minn. Stat. § 336.2-314.

308.   Pursuant to Minnesota Stat. § 336.2-314, Defendant warrants the Class Vehicles as merchantable, when they were not.  Minn. Stat.§336.2-314(2)(f).  The Class Vehicles are also not fit for the ordinary purposes for which they were to be used because they are unsafe to drive. *See* Minn. Stat. §336.2-314(2)(c).

309.   This implied warranty extends to Plaintiff and members of the Minnesota Sub-Class as a "person who may reasonably be expected to use, consume or be affected by the goods and who is injured by the breach of the warranty." Minnesota Stat. § 336.2-318.

310.   Plaintiff and the Minnesota Sub-Class, as the purchasers and lessors of the Class Vehicles were reasonably expected to be affected by the defects that cause the "Death Wobble."

311.   Defendant breached these implied warranties because the Class Vehicles were not merchantable.

312.   As a direct and foreseeable result of this breach, Plaintiff and the Minnesota Sub-Class have suffered injury.

313.   Plaintiff provided Defendant notice of their breach of warranty claim as set forth above.

## TENTH CAUSE OF ACTION
## VIOLATION OF THE MINNESOTA UNLAWFUL TRADE PRACTICES ACT (Minn. Stat. §§325D.09-325D.16)
## On Behalf of the Minnesota Subclass

314.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

315.   Minnesota Statute § 8.31, subdivision 3a, provides: "any person injured by a violation of any of the laws referred to in subdivision 1  may bring a civil action and recover damages, together with costs and disbursements… reasonable attorneys' fees, and receive other equitable relief as determined by the court.

316.   Subdivision 1 includes the Unlawful Trade Practices Act, which states: "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise." Minn. Stat. § 325D.13.

83

317.   FCA is engaged in the business of designing, manufacturing, advertising, promoting, distributing and selling motor vehicles, including Class Vehicles.

318.   FCA, in connection with the sale of the Class Vehicles, has knowingly misrepresented their true quality by failing to disclose the known probability of the "Death Wobble."

319.   FCA knew of the probability that the "Death Wobble" would occur when the Class Vehicles are operated at routine highway speeds and did not disclose it to consumers like Plaintiff and did not provide any warning to protect consumers like Plaintiff or instructions on how to safely operate the vehicle during the "Death Wobble" or how to return the vehicle to normal operating conditions once the "Death Wobble" ensued.

320.   FCA knew of the Class Vehicles' propensity to "Death Wobble" at the time of sale. The causes of the "Death Wobble" in the Class Vehicles are latent and are not something that Plaintiff or the Minnesota Sub-Class members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

321.   FCA intended that consumers like Plaintiff and members of the Minnesota Sub-Class rely on its deceptive, false and misleading misrepresentations or omissions of material fact in order to increase its sales and profits.

322.   Upon information and belief, FCA's false and misleading representations of fact and conduct influenced the purchasing decisions of Plaintiff and the Minnesota Sub-Class, resulting in harm to Plaintiff and the Minnesota Sub-Class.

323.   FCA intended that Plaintiff and the other members of the Minnesota Sub-Class rely on its acts of concealment and omissions by purchasing the Class Vehicles at full price rather than paying less or purchasing a competitors' vehicle.

324.   Had FCA disclosed all material information regarding the Death Wobble to Plaintiff and other members of the Minnesota Sub-Class, they would not have purchased the Class Vehicles, or they would have paid less for them.

325.   As a result of the foregoing acts, omissions, and practices, Plaintiff and other members of the Minnesota Sub-Class have suffered an ascertainable loss by purchasing defective Class Vehicles that are unable to perform their essential function for their expected useful life and present a risk of safety to Plaintiff and members of the Minnesota Sub-Class. Plaintiff and the Minnesota Sub-Class are entitled to recover such damages, together with appropriate penalties, including damages, attorneys' fees, and costs of suit.

## ELEVENTH CAUSE OF ACTION
## VIOLATION OF THE MINNESOTA PREVENTION OF
## CONSUMER FRAUD ACT (Minn. Stat. §§325F.69, et seq.)
## On Behalf of the Minnesota Subclass

326.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

327.    Minnesota Statute § 8.31, subdivision 3a, provides: "any person injured by a violation of any of the laws referred to in subdivision 1  may bring a civil action and recover damages, together with costs and disbursements… reasonable attorneys' fees, and receive other equitable relief as determined by the court.

328.    Subdivision 1 includes Minn. Stat. § 325F.69, which provides that:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable.

329.  FCA is engaged in the business of designing, manufacturing, advertising, promoting, distributing and selling motor vehicles, including the Class Vehicles.

330.    FCA, in connection with the sale of the Class Vehicles, has knowingly misrepresented their true quality by failing to disclose the known probability of the "Death Wobble."

331.    FCA knew of the probability that the "Death Wobble" would occur when the Class Vehicles are operated at routine highway speeds and did not disclose

it to consumers like Plaintiff and did not provide any warning to protect consumers like Plaintiff or instructions on how to safely operate the vehicle during the "Death Wobble" or how to return the vehicle to normal operating conditions once the "Death Wobble" ensued.

332.   FCA had knowledge of the Class Vehicles' propensity to "Death Wobble" at the time of sale. The causes of the "Death Wobble" in the Class Vehicles are latent and are not something that Plaintiff or the Minnesota Sub-Class members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

333.   FCA intended that consumers like Plaintiff and members of the Minnesota Sub-Class rely on its deceptive, false and misleading misrepresentations or omissions of material fact in order to increase its sales and profits.

334.   Upon information and belief, FCA's false and misleading representations of fact and conduct influenced the purchasing decisions of Plaintiff and the Minnesota Sub-Class, resulting in harm to Plaintiff and the Minnesota Sub-Class.

335.   FCA intended that Plaintiff and the other members of the Minnesota Sub-Class to rely on its acts of concealment and omissions by purchasing the Class Vehicles at full price rather than paying less or purchasing competitors' vehicle.

336.   Had FCA disclosed all material information regarding the Death Wobble to Plaintiff and other members of the Minnesota Sub-Class, they would not have purchased the Class Vehicles, or they would have paid less for them.

337.   As a result of the foregoing acts, omissions, and practices, Plaintiff and other members of the Minnesota Sub-Class have suffered an ascertainable loss by purchasing defective Class Vehicles that are unable to perform their essential function for their expected useful life and present a risk of safety to Plaintiff and members of the Minnesota Sub-Class. Plaintiff and the Minnesota Sub-Class are entitled to recover such damages, together with appropriate penalties, including damages, attorneys' fees, and costs.

## CLAIMS ON BEHALF OF THE GEORGIA SUBCLASS

**TWELFTH CLAIM FOR RELIEF**
**BREACH OF EXPRESS WARRANTY**
**(Ga. Code Ann. § 11-2-313, et seq.)**
**On Behalf of the Georgia Sub-Class**

338.   Plaintiff Trina Hancock ("Plaintiff," for purposes of all Georgia Subclass Counts) hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

339.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

340.   Defendant provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became part of the basis of the bargain.

341.   In connection with the purchase or lease of a Class Vehicle, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials and workmanship."

342.   The parts affected by the "Death Wobble" were distributed by Defendant in the Class Vehicles and are covered by the warranties Defendant provided to all purchasers and lessors of Class Vehicles.

343.   Defendant breached these warranties by selling and leasing Class Vehicles with the Death Wobble, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

344.   Plaintiff notified Defendant of the breach within the warranty period, but Defendant already knew of the defects causing the "Death Wobble" and yet chose to conceal it. Defendant failed to comply with its warranty obligations.

345.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defects were discovered.

346.   Defendant's Chief Technical Compliance Officer, Mark Chernoby, attributed the defects causing the "Death Wobble" as ones that resulted from "a combination of design and manufacturing process."

347.   As a direct and proximate cause of Defendant's breach, Plaintiff and the members of each Sub-Class bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Sub-Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the "Death Wobble."

348.   Defendant's attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

349.   Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

350.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Sub-Classes. The repeated band-aid repairs by replacing the steering damper are designed to push the "Death Wobble" issue beyond the warranty period shifting the repair burden to Plaintiffs and Sub-Class members. A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have

known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

351.   Plaintiff and the Sub-Classes Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

<u>THIRTEENTH CLAIM FOR RELIEF</u><br>
<b>BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY</b><br>
<b>(Ga. Code Ann. § 11-2-314)</b><br>
<u><b>On Behalf of the Georgia Sub-Class</b></u>

352.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

353.   FCA manufactured and distributed Class Vehicles throughout the United States for sale to Plaintiff and the Georgia Sub-Class members.

354.   FCA impliedly warranted to Plaintiff and members of the Georgia Sub-Class that their Class Vehicles were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

355.   As alleged herein, FCA breached the implied warranty of merchantability because the Class Vehicles suffer from defects that cause the "Death Wobble" when operated at normal highway speeds.   The Class Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

356.   After Plaintiff experienced the "Death Wobble" on numerous occasions and returned the vehicle to the dealership on multiple occasions without relief,

Plaintiff gave reasonable and adequate notice to FCA that the Class Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

357.   FCA was also provided notice of these issues by complaints lodged by consumers with FCA and NHTSA – which vehicle manufacturers like FCA routinely monitor – before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

358.   Due to the defects that manifest as the "Death Wobble," Plaintiff and the members of each Sub-Class are unable to operate their vehicles as intended in a safe condition, substantially free from defects.  The Class Vehicles do not provide safe and reliable transportation to Plaintiff and Georgia Sub-Class members under conditions acknowledged by Defendant.  As a result, Plaintiff and members of the Georgia Sub-Class are unable to safely drive their Class Vehicles without manifestation, or imminent threat of manifestation, of the "Death Wobble."

359.   Plaintiff did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies.  Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiff is entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Sub-Classes. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.  As a direct and proximate result

of the breach of implied warranty of merchantability, Plaintiff and members of the

Georgia Sub-Class have been injured in an amount to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF
### VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(Ga. Code Ann. § 10-1-390, *et seq*.)
### On Behalf of the Georgia Sub-Class

360.   Plaintiff hereby incorporates by reference the allegations contained in
the preceding paragraphs of this Complaint.

361.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares
"[u]nfair or deceptive acts or practices in the conduct of consumer transactions and
consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. §
10-1-393(a), including but not limited to "representing that goods or services have
sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that
they do not have," "[r]epresenting that goods or services are of a particular standard,
quality, or grade . . . if they are of another," and "[a]dvertising goods or services with
intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

362.   In the course of its business, Defendant willfully failed to disclose and
actively concealed the "Death Wobble" discussed herein and otherwise engaged in
activities with a tendency or capacity to deceive.   Defendant also engaged in
unlawful trade practices by employing deception, deceptive acts or practices, fraud,
misrepresentations, or concealment, suppression, or omission of any material fact

with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

363.    Defendant knew it had installed defective parts that caused the "Death Wobble," knew that the Class Vehicles were not safe, as advertised, and knew it had installed no measures to prevent the "Death Wobble" from occurring.  Defendant knew this for many years but concealed all of that information.

364.    Defendant was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  Defendant concealed this information as well.

365.    By failing to disclose that the propensity of the Class Vehicles to experience the "Death Wobble," and by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, Defendant engaged in deceptive business practices in violation of the Georgia FBPA.

366.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Georgia Sub-Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

367.   Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Georgia Sub-Class.

368.   Defendant knew or should have known that its conduct violated the Georgia FBPA.

369.   As alleged above, Defendant made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

370.   Defendant owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defective design that cause the "Death Wobble";

    b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

    c.   Made incomplete representations about the safety and performance of the Class Vehicles while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

371.   Defendant's fraudulent omissions, concealment and misrepresentations of the defects causing the "Death Wobble" and the Class Vehicles' true performance were material to Plaintiff and the Georgia Sub-Class. A vehicle made by a reputable

manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

372.   Plaintiff and the Georgia Sub-Class suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information. Georgia Sub-Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Defendant's violations of the Georgia FBPA.

373.   Defendant had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Georgia FBPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

374.   Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

375.   As a direct and proximate result of Defendant's violations of the Georgia FBPA, Plaintiff and the Georgia Sub-Class have suffered injury-in-fact and/or actual damage.

376.    Because Defendant fraudulently concealed the defects causing the "Death Wobble" and the true performance of Class Vehicle, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

377.    Plaintiff and the Georgia Sub-Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann § 10-1-399(a).

378.    Plaintiff also seeks an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann § 10-1-399.

## CLAIMS ON BEHALF OF THE NORTH CAROLINA SUBCLASS

### FIFTEENTH CLAIM FOR RELIEF
### BREACH OF EXPRESS WARRANTY
### (N.C. Gen. Stat. § 25-2-313 and § 25-2A-210)
### On Behalf of the North Carolina Sub-Class

379.    Plaintiff Ken Schafer ("Plaintiff," for purposes of all North Carolina Subclass Counts) hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

380.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-313(1).

381.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p) and § 25-2A-210.

382.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and N.C. Gen. Stat. § 25-2A-103(1)(h).

383.   Defendant provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became part of the basis of the bargain.

384.   In connection with the purchase or lease of a Class Vehicle, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials and workmanship."

385.   The parts affected by the "Death Wobble" were distributed by Defendant in the Class Vehicles and are covered by the warranties Defendant provided to all purchasers and lessors of Class Vehicles.

386.   Defendant breached these warranties by selling and leasing Class Vehicles with the Death Wobble, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

387.    Plaintiff notified Defendant of the breach within the warranty period, but Defendant already knew of the defects causing the "Death Wobble" and yet chose to conceal it. Defendant failed to comply with its warranty obligations.

388.    Defendant's Chief Technical Compliance Officer, Mark Chernoby, attributed the defects causing the "Death Wobble" as ones that resulted from "a combination of design and manufacturing process."

389.    As a direct and proximate cause of Defendant's breach, Plaintiff and the members of each Sub-Class bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiff and Sub-Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the "Death Wobble."

390.    Defendant's attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

391.    Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

392.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and members of the North Carolina Sub-Classes.  The repeated band-aid repairs by replacing the steering damper are designed to push the "Death Wobble" issue beyond the warranty period

99

shifting the repair burden to Plaintiffs and North Carolina Sub-Class members. A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

393.   Plaintiff and the North Carolina Sub-Classes Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## CLAIMS ON BEHALF OF THE CALIFORNIA SUBCLASS

### SIXTEENTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
### (CAL. CIV. CODE § 1750, *et seq.*)
### On Behalf of the California Subclass

394.   Plaintiff incorporates by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

395.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

396.   FCA is a "person" as defined by California Civil Code § 1761(c).

397.   Plaintiff and California Subclass members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

398.   By failing to disclose and concealing the "Death Wobble" defect from Plaintiff and California Subclass members, FCA violated California Civil Code § 1770(a), as it represented that the Class Vehicles had characteristics and benefits that they do not have and represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

399.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

400.   Defendant knew that the Class Vehicles suffered from an inherent safety defect, were defectively designed, and were not suitable for their intended use.

401.   Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff and California Subclass members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.   Additionally, because of the "Death Wobble" defect, Plaintiff and California Subclass members were harmed and suffered damages in that the Class Vehicles are not suitable for their intended use and are dangerous.

402.  Defendant was under a duty to Plaintiff and California Subclass members to disclose the defective and unsafe nature of the Class Vehicles because:

    (a)    Defendant was in a superior position to know the true state of

facts about the safety defect in the Class Vehicles;

(b)     Plaintiff and California Subclass members could not reasonably
have been expected to learn or discover that their vehicles had a
defect with dangerous safety concerns until it manifested; and

(c)     Defendant knew that Plaintiff and California Subclass members
could not reasonably have been expected to learn of or discover
the safety defect.

403.   In failing to disclose the defective nature of the Class Vehicles,
Defendant knowingly and intentionally concealed material facts and breached its
duty not to do so.

404.   The facts Defendant concealed from or failed to disclose to Plaintiff
and California Subclass members are material in that a reasonable consumer would
have considered them to be important in deciding whether to purchase or lease the
Class Vehicles or pay less.  Had Plaintiff and California Subclass members known
that the Class Vehicles were defective, they would not have purchased or leased the
Class Vehicles or would have paid less for them.

405.   Plaintiff and California Subclass members are reasonable consumers
who do not expect their Class Vehicles to be defective, as described herein.  This is
the reasonable and objective consumer expectation relating to a Class Vehicle.

406.   Because of Defendant's conduct, Plaintiff and California Subclass members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience the "Death Wobble."

407.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff and California Subclass members suffered and will continue to suffer actual damages.

408.   Plaintiff and California Subclass members are entitled to equitable relief.

**SEVENTEENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(CAL. COM. CODE §§ 2313 and 10210)**
**On Behalf of the California Subclass**

409.   Plaintiff incorporates by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

410.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

411.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

412.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

413.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

414.   FCA provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became a material part of the bargain.

415.   In connection with the purchase or lease of a Class Vehicle, FCA provides an express warranty for a period of three years or 36,000 miles, whichever occurs first.  This warranty exists to cover "defect in materials and workmanship."

416.   The parts affected by the "Death Wobble" were distributed by Defendant in the Class Vehicles and are covered by the warranties Defendant provided to all purchasers and lessors of Class Vehicles.

417.   Defendant breached these warranties by selling and leasing Class Vehicles with the "Death Wobble" defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free—and effective—repairs or replacements during the applicable warranty periods.

418.   Plaintiff notified Defendant within the warranty period, but Defendant already knew of the defects causing the "Death Wobble." Defendant failed to comply with its warranty obligations.

419.   In addition, FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA, within a reasonable amount of time after the defects were discovered.

420.   Defendant's Chief Technical Compliance Officer, Mark Chernoby, attributed the defects causing the "Death Wobble" as ones that resulted from "a combination of design and manufacturing process."

421.   As a direct and proximate cause of Defendant's breach, Plaintiff and California Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.  Plaintiff and California Subclass members have also incurred and will continue to incur costs related to the diagnosis and repair of the "Death Wobble."

422.   Defendant's attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

423.   Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

424.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and California Subclass members. The repeated band-aid repairs of replacing the steering damper are designed to push the "Death Wobble" issue beyond the warranty period shifting the repair burden to Plaintiff and California Subclass members.  A gross disparity in bargaining power existed between Defendant and Class members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

425.   Plaintiff and the California Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

**EIGHTEENTH CAUSE OF ACTION**
**BREACH OF THE IMPLIED WARRANTY**
**PURSUANT TO THE SONG-BEVERLY CONSUMER WARRANTY ACT**
**(CAL. CIV. CODE §§ 1792 and 1791.1, *et seq*.)**
**On Behalf of the California Subclass**

426.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

427.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

428.   Plaintiff and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

429.   FCA is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

430.   The Class Vehicles are and were at all relevant times are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

431.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

432.   FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.  FCA directly sold and marketed the Class Vehicles to customers through authorized dealers, like those from whom Plaintiff and the California Subclass members bought or leased their vehicles.  FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff and the California Subclass members, with no modification.

433.   FCA provided Plaintiff and California Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

434.   FCA impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things:

(i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

435.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and California Subclass members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including, but not limited to, the "Death Wobble" defect, and the existence of the defect at the time of sale or lease and thereafter.  FCA knew of this defect at the time these sale or lease transactions occurred.

436.   As a result of FCA's breach of the applicable implied warranties, the Plaintiff and the California Subclass members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Additionally, as a result of the "Death Wobble" defect, Plaintiff and the California Subclass members were harmed and suffered actual damages.

<u>NINETEENTH CAUSE OF ACTION</u>
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
(CAL. COM. Code § 2314)
<u>On Behalf of the California Subclass</u>

437.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

438.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

439.   FCA is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code § 2104.

440.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

441.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.   Specifically, the Class Vehicles are inherently defective in that they contain the "Death Wobble" defect, as described herein, and the Class Vehicles were not adequately designed, manufactured, and tested.

442.   FCA was clearly on notice of the defect, as described herein.

443.   Plaintiff and California Subclass members have had sufficient direct dealings with either FCA or its agents (*e.g.*, dealerships) to establish privity of contract.   Notwithstanding this, privity is not required because Plaintiff and

California Subclass members are intended third-party beneficiaries of contracts between FCA and its dealers; specifically, they are the intended beneficiaries of FCA's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the "Death Wobble" defect and nonconformities.

444.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the California Subclass members have been damaged in an amount to be proven at trial.

**TWENTIETH CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA BUSINESS AND**
**PROFESSIONS CODE § 17200, *ET SEQ.***
**On Behalf of the California Subclass**

445.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

446.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

447.   Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff and California Subclass members,

suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the "Death Wobble" defect, Plaintiff and California Subclass members were harmed and suffered actual damages.

448. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

449. Plaintiff and California Subclass members are reasonable consumers who do not expect their Class Vehicles to be defective.

450. Defendant knew the Class Vehicles were defectively designed or manufactured, and were not suitable for their intended use.

451. In failing to disclose the "Death Wobble" defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

452. Defendant was under a duty to Plaintiff and California Subclass members to disclose the defective and unsafe nature of the Class Vehicles and because:

> (a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles; and
>
> (b)   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff and California Subclass members.

453.    The facts Defendant concealed from or failed to disclose to Plaintiff and California Subclass members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had they known of the defect, Plaintiff and California Subclass members would have paid less for Class Vehicles or would not have purchased or leased them at all.

454.    Defendant continued to conceal the defective nature of the Class Vehicles even after problems were reported.

455.    Defendant's conduct was and is likely to deceive consumers.

456.    Defendant's acts, conduct, and practices were unlawful, in that they constituted:

  (a)    Violations of California's Consumers Legal Remedies Act;

  (b)    Violations of the Song-Beverly Consumer Warranty Act;

  (c)    Breach of the Implied Warranty of Merchantability under California Commercial Code section 2314;

  (d)    Violations of the Magnuson-Moss Warranty Act; and

  (e)    Breach of Express Warranty under California Commercial Code section 2313.

457.    By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

458.   Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

459.   As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and California Subclass members have suffered and will continue to suffer actual damages.

460.   Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and California Subclass members.

<u>**REQUEST FOR RELIEF**</u>

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment against FCA and in favor of Plaintiffs, the Class, and Sub-Classes, and award the following relief:

A.   Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Sub-Classes, and Plaintiffs' counsel as counsel for the Sub-Classes;

B.   An order awarding declaratory relief and temporarily and permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.   Appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Class

Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and members of all Sub-Classes with appropriate curative notice regarding the existence and cause of the "Death Wobble";

D.      An award of appropriate damages to repair or replace the Class Vehicles;

E.      A declaration that FCA is financially responsible for all Class notice and the administration of Class relief;

F.      An order awarding any applicable statutory and civil penalties;

G.      An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

H.      An award of costs, expenses, and attorneys' fees as permitted by law; and

I.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: August 6, 2021                    Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)

**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
eeh@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

Simon B. Paris, Esquire
Patrick Howard, Esquire
**SALTZ, MONGELUZZI,**
**& BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA  19103
T: 215-496-8282;
F: 215-496-0999
sparis@smbb.com
phoward@smbb.com

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF**
555 Lancaster Avenue
Berwyn, PA 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

Daniel E. Gustafson
David A. Goodwin
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 S. Sixth St., Suite 2600
Minneapolis, MN 55402

115

Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com

Christopher D. Moon
Kevin O. Moon
**MOON LAW APC**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile: (650) 542-8432
chris@moonlawapc.com
kevin@moonlawapc.com

*Attorneys for Plaintiffs and the Subclasses*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 6, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com

117